## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION; FAMILY HEALTH COUNCIL OF CENTRAL PENNSYLVANIA,<br><br>    Plaintiffs,<br><br>    v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as United States Secretary of Health and Human Services; BRIAN CHRISTINE, in his official capacity as Assistant Secretary for Health; AMY L. MARGOLIS, in her official capacity as Deputy Director of the Office of Population Affairs,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 26-cv-<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
**(Challenge to unlawful portions of the FY 2027 Notice of Funding Opportunity for Title X)**

## <u>INTRODUCTION</u>

1.     This action, brought under the Administrative Procedure Act ("APA"), challenges aspects of Defendants' fiscal year ("FY") 2027 Notice of Funding Opportunity ("NOFO") for Title X, the nation's only dedicated federal family

planning program. The NOFO subverts the integrity of the Title X grant application process and, in so doing, enables Defendants to hijack the Title X program in order to give federal grants to entities that further Defendants' political agenda instead of fulfilling Congress's mandate to "offer a broad range of acceptable and effective family planning methods and services" to patients on a voluntary basis. *See* 42 U.S.C. § 300(a). Accordingly, well-qualified prospective Title X grantees, including highly experienced providers that have been in the Title X program for decades, are at serious risk of being excluded solely because they do not sufficiently align with Defendants' political priorities—some of which have nothing to do with the Title X program and some of which directly conflict with the current regulations. If Defendants are permitted to improperly invoke these ideological priorities under the NOFO to push highly qualified providers out of the program in favor of other entities, merely because the latter are "aligned" with Defendants' political views, it will be extremely detrimental to the patients that Title X serves, including potentially depriving them of critical family planning services.

2.    To start, the NOFO instructs that, before any consideration of their merits, all applications will first undergo a threshold "alignment review," through which Defendants will assess applicants' eligibility for a Title X grant based on alignment with three sets of agency priorities: Department of Health and Human Services ("HHS"), Office of the Assistant Secretary for Health ("OASH"), and

Office of Population Affairs ("OPA").[1] These Agency Priorities include such things as "ending diversity, equity, and inclusion," and "ending support for gender ideology," which is defined by this administration as the "false claim that males can identify as and thus become women and vice versa . . . [and that] there is a vast spectrum of genders that are disconnected from one's sex." Defendants, including "Presidential appointees," will conduct this alignment review, and the decision regarding applicants' eligibility will be final and not appealable.

3.      The alignment review process directly conflicts with the Title X statute, which mandates that HHS consider specific factors when deciding which entities will be awarded Title X grants, including the "number of patients to be served," "the extent to which family planning services are needed locally," and "the capacity [of applicants] to make rapid and effective use" of the grant funds. 42 U.S.C. § 300(b). If an applicant is eliminated at the alignment review stage, HHS will never consider that application under the statutorily mandated criteria, contrary to the Title X statute and the limits Congress has imposed on the Agency's authority.

4.      Furthermore, the NOFO's requirement that all applicants, and all grantees after grants are awarded, align with the Agency Priorities to end diversity, equity, and inclusion—including by rejecting "ideologically-laden concepts like

---

[1] Hereinafter, HHS, OASH, and OPA will be referred to collectively as "the Agency," and the HHS, OASH and OPA priorities collectively as "Agency Priorities."

health equity"—and to end support for "gender ideology," conflicts with Title X regulations that require the opposite. In fact, the Title X regulations require that grantees demonstrate their ability to "*advance* health equity," 42 C.F.R. § 59.7(a)(3) (emphasis added), and that Title X projects "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed," *id.* § 59.5(a)(3), "does not discriminate" based on "gender identity" and "sex characteristics," *id.* § 59.5(a)(4), and ensures that "transgender . . . persons" are "fully included and can actively participate in and benefit from family planning," *id.* § 59.2.

5.      In addition to conflicting with the Title X statute and regulations, the NOFO's alignment review scheme and requirement of alignment with certain Agency Priorities are arbitrary and capricious because they rely on factors Congress did not intend the Agency to consider, fail to provide prospective grantees fair notice as to what is required of them, and constitute a reversal of prior agency position without reasoned decision-making. For instance, the NOFO demands that prospective grantees align themselves with Agency Priorities that directly conflict with the Title X statute and the Agency's own regulations, without providing any acknowledgment of or explanation for the Agency's sudden reversal of position from its regulations, or any fair notice to prospective grantees as to how the Agency expects them to reconcile the conflicts.

6.      The unlawful aspects of the NOFO will cause serious harm. The NOFO's mandate that prospective grantees demonstrate to political appointees' satisfaction their alignment with political priorities that are irrelevant to or at odds with Title X in order to be deemed *eligible* for a grant stacks the deck against highly qualified applicants that would otherwise not only be eligible, but highly competitive, if their applications were reviewed under the statutorily mandated criteria. The NOFO enables Defendants to pick winners and losers based on political alignment, as opposed to merit and the ability to provide high-quality Title X services. This is not how federal grants should be awarded, and, specifically, this is not how Congress instructed Defendants to make Title X grants.

7.      As a result, highly qualified applicants that are experts in family planning care and deeply rooted in their communities, where they live and serve patients, may be deprived of fair consideration for a Title X grant and face serious risk of being deemed "ineligible" at the NOFO's alignment review stage, to the detriment of the program and the patients it is intended to serve.

8.      Accordingly, as discussed further below, Plaintiffs are entitled to relief under the APA, the challenged aspects and provisions of the NOFO must be declared unlawful and set aside, and Defendants must be enjoined from relying on them in the grant-making process.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2), as the claims asserted arise under federal law, and 5 U.S.C. § 702, as the claims asserted challenge final agency action.

10.    This Court is authorized to issue injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

11.    This Court is also authorized to issue relief under the APA, 5 U.S.C. §§ 702, 705, 706, including vacating and setting aside the unlawful portions of the NOFO pursuant to 5 U.S.C. § 706.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Family Health Council of Central Pennsylvania's corporate headquarters and principal place of business is in Camp Hill, Pennsylvania.

## PARTIES

### Plaintiffs

13.    Plaintiff National Family Planning & Reproductive Health Association ("NFPRHA") is a national, non-profit membership association that advances and elevates the importance of family planning in the nation's health care system and promotes and supports the work of family planning providers and administrators, especially those that provide care funded through government programs.

14. NFPRHA represents nearly 800 organizational members in forty-five states, Puerto Rico, and the District of Columbia. NFPRHA's membership includes state, county, and local health departments; private, non-profit family planning providers and administrators (including family planning councils, Planned Parenthood affiliates, and others); hospital-based health practices; and federally qualified health centers.

15. Within Title X, NFPRHA's members operate or administer more than 3,100 health centers that provide family planning services to more than 2.2 million patients each year.

16. The Title X program has 77 current grantees administering 84 grants. Fifty-six grantees are NFPRHA members, which operate 75% of the Title X projects (63 of the 84 total Title X grants). Many of NFPRHA's grantee members have provided Title X services for decades. It is anticipated that all or nearly all of NFPRHA's grantee members will apply for a Title X grant for FY 2027. As it has historically, NFPRHA intends to provide support and technical assistance to its members as they navigate the application process for FY 2027 funds.

17. NFPRHA brings this action in a representative capacity on behalf of its member organizations that intend to apply for a FY 2027 Title X grant, their staff, including clinicians, and the patients they serve.

18.   The interests that NFPRHA seeks to vindicate in this suit are central to its mission. NFPRHA is the leading national advocacy organization for the Title X family planning program and works to maintain Title X as a critical part of the public health safety net. In addition to its Title X advocacy, NFPRHA provides education, resources, and technical assistance to Title X grantees and subrecipients and supports those entities as they apply for Title X grant funding, and on an ongoing basis as they implement Title X.

