**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:26-cv-1684-JPW |
| v. | ) ) | (Hon. Jennifer P. Wilson) |
| ROBERT F. KENNEDY, JR., *et al.*, | ) ) | |
| Defendants. | ) ) | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................... ii

TABLE OF AUTHORITIES ............................................................. iv

QUESTION INVOLVED ....................................................................1

INTRODUCTION ...............................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................4

LEGAL STANDARD..........................................................................9

ARGUMENT ....................................................................................10

    I.  The Challenged Aspects of the NOFO Violate the APA........................10

        A. The NOFO Constitutes Final Agency Action for Purposes of the APA....................................................................10

        B. Aspects of the NOFO Are Contrary to the Title X Regulations...............................................................13

            i.  The NOFO's Requirement That Prospective Grantees Align Their Programs with Defendants' Anti-DEI Priority Is Contrary to the Title X Regulations...........................................13

            ii. The NOFO's Requirement That Prospective Grantees Align Their Programs with Defendants' Anti-Gender Ideology Priority Is Contrary to the Title X Regulations. .............15

        C. Defendants Issued the NOFO's Anti-DEI and Anti-Gender Ideology Priorities Without Undertaking Notice and Comment, Even Though Those Priorities Adopt a New Position Inconsistent with the Title X Regulations. ............................................17

        D. The NOFO Is Arbitrary and Capricious on Multiple Fronts...............18

            i.  The NOFO's Requirement to Align with the Anti-DEI Priority Is Arbitrary and Capricious...............................................20

            ii. The NOFO's Requirement to Align with the Anti-Gender Ideology Priority Is Arbitrary and Capricious. ...........................23

iii. The NOFO's Requirement to Align with the "Safeguard[ing] Life-affirming Program Delivery" Priority Is Arbitrary and Capricious..................................................................................25

iv. Provisions of the NOFO That Deprioritize Contraception Are Arbitrary and Capricious..............................................................27

v. The Requirement to Align With Priorities That Are Irrelevant to the Title X Program Is Arbitrary and Capricious. .....................33

E. The NOFO's Savings Clauses, Standing Alone, Do Not Cure Defendants' Unlawful Actions..........................................................34

II. Plaintiff NFPRHA's Members, Including Plaintiff FHCCP, Face Irreparable Harm if the Requested Relief Is Denied. ......................36

III. The Balancing of Harms and Public Interest Weighs in Favor of Granting Injunctive Relief...................................................................40

CONCLUSION ................................................................................................42

iii

## TABLE OF AUTHORITIES

**Cases**

*Allentown Mack Sales & Servs., Inc. v. NLRB,*
522 U.S. 359 (1998)..................................................................................................19

*Am. Fed'n of Tchrs. v. Dep't of Educ.,*
779 F. Supp. 3d 584 (D. Md. 2025) ..................................................................40

*Bennett v. Spear,*
520 U.S. 154 (1997)..........................................................................................10, 11

*California v. Health & Hum. Servs.,*
281 F. Supp. 3d 806 (N.D. Cal. 2017) ..................................................................40

*Ciba-Geigy Corp. v. U.S. EPA,*
801 F.2d 430 (D.C. Cir. 1986) ....................................................................... 12, 13

*City of Los Angeles v. Barr,*
No. 2:18-cv-07347-JLS-JC, 2020 WL 11272648 (C.D. Cal. June 17, 2020).......37

*City of Philadelphia v. Sessions,*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ........................................................... 10, 41

*CPG Int'l LLC v. Georgelis,*
No. 3:15cv176, 2015 WL 1786287 (M.D. Pa. Apr. 20, 2015)..............................38

*Drenth v. Boockvar,*
No. 1:20-cv-00829, 2020 WL 2745729 (M.D. Pa. May 27, 2020) ......................36

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.,*
804 F. Supp. 3d 524 (D. Md. 2025) ..................................................................38

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)..........................................................................................22

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................ 20, 22, 31

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)...........................................................................18

*Freedom Network USA v. Trump*,
  No. 25 C 12419, 2026 WL 800392 (N.D. Ill. Mar. 23, 2026) ...................... 12, 41

*Frisby v. U.S. Dep't of Hous. & Urb. Dev.*,
  755 F.2d 1052 (3d Cir. 1985) ...............................................................13

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ..............................................................19

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021)................................................................38

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989)................................................................37

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015)...............................................................37

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................... 38, 41

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
  No. CV 25-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .................40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................... 18, 32

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................40

v

*Nissan Chem. Corp. v. FDA*,
  744 F. Supp. 3d 1 (D.D.C. 2024) ...................................................................... 19, 30

*Pa. Dep't of Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
  241 F. Supp. 3d 506 (M.D. Pa. 2017) ...................................................................9

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015).................................................................................................18

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
  No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025).................... 10, 19, 22

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  337 F. Supp. 3d 308 (S.D.N.Y. 2018) ...................................................................37

*R.I. Coal. Against Domestic Violence v. Bondi*,
  794 F. Supp. 3d 58 (D.R.I. 2025)................................................................... 12, 39

*RiteScreen Co., LLC v. White*,
  No. 1:23-CV-00778, 2023 WL 12073667 (M.D. Pa. May 16, 2023)....................9

*SBC Inc., v. FCC*,
  414 F.3d 486 (3d Cir. 2005) ................................................................................17

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ...............................................................................40

*Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*,
  90 F.4th 122 (3d Cir. 2024)..................................................................................18

*TSG Inc. v. U.S. EPA*,
  538 F.3d 264 (3d Cir. 2008).................................................................................10

*U.S. Postal Serv. v. Postal Regul. Comm'n*,
  785 F.3d 740 (D.C. Cir. 2015) .............................................................................19

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)..................................................................................13

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994).....................................................................41

**Statutes & Acts of Congress**

42 U.S.C. § 300(a) ............................................................... 7, 28, 30, 31

42 U.S.C. § 300(b) ...........................................................................7

42 U.S.C. § 300a-6................................................................................26

5 U.S.C. § 706(2)(A)................................................................. 1, 9, 13, 18

5 U.S.C. § 706(2)(D)....................................................................... 9, 17

Consolidated Appropriations Act, 2026,
   Pub. L. No. 119-75, 140 Stat. 173 (Feb. 3, 2026)............................... 6, 26

Fam. Plan. Srvs. and Population Rsch. Act of 1970,
   Pub. L. No. 91-572, 84 Stat. 1504 (1970)....................................... 4, 28

**Regulations**

42 C.F.R. § 59.2 ................................................................... *passim*

42 C.F.R. § 59.3 ...............................................................................17

42 C.F.R. § 59.5(a)(1) .......................................................... 28, 30, 31

42 C.F.R. § 59.5(a)(2) ........................................................................28

42 C.F.R. § 59.5(a)(3) .......................................................... *passim*

42 C.F.R. § 59.5(a)(4) .......................................................... 17, 16

42 C.F.R. § 59.5(a)(5) ...............................................................................26

42 C.F.R. § 59.5(b)(3)(iii) ................................................................. 14, 17

42 C.F.R. § 59.7(a)(3) ................................................................... 14, 15, 17

**Other Authorities**

Daniels, Kimberly, et al., *Contraceptive Methods Women Have Ever Used:
   United States, 2015-2019*, National Health Statistics Reports, No. 195
   (Dec. 14, 2023) ...............................................................................32

Daniels, Kimberly, et al., *Current Contraceptive Status Among Women Aged 15-
   49: United States, 2017-2019*, National Center for Health Statistics Data Brief,
   No. 388 (Oct. 2020) ........................................................................32

Daniels, Kimberly, et al., *Current Contraceptive Status Among Women Aged 15-
   49: United States, 2022-2023*, National Center for Health Statistics Data Brief,
   No. 539 (Aug. 2025) ........................................................................32

Ensuring Access to Equitable, Affordable, Client-Centered, Quality Fam. Plan.
   Servs., 86 Fed. Reg. 56144-01 (Oct. 7, 2021) .....................................18

*Providing Quality Family Planning Services in the United States:
   Recommendations of the U.S. Office of Population Affairs (Revised 2024)* ........20

Provision of Abortion-Related Servs. in Fam. Plan. Servs. Projects,
   65 Fed. Reg. 41281 (July 3, 2000)....................................................26

## QUESTION INVOLVED

Whether the challenged provisions of Defendants' Notice of Funding Opportunity for fiscal year ("FY") 2027 Title X grant funds violate the Administrative Procedure Act ("APA") because they are not in accordance with law, they are without observance of procedure required by law, and they are arbitrary and capricious. 5 U.S.C. § 706(2)(A), (D).