19.   Among NFPRHA's members is Plaintiff Family Health Council of Central Pennsylvania ("FHCCP"), a private, not-for-profit organization with a mission of building and supporting community-based health networks through partnership, advocacy, and effective resource provision.

20.   FHCCP oversees and supports a diverse network of organizations providing a range of vital services and medical care, including gynecological care, cancer screening and education, tobacco prevention and cessation, housing, nutrition advice and healthy foods, and HIV/AIDS support services. Family planning is a cornerstone of FHCCP's services, and the organization prides itself on providing care to low-income and un- or under-insured individuals who otherwise may have no access to this health care.

21.   Since the organization's founding in 1973, each grant cycle, FHCCP has applied for and been awarded Title X funding to provide family planning

services, including a broad range of contraceptive services, natural family planning, pregnancy testing, screening for breast and cervical cancer, testing and treatment for sexually transmitted infections ("STIs"), basic infertility services, health education, and referrals for other health and social services.

22. Under its current Title X grant, FHCCP subcontracts with a network of 19 service providers at approximately 48 service sites in a 24-county region in Central Pennsylvania to support the delivery of confidential, high-quality family planning services to over 31,000 low-income Pennsylvanians each year.

23. There is an ongoing need for comprehensive family planning services in Central Pennsylvania. FHCCP has a demonstrated capacity to provide those services and aims to continue providing them as part of the Title X program. As it has done for more than half a century, FHCCP intends to apply for Title X funding in the next grant application cycle under the FY 2027 NOFO.

## Defendants

24. Defendant Robert F. Kennedy Jr. is the United States Secretary of Health and Human Services ("the Secretary"), and he is sued in his official capacity. Secretary Kennedy is responsible for all aspects of the operation and management of HHS, including implementing and fulfilling HHS's duties under the United States Constitution, statutory law, and applicable regulations.

25.    HHS is an "agency" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 551(1). HHS is the agency to which congressional Title X funding is appropriated, *see* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 262 (2026), and is responsible for implementing Title X.

26.    Defendant Brian Christine is the Assistant Secretary for Health and heads OASH, an office within HHS, and he is sued in his official capacity. OASH will administer the competition for the funds available under the NOFO.

27.    Defendant Amy L. Margolis is the Deputy Director of OPA, an office within HHS and within the purview of OASH, which administers and oversees the Title X program, and she is sued in her official capacity.

28.    OPA is the entity that announced the availability of funds through the NOFO.

**FACTUAL ALLEGATIONS**

**A. Overview of the Title X Program.**

29.    Title X became law as part of the "Family Planning Services and Population Research Act of 1970." Pub. L. No. 91-572, 84 Stat. 1504 (1970). The program provides high-quality family planning and sexual health care to all, with priority given to low-income patients. Title X provides access to effective contraceptive methods, cancer screenings, testing and treatment for STIs, other preventive services, and, fundamentally, the education and clinical care needed to

either achieve or prevent pregnancy—decisions made by patients according to their needs and values.

30.     The Title X program came into being a decade after the Food and Drug Administration's ("FDA") first approval of the oral contraceptive pill, which, at that time, was available only through physicians and at a high cost.

31.     During the 1960s, many low-income women had more children than they desired and this had a significant effect on poverty levels, individuals' ability to obtain an education, and maternal and child health. Research established that it was inequitable access to contraceptives that made low-income women less able to match their actual childbearing with their desired family size.

32.     President Richard M. Nixon therefore called on Congress to "establish as a national goal the provision of adequate family planning services . . . to all those who want them but cannot afford them," stressing that "no American woman should be denied access to family planning assistance because of her economic condition." Richard Nixon, *Special Message to the Congress on Problems of Population Growth* (July 18, 1969), available at https://www.presidency.ucsb.edu/documents/special-message-the-congress-problems-population-growth.

33.     With overwhelming bipartisan support, Congress responded by enacting Title X. Congress's concern was the "medically indigent"—the low-income

11

individuals who desired but could not access the most effective contraceptive methods that more affluent members of society could, and who were:

> forced to do without, or to rely heavily on the least effective nonmedical techniques for fertility control unless they happen to reside in an area where family planning services are made readily available by public health services or voluntary agencies.

S. Rep. No. 91-1004, at 9 (1970). Congress declared as the first purpose of the legislation that included Title X "making comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2(1).

34.    Title X became, and remains, the only dedicated source of federal funding for family planning services in this country.

35.    For over half a century, Title X funding has built and sustained a national network of family planning health centers that deliver critical preventive health care. It has enabled millions of low-income patients to both achieve and prevent pregnancy. For many people, Title X-funded care is the only health care they seek. In 2016, approximately 60% of patients sampled in a survey reported that a Title X health center was their only source of health care in the previous year.[2]

---

[2] Managi Lord-Biggers & Amy Friedrich-Karnik, *Features and Benefits of the Title X Program*, Guttmacher Institute (Feb. 2025), https://www.guttmacher.org/fact-sheet/features-and-benefits-title-x-program.

36.    Many Title X-funded organizations have been providing care in the network for decades, often from the very beginning of the Title X program in 1971. Title X health care providers have accordingly developed deep expertise and high responsiveness to patient needs.

37.    For instance, many Title X providers typically offer night and weekend hours, and have shaped their projects to best meet the needs of the local communities they serve. Many service sites are specialized family planning centers, whether run by non-profit providers or within government health departments, with clinicians working full-time on family planning care. Their expertise has benefited patients in essential ways, including that these specialized providers are significantly more likely to provide the full range of FDA-approved contraceptives, including intrauterine devices ("IUDs") and contraceptive implants, onsite.

38.    In 2023, the last year for which there are publicly available data, more than 3,800 Title X sites around the country served 2.8 million patients, with more than 4.3 million family planning visits.[3] Title X patients are disproportionately low-income, with the majority having incomes at or below the federal poverty level. *See* 2023 FPAR at 12–13. The program also serves a racially and ethnically diverse

---

[3] *See* Phil Killewald *et al*., Off. of Population Affs., Off. of the Assistant Sec'y for Health, U.S. Dep't of Health & Hum. Servs., *Family Planning Annual Report: 2023 National Summary* 10 (2024) ("2023 FPAR"), https://opa.hhs.gov/sites/default/files/2025-08/2023-FPAR-national-summary.pdf.

population: Title X patients are disproportionately African American and Latino/a, as compared to the general U.S. population.

39.    Indispensable to our nation's health care safety net, Title X plays a key role in ensuring that patients get the care they need without cost being a barrier, offering no-cost family planning and sexual health services to patients at or below 100% of the federal poverty level ($15,960 per year for a single-person household in 2026).[4]

**B.  The Title X Statute, Legislative Mandates, Regulations, and Guidance.**

40.    The Title X program is governed by the statute Congress enacted in 1970, subsequent legislative mandates, regulations promulgated by HHS, and additional guidance that the Agency publishes from time to time.

41.    The Title X statute establishes Congress's fundamental purpose in creating the program: "[T]he establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

---

[4] Off. of the Assistant Sec'y for Plan. & Evaluation, *Poverty Guidelines*, U.S. Dep't of Health & Hum. Servs., https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines (last visited June 10, 2026).

42.     The statute also demonstrates Congress's intent that a broad swath of entities be eligible to apply for family planning funds. *See, e.g.*, *id.* § 300(a) (all "public or nonprofit private entities" are eligible to receive grants).

43.     The Title X statute further requires that, in making funding decisions, the Secretary "shall" consider several enumerated factors. *See id.* § 300(b) ("In making grants and contracts under this section the Secretary *shall* take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance.") (emphasis added).