Suggested answer: Yes.

## INTRODUCTION

Plaintiffs National Family Planning & Reproductive Health Association ("NFPRHA") and Family Health Council of Central Pennsylvania ("FHCCP") challenge Defendants' July 9, 2026 FY 2027 Notice of Funding Opportunity for Title X ("NOFO"). The Title X program is the nation's only dedicated federal family planning program. This case challenges aspects of the NOFO under the APA. Plaintiffs' claims are based on clear conflicts and tension between the Title X statute and regulations, on the one hand, and the challenged aspects of the NOFO, on the other hand. Simply by reading the Title X statute and regulations alongside the NOFO, the clash is apparent, and, therefore, relief is warranted under the APA.

Plaintiffs are entitled to judgment as a matter of law, and, accordingly, believe that resolution via summary judgment is the most efficient avenue. As in most APA cases, there are no material facts in dispute, and the dispositive issues are legal ones.

1

Alternatively, this Court could grant interim relief to prevent irreparable harm under the Rule 65 preliminary injunction framework. Regardless of which procedural path the Court prefers, Plaintiffs respectfully seek a ruling by October 13, 2026, which would be 90 days before the application due date of January 11, 2027. Typically, a minimum of 90 days to prepare and submit an application before the deadline is the gold standard. Having 90 days for the grant writing process is particularly important for certain applicants, such as governmental health departments, that are required to go through multiple layers of internal review. A resolution by October 13, 2026, would also ensure that the application and award process proceeds on the timetable set forth in the NOFO, albeit without the unlawful aspects of the NOFO, even if there is an expedited appeal of this Court's decision. It is critical that there be no lapse or delay in the awarding of funding, which would disrupt the provision of critical Title X family planning services.

Under the summary judgment standard, Plaintiffs are entitled to judgment as a matter of law, and, under the preliminary injunction standard, Plaintiffs satisfy all requirements for obtaining injunctive relief, including that they are likely to succeed on the merits of their claims. First, the NOFO requires that prospective grantees align their programs with the political priorities of the Department of Health and Human Services ("HHS"), Office of Assistant Secretary for Health ("OASH"), and Office

2

of Population Affairs ("OPA"),[1] which conflict with the Title X regulations. For example, applicants must align with the Agency Priorities to end diversity, equity, and inclusion efforts, including by abandoning "health equity" as a concept, and to end support for "gender ideology," by which Defendants mean the idea that people can identify as a gender distinct from their sex assigned at birth. But the Title X regulations require Title X grantees to *advance* health equity and to provide services that are client-centered, inclusive, and nondiscriminatory, with explicit protections for transgender patients.

Second, to the extent that the NOFO's requirement of alignment with these priorities is a backdoor attempt to amend or repeal the Title X regulations, the Agency's actions are unlawful because any amendments to the Title X regulations must go through public notice and comment.

Third, the NOFO is arbitrary and capricious on multiple fronts, including because it fails to provide prospective grantees fair notice as to what is required of them, and it reverses prior Agency positions without acknowledgment or reasoned decision-making.

Accordingly, for the reasons discussed below, Plaintiffs respectfully request that this Court grant their motion for summary judgment, or, alternatively, their

---

[1] Hereinafter, HHS, OASH, and OPA will be referred to collectively as "the Agency," and the HHS, OASH and OPA priorities collectively as "Agency Priorities."

motion for a preliminary injunction if the Court cannot reach the merits before October 13, 2026.

<h3 style="text-align:center"><strong><u>FACTUAL AND PROCEDURAL BACKGROUND[2]</u></strong></h3>

Title X became law as part of the "Family Planning Services and Population Research Act of 1970," the first purpose of which was "making comprehensive voluntary family planning services readily available to all persons desiring such services." Fam. Plan. Srvs. and Population Rsch. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504 § 2(1) (1970); *see also* SUF ¶¶ 27–28. Accordingly, for over half a century, Title X funding has built and sustained a national network of family planning health centers that deliver critical, high-quality family planning and sexual health care to all, with priority given to the low-income patients that the program was established to serve. SUF ¶¶ 29–31. Over the course of its history, the Title X program has enabled millions of low-income patients to both achieve and prevent pregnancy, according to their needs and values. *Id.* ¶ 32.

Applications for Title X funding are generally solicited through a Notice of Funding Opportunity, commonly referred to as a NOFO. *Id.* ¶ 56. A NOFO describes the availability of funding, encourages entities to apply for funding, offers an overview of the program's requirements and priorities, and details how applications

---

[2] Plaintiffs hereby incorporate their detailed Statement of Undisputed Facts that is filed simultaneously with this brief. *See* Pls.' Stmt. of Undisputed Facts Supp. Mot. for Summ. J. ("SUF").

will be evaluated. *Id.* ¶ 69. Given the extensive and detailed requirements that Title X grant applications must satisfy, applicants typically devote multiple months to preparing their applications prior to submission. *Id.* ¶¶ 64–65. Defendants generally make award decisions and issue grants to successful applicants by April 1, around the time that the prior grant term ends on March 31, so as to prevent a funding lapse and ensure continuity in Title X service provision. *Id.* ¶ 60.

In April of 2026, Defendants published a new competitive NOFO for Title X funding, soliciting applications for Title X family planning projects to provide Title X services starting in FY 2027, for a five-year term, with an anticipated grant award date of April 1, 2027, and, on July 9, 2027, Defendants published a revised NOFO. *Id.* ¶¶ 57–58; *see also* NOFO, attached as Ex. A. The deadline to apply for Title X funding under the NOFO is January 11, 2027. SUF ¶ 61. Among the Agency Priorities with which prospective grantees must align is the Agency's priority to end diversity, equity, and inclusion ("Anti-DEI Priority"). *Id.* ¶¶ 74–77, 96–97, 104–05; *see also* Ex. A; OASH Priorities, attached as Ex. B; HHS Priorities, attached as Ex. C. Under this priority, OASH instructs that it will "prioritize efforts that go beyond the use of ideologically laden concepts" like "health equity," which OASH claims "has not translated into measurable improved health for minority populations." SUF ¶¶ 75–76.

5

Another Agency Priority with which prospective grantees must align is ending support for, or combating, what the Agency calls "gender ideology" ("Anti-Gender Ideology Priority"). *Id.* ¶¶ 74, 78–79, 83, 89, 96, 98, 104–05; *see also* Exs. A, B & C. The Trump administration has defined "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa . . . [and that] there is a vast spectrum of genders that are disconnected from one's sex." SUF ¶ 80.

The NOFO also indicates that applicants are expected to "contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery" *Id.* ¶¶ 91–92. This phrase is used under the Agency's "Enforcing the Hyde Amendment" priority, which relates to restrictions on the use of certain federal funds to pay for abortions. *Id.* ¶ 91; *see also* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 317 (Feb. 3, 2026).