44.     The statute also includes a prohibition on the use of Title X funds "in programs where abortion is a method of family planning." *Id.* § 300a-6.

45.     Additionally, every year from 1996 to the present, in making appropriations for Title X, Congress has mandated that "all pregnancy counseling [in the Title X program] shall be nondirective." *See* Consolidated Appropriations Act, 2026, Pub. L. 119-75, 140 Stat. 173, 262.

46.     The Title X regulations operate similarly to the statute. First, they confirm that the program's *raison d'être* is "the establishment and operation of voluntary family planning projects," which "shall consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1. The

regulations further clarify that family planning services "include a broad range of medically approved services, which includes Food and Drug Administration (FDA)-approved contraceptive products and natural family planning methods, for clients who want to prevent pregnancy and space births, pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, and other preconception health services." *Id.* § 59.2; 59.5(a)(1); *see also id.* at § 59.5(b)(1) (each project must provide "for medical services related to family planning (including . . . contraceptive supplies) . . . and provide for the effective usage of contraceptive devices and practices").

47.    The Title X regulations further Congress's intent that a broad range of entities be eligible to participate in the program. Specifically, in answering the question of "[w]ho is eligible to apply for a family planning services grant," the regulations provide that "*[a]ny* public or nonprofit private entity in a State may apply." *Id.* § 59.3 (emphasis added). The regulations also specify the criteria the Agency will use to decide which family planning services projects to fund, which includes all the criteria mandated to be considered by the statute. *See id.* § 59.7.

48.    Additionally, a major focus of the regulations is HHS's emphasis on advancing health equity through the Title X program and ensuring that projects provide inclusive family planning services to diverse, underserved communities. For example, the Title X regulations direct the Secretary to take into account "[t]he

16

ability of the applicant to advance health equity" in assessing Title X grant applications. *Id.* § 59.7(a)(3).

49. HHS defines "[h]ealth equity" to mean "when all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances" and defines "[q]uality healthcare" as healthcare that is not only safe and effective but also "equitable." *Id.* § 59.2.

50. The Agency's regulations instruct that "[e]ach project supported" in the Title X program "must" "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed." *Id.* § 59.5(a)(3).

51. The Agency regulations define "[i]nclusive" to mean that "all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities." *Id.* § 59.2. This definition of inclusive care specifically identifies "transgender . . . persons" as individuals who must be able to benefit from and be included in family planning. *Id.*; *see also id.* (defining "[c]ulturally and linguistically appropriate services" as health care that is "respectful of, and responsive to, the health beliefs, practices and needs of diverse patients"). Regulations prohibit Title X projects from providing services in a discriminatory manner, with explicit protections against

discrimination on the basis of, *inter alia*, "gender identity" and "sex characteristics." *Id.* § 59.5(4).

52.    The Title X regulations further instruct that each Title X project must "[p]rovide for opportunities for community education, participation, and engagement to," *inter alia*, "[p]romote continued participation in the project by diverse persons to whom family planning services may be beneficial to ensure access to equitable, affordable, client-centered, quality family planning services." *Id.* § 59.5(b)(3)(iii).

53.    The regulations require Title X projects to "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding . . . [p]renatal care and delivery;" "[i]nfant care, foster care, or adoption; and" "[p]regnancy termination." *Id.* § 59.5(a)(5)(i)(A)–(C). If a client requests such information and counseling, the Title X project must "provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling." *Id.* § 59.5(a)(5)(ii).

54.    Existing guidance documents reinforce these regulatory mandates. For example, the Title X Handbook, a guidance document produced by OPA which "provides information critical to managing a Title X project" and is intended to "help

recipients and subrecipients be successful as they implement their Title X projects,"[5] further instructs that "[a]dvancing equity for all, including people from low-income families, people of color, and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, is a priority for HHS, OPA, and Title X." Title X Program Handbook at 12.

55.    The Title X regulations also require family planning services offered within the program to be provided "consistent with nationally recognized standards of care." 42 C.F.R. § 59.5(a)(3). On OPA's website, it states that *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*[6] (the "2024 QFP") "is a nationally recognized standard of care when implementing the Title X requirements." *See* Off. Population Affs., *OPA Program Policy Notice 2024-02*, https://opa.hhs.gov/node/4173 (last visited June 15, 2026). The 2024 QFP is an update to the 2014 QFP standards,[7] which

---

[5] Off. of Population Affs., Title X Program Handbook 6 (2024) ("Title X Handbook"), https://opa.hhs.gov/sites/default/files/2025-01/Title%20X%20Program%20Handbook_Dec%202024_FINAL.pdf.

[6] Sarah E. Romer, et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, Am. J. Prev. Med. 2024; 67, S41-S86, https://www.ajpmonline.org/article/S0749-3797(24)00310-6/fulltext.

[7] Loretta Gavin et al., *Providing quality family planning services: recommendations of CDC and the U.S. Office of Population Affairs*, MMWR Recomm. Rep. 2014 (1-54), https://www.cdc.gov/mmwr/preview/mmwrhtml/rr6304a1.htm ("2014 QFP").

Title X-funded entities have been required to adhere to since they were issued in 2014. *See* Title X Program Handbook at 10.

56. The 2024 QFP update to the 2014 QFP "includes newer approaches to care by adopting a health equity lens and recognizing the impact of structural and interpersonal racism, classism, ableism, and bias based on sexual orientation and/or gender identity on health and [sexual and reproductive health] care." *See* 2024 QFP at S42; *see also id.* at S47–48 (listing "[i]nclusivity," including for LGBTQI people, as one of the "guiding principles" of sexual and reproductive health care delivery); *id.* at S72 ("Providers should support the sexual and reproductive health care needs of all people regardless of their gender identity by providing gender-inclusive and affirming care.").

57. The 2024 QFP update further instructs that "[p]roviders should also support people interested in using birth control methods for reasons other than contraception. Noncontraceptive indications for some methods include STI prevention; gender-affirming care; menstrual management or suppression; and treatment of acne, premenstrual dysphoric disorder (PMDD), heavy or painful periods, polycystic ovary syndrome (PCOS), and endometriosis." *Id*. at S55.

58. Furthermore, the 2014 QFP says the recommendations "encourage taking a client-centered approach" to providing care. 2014 QFP at 2. The 2014 QFP defines "client-centered" care as care that "is respectful of, and responsive to,

20

individual client preferences, needs, and values; client values guide all clinical decisions." *Id.* at 4. The 2014 QFP also explains that taking a "client-centered approach" involves, *inter alia*, "highlighting that the client's primary purpose for visiting the service site must be respected," "encouraging the availability of a broad range of contraceptive methods so that clients can make a selection based on their individual needs and preferences," and "reinforcing the need to deliver services in a culturally competent manner so as to meet the needs of all clients, including . . . those who are lesbian, gay, bisexual, transgender, or questioning their sexual identity (LGBTQ)." *Id.* at 2.

59.    The 2014 QFP also prioritizes effectiveness and, for example, "support[s] offering a full range of Food and Drug Administration (FDA)-approved contraceptive methods as well as counseling that highlights the effectiveness of contraceptive methods" so that "clients can make a selection based on their individual needs and preferences." *Id.* at 2. The 2014 QFP further emphasizes "[e]quitable," "[e]vidence-based," and "quality" care that is "consistent with current professional knowledge" and "does not vary in quality because of the personal characteristics of clients." *Id*. at 4.

**C. Title X Grant-Making Process.**

60.    As described *supra*, the Title X statute authorizes the Secretary of HHS to make grants to "public or nonprofit private entities to assist in the establishment

and operation of voluntary family planning projects." 42 U.S.C. § 300(a). These Title X grants support Title X "projects" for particular geographic locations. Within each Title X project, there are typically three levels: (1) the grantee entity, (2) subrecipient organizations, and (3) individual health centers, or service sites, operated either directly by the grantee or run by subrecipients.