The NOFO also requires alignment with the Agency's priority to "reduc[e] overmedicalization in health care" ("Reducing Overmedicalization Priority"). SUF ¶¶ 83–88; *see also* Exs. A & B. The NOFO's only mention of contraception is under this heading. SUF ¶ 88. The NOFO says that "OPA recognizes the overreliance on pharmaceutical and surgical treatments" and notes that there has a been "a decrease in females' current use of any contraception" and that "the most common reason

women reported discontinuing use related to dissatisfaction was side effects." *Id*. ¶ 84. The NOFO says that a key strategy for advancing this priority includes "expanding access to fertility-awareness–based methods (often referred to as natural family planning)." *Id*. ¶ 87.

Applications will be assessed on their merits by federal staff and an independent review panel (the "Merit Review"). *Id*. ¶ 95. The most significant criterion in the Merit Review—valued at 35 potential points out of a total of 100—is the "extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities . . . and HHS priorities." *Id*. ¶ 96. In contrast, the extent to which applicants substantiate "that Title X family planning services are needed locally" and demonstrate their capacity to make "rapid and effective use of Federal assistance"—factors drawn directly from the Title X statute, *see* 42 U.S.C. § 300(b)—are worth only 15 points and 5 points, respectively. SUF ¶ 103. And the degree to which applicants describe the provision of a "broad range of methods and services to address client needs"—again, a statutory requirement of the program, *see* 42 U.S.C. § 300(a)—and comply with the Title X statute, regulations, and legislative mandates are worth only 10 points and 15 points, respectively. SUF ¶¶ 101–02. After the Merit Review, OPA "will coordinate with a senior appointee to provide recommendations for funding," and, in providing these recommendations, "the program office will take into consideration . . . [a]lignment with HHS and OASH

priorities, where authorized by law and within the scope of the program." *Id*. ¶¶ 104–05.

Many of Plaintiff NFPRHA's members—including Plaintiff FHCCP—are current (and longstanding) Title X grantees and intend to apply for FY 2027 Title X grants under the NOFO. *Id*. ¶¶ 7–8, 15, 19. They anticipate needing to start preparing their applications no later than 90 days prior to the January 11, 2027, deadline. *Id*. ¶¶ 64–68. In addition to the complexity of the application, some prospective grantees, like governmental health departments, have various layers of internal review, including the legal department and the finance/accounting department, and the governor's office. *Id*. ¶ 68. Some health departments have subrecipients apply for subgrants after the NOFO is released and before applications are due so that information and budgeting can be included in the grant application. *Id*.

Plaintiffs commenced this action on June 18, 2026, to challenge the unlawful components of the NOFO. On July 2, 2026, Plaintiffs moved for summary judgment, or, in the alternative, a preliminary injunction. On July 9, 2026, Defendants published a revised NOFO. *See* Ex. A. On that same day, the Court held a conference and scheduled another conference for July 16, 2026. On July 13, Plaintiffs amended their complaint to challenge the revised NOFO. Plaintiffs now again move for summary judgment or, in the alternative, a preliminary injunction, and respectfully seek a ruling by October 13, 2026.

## LEGAL STANDARD

Pursuant to the APA, a court must set aside any agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A); *id.* § 706(2)(D).

In an APA action, summary judgment is the mechanism for deciding, as a matter of law, whether agency action is consistent with the APA's standard of review. *See, e.g.*, *Pa. Dep't of Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 241 F. Supp. 3d 506, 511 (M.D. Pa. 2017). As detailed below, Plaintiffs are entitled to summary judgment on each of their claims under the APA.

Alternatively, to obtain a preliminary injunction, a plaintiff must establish: (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if relief were denied; (3) that the harm defendants would suffer would not outweigh the harm the plaintiff would suffer if relief were denied; and (4) that the public interest weighs in favor of granting the injunctive relief. *RiteScreen Co., LLC v. White*, No. 1:23-CV-00778, 2023 WL 12073667, at *3 (M.D. Pa. May 16, 2023) (internal citations and quotations omitted). Again, as detailed below, Plaintiffs satisfy all of these factors.

9

## ARGUMENT

**I.      The Challenged Aspects of the NOFO Violate the APA.**

**A.      The NOFO Constitutes Final Agency Action for Purposes of the APA.**

Plaintiffs are entitled to challenge the NOFO under the APA because it constitutes final agency action. An agency's action is final for purposes of the APA—and thus reviewable by a court—when it satisfies a two-part test: first, the action must mark the consummation of the agency decision-making process, and second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *TSG Inc. v. U.S. EPA*, 538 F.3d 264, 267 (3d Cir. 2008) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The NOFO constitutes final agency action under this test.

First, the NOFO marks the "consummation" of the agency's decision-making process as to its considerations, criteria, and priorities for evaluating FY 2027 Title X grant applications and making grant awards. *See* SUF ¶¶ 69–70, 109–110; *see also* Ex. A. The NOFO, formally issued by HHS, "does not contemplate any further deliberation or subsequent iteration" as to its substance, and reflects a "settled agency position" on the criteria for assessing applications for Title X grants in this upcoming awards cycle. *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 25-2453, 2025 WL 2840318, at *18 (D.D.C. Oct. 7, 2025); *see also City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 615 (E.D. Pa. 2017)

10

(holding agency's decision to impose certain challenged conditions on applicants for grant funds constituted final agency action); SUF ¶¶ 69–70, 109–10.

Second, Defendants' action is "one by which rights or obligations have been determined, [and] from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (cleaned up). The NOFO directs all "applicants to review [the] . . . information in this funding announcement to ensure that their application complies with all requirements and instructions." SUF ¶ 71. The NOFO makes clear that all Title X grant recipients "*must* align program design and activities with agency priorities" and "*must* demonstrate ongoing compliance with these priorities . . . through program design, implementation, reporting, and evaluation." *Id.* ¶¶ 73, 108 (emphases added); *see also id.* ¶¶ 81, 93, 96, 104–05. If a grantee does not so align, or does not demonstrate ongoing compliance, the NOFO confirms that such failure "may result in corrective action" including, *inter alia*, grant termination "for no longer effectuating . . . agency priorities." *Id.* ¶ 108.

The NOFO thus firmly establishes that adherence to the Agency's Priorities is an "obligation" incumbent upon any entity that hopes to become and remain a Title X grantee, and that "legal consequences" flow from the failure to satisfy that obligation. *Bennett*, 520 U.S. at 177. That is, absent demonstrated alignment with the Agency's Priorities, an applicant will face the legal consequence of being "effectively barred from applying for and receiving funds which they are legally

11

entitled to seek." *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025); *see also City of Philadelphia*, 280 F. Supp. 3d at 615 (holding agency's decision to impose certain challenged conditions on applicants for grant funds was "one from which legal consequences will flow"); *Freedom Network USA v. Trump*, No. 25 C 12419, 2026 WL 800392, at *19 (N.D. Ill. Mar. 23, 2026) (finding the second prong of the *Bennett* test to be satisfied where, *inter alia*, "[b]ased on the evaluation of its grant application under the [challenged] NOFO conditions, [the plaintiff] may not receive funding").

Even if an applicant is awarded a grant under the NOFO, it will "face looming uncertainty regarding whether [it must] modify [its] activities" in ways that conflict with Title X regulations and guidance, *see infra* 13–17, or risk the legal consequence of "termination of [any awarded] funding." *Freedom Network USA*, 2026 WL 800392, at *19; *R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 68 (finding second prong of the *Bennett* test satisfied where "challenged conditions will potentially change the lawful scope of activities permitted with grant funds, [and] lead to the termination of grant awards").