61.    In making grants, the statute directs that "the Secretary *shall* take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." *Id*. at § 300(b) (emphasis added); *see also* 42 C.F.R. § 59.7 (regulations setting out factors Agency must "tak[e] into account" in making grant awards, including all the statutory factors).

62.    The Agency solicits applications for Title X funding by publishing a Notice of Funding Opportunity or NOFO. A NOFO describes the availability of funding, encourages entities to apply for funding, offers an overview of the program's requirements and priorities, and details how applications will be evaluated.

63.    Interested entities structure their applications in accordance with the requirements and programmatic priorities set out in the NOFO. Applicants typically devote multiple months to coordinating the content of and preparing their applications. This is because applications must satisfy extensive and detailed

requirements; accordingly, applicants generally need a significant amount of time to gather and compile all the requisite information in the manner directed by the NOFO.

64.    For example, applications must include a project narrative of no more than 50 pages, which sets out the applicant's capabilities and work plan for delivering Title X-funded services. Supporting documentation of no more than 50 pages is also required. The application must detail all health care and educational services that would be provided under the grant, the areas of the country that the applicant seeks to serve, and the providers through which services will be offered. This includes the providers' locations and hours of operation; the estimated number of people that the providers will serve; and the nature of the services that will be offered at each service site. Further, if all Title X services cannot be offered at a particular service site, applicants must offer a justification for why this is the case and describe their plan to ensure access to the full range of Title X services for people that seek care in that particular site.

65.    Applicants must also provide evidence of their expertise in providing clinical care and their experience working in the proposed service area and provide documentation of the need for Title X services in that area, as well as the process through which a needs assessment was conducted. Applicants must also report on how, using the needs assessment, they will provide services and improve service delivery. Applicants must describe the populations that would be served using Title

X grant funds and how they would address barriers to people's access to and use of Title X care.

66. Applicants must provide a detailed staffing plan, including how clinical providers' licensure and credentialing are verified and maintained, and describe their plans for financial monitoring, accounting, internal control and compliance, and quality improvement for all providers funded under the grant.

67. A Title X project is defined by the proposed family planning activities to be conducted by the grantee and any subrecipients that are described in detail in the grantee's application to HHS and then funded through the finalized grant. Historically, prospective grantees that go on to be selected for and receive Title X grant awards are held to the representations they made in their applications regarding the nature, purpose, and scope of their Title X project and associated activities. Accordingly, what a prospective grantee represents it will do in an application for a grant is very important as—if awarded a grant—that grantee will then be expected to make good on those representations.

68. Title X grant funds are generally awarded for a period of performance of up to five years, to be funded in annual increments (called budget periods). To obtain funds for subsequent budget periods of the approved period of performance, successful applicants that are awarded grants are required to submit noncompeting

24

continuation grant applications that include a project narrative, work plan, budget, and budget justification for the upcoming year.

69.    The Agency generally makes award decisions and issues grants to successful applicants by April 1, around the time the prior performance period ends on March 31. This timing ensures that there is no lapse in funding and, accordingly, no lapse in the provision of critical family planning services.

**D. The Title X FY 2027 NOFO.**

70.    In April of 2026, OPA released funds for the final budget period (i.e., FY 2026) of the approved five-year period of performance under the FY 2022 NOFO. At the same time, OPA published a new competitive NOFO, which is the subject of this litigation, soliciting applications for projects to provide Title X services starting in FY 2027, for a five-year term, with an anticipated grant award date of April 1, 2027. NOFO at 1 (attached as Ex. A).

71.    The deadline to apply for funding under the NOFO is January 9, 2027. *Id*.

72.    The NOFO indicates that a "Technical Assistance Webinar" will take place on September 15, 2026. *Id.* Following the webinar, the Agency typically will post a document addressing frequently asked questions regarding the grant application process.

73.    NFPRHA expects that some of its members that intend to submit applications for FY 2027 Title X grants will soon start preparing their applications, and those that have not started by the time of the September 15, 2026 Technical Assistance Webinar will prepare their applications immediately afterwards, to meet the January 2027 deadline for submission.

74.    The NOFO states that the Agency will only fund "activities . . . in compliance with the requirements of the Title X statute, legislative mandates, and regulations." *Id.* at 3.

75.    The NOFO includes requirements that have not previously been included in prior NOFOs. For example, as a threshold eligibility requirement, the NOFO requires "alignment" with three sets of priorities: those of HHS, OASH, and OPA. *See Id.* at 38. Specifically, the NOFO says that an application "will first undergo an initial qualification and alignment review conducted by HHS . . . personnel in coordination with Federal program staff, including senior Department officials or other designated Presidential appointees." *Id.*; *see also id.* (noting that all "applications will be reviewed by a senior appointee or appointee's designee to assess alignment with: HHS, OASH and OPA priorities") (the "Alignment Review"). The Alignment Review occurs prior to any review of the application's merits and results in "a final determination of eligibility based on this initial review," which "is not appealable." *Id.* Indeed, the NOFO makes clear that applications that are

"[d]isqualified" at the alignment review stage "will not be reviewed" against the

Merit Review Criteria. *Id*. at 40.

76.    The NOFO identifies the following as OASH priorities as those that

Title X grantees "must align [their] program design and activities" with in carrying

out any project that is funded under the NOFO:

> 1) Address the chronic disease epidemic
>
> 2) End diversity, equity, and inclusion (DEI) policies and practices across OASH's programs
>
> 3) Reduce overmedicalization in health care and increase focus on optimal health and addressing underlying root causes
>
> 4) Provide medically accurate and reliable information necessary for informed consent
>
> 5) Promoting evidence-based care through the delivery of Title X services
>
> 6) Enforce the Hyde Amendment
>
> 7) Ensure gold standard science, curtail corporate capture and prevent conflicts of interest
>
> 8) To the extent allowed under Federal law and regulations, including the preliminary injunction issued in New York, et al. v. DOJ, et al. (DRI), 1:25-cv-00345, OASH will prioritize programs, partnerships, and funding mechanisms that further the agency's priority to ensure that federal resources are not used to facilitate or incentivize illegal immigration
>
> 9) Ensure adolescent program materials are age-appropriate
>
> 10) Protect parental rights to direct the religious upbringing of their children

*Id*. at 7–8.

27

77.    Additional, and sometimes overlapping, OASH priorities are found on its website, including the priority of "[e]nding support for gender ideology, including sex-rejecting procedures for children" as well as "[e]nsuring OASH funds benefit eligible individuals and not illegal aliens." Priorities of Off. of the Assistant Sec'y for Health (attached as Ex. B) ("OASH Priorities").

78.    The NOFO identifies the following as OPA priorities: Addressing the chronic disease epidemic through the delivery of Title X services; Reducing overmedicalization in health care and increasing focus on optimal health through the delivery of Title X services; Promoting body and health literacy through the delivery of Title X services; Advancing reproductive goals counseling through the delivery of Title X services; Promoting evidence-based care through the delivery of Title X services; Enforcing the Hyde Amendment through the delivery of Title X services; Ensuring OASH funds benefit eligible individuals and not illegal aliens through the delivery of Title X services; and Implementing a Quality Improvement and Quality Assurance (QI/QA) Plan. *See* NOFO at 11–15 ("OPA Priorities").

79.    The HHS priorities also include ending diversity, equity, and inclusion and "combat[ing] gender ideology" as well as priorities that are unrelated to the provision of family planning services, such as "[e]nd[ing] crime and disorder on America's streets." U.S. Dep't of Health and Hum. Servs. Priorities (attached as Ex. B) ("HHS Priorities").