In sum, "the agency [has] publicly articulate[d] an unequivocal position" in the NOFO that, first, will be used to determine which applicants should be awarded Title X funding, and that, second, will serve as a tool to evaluate grantee compliance. *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). Because the

12

Agency expects prospective Title X grantees "to alter their primary conduct to conform to [its priorities], the agency has voluntarily relinquished the benefit of postponed judicial review," and the NOFO constitutes reviewable, final agency action. *Id.*

### B. Aspects of the NOFO Are Contrary to the Title X Regulations.

A plaintiff is entitled to relief under the APA when an agency acts contrary to or in violation of the Agency's own "existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Frisby v. U.S. Dep't of Hous. & Urb. Dev.*, 755 F.2d 1052, 1055 (3d Cir. 1985) (noting that "the agency is bound by its own regulations" and failure to act in compliance with its own regulations "is fatal to such action"); *see* 5 U.S.C. § 706(2)(A). As detailed below, the NOFO's requirement that grantees align themselves with the Anti-DEI and Anti-Gender Ideology Priorities is contrary to and in violation of the Title X regulations.

### i. The NOFO's Requirement That Prospective Grantees Align Their Programs with Defendants' Anti-DEI Priority Is Contrary to the Title X Regulations.

The NOFO requires applicants to align with the Agency's Anti-DEI Priority. *See* SUF ¶¶ 74–77, 96–97, 104–05; *see also* Exs. A, B, & C. But this priority conflicts with the Title X regulations, which say that "[e]ach program supported under this part must . . . provide services in a manner that is . . . *inclusive* . . . and ensures *equitable* and quality service delivery." 42 C.F.R. § 59.5(a)(3) (emphases

added). Similarly, the regulations state that Title X projects must "[p]romote continued participation in the project by *diverse* persons to whom family planning services may be beneficial to ensure access to *equitable*, affordable, client-centered, quality family planning services." *Id.* § 59.5(b)(3)(iii) (emphases added). The regulations define "inclusive" as:

> [W]hen all people are fully included and can actively participate in and benefit from family planning, including, but not limited to, individuals who belong to underserved communities, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities, persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequity.

*Id.* § 59.2. An applicant cannot simultaneously align with the Agency's Anti-DEI Priority *and* adhere to the Title X regulations that require the provision of services in a manner that is inclusive, equitable and serves a diverse population.

Furthermore, the regulations require the Agency to take into account "[t]he ability of the applicant to advance health equity," when awarding grants. 42 C.F.R. § 59.7(a)(3). Health equity is defined as when "all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances." *Id.* § 59.2. Again, an applicant cannot align with the Anti-DEI Priority's demand that it *reject* "health equity," *see, e.g.*, SUF ¶¶ 75–76, *and* adhere to the regulations'

14

requirement to "*advance* health equity," 42 C.F.R. § 59.7(a)(3) (emphasis added); *see also id.* § 59.5(a)(3) (requiring Title X projects to provide services in a manner that "ensures equitable and quality service delivery"). Accordingly, Defendants should be permanently, or preliminarily, enjoined from basing any decision to award or withhold points at the Merit Review stage, or award or deny a Title X grant more generally, in whole or in part on alignment with the Anti-DEI Priority, and, if this Court grants summary judgment, it should vacate the NOFO's requirement to align with OASH's and HHS's Anti-DEI Priority.

> ### ii. The NOFO's Requirement That Prospective Grantees Align Their Programs with Defendants' Anti-Gender Ideology Priority Is Contrary to the Title X Regulations.

The NOFO directs prospective grantees to align with Defendants' Anti-Gender Ideology Priority. *See* SUF ¶¶ 74, 78–79, 83, 89, 96, 98, 104–05; *see also* Exs. A, B & C. But this priority is in direct conflict with the Title X regulations, which provide that Title X projects "must" provide services in a manner that is "client centered, culturally and linguistically appropriate, inclusive, and trauma informed; and ensures equitable and quality service delivery with nationally recognized standards of care." 42 C.F.R. § 59.5(a)(3). The regulations further define "inclusive" care as "when all people are fully included and can actively participate in and benefit from family planning, including but not limited to . . . *lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons.*" *Id.* § 59.2 (emphases added).

15

Moreover, the regulations require Title X projects to "[p]rovide services in a manner that does not discriminate against any client based on . . . sexual orientation, *gender identity* [or] *sex characteristics*." *Id.* § 59.5(a)(4) (emphases added). Accordingly, a prospective grantee cannot both align with Defendants' priority of "ending support" for the concept that "there is a vast spectrum of genders that are disconnected from one's sex," in favor of a view that "the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology," SUF ¶¶ 78–80, while simultaneously ensuring that the care they provide to a transgender or queer person whose gender does not align with their sex assigned at birth is "client-centered," "fully inclu[sive]" and does not discriminate against them based on their "gender identity" or "sex characteristics," 42 C.F.R. § 59.5(a)(3); *id.* § 59.2; *id.* § 59.5(a)(4). For example, although it is unclear, alignment with the Anti-Gender Ideology Priority may require a Title X grantee to refuse to respect and use a Title X patient's pronouns when the patient's gender identity (and pronouns) diverges from their sex assigned at birth. But to do so would be to defy the regulatory requirement to provide inclusive, "client-centered" care that does not discriminate on the basis of gender identity. In short, the NOFO's requirement of alignment with the Agency's Anti-Gender Ideology Priority and the regulations' requirement to provide inclusive, client-centered, and non-discriminatory care cannot be reconciled. Accordingly, Defendants should be permanently, or preliminarily, enjoined from

16

basing any decision to award or withhold points at the Merit Review stage, or to award or deny a Title X grant more generally, in whole or in part on alignment with the Anti-Gender Ideology Priority, and, if this Court grants summary judgment, it should vacate the NOFO's requirement to align with Defendants' Anti-Gender Ideology Priority.

> ### C. Defendants Issued the NOFO's Anti-DEI and Anti-Gender Ideology Priorities Without Undertaking Notice and Comment, Even Though Those Priorities Adopt a New Position Inconsistent with the Title X Regulations.

The APA proscribes agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). An agency action that adopts a new position inconsistent with existing regulations is a legislative rule and the procedure demanded by law is the APA's requirement of public notice and comment. *SBC Inc., v. FCC*, 414 F.3d 486, 498 (3d Cir. 2005) ("[I]f an agency's present interpretation of a regulation is a fundamental modification of a previous interpretation, the modification can only be made in accordance with the notice and comment requirements of the APA").

As established *supra* 13–17, the NOFO's requirement that grantees align their programs with the Agency's Anti-DEI and Anti-Gender Ideology Priorities conflict with the Title X regulations. *See* SUF ¶¶ 74–79, 83, 89, 96–98, 104–05; 42 C.F.R. § 59.3, 42 C.F.R. §§ 59.2, 59.5(a)(3), (a)(4), (b)(3)(iii), 59.7(a)(3). Those regulations are legislative rules that were promulgated through notice and comment. *See*

17

Ensuring Access to Equitable, Affordable, Client-Centered, Quality Fam. Plan. Servs., 86 Fed. Reg. 56144-01 (Oct. 7, 2021). The law is clear: agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Thus, to the extent that the NOFO's requirement of alignment with the Agency's Anti-DEI and Anti-Gender Ideology Priorities is a backdoor attempt to amend or repeal the regulatory mandates that these priorities contravene, it fails to follow the APA's notice and comment procedures and is therefore unlawful.