80.   The NOFO states that Title X grant recipients "*must* align program design and activities with [the enumerated] agency priorities" and "*must* demonstrate ongoing compliance with these priorities . . . through program design, implementation, reporting, and evaluation," and that "[f]ailure to meaningfully align funded activities with the applicable requirements may result in corrective action," "including termination . . . for no longer effectuating program goals or agency priorities." NOFO at 8 (emphases added).

81.   Applicants that survive the Alignment Review will move onto a review of the merits of their applications, which will be conducted by federal staff and an independent review panel (the "Merit Review"). *Id*. at 40. The most significant criterion in the Merit Review—valued at 35 potential points out of a total of 100— is the "extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities." *Id*. at 41. In contrast, the extent to which applicants describe the provision of a "broad range of methods and services to address client needs" and "the number of low-income clients to be served"—factors drawn directly from the Title X statute—is worth only 10 points, and the degree to which applicants comply with the Title X statute, regulations, and legislative mandates is worth only 15 points. *Id*. at 40–41.

82.   The NOFO further instructs that in addition to the Merit Review, OPA will "coordinate with a senior appointee to provide recommendations for funding to

the Grants Management Officer to conduct the required risk analysis consistent with 2 CFR 200 and applicable HHS policy." *Id*. at 42. The NOFO makes clear that "[n]o award decision is final until a Notice of Award is issued by the Grants Management Office, in coordination with a senior appointee or appointee's designee, consistent with the Executive Order on 'Improving Oversight of Federal Grantmaking.'" *Id.*

83. The NOFO represents the consummation of the Agency's decision-making process as to its considerations, criteria, and priorities for evaluating FY 2027 Title X grant applications and making FY 2027 Title X grant awards.

84. There is nothing in the NOFO that would indicate that it is interim, temporary, or subject to further revision. Indeed, the NOFO makes clear that prospective grantees are "encourage[d] . . . to review all program requirements, eligibility information, application format and submission information, evaluation criteria, and other information in this funding announcement to ensure that their application complies with all requirements and instructions." *Id*. at 3.

85. As of the date of this filing, Plaintiffs have received no communication from the Agency indicating that that NOFO is interim, temporary, or subject to further revision.

## LEGAL ALLEGATIONS

### A. The NOFO's Alignment Review Is Contrary to the Title X Statute and Regulations, and in Excess of Statutory Authority.

86.    As detailed above, the Title X statute makes clear that, "[i]n making grants," "the [HHS] Secretary *shall* take into account" several enumerated factors, namely, "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b) (emphasis added); *see also* 42 C.F.R. § 59.7(a) (Title X regulations listing factors the HHS Secretary must take into account, which include the factors listed in the statute).

87.    But the NOFO requires applications to undergo an Alignment Review before moving to the Merit Review. Accordingly, applicants that do not pass the Alignment Review will not be evaluated based on the factors that Congress expressly directed the Agency to "take into account." 42 U.S.C. § 300(b). The NOFO's Alignment Review therefore conflicts with the Title X statute and exceeds the Agency's statutory authority.

88.    The Alignment Review is also in conflict with the Title X regulations' requirement that a broad range of entities be eligible to seek grants. Under the heading "Who is *eligible* to apply for a family planning services grant?", the

regulations provide an unambiguous answer: "*Any* public or nonprofit private entity in a State may apply for a grant." 42 C.F.R. § 59.3 (emphases added).

89.    The NOFO, however, says that the Alignment Review will be used to make "a final determination *of eligibility* based on this initial review." NOFO at 38 (emphasis added). Thus, the NOFO conflicts with the regulations' clear mandate that any non-profit entity be "eligible" to apply for a Title X grant.

## B. The NOFO Requires Alignment with Agency Priorities That Are Contrary to Law.

### 1. The Anti-DEI Priority.

90.    The NOFO demands alignment with OASH's priority to "[e]nd diversity, equity, and inclusion . . . policies and practices." NOFO at 7. Under this priority, OASH instructs that it will "prioritize efforts that go beyond the use of ideologically laden concepts" like "health equity," which OASH claims "has not translated into measurable improved health for minority populations." OASH Priorities. Similarly, HHS's priorities describe "[s]o-called 'diversity, equity, and inclusion' (DEI) programs" as "illegal race discrimination" that the Agency "will not tolerate." HHS Priorities. (Together, and independently, these constitute the Agency's "Anti-DEI Priority.")

91.    The Anti-DEI Priority is in direct conflict with the Title X regulations' command that projects provide services in an "inclusive" and "equitable" manner and encourage participation in the project by "diverse persons," 42 C.F.R. §§

32

59.5(a)(3), (b)(3)(iii); *see also id.* § 59.2 (defining "inclusive" as "when all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities," specifically identifying racial and ethnic minorities and "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons"). The Anti-DEI Priority is similarly in conflict with the Title X regulatory requirement that applicants for grant funding demonstrate the "ability . . . to *advance* health equity." *Id.* § 59.7(a)(3) (emphasis added); *see also id.* § 59.5(a)(3) (Title X projects must "ensure[] equitable and quality service delivery").

### 2. The Anti-Gender Ideology Priority.

92.    The OASH and HHS priorities targeting transgender individuals and transgender-related health care fall under the OPA priority of "[p]romoting evidence-based care through the delivery of Title X services." NOFO at 14. The Agency describes this priority as "Ending support for" or "Combat[ing]" what it calls "gender ideology." OASH Priorities; HHS Priorities; NOFO at 14 (together, and independently, the Agency's "Anti-Gender Ideology Priority").

93.    The Trump administration has defined "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa . . . [and that] there is a vast spectrum of

genders that are disconnected from one's sex." *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025). Furthermore, on page 37, the NOFO references the "Improving Oversight of Federal Grantmaking" Executive Order, which says that "discretionary awards must . . . demonstrably advance the President's policy priorities" and "discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or that the notion that sex is a chosen or mutable characteristic." NOFO at 37; *see also* Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025).

94.    Under the Anti-Gender Ideology Priority, the Agency has stated an intent to "prioritize OASH programs and funding that accurately reflect the scientific biological reality of sex," "including the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology." OASH Priorities; *see also* HHS Priorities ("It is an HHS priority to ensure our programs accurately reflect science, including the biological reality that a person's sex as either male or female is unchangeable and determined by objective biology."); NOFO at 14 (corresponding OPA priority instructs that the Agency "will prioritize funding for grantees who . . . respect[] biological reality").

95.    The NOFO's requirement of alignment with the Anti-Gender Ideology Priority conflicts with the Title X regulations' explicit requirement that family planning projects ensure that "transgender . . . persons" are "fully included and can

actively participate in and benefit from family planning." 42 C.F.R. § 59.2; *see id.* § 59.5(a)(3) (Title X projects must provide care that is "client-centered" and "inclusive"). Additionally, alignment with the Anti-Gender Ideology Priority contravenes the regulations' prohibition on providing family planning services in a manner that discriminates on the basis of "gender identity" and "sex characteristics." *Id.* § 59.5(4).

### C. The NOFO Reverses Prior Agency Positions Without Observance of the Procedure Required by Law.

96.    The Title X regulations were the product of notice and comment rulemaking. *See* Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56177 (Oct. 7, 2021).

97.    To the extent the Agency is attempting to amend, repeal, and/or replace the regulatory mandates regarding advancing "health equity," providing services in a "inclusive" and "equitable" manner, and encouraging the participation of "diverse" persons, *see supra* ¶¶ 48–52, via the NOFO's requirement of alignment with the Anti-DEI Priority, it failed to do so through notice and comment rulemaking, as required by law.