### D.    The NOFO Is Arbitrary and Capricious on Multiple Fronts.

The APA also requires courts to hold unlawful and set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*, 90 F.4th 122, 130 (3d Cir. 2024) ("[A]n agency action must 'be reasonable and reasonably explained'" (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). In other words, the APA requires agencies to engage in "reasoned

18

decisionmaking" which must be "logical and rational." *Allentown Mack Sales & Servs., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

On this front, one "principle so fundamental to reasoned decision-making that [it] is only rarely articulated," is that any agency requirements must "give entities fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *9, *16, *22, *23 ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context." (citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)); *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (explaining, in context of arbitrary and capricious analysis, the rule that agency requirements must permit those subject to them "to identify, with ascertainable certainty, the standards with which the agency expects parties to conform" (internal quotation marks and citation omitted)); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015) (finding agency's order arbitrary and capricious "because it fails to articulate a comprehensible standard," and "offers no meaningful guidance").

Further, when an agency action changes or reverses a prior policy, the agency must "display awareness that it *is* changing position" and must also provide a "more detailed justification than what would suffice for a new policy created on a blank slate" if the new policy "rests upon factual findings that contradict those which underlay its prior policy" or where the "prior policy has engendered serious reliance

19

interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). For the reasons set forth below, the challenged provisions of the NOFO constitute classic arbitrary and capricious agency action.

### i. The NOFO's Requirement to Align with the Anti-DEI Priority Is Arbitrary and Capricious.

The NOFO's requirement to align with the Anti-DEI Priority is arbitrary and capricious for at least three reasons. First, as discussed *supra* 13–15, the Anti-DEI Priority directly conflicts with the Title X regulations. Demanding an applicant satisfy requirements that are in direct conflict with each other, without actually explaining how to reconcile them, *see infra* 34, is arbitrary and capricious agency action.

Second, given the conflict, the NOFO appears to amount to a reversal of the Agency's prior position within the Title X program, found both in the Title X regulations and guidance, without any "display [of] awareness that it *is* changing position," *FCC*, 556 U.S. at 515, or explanation for the change, let alone a reasoned one. On top of the Title X regulations, additional evidence demonstrates that Defendants have departed from their prior position on DEI and health equity. For example, *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)* (the "2024 QFP")—"a nationally recognized standard of care when implementing the Title X

20

requirements"[3] —focuses on inclusivity and health equity throughout. *See, e.g.*, *id.* ¶ 48 (the 2024 QFP adopts a "health equity lens and recognize[s] the impact of structural and interpersonal racism, classism, ableism, and bias based on sexual orientation and/or gender identity on health and [sexual and reproductive health] care"); *see also id.* ¶ 50 (defining inclusive care as "culturally and linguistically affirming, meaning that services respond to diverse cultural health beliefs and practices, preferred language, health literacy, and other communication needs of patients."). The Title X Handbook—a guidance document produced by OPA that "provides information critical to managing a Title X project" intended to "help recipients and subrecipients be successful as they implement their Title X projects, *id.* ¶ 36—further instructs that "[a]dvancing equity for all, including people from low-income families, people of color, and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, is a priority for HHS, OPA, and Title X," *id.* ¶ 37. Yet the NOFO contains no explanation for the Agency's about-face from the Title X regulations and this program guidance. *Id.* ¶ 112. This stark and sudden change in the Agency's position on DEI, including health equity, within Title X, without any demonstrated awareness

---

[3] The Title X regulations require Title X services to be provided "consistent with nationally recognized standards of care." 42 C.F.R. § 59.5(a)(3). The OPA, on its website, states that the 2024 QFP "is a nationally recognized standard of care when implementing the Title X requirements." SUF ¶ 42.

of the shift, let alone any explanation for it (much less a reasoned one), violates the APA. *See FCC*, 556 U.S. at 515 (APA prohibits an agency from "depart[ing] from a prior policy *sub silentio*"); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (holding that "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'") (citation omitted).

Finally, even if the Court does not find a conflict between the Title X regulations and Defendants' Anti-DEI Priority, the Court should nevertheless find that this priority is arbitrary and capricious because it leaves Plaintiff NFPRHA's members, including Plaintiff FHCCP, with no "fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23. To start, it is unclear how grantees can align their applications with this priority, especially when much of the language seems to apply to federal agencies rather than prospective grantees. SUF ¶¶ 76–77, 97, 111. For example, the OASH priority says "OASH is committed to restoring merit-based opportunities and, to the extent permitted by law, removing discriminatory or otherwise illegal practices, such as providing benefits and advantages based on race or ethnicity rather than need, severity of disease, or other legitimate basis." *Id.* ¶ 77. Similarly, the HHS priority says that "[r]ather than supporting DEI programs, HHS will end race-based special preferences in grant making and instead direct resources to programs that advance

the health and longevity of all Americans." *Id*. ¶ 97. The NOFO does not explain whether or how prospective grantees are supposed to align themselves with these priorities that seemingly refer only to actions taken by the Agency. *Id*. ¶ 111. Moreover, it is not clear how applicants would even be capable of realizing the strategies listed under the Anti-DEI Priority, such as "focus[ing] on solution-oriented approaches," "includ[ing] testing, advancing, scaling, and implementing innovative evidence-based interventions and treatments that address poor health outcomes." *Id.* ¶ 76. It is similarly unclear what "efforts" the Agency expects grantees to take that would "go beyond the use of ideologically laden concepts" like health equity, or how Title X grantees are expected to "implement . . . interventions" that address the "root causes of Americans' chronic disease epidemic." *Id*. The NOFO's failure to provide any comprehensible notice as to how the Agency expects grantees to align with its Anti-DEI Priority further reinforces the arbitrariness and capriciousness of this requirement.

### ii. The NOFO's Requirement to Align with the Anti-Gender Ideology Priority Is Arbitrary and Capricious.

The NOFO's Requirement to align with the Anti-Gender Ideology Priority is arbitrary and capricious for much the same reasons. First, just like the Anti-DEI Priority, the Anti-Gender Ideology Priority conflicts with the Title X regulations, *see supra* 15–17, and the NOFO provides no actual explanation of how to reconcile the conflict, *see infra* 34, rendering it arbitrary and capricious.

23

Second, the NOFO appears to reflect a reversal of the Agency's position on transgender inclusion found both in the Title X regulations and program guidance, without any recognition of that change within the Title X program and with no reasoned explanation for it. Again, the switch in position is evinced not just through the regulations, but through the 2024 QFP. *See* SUF ¶ 49 (2024 QFP lists "inclusivity," including for LGBTQI people, as one of the "guiding principles" of sexual and reproductive health care delivery); *id.* ¶ 51 (2024 QFP explains that "[p]roviders should support the sexual and reproductive health care needs of all people regardless of their gender identity by providing gender-inclusive and affirming care."); *see also id.* ¶ 52 (2024 QFP states that: "This includes ensuring that patient information in medical records and portals accurately reflects their identity. Rather than making assumptions, healthcare providers should ask patients about their sex assigned at birth, current anatomy, preferred name, gender identity, and pronouns."). The 2024 QFP is an update to the 2014 QFP, which says that health care providers should take a "client-centered approach" to meet the needs of all clients, including those who are lesbian, gay, bisexual, transgender, or questioning their sexual identity (LGBTQ). *Id.* ¶¶ 43–45. Again, the Agency has offered no attempt to explain or justify its seeming reversal of course via the Anti-Gender Ideology Priority. *Id.* ¶ 114.

24

Finally, even if the Court does not find a conflict between the Title X regulations and the Anti-Gender Ideology Priority, there is another basis to find it arbitrary and capricious: it is vague and, as a result, it fails to provide fair notice to applicants. For example, it is unclear how a potential grantee should align itself with OASH's priority to "ensure" that OASH programs "reflect . . . the biological reality that a person's sex, as either male or female, is unchangeable." *Id.* ¶ 78–79, 89. Does this mean that applicants and eventual Title X grantees are prohibited from respecting patients' pronouns? The NOFO does not clearly answer this question, nor provide any real guidance as to how to align with this priority. *Id.* ¶ 113. This failure condemns it under the APA.