98.    Similarly, to the extent the Agency is attempting to amend, repeal, and/or replace the regulatory mandates regarding inclusivity, client-centeredness, and non-discrimination on the basis of gender identity and sex-characteristics via the

NOFO's requirement of alignment with the Anti-Gender Ideology Priority, it failed to do so through notice and comment rulemaking, as required by law.

### D. The NOFO's Requirement of Alignment with Agency Priorities Is Arbitrary and Capricious.

#### 1. The Alignment Review Is Arbitrary and Capricious.

99.    As discussed, *supra* ¶¶ 75–80, the Alignment Review permits the Agency to deem applicants ineligible for Title X grant funding without regard for the factors that Congress expressly mandated that the Agency consider in making grant decisions. *See* 42 U.S.C. § 300(b).

100.    By eliminating applications from consideration based exclusively on extra-statutory criteria—specifically, failure to align with the Agency's Priorities—the Agency is definitionally *not* "tak[ing] into account" the factors Congress expressly intended it to consider "[i]n making grants," *id.*

101.    Even if there were no conflict, the Alignment Review is nevertheless confusing given its requirement of alignment with priorities that have nothing to do with the provision of family planning services, thereby providing no fair notice to prospective grantees as to how to satisfy alignment with these priorities. *See, e.g.*, HHS Priorities (priorities include "Further our understanding of autism"; "Investigate and care for those with Long COVID"; "Advance the scientific understanding of the aging process"; and "End crime and disorder on America's

36

streets"). Nor does the NOFO explain how a grantee should accomplish all these priorities with limited grant funds.

### 2. Requiring Alignment with the Anti-DEI Priority Is Arbitrary and Capricious.

102.    The Anti-DEI Priority is in direct conflict with the Agency's regulations requiring Title X projects to advance health equity through the provision of family planning services by providing inclusive care to diverse communities. *See supra* ¶¶ 48–52. As a result, the Agency is effectively requiring grantees to comply with contradictory requirements, or to comply with a requirement that violates the Agency's own regulations, without providing any explanation for the conflict or guidance to prospective grantees as to how to reconcile this conflict.

103.    The direct conflict between the Anti-DEI Priority and the Agency's regulations and program guidance also indicates that the Agency is reversing its prior position in favor of diversity, health equity, and inclusion. But the Agency does not acknowledge this change in position within the context of the Title X program, let alone provide a reasoned explanation for it.

104.    Even absent a conflict with the regulations, the NOFO's requirement of alignment with the Anti-DEI Priority is so vague as to deprive applicants for funding of the opportunity to know what is required of them. For instance, the Anti-DEI Priority seems to focus principally on the *Agency's* conduct. *See, e.g.*, OASH Priorities (describing *OASH's* "commit[ment] to restoring merit-based opportunities

and, to the extent permitted by law, removing discriminatory or otherwise illegal practices"); HHS Priorities ("*HHS* will end race-based special preferences in grant making and instead direct resources to programs that advance the health and longevity of all Americans." (emphasis added)). Applicants are left to guess at how *they*—as opposed to the Agency—are meant to align with these priorities.

105.    Moreover, it is not clear how applicants would even be capable of "focus[ing] on solution-oriented approaches," "includ[ing] testing, advancing, scaling, and implementing innovative evidence-based interventions and treatments that address poor health outcomes." *See* OASH Priorities. It is similarly unclear what "efforts" the Agency expects grantees to take that would "go beyond the use of ideologically laden concepts" like DEI and health equity, or how Title X grantees are expected to "implement . . . interventions" that address the "root causes of Americans' chronic disease epidemic." OASH Priorities.

### 3. Requiring Alignment with the Anti-Gender Ideology Priority Is Arbitrary and Capricious.

106.    As explained *supra* at ¶¶ 92–95, the Anti-Gender Ideology Priority conflicts with the Agency's own regulations, which explicitly require the inclusion of transgender individuals in the provision of family planning services and prohibit discrimination on the basis of gender identity and sex characteristics. The NOFO is silent on how to reconcile this conflict.

107. Given the stark conflict between the Anti-Gender Ideology Priority and the Agency's regulations and guidance materials requiring the inclusion of transgender individuals in Title X-funded family planning services, this Priority suggests a reversal of the Agency's prior position within the Title X program. But the Agency has neither acknowledged this reversal nor provided a reasoned explanation for it.

108. Furthermore, it is unclear how a potential grantee is expected align itself with OASH's priority to "ensure" that OASH programs "reflect . . . the biological reality that a person's sex, as either male or female, is unchangeable," and the NOFO provides no guidance as to how to do so. *Id*.

### 4. Requiring Prospective Grantees to Contribute to Agency Efforts to "Safeguard Life Affirming Program Delivery" Is Arbitrary and Capricious.

109. The NOFO also indicates that applicants are expected to "contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery." NOFO at 15.

110. Although it is unclear what the term "life-affirming" means, given that this phrase is used under the Agency's "Enforcing the Hyde Amendment" priority, which relates to restrictions on the use of federal funds to pay for abortions, the phrase appears to reflect an anti-abortion position.

111.    All Title X grantees already must comply with the Title X statute, which provides that "[n]one of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Moreover, grantees are precluded from "tak[ing] [] affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." Provision of Abortion-Related Servs. in Fam. Plan. Servs. Projects, 65 Fed. Reg. 41281 (July 3, 2000).

112.    At the same time, the Title X regulations and congressional rider mandate that projects provide non-directive counseling to pregnant clients about their pregnancy options, including "[p]regnancy termination." 42 C.F.R. § 59.5(a)(5)(i); Pub. L. No. 119-75, 140 Stat. at 262. When requested by a client, Title X projects must also provide referrals for abortion care. 42 C.F.R. § 59.5(a)(5)(ii); Pub. L. 119-75, 140 Stat. at 262.

113.    How applicants are expected to satisfy their obligations to provide information about and referrals for abortion, while also advancing the priority of "safeguard[ing] life-affirming . . . program delivery," is never addressed in the NOFO. NOFO at 15; *see also* OASH Priorities (OASH will prioritize programs that "respect the dignity of life"); HHS Priorities ("HHS will prioritize programs and funding mechanisms that respect the dignity of human life at all stages of development"). Applicants therefore do not know what this Agency Priority means

nor how to navigate the tension between it and the regulations and congressional rider.

### 5. The Provisions of the NOFO That Deprioritize Contraception Are Arbitrary and Capricious.

114. The NOFO also requires alignment with the Agency's priority to "reduc[e] overmedicalization in health care" ("Reducing Overmedicalization Priority"). *See* NOFO at 7, 12; OASH Priorities.

115. The NOFO's only mention of contraception is under this heading, and it is in a disparaging context. The NOFO says that "OPA recognizes the overreliance on pharmaceutical and surgical treatments" and notes that there has a been "a decrease in females' current use of contraception" and that "the most common reason women reported discontinuing use related to dissatisfaction was side effects." NOFO at 12. The NOFO states that the "approach" of overreliance on pharmaceutical and surgical treatments "has failed to adequately address the root causes of the nation's chronic disease burden, resulting in ongoing health challenges that affect fertility, pregnancy outcomes, and long-term health outcomes." *Id*.; *see also* OASH Priorities ("OASH recognizes the pervasive overreliance on pharmaceutical and surgical interventions, which have failed to sufficiently address the chronic disease epidemic.").

116. The NOFO also states that OPA is seeking to "strengthen approaches that focus on the underlying behavioral and lifestyle factors of health—such as

41

nutrition, sleep, physical activity, stress management, and environmental factors," which "impact overall health and are shown to be effective in improving optimal health," through the delivery of Title X services. NOFO at 12. The NOFO says that a key strategy for "advancing optimal health" includes "expanding access to fertility-awareness–based methods (often referred to as natural family planning)." *Id.* at 13.