### iii. The NOFO's Requirement to Align with the "Safeguard[ing] Life-affirming Program Delivery" Priority Is Arbitrary and Capricious.

The NOFO's requirement that Title X applicants and grantees align with the Agency's Priority to "safeguard life-affirming program delivery," *see id.* ¶ 91, also fails to provide applicants fair notice as to what is required of them, and is thus arbitrary and capricious. The NOFO says that "[t]o the extent permitted by applicable law, OASH will prioritize programs and funding that uphold Hyde protections and do not use taxpayer resources to promote or support elective abortion." *Id.* ¶ 90. The NOFO then indicates that the agency "expect[s] recipients to demonstrate how their Title X projects . . . contribute to broader HHS efforts to

25

safeguard life-affirming, lawful, and ethical program delivery." *Id.* ¶ 91. But it is unclear what is required of applicants for alignment with the priority of "safeguard[ing] life-affirming . . . program delivery."

To start, it is unclear what the term "life-affirming" even means as it is not defined in the NOFO, *id.* ¶ 92, though given that this phrase is used under the Agency's "Enforcing the Hyde Amendment" priority, which relates to restrictions on the use of certain federal funds to pay for abortions, Plaintiffs presume the phrase reflects an anti-abortion position. But all Title X grantees *already* must comply with the governing statute that says that "[n]one of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. On top of this, Title X projects are *already* precluded from "tak[ing] . . . affirmative action . . . (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." Provision of Abortion-Related Servs. in Fam. Plan. Servs. Projects, 65 Fed. Reg. 41281 (July 3, 2000). At the same time, however, the Title X regulations *require* Title X projects to offer pregnant clients the opportunity to be provided information and counseling on the range of pregnancy options, including "pregnancy termination," and to make referrals to such care, upon request. 42 C.F.R. § 59.5(a)(5). Moreover, the annual rider passed by Congress similarly *requires* all pregnancy counseling in the Title X program to be "nondirective," meaning such counseling must be neutral and not

26

biased towards a particular outcome. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 262 (Feb. 3, 2026). The NOFO does not explain how a prospective grantee is meant to align with this priority given these existing parameters regarding counseling and abortion provision with federal funds. SUF ¶ 115. Accordingly, applicants are left without any guidance as to how to align themselves with the Agency Priority of "safeguarding life-affirming care," and it is therefore arbitrary and capricious.

### iv. Provisions of the NOFO That Deprioritize Contraception Are Arbitrary and Capricious.

The NOFO requires applicants to align with the Agency's Reducing Overmedicalization in Health Care Priority. *Id.* ¶¶ 74, 83. Under this heading, the NOFO says that "OPA recognizes the overreliance on pharmaceutical and surgical treatments" and notes that there has a been "a decrease in females' current use of any contraception" with "the most common reason women reported discontinuing use related to dissatisfaction was side effects. This approach has failed to adequately address the root causes of the nation's chronic disease burden, resulting in ongoing health challenges that affect fertility, pregnancy, outcomes, and long-term health outcomes." *Id.* ¶ 84. The NOFO also states:

> Through the delivery of Title X services, OPA seeks to strengthen approaches that focus on the underlying behavioral and lifestyle factors of health—such as nutrition, sleep, physical activity, stress management, and

27

> environmental factors—that impact overall health and are
> shown to be effective in improving optimal health.

*Id.* ¶ 86. The NOFO says that a key strategy "for advancing optimal health" includes "expanding access to fertility-awareness–based methods (often referred to as natural family planning)," *id.* ¶ 87, *i.e.*, non-medical forms of contraception. But Congress created the Title X program primarily to "offer a *broad range* of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a) (emphasis added). While the statute says that natural family planning methods shall be included in the "broad range" of "family planning methods," those methods cannot be elevated over medically approved methods. *See, e.g.*, 42 C.F.R. § 59.5(a)(2) (directing Title X projects to "[p]rovide services without subjecting individuals to any coercion . . . to employ or not to employ any particular methods of family planning."). Indeed, the explicit congressional purpose of Title X is to develop "*comprehensive* programs of family planning services." *See supra* 4; *see also* SUF ¶ 28 (quoting Pub. L. No. 91-572, § 2(1) (1970) (emphasis added)). Furthermore, the Title X regulations require projects to provide "a broad range of medically approved services, which includes Food and Drug Administration (FDA)-approved contraceptive products." 42 C.F.R. §§ 59.2; 59.5(a)(1).

The tension that the NOFO creates between the Title X statute's and regulations' emphases on a "broad range" of "family planning methods," including—specifically—contraception, and the provisions of the NOFO that

deprioritize contraception, renders those provisions arbitrary and capricious for two main reasons.

First, reading the NOFO with the Title X statute and regulations—as one must—applicants have no fair notice as to whether they are being asked to downplay the provision of contraception in their applications and, subsequently, programs. Although the NOFO appropriately says that "successful proposals" shall include a description of "the broad range of acceptable and effective medically approved family planning methods (including natural family planning)," SUF ¶ 94, the NOFO does not clarify how an applicant should simultaneously address strategies for "reducing overmedicalization," *id.* ¶ 116. Furthermore, applicants are left to guess how to reconcile this priority with the Agency's own guidance, which recognizes that contraception is important not just for pregnancy prevention but also for treating a range of medical conditions and symptoms. *Id.* ¶¶ 42, 55. In addition, the NOFO includes only one (disparaging) use of the word "contraception," incorrectly claiming that there has been a decrease in contraception use due to side effects, *id.* ¶ 88; *see infra* 31–33, further raising the question of whether the NOFO is asking applicants to say that they will deprioritize the provision of contraception in the Title X program.

Moreover, in the Merit Review process, the portion of an application describing how a potential grantee will provide family planning services is given

29

substantially less weight than is given to alignment with the Agency Priorities. SUF ¶¶ 96, 101–03. Indeed, the merits criterion that asks applicants to demonstrate "the extent to which the applicant . . . describes the broad range of methods and services that will be provided" is worth only 10 points in the scoring process. *Id.* ¶ 101. Likewise, the merits criterion that asks whether the project plan "adequately provides for the requirements set forth in the Title X statute, regulations, and legislative mandates"—including, presumably, the requirement to provide a "broad range of . . . methods," 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(1)—is worth only 15 points in the Merit Review. SUF ¶ 101. However, the criterion that asks applicants to demonstrate "the extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities . . . and HHS priorities" is worth 35 points. *Id.* ¶ 96. Again, this signals to applicants that the provision of contraception is less important than alignment with the Agency's Priorities. Accordingly, an applicant cannot "identify, with ascertainable certainty, the standards with which the agency expects parties to conform," *Nissan Chem. Corp.*, 744 F. Supp. 3d at 9, with respect to contraception, and is left to guess at how to reconcile the tension between the NOFO's emphasis on Agency Priorities and what is required under the statute and the regulations.

Second, to the extent the NOFO reflects an intent to prioritize grant applicants that primarily or exclusively provide natural family planning over applicants that

provide the full range of family planning, it would be a reversal of agency position within the Title X program, without any "display[ed] awareness" of the change and lacking a reasonable, "detailed justification" for it, particularly one that takes into account the reliance interests that have been engendered over decades. *FCC*, 556 U.S. at 515. Indeed, the provision of a broad range of family planning methods, guided by patient preference, is a hallmark of the Title X program, as mandated by Congress, the regulations, and decades of prior practice, and critical to the clients served by the program. *See* 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(1); SUF ¶¶ 32–33.