117.   Moreover, in the Merit Review process, "the extent to which the applicant . . . describes the broad range of methods and services that will be provided" is worth only 10 points in the scoring process, *id.* at 40, while "the extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities" is worth 35 points, *id*. at 41.

118.   However, Congress has mandated that the Title X program "offer a broad range of acceptable and effective family planning methods and services," 42 U.S.C. § 300(a)—a mandate that is the core purpose of the program.

119.   Further, as discussed *supra* ¶ 57, the 2024 QFP update instructs that "[p]roviders should also support people interested in using birth control methods for reasons other than contraception," including menstrual management or suppression, treatment of acne, PMDD, heavy or painful periods, PCOS, and endometriosis. Indeed, millions of patients rely on contraceptives not only to prevent pregnancy but to manage, treat, or prevent various gynecological or endocrine issues.

120. The NOFO creates tension between, on the one hand, the Title X statute and regulations' emphases on a "broad range" of "family planning methods," including contraception, and, on the other, the NOFO's provisions that deprioritize contraception.

121. The NOFO also creates tension between, on the one hand, the QFP's instruction that patients should be supported in using contraceptives for purposes other than pregnancy prevention, and, on the other hand, the NOFO's provisions that emphasize reducing reliance on "pharmaceutical treatments" and deprioritizing contraception.

122. This tension leaves applicants to guess at how to align themselves with the Agency's Reducing Overmedicalization Priority and the NOFO's overarching, seeming deemphasis of contraception, while also (1) complying with the statutory and regulatory requirement to provide a broad range of family planning methods, *including* contraceptive products, and (2) providing contraception in line with the QFP, evidence-based practice, and patient needs for myriad purposes other than pregnancy prevention.

123. Moreover, to the extent that the NOFO reflects the Agency's abandonment of its longstanding approach of promoting access to high-quality, effective family planning services (including *both* medical contraceptives *and* natural family planning methods), in favor of prioritizing applicants focused

primarily on the provision of natural family planning methods, that is a reversal of the Agency's prior position without any acknowledgment or reasoned explanation.

124. Likewise, to the extent that the NOFO reflects the Agency's abandonment of its longstanding approach of supporting patient use of contraceptives for reasons other than pregnancy prevention, in favor of prioritizing applicants focused primarily or solely on non-pharmaceutical methods of addressing gynecological and endocrine issues that could otherwise be treated through medical contraceptives, that is a reversal of the Agency's prior position without any acknowledgment or reasoned explanation.

**E. The 2027 NOFO Risks Imposing Severe and Irreparable Harms and Costs.**

125. The NOFO inflicts several significant harms on Plaintiff NFPRHA's members (including Plaintiff FHCCP), their staff, and the patients they serve.

126. First, the NOFO puts well-qualified prospective Title X grantees, including highly experienced providers that have been in the program for decades, at serious risk of being deemed "ineligible" for a Title X grant solely because they do not sufficiently align with unlawful, irrelevant, and/or vague political priorities.

127. If highly qualified providers are excluded from participation in the Title X program based on failure to sufficiently align with unlawful, irrelevant, and/or vague political priorities, and entities in alignment with those priorities are given grants in their stead, the patients whom the Title X program is intended to

44

serve will suffer the consequences and will be at risk of losing access to high-quality, community-based Title X family planning services.

128. Second, because some Agency Priorities are in direct conflict with the Title X regulations, *supra* ¶¶ 90–95, and others are in tension with the Title X regulations and/or guidance, *supra* ¶¶ 114–124, the NOFO's requirement that grant recipients "develop and implement plans to address the program priorities and provide evidence of the project's capacity to address program priorities," NOFO at 11, essentially forces prospective grantees to attest that they will act in ways that are, at best, in tension with, and, at worst, directly contrary to governing Title X regulations and guidance or be deemed ineligible for funding for critical family planning services. Forcing prospective grantees to commit to acting contrary to the Title X regulations and guidance—including guidance setting forth the nationally recognized standards of care for providing family planning services, will impose significant harms on Title X patients and the Title X network generally.

129. Third, inasmuch as certain Agency Priorities conflict with the Title X regulations and are an attempt to amend the regulations, the Agency was required to undertake notice and comment rulemaking. The Agency's failure to do so deprived Plaintiff NFPRHA's members, including Plaintiff FHCCP, of the opportunity to comment on a regulatory matter of the utmost importance to their organizations and the patients they serve.

130. The allegations of the preceding paragraphs are incorporated by reference in the following claims.

## FIRST CAUSE OF ACTION

### (Violation of APA – Not in Accordance with Law, 5 U.S.C. § 706(2)(A))

131. The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A). This includes action that is contrary to or violative of the Agency's own "existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

132. The NOFO constitutes final agency action. It marks the consummation of the agency's decision-making process as to its priorities, considerations, and criteria for evaluating FY 2027 Title X grant applications and making awards, as well as the requirements for grantees upon receiving a grant award, and rights and obligations are therefore determined by, and legal consequences flow from, the NOFO.

133. The NOFO's Alignment Review—through which prospective Title X grantees will be deemed ineligible for Title X grants if they don't sufficiently align with Agency Priorities prior to the Merit Review—conflicts with and is contrary to both (1) the Title X statute, which mandates that, "[i]n making grants" the Agency "*shall* take into account" specific factors, including, *inter alia*, "the number of

46

patients to be served" and "the extent to which family planning services are needed locally," 42 U.S.C. § 300(b) (emphasis added), and, (2) the Title X regulations, which instruct that "*[a]ny* public or nonprofit private entity in a State" should be "*eligible* to apply," for a grant. 42 C.F.R. § 59.3 (emphases added).

134.   The NOFO's requirement that Title X grantees align themselves with the Agency's Anti-DEI and Anti-Gender Ideology Priorities also conflicts with and is contrary to the Title X regulations, which require grantees to, *inter alia*, demonstrate their "ability . . . to advance health equity," *id.* § 59.7(a)(3), and to "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed," *id.* § 59.5(a)(3), "does not discriminate" on the basis of "gender identity" and "sex characteristics," *id.* § 59.59(a)(4), and ensures that "transgender . . . persons" are "fully included and can actively participate in and benefit from family planning," *id.* § 59.2.

135.   As a result of Defendants' unlawful conduct, Plaintiff NFPRHA's members, including Plaintiff FHCCP, their staff, and the individuals they serve are at serious risk of suffering irreparable harm.

### SECOND CAUSE OF ACTION

**(Violation of APA – In Excess of Statutory Authority, 5 U.S.C. § 706(2)(C))**

136.   The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A).

47

137. The NOFO constitutes final agency action. It marks the consummation of the agency's decision-making process as to its priorities, considerations, and criteria for evaluating FY 2027 Title X grant applications and making awards, as well as the requirements for grantees upon receiving a grant award, and rights and obligations are therefore determined by, and legal consequences flow from, the NOFO.

138. The NOFO's Alignment Review—through which prospective Title X grantees may be deemed ineligible for Title X grants if they don't sufficiently align with Agency Priorities prior to the Merit Review—exceeds the Agency's authority under the Title X statute, which mandates that, "[i]n making grants" the Agency "*shall* take into account" specific factors, including, *inter alia*, "the number of patients to be served" and "the extent to which family planning services are needed locally." 42 U.S.C. § 300(b) (emphasis added).

139. As a result of Defendants' unlawful conduct, Plaintiff NFPRHA's members, including Plaintiff FHCCP, their staff, and the individuals they serve are at serious risk of suffering irreparable harm.