If the NOFO signals that the Title X program is shifting away from the provision of a broad range of family planning methods, it provides no acknowledgment of the shift, let alone a "reasoned" explanation for it. SUF ¶ 117. Although the NOFO implies that fewer women used contraception in 2022-2023 compared to 2017-2019 *because* of dissatisfaction with side effects from contraception, *id.* ¶¶ 84–85, the cited studies do not support this conclusion. Rather, two of those studies show that the percent of women actively using contraception decreased between 2017-2019 and 2022-2023, *not* because of dissatisfaction with a contraceptive method's side effects (which is never mentioned in these studies), but because there was an increase in the number of women who were not using contraception because they were not having intercourse or were pregnant, post-

31

partum, or seeking pregnancy.[4] The other study cited in the NOFO found that some women discontinue certain types of contraception, specifically oral contraception, condoms, or intrauterine devices, due to dissatisfaction based a range of reasons, such as side effects, difficulty using the method, difficulty in obtaining the method, and worry about its efficacy.[5] But there is no indication that these women stopped using contraception altogether, rather than just switching to a different method or even to a different brand of the same method. Indeed, the report acknowledges the importance of contraception, noting that "virtually all women of reproductive age who had ever had sexual intercourse with a male partner [have] us[ed] at least one contraceptive method at some point in their life up to the time of interview (99.2%...)."[6] Accordingly, to the extent that Defendants are relying on these studies as justification for their about-face, the only reason that they have offered actually "runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n*, 463

---

[4] Daniels, Kimberly, et al., *Current Contraceptive Status Among Women Aged 15-49: United States, 2017-2019*, National Center for Health Statistics Data Brief, No. 388, at 1–2 (Oct. 2020); Daniels, Kimberly, et al., *Current Contraceptive Status Among Women Aged 15-49: United States, 2022-2023*, National Center for Health Statistics Data Brief, No. 539, at 1–2 (Aug. 2025) (cited in Ex. A, NOFO at n.1).

[5] Daniels, Kimberly, et al., *Contraceptive Methods Women Have Ever Used: United States, 2015-2019*, National Health Statistics Reports, No. 195, at 7, Table 6 (Dec. 14, 2023) (cited in Ex. A, NOFO at n.2)

[6] *Id*. at 1.

U.S. at 43, and they have thus failed to demonstrate that their decision to deprioritize contraception in the NOFO is "reasoned."

> **v.    The Requirement to Align With Priorities That Are Irrelevant to the Title X Program Is Arbitrary and Capricious.**

It is unclear whether grant applicants are required to align with Agency Priorities that have nothing to do with the Title X program. For instance, the NOFO indicates that the largest component of an application's score in the Merit Review process will be the "extent to which the applicant proposes strategies that meaningfully advance OPA's program priorities . . . *and HHS priorities*," without limiting that expectation of alignment with the latter of those priorities to those that are within the scope of the program. SUF ¶ 96 (emphasis added). The absence of even an attempted limitation, *infra* 34, is particularly problematic, given that several HHS Priorities, attached as Exhibit C, appear entirely unrelated to Title X and the provision of family planning services, including the priorities of "[f]urther[ing] our understanding of autism," "[i]nvestigat[ing] and car[ing] for those with Long COVID," "[a]dvanc[ing] the scientific understanding of the aging process," and "[e]nd[ing] crime and disorder on America's streets." *Id.* ¶ 99; *see also* Ex. C. Does the Agency expect grantees to demonstrate alignment with *all* of those priorities? And, if the answer to that question is yes, exactly *how* does the Agency expect a grantee to demonstrate alignment with "[e]nd[ing] crime and disorder on America's

33

streets" in the context of providing family planning services within Title X? And does the Agency expect grantees to divert Title X grant funds away from providing family planning care towards furthering this goal? The NOFO does not answer these questions. *Id.* ¶ 100.

### E.    The NOFO's Savings Clauses, Standing Alone, Do Not Cure Defendants' Unlawful Actions.

In some places, the NOFO says that applicants must align with the HHS, OASH, and OPA priorities only "when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance," or "to the extent authorized by law," or "where authorized by law," and only where "consistent with program authority and the scope of the award" or "within the scope of the program." SUF ¶¶ 73, 81, 105, 108. To the extent these "savings clauses" constitute the Agency's attempt to resolve the NOFO's failings, they do nothing of the sort. Indeed, they only increase confusion and exacerbate the arbitrariness and capriciousness of the Agency's action.

To begin, the savings clauses are not included in all places where alignment with the Agency's Priorities is required by the NOFO. For example, in detailing the requirements for an application's project narrative, the NOFO instructs applicants to "describe plans and strategies for providing family planning services that address OPA program priorities," including the "[r]educing overmedicalization," "[e]nforcing Hyde," and "[p]romoting evidence-based care" priorities, without

34

specifying that such descriptions should not include "plans and strategies" that would conflict or be in tension with the law. *Id.* ¶ 93. Furthermore, particularly concerning is the absence of a savings clause in the Merit Review criterion, that instructs that 35% of an applicant's total points will be based on the extent to which they propose strategies that meaningfully advance OPA's and HHS's priorities, full stop. *Id.* ¶ 96. The presence of savings clauses in *some but not all* places where alignment with Agency Priorities is mentioned leaves prospective grantees unclear as to whether the Agency intends its attempted "caveats" or "carve outs" to apply to its review of applications for alignment with the Agency's Priorities writ large, or only where specified.

Further, even where they do appear, the NOFO's savings clauses do not provide any clear guidance to a Title X applicant as to where Defendants will draw the line when there is conflict or tension between the Agency's Priorities and the Title X regulations, as discussed *supra* 13–17, 25–33. Indeed, the savings clauses only *add* to the NOFO's ambiguity. For example, the savings clauses suggest that there is *some* lawful means of reconciling, for instance, the Anti-DEI Priority with the regulation's requirement to advance health equity—but the two are in direct and unavoidable conflict. *See supra* 13–15. It is simply not possible to comply with both given that one prohibits something that the other commands. And yet the savings clauses imply that there nevertheless is a way to do both, without shedding any light

35

on how to do so. Similarly, although the NOFO attempts to limit alignment with Agency Priorities that are within the "scope" of the Title X program or award, *see* SUF ¶¶ 73, 81, 105, applicants are left to guess which priorities the Agency considers to be "within the scope." As detailed above, the absence of any explication here is particularly problematic for the HHS priorities given the patent irrelevance of some of those priorities to the Title X program. *See supra* 33–34; SUF ¶ 99 (citing HHS priorities as including, *inter alia*, "[e]nd[ing] crime and disorder on America's streets"). Without any guidance from Defendants, applicants can only sift through all three sets of priorities, take their best guess as to what to address, and prepare themselves for the consequences of guessing wrong—namely, loss of up to 35 points in the Merit Review, or a senior appointee's recommendation that their applications should not be awarded. *See supra* 7–8. Moreover, given that these are new Agency Priorities, Title X applicants do not have any historical basis to inform how they should weed through the various priorities to decide which ones to address in their applications. SUF ¶ 118. Accordingly, the NOFO's savings clauses do not remedy Defendants' unlawful actions.

## II. Plaintiff NFPRHA's Members, Including Plaintiff FHCCP, Face Irreparable Harm if the Requested Relief Is Denied.

To demonstrate irreparable harm, Plaintiffs "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Drenth v. Boockvar*, No. 1:20-cv-00829, 2020 WL 2745729, at *5 (M.D. Pa. May

27, 2020) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). Plaintiffs satisfy the standard here.