**THIRD CAUSE OF ACTION**

**(Violation of APA – Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D))**

140. The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

141. The NOFO constitutes final agency action. It marks the consummation of the agency's decision-making process as to its priorities, considerations, and criteria for evaluating FY 2027 Title X grant applications and making awards, as well as the requirements for grantees upon receiving a grant award, and rights and obligations are therefore determined by, and legal consequences flow from, the NOFO.

142. To reverse or amend a rule issued in the first instance through notice and comment rulemaking, an agency must again allow for notice-and-comment and, following from that, engage in reasoned decision making.

143. To the extent the NOFO's requirement of alignment with the Agency's Anti-DEI and/or Anti-Gender Ideology Priorities constitutes an amendment to or reversal of the Title X regulations that those priorities conflict with, *see supra* Count I, the Agency failed to "observ[e]" the notice and comment rulemaking "procedure required by law." 5 U.S.C. § 706(2)(D).

144. As a result of Defendants' unlawful conduct, Plaintiff NFPRHA's members, including Plaintiff FHCCP, their staff, and the individuals they serve are at serious risk of suffering irreparable harm.

## FOURTH CAUSE OF ACTION

### (Violation of APA – Arbitrary, Capricious, and Abuse of Discretion, 5 U.S.C. § 706(2)(A))

145.   The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

146.   The NOFO constitutes final agency action. It marks the consummation of the agency's decision-making process as to its priorities, considerations, and criteria for evaluating FY 2027 Title X grant applications and making awards, as well as the requirements for grantees upon receiving a grant award, and rights and obligations are therefore determined by, and legal consequences flow from, the NOFO.

147.   The NOFO's Alignment Review is arbitrary and capricious because it relies on factors to determine prospective grantees' eligibility for Title X funds—namely, alignment (or lack thereof) with Agency Priorities—that Congress did not intend the Agency to consider, and fails to consider the statutorily mandated factors that Congress has instructed the Agency "*shall* take into account" in making grants. 42 U.S.C. § 300(b) (emphasis added).

148.   The NOFO's requirement that Title X grantees align themselves with the Agency's Anti-DEI and Anti-Gender Ideology Priorities is arbitrary and capricious because (1) it demands that prospective grantees align themselves with

Agency Priorities that directly conflict with Title X regulations, *see supra* Count I, without any explanation of how to reconcile the two; (2) appears to amount to a reversal of Agency position on DEI, including health equity, and "gender ideology" within the Title X program, without any display of awareness that the Agency made that change in the Title X program, or reasoned explanation for it; and (3) it fails to provide prospective grantees with fair notice as to what is required of them for alignment.

149.   The NOFO's requirement that Title X grantees align themselves with the Agency's Priority of "safeguard[ing] life-affirming . . . program delivery" is arbitrary and capricious because it fails to provide prospective grantees with fair notice as to what is required of them for alignment.

150.   The NOFO's requirement of alignment with the Reducing Overmedicalization Priority, coupled with its seeming deemphasis of contraception, is in tension with both the Title X statutory and regulatory requirements that projects offer a broad range of family planning methods, including contraceptive products, and Agency guidance that directs providers to support patients interested in using contraception for reasons other than pregnancy prevention.

151.   The NOFO's requirement of alignment with the Reducing Overmedicalization Priority, coupled with its seeming deemphasis of contraception, is thus arbitrary and capricious because it (1) fails to provide prospective grantees

with fair notice as to what is required of them given the tension between the NOFO, on one hand, and the Title X statute, regulations, and guidance, on the other; and (2) appears to amount to a reversal of Agency position on the importance of the provision of broad range of family planning methods, including contraception, and support for patients interested in using contraception for reasons other than pregnancy prevention in the Title X program, without any display of awareness of that change in the Title X program, or reasoned explanation for it.

152. As a result of Defendants' unlawful conduct, Plaintiff NFPRHA's members, including Plaintiff FHCCP, their staff, and the individuals they serve are at serious risk of suffering irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(A) Declare unlawful and set aside the following portions of the FY 2027 NOFO:

    i. The "alignment review conducted by HHS GAM personnel in coordination with Federal program staff, including senior Department officials or other designated Presidential appointees," which is intended "to assess alignment with . . . HHS, OASH, and OPA priorities";

ii.  The requirement that prospective Title X grantees demonstrate, and that Title X grant recipients ensure, alignment with:

1.  The Agency's Anti-Gender Ideology Priority, *see* Exs. A–C;

2.  The Agency's Anti-DEI Priority, *see* Exs. A–C;

3.  The Agency's Priority of "safeguard[ing] life-affirming . . . program delivery," *see* Ex. A–C; and

4.  The Agency's "Reducing Overmedicalization" Priority, *see* Exs. A–B, to the extent that the application of and alignment with that priority within the context of the Title X program constitutes a departure from the statutory and regulatory requirement that Title X projects provide a broad range of family planning methods, including contraception, and/or a departure from agency guidance directing providers to support patients interested in using contraception for reasons other than pregnancy prevention.

(B)  Declare that, to the extent the Agency is purporting to amend the Title X regulations with respect to DEI, including health equity, and

transgender inclusion and non-discrimination via the NOFO, the Agency has failed to observe the notice and comment rulemaking procedure required by law;

(C) Award injunctive relief prohibiting Defendants from:

    i. Subjecting any otherwise eligible entity's application to a pre-merits "Alignment Review" assessing alignment with OASH, OPA, and HHS priorities;

    ii. Using the Agency's Anti-Gender Ideology Priority in the Agency's evaluation of the merits of an entity's application;

    iii. Using the Agency's Anti-DEI Priority in the Agency's evaluation of the merits of an entity's application;

    iv. Using the Agency's priority of "safeguard[ing] life-affirming . . . program delivery," in the Agency's evaluation of the merits of an entity's application;

    v. Using the Agency's "Reducing Overmedicalization" Priority in the Agency's evaluation of the merits of an entity's application, to the extent that doing so would penalize an entity's intended provision of contraception in a manner that constitutes a departure from the statutory and regulatory requirement that Title X projects provide a broad range of family planning methods,

including contraception, and/or a departure from agency guidance directing providers to support patients interested in using contraception for reasons other than pregnancy prevention;

vi. Requiring grant recipients funded under the NOFO to align their projects with the Agency's Anti-Gender Ideology, Anti-DEI, "safeguard[ing] life-affirming program delivery," and "Reducing Overmedicalization" Priorities, to the extent that doing so would conflict with the Title X statute, legislative mandates, and/or regulations;

(D)    Award Plaintiffs their costs and their attorney's fees in bringing this action pursuant to 28 U.S.C. § 2412; and

(E)    Grant such other or further relief as this Court may deem just and proper.

June 18, 2026

Respectfully submitted,

*/s/ Sara J. Rose*
Pa. Bar # 204936
American Civil Liberties Union of
Pennsylvania
P.O. Box 23058
Pittsburgh, PA 15222
T: (412) 681-7736
srose@aclupa.org

55

Brigitte Amiri*
NY Bar # 3017167
Meagan Burrows*
NY Bar # 5341094
Ryan Mendias*
NY Bar # 5742242
Chelsea Tejada*
NY Bar # 5845300
Nora Ellmann*
NY Bar # 6192355
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2500
bamiri@aclu.org
mburrows@aclu.org
rmendias@aclu.org
ctejada@aclu.org
nellmann@aclu.org

*Attorneys for Plaintiffs*

Robin Summers*
D.C. Bar # 219473
National Family Planning & Reproductive
Health Association
1025 Vermont Ave. NW, Suite 800
Washington, D.C. 20005
T: (202) 293-3114
rsummers@nfprha.org

*Attorney for Plaintiff National Family
Planning & Reproductive Health
Association*

*\*Pro hac vice motions forthcoming*

56