First, the challenged components of the NOFO irreparably harm Plaintiff NFPRHA's members, including Plaintiff FHCCP, by requiring alignment with the Agency's Priorities in order to be competitive for a Title X grant—including those that conflict with the Title X regulations—and thereby placing many at a competitive disadvantage in the FY 2027 Title X grant cycle. *See* SUF ¶¶ 96, 105; Decl. of Clare Coleman in Supp. of Pls.' Mot. for Summ. J. or Prelim. Inj. ("Coleman Decl.") ¶¶ 76–78, attached as Ex. D; Decl. of Patricia Fonzi in Supp. of Pls.' Mot. for Summ. J. or Prelim. Inj. ("Fonzi Decl.") ¶¶ 5, 62–66, attached as Ex. E; *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) (recognizing that "putting plaintiffs at a competitive disadvantage constitutes irreparable harm"); *see also e.g.*, *City of Los Angeles v. Barr*, No. 2:18-cv-07347-JLS-JC, 2020 WL 11272648, at *8 (C.D. Cal. June 17, 2020) (holding plaintiff suffers irreparable harm where failure to comply with challenged conditions imposed during grant application process would "jeopardize its ability to compete for future funding"); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (plaintiff irreparably injured based on its inability to "compete for funding on a level (and legal) playing field" under challenged funding opportunity announcement, since once the competition was over, there

could be "no do over and no redress") (internal quotations and citation omitted); *cf.*

*CPG Int'l LLC v. Georgelis*, No. 3:15cv176, 2015 WL 1786287, at *11 (M.D. Pa.

Apr. 20, 2015) (plaintiff irreparably injured from being placed at a competitive

disadvantage that would not later be remediable because it would have "no way of

proving that any particular loss [] was attributable to []unfair competition").

Second, the NOFO's challenged provisions force many of Plaintiff

NFPRHA's members, including Plaintiff FHCCP, to confront a "Hobson's Choice."

On the one hand, they can try to align with the Agency's Priorities, even if it means

that they must divert limited resources away from providing core Title X services,

and risk undermining their ability to provide the same access to services in their

community, resulting in harm to their missions. *See* Fonzi Decl. ¶¶ 67–70; Coleman

Decl. ¶ 75; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir.

2016) (holding that increased difficulty for plaintiff to accomplish their "primary

mission" is adequate to show irreparable harm); *Elev8 Baltimore, Inc. v. Corp. for

Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 566 (D. Md. 2025) (finding irreparable

harm where nonprofits had been forced to "divert resources away from core

activities and mission-driven work") (citing *HIAS, Inc. v. Trump*, 985 F.3d 309, 326

(4th Cir. 2021)). On the other hand, they can decide to not align with the Agency's

Priorities, and instead align with Title X regulations but, in doing so, they jeopardize

their ability to obtain a grant, and, if awarded a grant, expose themselves to

38

significant penalties for failure to align, including termination. *See* SUF ¶¶ 96, 104–105, 108; Fonzi Decl. ¶¶ 62–66; Coleman Decl. ¶¶ 76–77. This in turn could upend their budgets and compromise their ability to provide vital services to patients in their communities. Fonzi Decl. ¶¶ 12, 66. In short, no matter which way they turn, the harm is irreparable. *See, e.g.*, *R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 72 (finding irreparable harm where plaintiffs faced with choice between "[a]ccepting grant funds subject to the challenged conditions" and "guess[ing] at what formerly unobjectionable activities are now proscribed," which "comes with serious risks of [penalty]" or "declining to apply for or accept grants, which they would otherwise be eligible to receive," and forgoing "hundreds of thousands of dollars" and the ability to provide "crucial programs and services for the vulnerable populations they work with").

Third, because the NOFO's requirement of alignment with the Anti-DEI and Anti-Gender Ideology Priorities appears to effectively amend the Title X regulations in a manner that harms Plaintiffs, *see supra* 17–18, Defendants' failure to permit them the ability to comment on those changes irreparably harms them too. Fonzi Decl. ¶ 54. Indeed, numerous courts have recognized that the loss of an opportunity to offer comments on a rule promulgated in violation of the APA's notice and comment requirements constitutes irreparable harm where, as here, the plaintiff has suffered some additional concrete harm. *See, e.g.*, *Am. Fed'n of Tchrs. v. Dep't of*

*Educ.*, 779 F. Supp. 3d 584, 621 (D. Md. 2025) ("Where a Plaintiff has been deprived of notice and the opportunity 'to have their comments considered prior to the promulgation of a rule which threatens' serious harms to their interests, they have suffered 'irreparable harm.'" (internal citations omitted)); *see also California v. Health & Hum. Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017); *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2025 WL 3198970, at *6 (D.D.C. Nov. 17, 2025). Indeed, if that were not so, "section 553 [of the APA] would be a dead letter." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002)).

Accordingly, for all of these reasons, Plaintiff NFPRHA's members, including Plaintiff FHCCP, face irreparable harm.

## III.    The Balancing of Harms and Public Interest Weighs in Favor of Granting Injunctive Relief.

The balancing of harms and public interest weigh heavily in favor of injunctive relief. As detailed above, Plaintiff NFPRHA's members, including Plaintiff FHCCP, will suffer irreparable harms in the form of being denied the opportunity to compete on a level playing field for grants, and being forced to choose between diverting funds from the core purpose of Title X—and thereby risking harm to their missions—or exposing themselves to penalties, including losing up to 35 points in the Merit Review, having a senior appointee possibly recommend that they

40

should not receive an award, and, if awarded a grant, having any awarded grant terminated. *See supra* 7–8. Conversely, a preliminary injunction "would . . . cause [Defendants]—at most—[only] a minor hardship: paying funds that Congress had appropriated for disbursement consistent with the purposes" of the Title X Program and pursuant to the Title X statute and regulations. *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 658 (E.D. Pa. 2017). Further, "the issuance of a preliminary injunction will not prevent the government from considering grant applications and disbursing federal funding to grant applicants"—indeed, Defendants remain "free to process the grant applications and disburse federal funding as long as [they] do[] so within the limits set by the [Title X statute and regulations] and APA." *Freedom Network USA*, 2026 WL 800392, at *22. Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action[;] . . . [t]o the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'" and the regulations that they themselves promulgate. *League of Women Voters of U.S.*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Accordingly, Plaintiffs have carried their burden, and injunctive relief is appropriate here.

41

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, or, in the alternative, for a preliminary injunction.

July 15, 2026                          Respectfully submitted,

                                       /s/ Brigitte Amiri
                                       Brigitte Amiri*
                                       NY Bar # 3017167
                                       Meagan Burrows*
                                       NY Bar # 5341094
                                       Ryan Mendias*
                                       NY Bar # 5742242
                                       Chelsea Tejada*
                                       NY Bar # 5845300
                                       Nora Ellmann*
                                       NY Bar # 6192355
                                       American Civil Liberties Union Foundation
                                       125 Broad Street, 18th Floor
                                       New York, NY 10004
                                       T: (212) 549-2500
                                       bamiri@aclu.org
                                       mburrows@aclu.org
                                       rmendias@aclu.org
                                       ctejada@aclu.org
                                       nellmann@aclu.org

                                       Sara J. Rose
                                       Pa. Bar # 204936
                                       Witold J. Walczak
                                       Pa. Bar # 62976
                                       American Civil Liberties Union of Pennsylvania
                                       P.O. Box 23058
                                       Pittsburgh, PA 15222

42

Tel: (412) 681-7736
srose@aclupa.org
vwalczak@aclupa.org

*Attorneys for Plaintiffs*

Robin Summers*
D.C. Bar No. 219473
National Family Planning & Reproductive Health Association
1025 Vermont Ave. NW, Suite 800
Washington,          D.C.          20005
T: (202) 293-3114
rsummers@nfprha.org

*Attorney for Plaintiff NFPRHA*

*Special admission approved*

43

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2026, I filed the foregoing Motion for Summary Judgment or, in the Alternative, a Preliminary Injunction electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means.

*/s/ Brigitte Amiri*
Brigitte Amiri

44