**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.<br><br>Defendants. | No. 1:26-cv-1684-JPW<br><br>(Hon. Jennifer P. Wilson) |

**<u>APPENDIX OF UNPUBLISHED CASES</u>**


BRIAN D. MILLER.
*United States Attorney*

TIMOTHY S. JUDGE
*Deputy Chief Civil Division,*
*Assistant United States Attorney*

# Appendix of Unpublished Cases

1. *Citizens Alert Regarding the Environment v. EPA*,
   102 Fed. Appx. 167 (D.C. Cir. 2004), (unpublished, federal appendix)

2. *Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*,
   446 Fed. Appx. 453 (3d Cir. 2011) (unpublished)

3. *Planned Parenthood of Greater N.Y. v. U.S. Department of Health & Human Services*,
   No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025)
   (Unreported district court opinion)

4. *Freedom Network USA v. Trump*,
   No. 25 C 12419, 2026 WL 1899186 (N.D. Ill. Mar. 23, 2026)
   (unreported)

5. *Sydnor v. Office of Pers. Mgmt.*,
   No. CIV.A. 06-0014, 2008 WL 1990808 (E.D. Pa. May 7, 2008), aff'd, 336 Fed. Appx. 175 (3d Cir. 2009)
   (unpublished, unreported)

August 6, 2026

Respectfully submitted,

BRIAN D. MILLER

United States Attorney

s/ Timothy S. Judge
TIMOTHY S. JUDGE
Deputy Chief, Civil Division
PA Bar No. 203821
William J. Nealon Federal Building
U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18507
Tel: (570) 348-2827
timothy.s.judge@usdoj.gov

*Counsel for Defendants*

KeyCite Yellow Flag
Distinguished by Multnomah County v. Azar, D.Or., August 30, 2018

102 Fed.Appx. 167
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also District of Columbia Rules 32.1,
36. (Find CTADC Rule 32.1 and Find CTADC Rule 36)
United States Court of Appeals,
District of Columbia Circuit.

CITIZENS ALERT REGARDING THE
ENVIRONMENT and David Kurtz, Appellants,
v.
ENVIRONMENTAL PROTECTION
AGENCY, et al., Appellees.

No. 03–5159.
|
June 15, 2004.

**Synopsis**
**Background:** Environmental group brought action alleging that township's sewer construction project failed to comply with National Environmental Policy Act (NEPA). The United States District Court for the District of Columbia entered judgment in favor of defendants, and group appealed.

**Holdings:** The Court of Appeals held that:

[1] claim that Environmental Protection Agency (EPA) failed to conduct adequate NEPA review was not ripe for adjudication;

[2] Eleventh Amendment barred challenge to state agencies' state environmental review; and

[3] EPA's participation in project was not so substantial as to require nonfederal participants to comply with NEPA.

Dismissed in part, and affirmed in part.

**Procedural Posture(s):** On Appeal.

West Headnotes (4)

[1] **Environmental Law** Ripeness

Environmental group's claim that Environmental Protection Agency (EPA) failed to conduct adequate NEPA review of environmental impact of sewer construction project was not ripe for adjudication, even though EPA was contemplating direct grant to partially fund sewer line and had consulted with township during planning process, where EPA was currently conducting NEPA review, and had issued proposed findings, but had not yet made final determination as to environmental effects of sewer line, or on whether to award grant. National Environmental Policy Act of 1969, § 102, 42 U.S.C.A. § 4332.

2 Cases that cite this headnote

[2] **Environmental Law** Accrual, computation, and tolling

Facial challenge to Environmental Protection Agency's (EPA) approval of state's program for disbursing its state revolving funds, provided in large part by EPA grants, to individual wastewater disposal projects accrued when EPA's approval was given, where program had not changed since then. 28 U.S.C.A. § 2401; National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

4 Cases that cite this headnote

[3] **Federal Courts** Abrogation by Congress
**Federal Courts** Waiver by State; Consent
**Federal Courts** Agencies, officers, and public employees

Eleventh Amendment deprived federal district court of jurisdiction over environmental group's challenge to state agencies' state environmental review of sewer construction project, absent indication that Congress abrogated, or state waived, sovereign immunity. U.S.C.A. Const.Amend. 11.

2 Cases that cite this headnote

**[4]** **Environmental Law** Waste; hazardous materials

Federal participation in township's sewer construction project was not so substantial as to require township and nonfederal participants to comply with NEPA, even though federal Environmental Protection Agency (EPA) was considering whether to contribute funds to project, where, if EPA's environmental review were to conclude that project should not be funded due to adverse environmental impacts, such finding would not have impeded legality of sewer line, and township would have constructed sewer line even if federal funding was denied. National Environmental Policy Act of 1969, § 102, 42 U.S.C.A. § 4332.

5 Cases that cite this headnote

***168** Appeal from the United States District Court for the District of Columbia. (No. 03cv00417).

**Attorneys and Law Firms**

Enrico G. Nardone, Law Office of Enrico G. Nardone, Babylon, NY, David Kurtz, Lake Ariel, PA, for Plaintiffs–Appellants.

Mark R. Haag, Lisa Elizabeth Jones, Susan L. Pacholski, Attorney, U.S. Department of Justice, Washington, DC, Joseph S. Cigan, III, PA Department of Environmental Protection, Office of Chief Counsel, Wilkes–Barre, PA, Kimberly A. Hummel, Attorney General's Office of State of Pennsylvania, Harrisburg, PA, John E. Childe, Law Office of John E. Childe, Jr., Palmyra, PA, Stephen William Saunders, Kreder Brooks Hailstone, Scranton, PA, for Defendants–Appellees.

Before: GINSBURG, Chief Judge, and HENDERSON and ROGERS, Circuit Judges.

***JUDGMENT***

****1** This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs by the parties and arguments of counsel. It is

**ORDERED AND ADJUDGED** that CARE's claims against EPA, the Pennsylvania Department of Environmental Protection, and the Pennsylvania Infrastructure Development Authority are dismissed, and the judgment in favor of Jefferson Township, Jefferson Township Sewer Authority, and the Lackawanna River Basin Sewer Authority is affirmed.

Citizens Alert Regarding the Environment ("CARE") and pro se appellant David Kurtz appeal an order of the district court denying declaratory and injunctive relief against construction of a sewer line in Jefferson Township, Pennsylvania, on the basis that the project failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (2004). *Citizens Alert Reg. the Environ. v. U.S. EPA,* 259 F.Supp.2d 9 (D.D.C.2003).

**[1]** First, as to EPA, appellants' primary challenge relates to EPA's supposed failure to review the environmental impact of the Jefferson Township sewer project, as required by 42 U.S.C. § 4332, where EPA is contemplating a direct grant of $1.7 million to the Township to partially fund the sewer line and has consulted with the Township during the planning process. EPA is currently conducting the review required by NEPA in association with the proposed grant, and has issued proposed findings, but has not yet made a final determination as to the environmental effects of the sewer line, or on whether to award the grant. Until EPA completes its review and reaches a decision, there has been no final agency action within the meaning of 5 U.S.C. § 704 (2004) and the matter is not ripe for judicial review. *Cf. Coalition for Underground Expansion v. Mineta,* 333 F.3d 193 (D.C.Cir.2003).

**[2]** Appellants' second claim against EPA is that it acted arbitrarily and capriciously in approving Pennsylvania's program for disbursing its state revolving funds, provided in large part by EPA grants, to individual wastewater disposal projects, such as the $11 million grant that is the primary source of funding for the Jefferson Township sewer. EPA approved the environmental review process Pennsylvania uses in connection with its state revolving fund in 1991, and nothing suggests that the program has changed since then. Under the six-year statute of limitations for actions against the United States, 28 U.S.C. § 2401(a) (2004), any facial ***169** challenge to EPA's approval of Pennsylvania's environmental review process is time-barred. Absent any showing that EPA

had substantial control over the individual state grant to the Township, any as-applied challenge to the adequacy of the Pennsylvania Department of Environmental Protection's review of the Jefferson Township sewer presents a question of state law and not a federal claim.

**[3]** Second, CARE has also sued the Pennsylvania Department of Environmental Protection and the Pennsylvania Infrastructure Development Authority, which, respectively, conducted the state environmental review and appropriated the majority of the funds for the Jefferson Township sewer line. As CARE has sued these state agencies directly rather than pursuing its claim for injunctive and declaratory relief against individual state officers, the Eleventh Amendment deprives the court of jurisdiction as there is no indication that Congress has abrogated, or the state waived, sovereign immunity towards suits of this kind. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

****2** **[4]** CARE's remaining claim is its request for injunctive relief against Jefferson Township, Jefferson Township Sewer Authority, and the Lackawanna River Basin Sewer Authority. Nonfederal participants in federal actions need not themselves comply with NEPA, *see Macht v. Skinner,* 916 F.2d 13, 18 (D.C.Cir.1990). There is, however, some precedent for enjoining nonfederal actors from participating in major federal actions until the relevant federal actors have met their obligations under NEPA. *See, e.g., Sierra Club v. Hodel,* 544 F.2d 1036 (9th Cir.1976); *Don't Ruin Our Park v. Stone,* 749 F.Supp. 1386, 1387–88 (M.D.Pa.1990); *La Raza Unida v. Volpe,* 337 F.Supp. 221 (N.D.Cal.1971); *cf. Biderman v. Morton,* 497 F.2d 1141, 1147 (2nd Cir.1974). But this arises only where "the federal participation in the project is so substantial that the state should not be allowed to go forward until all the federal approvals have been granted in accordance with NEPA." *Macht v. Skinner,* 916 F.2d at 18–19. Here, by contrast, there is no legal impediment to the municipal defendants' construction of the sewer line without federal involvement or approval: if EPA's environmental review were to conclude that the project should not be funded due to adverse environmental impacts, and to deny the requested grant, such a finding would not impede the legality of the sewer line. Nor, as the district court properly found, would there be any factual impediment: the federal funds subject to NEPA requirements amount to only $1.7 million of a $15 million project, and the Township will construct the sewer line with or without them. 259 F.Supp.2d at 21–22. While the Township arguably jeopardizes its federal funding by proceeding with construction before EPA has reached a decision on the grant request, because this course of action limits the Township's ability to make alterations to the project that might be necessary to secure EPA's approval, nothing in NEPA prevents the Township from taking that risk.

Appellant Kurtz's reliance on *Ross v. FHA,* 162 F.3d 1046 (10th Cir.1998), as well as CARE's reliance on *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department,* 446 F.2d 1013 (5th Cir.1971), is misplaced; both cases stand merely for the proposition that a major federal action may not be improperly segmented into federal and non-federal portions so as to avoid NEPA review of the whole. Nothing of the sort has occurred here: EPA's ongoing NEPA review encompasses the entire sewer line, and unlike in the ***170** cases appellants cite, federal approval is not a legal prerequisite to construction.

Accordingly, we dismiss the claims against EPA and the state defendants in part for lack of jurisdiction and in part on the merits, and affirm the district court's grant of summary judgment in favor of the municipal defendants.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

**All Citations**

102 Fed.Appx. 167, 2004 WL 1336644

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

446 Fed.Appx. 453
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA
v.
The ESTATE OF Joseph A. CERNIGLIA; CWB1, LLC; Compania Holdings Corporation; Melissa Cerniglia; Valley National Bank; Riccardo Botti; Kevin Wynn CWB1, LLC., Appellant.

No. 10–4545
|
Argued July 12, 2011.
|
Filed: July 28, 2011.

**Synopsis**
**Background:** In interpleader action involving proceeds of death benefit of life insurance policy, the United States District Court for the District of New Jersey, William H. Walls, J., denied named beneficiary's request for a preliminary injunction, and beneficiary appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

[1] litigation regarding ownership of limited liability company (LLC) did not have to be resolved before life insurance policy death benefit could be paid to LLC, which was the named beneficiary, and

[2] claimant to an interpleader stake demonstrated a likelihood of irreparable harm if it was not granted a preliminary injunction.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (3)

**[1]** **Insurance** Named beneficiaries, in general

Litigation regarding ownership of limited liability company (LLC) did not have to be resolved under New Jersey law before life insurance policy death benefit could be paid to LLC, which was the named beneficiary. N.J.S.A. § 42:2B–1 et seq.

1 Case that cites this headnote
More cases on this issue

**[2]** **Injunction** Insurance

Claimant to an interpleader stake demonstrated a likelihood of irreparable harm if it was not granted a preliminary injunction compelling payment of life insurance policy death benefit to it as named beneficiary; death benefit was a necessary financial resource that had to be paid without delay to secure services of a chef in order to enable claimant to have any possibility of rehabilitating its business after death of its talented chef who was claimant's main asset.

6 Cases that cite this headnote
More cases on this issue

**[3]** **Injunction** Insurance

Public interest favored grant of a preliminary injunction directing payment of life insurance policy death benefit to named beneficiary; injunction furthered the public interest by facilitating beneficiary's ability to continue operations and enforcing the plain language of the policy.

1 Case that cites this headnote
More cases on this issue

***453** On Appeal from the United States District Court for the District of New Jersey (D.C. No. 2–10–cv–05597), District Judge: Honorable William H. Walls.

**Attorneys and Law Firms**

Edward Griffith (Argued), Bolatti & Griffith, New York, NY, for Appellant, CWB1, LLC.

Anthony J. Fusco, Jr. [1], Fusco & Macaluso, Passaic, NJ, for Appellees, Riccardo Botti and Kevin Wynn.

***454** Steven P. Del Mauro, McElroy, Deutsch, Mulvaney & Carpenter, Newark, NJ, for Guardian Life Insurance Company of America.

Before: RENDELL, SMITH and FISHER, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

CWB1, LLC ("CWB1") appeals from an order of the District Court denying its request for a preliminary injunction. For the reasons stated herein, we will reverse the District Court's order and direct that the injunction be issued in CWB1's favor.

I.

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Joseph A. Cerniglia was a renowned chef and partial owner of Campania, a restaurant in Fairlawn, New Jersey. CWB1, a New Jersey limited liability company, owned Campania. Riccardo Botti, Kevin Wynn, and Cerniglia held ownership interests in CWB1 as members. On October 25, 2005, CWB1 purchased a life insurance policy (the "Policy") from The Guardian Life Insurance Company of America ("Guardian"). The Policy named Cerniglia as the insured, and listed CWB1 as the owner and beneficiary. On September 16, 2010, Cerniglia, Botti, and Wynn sold their interests in CWB1 to Campania Holdings Corporation ("CHC") pursuant to a transfer agreement. Philip Neuman is the managing director of CHC. On September 24, 2010, Cerniglia died. In the months following, Campania's business declined significantly, and it was eventually closed.

After Cerniglia's death, Guardian faced competing claims to the Policy death benefit, and filed an interpleader complaint against CWB1, CHC, Cerniglia's estate, Melissa Cerniglia (Cerniglia's widow), Botti, Wynn, and Valley National Bank. [2] CWB1 and CHC filed an answer and a cross-claim against the estate, Melissa Cerniglia, Botti, and Wynn seeking a declaratory judgment that those parties had no rights under the Policy and moved for a preliminary injunction directing payment of the Policy death benefit. Neuman submitted a declaration describing the negative impact of Cerniglia's death on Campania's business. In response, Botti and Wynn disputed payment of the Policy death benefit to CWB1 based on their belief that ownership of CWB1 had reverted to them because Neuman breached the transfer agreement. Botti and Wynn suggested that a breach of contract action would be filed, but no such claims were before the District Court. [3] In the meantime, the estate and Melissa Cerniglia withdrew their claims to the Policy death benefit.

At the preliminary injunction hearing before the District Court, CWB1 argued that all parties agreed that CWB1 was the beneficiary of the policy and, notwithstanding any breach of contract litigation, the Policy death benefit should be paid to the company. Counsel for Botti and Wynn stated that "[o]bviously we all agree that the money is to be paid to the corporation," meaning, to CWB1. (App. at 199.) But, Botti and Wynn argued that it should not be paid because of the uncertainty as to the proper ownership of CWB1. The District Court rejected CWB1's arguments, ruling that the company failed to establish a likelihood of success on the ***455** merits or irreparable harm. The District Court reasoned that ownership of CWB1 would have to be resolved before the company received the Policy death benefit. The District Court also concluded that CWB1's allegations of irreparable harm were insufficient and unsupported. In doing so, the District Court refused to allow Neuman to testify regarding the statements set forth in his declaration. On November 30, 2010, the District Court granted Guardian interpleader relief and released it from any liability. The sum of the Policy death benefit, plus interest, was deposited with the clerk of court. CWB1 filed a timely notice of appeal. [4]

II.

"[W]e use a three-part standard to review a District Court's decision to grant or deny a preliminary injunction." *Rogers v. Corbett,* 468 F.3d 188, 192 (3d Cir.2006). "The District Court's findings of fact are reviewed for clear error, the District Court's conclusions of law are evaluated under a plenary standard, and the ultimate decision to grant [or deny

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

a] preliminary injunction is reviewed for abuse of discretion." *Id.*

III.

Federal Rule of Civil Procedure 22 provides that "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." Fed.R.Civ.P. 22(a)(1). In an interpleader action, "the court determines whether the interpleader complaint was properly brought and whether to discharge the stakeholder from further liability to the claimants." *Prudential Ins. Co. of Am. v. Hovis,* 553 F.3d 258, 262 (3d Cir.2009).[5] Then, "the court determines the respective rights of the claimants to the interpleaded funds." *Id.* In evaluating whether a preliminary injunction should issue, we consider "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.,* 562 F.3d 553, 556 (3d Cir.2009).

A. Likelihood of CWB1's Success on the Merits

**[1]** With respect to the likelihood of success on the merits, CWB1 argues that the District Court erred in concluding that the litigation regarding ownership of the company had to be resolved before the Policy death benefit could be paid. We agree. The litigation over ownership of CWB1 is irrelevant to CWB1's claim. Indeed, the Policy is explicit on this point—CWB1 is the named beneficiary. (App. at 60 ("Guardian will pay the death proceeds to the beneficiary[.]")) Moreover, New Jersey law makes clear that members of a limited liability company are distinct from the LLC itself. The New Jersey Limited Liability Company Act, 42 N.J.S.A. § 42:2B *et seq.,* describes the limited liability company as a distinct legal entity, ***456** separate and apart from its member owners. New Jersey courts also have emphasized that a life insurance policy is a company asset where, as here, the policy names an employee as an insured, the policy lists the company as the beneficiary, and the company pays for the policy. *See, e.g., Equitable Life Assur. Soc'y. of U.S. v. New Horizons, Inc.,* 28 N.J. 307, 146 A.2d 466, 467 (1959) ("Although the employee is the insured,' the employer is the applicant for, and owner and beneficiary of, the policy."); *Mitzner v. Lights 18, Inc.,* 282 N.J.Super. 355, 660 A.2d 512, 514 (N.J.Super.Ct.App.Div.1994) *aff'd* 140 N.J. 573, 660 A.2d 480 (1995) ("[K]ey man insurance, which reimburses an employer upon the death of a key employee or principal, is owned by the employer who also applies for and is the beneficiary of the policy."). CWB1, Botti, and Wynn agree that the company is, indeed, the lawful beneficiary. The argument advanced by Botti and Wynn focuses on their belief that the Policy death benefit should not be paid to CWB1 because they assert Neuman is no longer the lawful owner. This contention ignores the formalities of the limited liability company and incorrectly equates Neuman with CWB1. Even if CHC, with Neuman as managing director, is not the lawful owner of CWB1, that does not change the fact that CWB1 is the beneficiary. Because CWB1 demonstrated a likelihood of success on the merits in that it is the beneficiary of the Policy death benefit, the District Court erred in concluding otherwise.

B. Likelihood of Irreparable Harm to CWB1

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484–85 (3d Cir.2000). Mere economic harm is insufficient; rather, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.1989). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 726 (3d Cir.2004) (internal quotation marks omitted).

**[2]** At the preliminary injunction hearing and in its submissions to the District Court, CWB1 maintained that it would suffer irreparable harm because Campania would be forced to shut down, employees would be laid off, and the restaurant would lose its growing customer base. CWB1 argues that the District Court erred in rejecting its evidence of impending harm and refusing to allow Neuman to testify regarding the company's financial status. We agree. Although CWB1 essentially seeks a monetary payment, its posture as a claimant to an interpleader stake distinguishes this case from the traditional notion of economic harm. CWB1 may recover only the Policy death benefit; monetary damages in the traditional sense are not available to it in this instance. Moreover, its allegations—amply supported in Neuman's

declaration—of the impending loss of key employees, as well as a decline in its customer base, sufficiently demonstrates a likelihood of irreparable harm to CWB1.[6] *See id.* at 726. Without the payment of the Policy death benefit, CWB1 cannot be made whole. *See Brenntag Int'l. Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999) (irreparable harm is found "where, but for the grant of equitable relief, there is a substantial chance that upon ***457** final resolution of the action the parties cannot be returned to the positions they previously occupied"). This is due to the fact that CWB1's main asset was Cerniglia's talent as a chef, which the Policy was designed to protect and allow the company to continue operating upon his death. The Policy death benefit is a necessary financial resource that must be paid without delay if the company has any possibility of rehabilitating its business. Because CWB1 has no other remedy at law, the District Court clearly erred in finding that CWB1's harm was compensable by monetary damages. Given that the issuance of a preliminary injunction is "the only way of protecting [the company] from harm," *Instant Air Freight,* 882 F.2d at 801, CWB1 established a likelihood of irreparable injury.

C. Potential Harm to Botti and Wynn

Although the District Court did not address the remaining two requirements, we may nonetheless evaluate them where, as here, the record provides a sufficient factual basis to do so. *See Kos Pharm.,* 369 F.3d at 712. Before the District Court, CWB1 argued that Botti and Wynn would suffer no harm if the injunction was issued. Botti and Wynn did not articulate any allegations of harm on their behalf. Their focus on alleged breaches of the transfer agreement was misplaced, as these claims were not before the District Court. "We have recognized that [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Id.* at 729. Considering that CWB1 established a strong likelihood of success, any harm Botti and Wynn might suffer is outweighed by the harm to CWB1 absent an injunction. CWB1 met its burden to establish this factor.

D. Public Interest

**[3]** Finally, CWB1 maintains that the public interest favors the grant of a preliminary injunction. "[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir.1994). Such is the case here. As CWB1 alleged, directing payment of the Policy death benefit to CWB1 furthers the public interest by facilitating the company's ability to continue operations and enforcing the plain language of the Policy. Because CWB1 met its burden to establish each element required to obtain a preliminary injunction, the District Court abused its discretion in rejecting its request. Going forward, the District Court should order the release of the Policy death benefit to CWB1 without delay.

IV.

For the foregoing reasons, we will reverse the order of the District Court and remand so that the District Court may direct payment of the Policy death benefit to CWB1.

**All Citations**

446 Fed.Appx. 453

## Footnotes

1 The Court notes that Counsel for Botti and Wynn, Anthony J. Fusco, Jr., failed to appear for the scheduled oral argument in this matter, despite his acknowledged receipt of the notification of oral argument. Although we decline to take further action in this regard, his absence and subsequent correspondence with the Court demonstrates a lack of professionalism rarely seen and hopefully not repeated before the Court. We also note that Mr. Fusco's absence had no bearing on the outcome of this appeal.

2 Guardian subsequently released Valley National Bank from the lawsuit.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3 The parties have represented to the Court that a breach of contract claim is pending in New Jersey state court.

4 The District Court had jurisdiction over Guardian's interpleader complaint and CWB1's counterclaim against Guardian pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction. The District Court had supplemental jurisdiction over CWB1's cross-claim against Botti and Wynn pursuant to 28 U.S.C. § 1367(a). Our source of jurisdiction is 28 U.S.C. § 1292(a)(1).

5 The threshold requirements for rule interpleader were satisfied. Diversity of citizenship was present between Guardian (a citizen of New York) and the Estate, Melissa Cerniglia, CWB1, Botti, and Wynn (citizens of New Jersey). The amount in controversy exceeded $75,000.

6 Because CWB1 properly supported its allegations of irreparable harm, the District Court abused its discretion in prohibiting Neuman from testifying to that effect.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2840318
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

PLANNED PARENTHOOD OF GREATER NEW YORK et al., Plaintiffs,
v.
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES et al., Defendants.

Civil Action No. 25-2453
|
Signed October 7, 2025

**Attorneys and Law Firms**

Emily B. Nestler, Valentina De Fex, Pro Hac Vice, Planned Parenthood Federation of America, Washington, DC, Bonnie Devany, DOJ-United States Attorney's Office, Washington, DC, Daniel Reuben Yablon, Drew Alan Harker, John V. Hoover, Andrew Tutt, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Plaintiffs.

Michael Joseph Gerardi, DOJ-United States Attorney's Office, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

BERYL A. HOWELL, United States District Judge

***1** Plaintiffs, three Planned Parenthood entities that receive federal grants to conduct teenage pregnancy prevention programs around the country, seek to vacate a "Program Policy Notice" issued, in July 2025, by defendant Department of Health and Human Services ("HHS"). They argue that they cannot comply with the new requirements established in this notice and still operate effective programs under their grants as statutorily required. Having twice failed to obtain relief from these requirements in a preliminary posture, both before this Court and another judge in this district, *see* Min. Entry (July 31, 2025) (reflecting oral denial of plaintiffs' motion for a temporary restraining order); *Planned Parenthood of Greater New York v. U.S. Department of Health and Human Services*, No. 25-cv-1334 (TJK), 2025 WL 1768100 (D.D.C. June 26, 2025) (denying plaintiffs' motion for a preliminary injunction), plaintiffs have now moved for expedited summary judgment, Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 22. Defendants HHS and Secretary of HHS Robert Kennedy (collectively "defendants") have cross-moved to dismiss the case, under Federal Rules of Evidence 12(b)(1) and 12(b)(6), and opposed summary judgment. *See* Defs.' Cross-Mot. to Dismiss, ECF No. 25; Defs.' Opp'n to Pls.' MSJ ("Defs.' Opp'n"), ECF No. 24.

For the reasons explained below, plaintiffs have successfully demonstrated their entitlement to summary judgment on their claim in Count IV of their complaint that the policy notice is arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and defendants' arguments to dismiss that claim fail. Therefore, plaintiffs' motion is granted with respect to Count IV, and defendants' motion is denied. Plaintiffs are entitled to vacatur of the challenged policy notice.

## I. BACKGROUND

The factual background and procedural history relevant to the pending motion are described below. The facts are undisputed, unless otherwise indicated.

### A. Factual Background

The Teenage Pregnancy Prevention Program ("TPP") was created by Congress in 2009 as part of an appropriations act providing funds for "making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). The funds were allocated in two parts: Tier 1 and Tier 2. Tier 1 allocations, which constitute around 75% of the funding, are for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors," while Tier 2 allocations (the remaining 25%) go to "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024). HHS designates programs as replicable under Tier 1 after an extensive, evidence-based review process, as mandated by Congress, to ensure that those programs are "proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy or other associated risk factors." Off. of Population Affs. ("OASH"), Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER), U.S. DEP'T OF HEALTH &

HUMAN SERVS., https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review#ftn1 (quoting 2010 Consolidated Appropriations Act); Pls.' Statement of Material Facts ("Pls.' SMF") ¶ 12, ECF No. 22-2; Defs.' Resp. to Pls.' SMF ("Defs.' Resp.") ¶ 12, ECF No. 24-1 (not disputing the fact, only denying materiality).

**1. *TPP Grant Awards***

***2** HHS grants awards through a competitive process after issuing a "notice of funding opportunity" ("NOFO"). Pls.' SMF ¶ 17; *see also* 42 C.F.R. § 52.6(a) (describing how the Secretary should select the best projects for grants). The awards apply to a given "project period," during which HHS intends to keep funding the grant "without requiring the project to recompete for funds." 42 C.F.R. § 52.6(c)(1). Generally, the project is initially funded for one year, after which the grantee must annually submit an application for continuation of funds. *Id.* § 52.6(c)(2); *see also* Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶ 2, ECF No. 24-1. This application for a "non-competing continuation" ("NCC") award generally requires a progress report, a budget for the upcoming year, and a work plan. *See* Pls.' SMF ¶ 20; Pls.' MSJ, Ex. B at 56, NOFO 2023: Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services ("NOFO 2023"), ECF No. 22-4. Once funds are rewarded for the coming year, they are made available in an account from which grantees may "draw down" funds as needed for their approved project expenses. *See* Pls.' SMF ¶ 23; Defs.' Resp. ¶ 23 (not disputing fact, only denying materiality as outside the administrative record); Defs.' Opp'n at 12 (referring to plaintiffs as "drawing down" funds from their accounts, demonstrating agreement with this characterization of the process).

The TPP awards are subject to many standard requirements, including that recipients comply with "all applicable requirements of all other federal laws, executive orders, regulations, and public policies governing financial assistance awards." 2023 NOFO at 61; Defs.' SUF ¶ 4. As part of submitting an NCC application, grantees must further certify compliance with "[a]ll requirements imposed by program statutes and regulations, Executive Orders, and HHS grant regulations, as applicable." Defs.' SUF ¶ 4 (quoting Defs.' Opp'n to Pls.' Mot. for TRO, Ex. A, PPCCC Notice of Award at 6, ECF No. 14-1); Defs.' Opp'n, Decl. of Michael Gerardi, DOJ Senior Trial Counsel ("Gerardi Decl."), Ex. 1, SF-424B Form ¶ 18, ECF No. 24-3; *see also* AR (including plaintiffs' versions of these two documents).

As a general matter, if a grantee does not comply with the terms and conditions of its grant, HHS can pursue enforcement actions, such as imposing additional conditions, withholding funds, or terminating the award. 45 C.F.R. § 75.371 ("Remedies for noncompliance"); *id.* § 75.372 ("Termination"). When termination is pursued, HHS must provide a "notice of termination," *id.* § 75.373(a), and more broadly, "[u]pon taking any remedy for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action," *id.* § 75.374(a). A review committee then makes a final determination as to the adverse action. *See* 42 C.F.R. § 50.406.

**2. *Plaintiffs' Awards and the 2025 NCC Application Cycle***

Plaintiffs, Planned Parenthood of Greater New York ("PPGNY"), Planned Parenthood of California Central Coast ("PPCCC"), and Planned Parenthood of the Heartland ("PPH") (collectively, "plaintiffs"), are grantees of the TPP program. *See* Defs.' SUF ¶ 12.[1] They received five-year grants under the 2023 NOFO to pursue Tier 1 projects and are required annually to submit NCC applications. *See* Pls.' SMF ¶¶ 21, 22; Defs.' Resp. ¶ 22 (denying materiality, as outside of the administrative record); Defs.' SUF ¶ 12; Pls.' Resp. to Defs.' SUF ("Pls.' Resp.") ¶ 12, ECF No. 29 (merely clarifying defendants' facts as stated).

In January 2025, HHS issued guidance for NCC applications in their third year of funding. *See* Defs.' Opp'n to TRO, Ex. B, Guidance for NCC Award Application January 2025 ("Jan. 2025 NCC Guidance"), ECF No. 14-2; Defs.' SUF ¶ 6. That Guidance set a NCC application submission deadline of April 15, 2025, and instructed submission of various OASH forms, a brief project narrative and work plan, and detailed budget. *See* Jan. 2025 NCC Guidance at 1, 4; Defs.' SUF ¶¶ 6, 7.

HHS issued updated "Guidance" for NCC applications in March, just a few weeks before the deadline. *See* Pls.' MSJ, Ex. F, Guidance for NCC Award Application March 2025 ("Mar. 2025 NCC Guidance"), ECF No. 22-8; *see also* Defs.' SUF ¶ 8; Pls.' Resp. ¶ 8 (contesting instructions were merely "guidance" given imposition of new requirements). The March Guidance stated, in part, that:

***3** Recipients are expected to review and be aware of current Presidential Executive Orders. Recipients are encouraged to revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders. Recipients should review and be aware of all current Presidential Executive Orders; however, the following may be of most relevance to the work of the TPP program:

- Executive Order 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
- Executive Order 14190: Ending Radical Indoctrination in K-12 Schooling
- Executive Order 14187: Protecting Children from Chemical and Surgical Mutilation
- Executive Order 14151: Ending Radical and Wasteful Government DEI Programs and Preferencing
- Executive Order 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity.

2025 NCC Guidance at 4-5. Recipients were also instructed to "[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders, if applicable, including the steps taken to review the project and identify the modifications proposed." *Id.* at 5. Examples included "selecting a different evidence-based program for implementation" and "making adaptations to existing curriculum." *Id.*

Plaintiffs submitted their applications for NCC awards in April with what they describe as modifications made "under protest" and without "certifying compliance with the new EO 'alignment' requirement." Pls.' MSJ, Ex. C, Decl. of Wendy Stark, CEO of PPGNY ("PPGNY Decl.") ¶ 24, ECF No. 22-5; *id.*, Ex. D, Decl. of Jenna Tosh, CEO of PPCCC ("PPCCC Decl.") ¶ 38, ECF No. 22-6; *id.*, Ex. E, Decl. of Christine Cole, Sr. Dir. Educ. of Planned Parenthood of North Central States ("PPH Decl.") ¶ 23, ECF No. 22-7; Defs.' Resp. ¶ 25 (contesting the validity of these declarations outside of the administrative record and the "legal conclusion about the requirements of [p]laintiffs' grants"). Their applications were nonetheless approved on July 2, 2025. Pls.' SMF ¶ 26.

**3. *July Policy Notice***

The same day HHS approved plaintiffs' applications, HHS published a policy notice entitled "OASH Teen Pregnancy Prevention Program Policy Notice," referred to herein as the "July Policy Notice." Pls.' MSJ, Ex. G, July Policy Notice (July 1, 2025), ECF No. 22-9.[2] The July Policy Notice seeks to "clarify OASH policy for ... TPP Program grant recipients, to delineate when materials are not 'medically accurate,' 'age appropriate,' do not 'reduce teen pregnancy,' or are otherwise outside the scope of the TPP program." *Id.* at 1. The Notice first repeats the instructions from the March 2025 NCC Guidance, requiring "align[ment]" with executive orders, and then explains that this Notice "further clarif[ies] these expectations for TPP Program grantees" "[i]n light of recent Presidential Executive Orders, Supreme Court decisions, current court orders, and the NCC guidance." *Id.* at 2. That "clarif[ication]" imposes several further requirements that plaintiffs posit go beyond a general directive to "align" with executive orders and consider program revisions and instead instruct plaintiffs to make changes to their TPP curricula to comply or else risk termination of grant funding and potential claw back of funds. *See* Pls.' Mem. at 6.

***4** These requirements are divided into five sections, with separate headings. First, under the heading "Statutory Language," the Notice reminds recipients that they "must comply with the requirements set out in the statutory language of the annual HHS Appropriations Act," which is then quoted. July Policy Notice at 2. Second, under the heading "Ending Radical Indoctrination of Youth and Protecting Rights," the Notice quotes from Executive Order 14190, *Ending Radical Indoctrination in K-12 Schooling*, which issues a broad indictment of "America's schools" for "indoctrinat[ing] their children in radical, anti-American ideologies while blocking parental oversight," and further describes concerns such as "innocent children" being "compelled to adopt identities as either victims or oppressors solely based on their skin color" and being "made to question whether they were born in the wrong body." *Id.* at 2-3. The Notice then explains that "TPP-Program funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," citing the recent Supreme Court decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). Purportedly drawing from the holding in that opinion, the Notice instructs that "grant recipients are expected to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." July Policy Notice at 3.

Third, under the heading "Scope of the TPP Program," the July Policy Notice explains that because "[p]rograms cannot be funded under the TPP Program if they include materials or activities ... that are inconsistent with, or beyond the scope of, the statutory requirements for TPP programs" and the statute "makes no mention of ideological content such as the content at issue in *Mahmoud*, gender ideology, or discriminatory equity ideology," the "statute does not require, support, or authorize teaching minors about such content, including the radical ideological claim that boys can identify as girls and vice versa." *Id.* at 3-4. "Programs must be aimed at reducing teen pregnancy, not instructing in such ideological content." *Id.* at 4. The July Policy Notice further cautions that "material or instruction outside the scope of the TPP program may include other content that is not related to, or counter to the aim of, reducing teen pregnancy, such as content that encourages, normalizes, or promotes sexual activity for minors, including anal and oral sex, or masturbation, including through sexually themed roleplay." *Id.*

The fourth section, with the heading "Definitions," redefines two key terms originally described in the 2023 NOFO. *See id.* at 4-5. "Age appropriate" is redefined explicitly to exclude "material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content." *Id.* at 5. "Medically accurate" materials or instructions are redefined as "expected to include information on a full range of health risks, so that minors and their parents or guardians can make fully informed decisions." *Id.* This definition goes on to state: "[c]ontent that is not 'medically accurate' may include inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." *Id.* The Notice cautions that the "terms 'health equity,' 'equitable environment,' 'inclusivity,' and 'adolescent-friendly services' should not be construed to exceed the statutory scope of the TPP program, as described above, or to permit unlawful diversity, equity, or inclusion-related discrimination." *Id.*

Lastly, under the heading "Compliance," the July Policy Notice states that recipients "agree to comply with Department regulations and policies in their grant terms, and those determined noncompliant with the [Notice] may face grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a)." *Id.* "TPP Program grant recipients are expected to ensure all program materials comply with this [Notice,]" and "[m]aterials or activities outside the TPP Program's statutory scope, including those that are not 'medically accurate,' 'age appropriate,' or are unrelated to reducing teen pregnancy" are "not allowable." *Id.* The Notice acknowledged that existing programs, despite being approved, may no longer comply with these expectations: "[F]or the reasons described above, the prior administration erred in approving" materials no longer considered "medically accurate" or "age appropriate" and "that approval exceeded the agency's authority." *Id.* at 5-6. As a result, "compliance with this [Notice] may require some grantees to revise their TPP Program curricula and content." *Id.* The "need to comply with the statutory requirements of the TPP Program, Presidential Executive Orders, and the U.S. Constitution outweighs such burdens," however. *Id.* The July Policy Notice states plainly that the agency will no longer "fund materials or activities outside the TPP Programs' statutory scope" and thus may "re-evaluate the effectiveness of programs" and "impose additional conditions on grantees" as necessary. *Id.*

**B. Procedural Background**

***5** Plaintiffs challenged changes to the TPP program in the March NCC Guidance in a separate case starting this past spring, but the instant suit concerns the legality of the July Policy Notice.

**1. *NCC Guidance Lawsuit***

In May 2025, the three plaintiffs in the instant lawsuit, along with two other Planned Parenthood entities, sought preliminary relief enjoining the March 2025 NCC Guidance, *see PPGNY v. HHS*, No. 25-cv-1334 (TJK), Compl., ECF No. 1, arguing that the new requirements were "impossible" for them to meet and violated their APA and constitutional rights, *see id.*, Pls.' Mem. in Supp. of Mot. for PI at 1-3, ECF No. 8-1.[3] They anticipated that their NCC applications would be denied because they did not agree to align with all executive orders ("EOs"), as the March NCC Guidance required. *See id.* at 16-17. Their motion for a preliminary injunction was denied, however, based on a finding that their identified harm was too contingent and consequently, they failed to demonstrate the requisite imminent, irreparable harm. *See id.*, 2025 WL 1768100, at *1 (D.D.C. June 26, 2025). Despite plaintiffs' expressed belief that their applications would be denied, the court recognized that if HHS granted plaintiffs' applications, "they will not suffer irreparable harm at all," and if HHS denied them, HHS had agreed to hold their funding in

obligation until August 31, so the irreparable harm would not accrue until then. *Id.* at *4. The court subsequently, pursuant to a proposal by the parties, set an expedited briefing schedule for dispositive motions that would be ripe ten days prior to August 31. *See id.*, Min. Order (July 8, 2025).

As already mentioned, plaintiffs' NCC applications were approved on July 2, 2025. Given this approval, plaintiffs voluntarily dismissed the litigation challenging the March NCC Guidance that was focused on the NCC application process, *see id.*, Notice of Voluntary Dismissal, ECF No. 34 (filed July 11, 2025), and that case was then closed on July 14, 2025.

**2. *Initiation of this Lawsuit and Motion for TRO***

About three weeks after the first case was closed, on Tuesday, July 29, 2025, plaintiffs filed the instant suit, which was randomly assigned to the undersigned, challenging the July Policy Notice as generally making plaintiffs stuck between a proverbial rock and a hard place. *See* Compl., ECF No. 1. Despite having access to grant funds after approval of their NCC applications, plaintiffs contended they could not draw down funds from their accounts without certifying compliance with the July Policy Notice but such certification could not be made without substantially changing their programs in a way they believed would contradict the statutory requirement of implementing effective programs under Tier 1; and if they nonetheless certified compliance in protest, plaintiffs could be subject to arbitrary enforcement proceedings and subject to financially ruinous claw back of funds already expended. *See id.* ¶¶ 100-01. The July Policy Notice could be read, for instance, to require them to conduct abstinence-only programming, which has been proven ineffective, and to eliminate important components of their curricula, such as LGBT+-inclusive content. *See* Compl. ¶¶ 74, 83, 102. Their Complaint seeks vacatur of the July Policy Notice, asserting claims under the Administrative Procedure Act that the July Policy Notice is contrary to the Constitution under the Due Process Clause and the First Amendment, contrary to the TPP program authorizing statutes, and arbitrary and capricious, as well as an *ultra vires* cause of action. *Id*. ¶¶ 129-85.

***6** Concurrently with initiating this suit, plaintiffs PPGNY and PPCCC sought a temporary restraining order ("TRO") by Thursday, July 31, 2025, the date on which their financial situation would force them either to certify compliance with HHS's allegedly unlawful requirements in order to draw down funds from their NCC award accounts or to shut down their programs, if the July Policy Notice was not vacated. *See* Pls.' Mot. for TRO at 1-2, ECF No. 3.

This Court held an in-person hearing on July 31, 2025, and denied the requested relief in an oral ruling because plaintiffs lacked irreparable harm. *See* Min. Entry (July 31, 2025); Hr'g on Mot. for TRO Tr. ("TRO Hr'g Tr.") at 60:17-20, ECF No. 18. The Court reasoned that the possible risk of arbitrary enforcement did not constitute immediate irreparable harm, given uncertainty as to when or how the July Policy Notice would be enforced. *See* TRO Hr'g Tr. at 62:25-63:19. Further, plaintiffs' unexplained delay in seeking relief until the last minute—given that plaintiffs were aware of the July Policy Notice since July 2, even prior to dismissing their first suit pending before another Judge—weighed against granting relief. *See id.* at 65:10-19.

The next day, plaintiffs requested "clarification" of this Court's order. *See* Pls.' Emergency Motion to Clarify Order, ECF No. 17. Plaintiffs expressed their understanding that the Court "determined that there is no irreparable harm because Plaintiffs currently have the option to draw down funds unless and until the Policy Notice is enforced against them" and requested clarification that they could indeed "draw down funds without exposing themselves to risk of clawback or liability." *Id.* at 1-2. This motion was denied, given that, as defendants had argued, plaintiffs were not afforded any relief requiring clarification. *See* Min. Order (Aug. 2, 2025). Nonetheless, the Court noted that defendants themselves had implied in their briefing that plaintiffs could draw down funds "under protest," but expressed no further opinion on that possibility. *See id.* The Court further explained that because the Policy Notice was not self-effectuating, any enforcement requiring plaintiffs to change their programs in a detrimental way was too speculative to satisfy the stringent imminent and irreparable harm standard at the temporary restraining order stage. *See id.*

Since the denial of the TRO, plaintiffs have been forced to make the difficult choice they had anticipated, between drawing down funds in protest, which would risk enforcement proceedings, complying with the July Policy Notice despite its seemingly problematic dictates, and refusing federal money altogether. *See* Compl. ¶¶ 100-01. Plaintiffs have all refrained from drawing down funds for their year three expenses. *See* Pls.' SMF ¶ 49; Defs.' Reply in Supp. of MTD ("Defs.' Reply") at 4 & n.2, ECF No. 30 (agreeing with this fact, despite defendants' previous contestation made in error). PPH and PPCCC have relied on reserves to keep their

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

programming going for a short time, while PPGNY has had to halt its programming in the absence of the grant money. *See* Pls.' SMF ¶¶ 51-53; Defs.' SUF ¶¶ 51-53 (not contesting facts but denying materiality as facts are outside the administrative record).

**3. *Defendants' Motion for Transfer***

Following denial of plaintiffs' TRO, defendants moved to transfer this case to the Judge who presided over the prior dismissed case, pursuant to D.D.C. Local Rule 40.5, which allows for reassignment where two cases are related. *See* Defs.' Mot. to Transfer Case, ECF No. 19. Plaintiffs opposed. *See* Pls.' Opp'n to Defs.' Mot. to Transfer, ECF No. 21. This motion to transfer was denied because, despite the similar subject matter and overlapping parties between the first case challenging the March NCC Guidance and the instant matter challenging the July Policy Notice, the two cases are not technically related under the Local Rules. *See* Min. Order (Aug. 13, 2025). As this Court explained, for a case to be deemed related to a *closed* matter, the case must involve the "same parties" and "same subject matter," LCvR 40.5(a)(4), which has been interpreted to mean "identical parties," not parties in interest or merely overlapping parties, *see id.* (quoting *Wilderness Soc'y v. Bernhardt*, No. 20-cv-1176 (BAH), 2021 WL 2849635, at *2 (D.D.C. June 2, 2020)). The earlier dismissed case had two additional Planned Parenthood entities that are not plaintiffs in this case, so the parties are not identical under Local Rule 40.5(a)(4). *See id.* The random assignment of this case has therefore remained before this Court.

**4. *Pending Motions***

***7** The same day as defendants filed the motion to transfer, plaintiffs moved for a scheduling order for expedited summary judgment briefing. *See* Pls.' Mot. for Scheduling Order, ECF No. 20. Feeling the financial constraints resulting from not drawing down on awarded grant funds, plaintiffs proposed a schedule to ensure the summary judgment motion would be ripe by mid-September and proposed that defendants provide the administrative record within 30 days of this Court's resolution of the summary judgment motion, assuming the motion were denied. *See id.* Defendants opposed. *See id.* ¶ 4 (indicating defendants' opposition); *see also* Defs.' Mot. to Transfer (filed on the same day as plaintiffs' motion for a briefing schedule).

Concurrently with denying defendants' transfer motion, this Court granted plaintiffs' motion for a scheduling order and imposed the requested schedule. *See* Min. Order (Aug. 13, 2025). Anticipating the difficulty of resolving a summary judgment motion regarding agency actions about a complex grant program in the absence of an administrative record or any stipulated facts and recognizing the urgent time constraints raised by plaintiffs facing financial duress, this Court invited the parties to follow the procedures in D.D.C. Local Rule 7(h)(1), which instructs the parties to provide statements of material fact and responses to the other side's statements, despite that rule not generally applying to APA actions, such as this one. *See id.*; *see also, e.g., Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, ––– F. Supp. 3d ––––, 2025 WL 1795090, at *21 (D.D.C. June 30, 2025) (denying cross-motions for summary judgment in an APA case due to the deficient factual record, including the lack of an administrative record and no "statement of undisputed or disputed material facts that would have assisted in clarifying whether either side satisfied the applicable standard for summary judgment"). If the administrative record could not be produced in time for adjudication of plaintiffs' motion, such a procedure would facilitate at least an abbreviated understanding of the basic, undisputed factual premises in this case.[4]

Plaintiffs moved for summary judgment on Counts I, III, IV, and V of their Complaint, which, respectively, allege that the July Policy Notice is constitutionally defective, contrary to statute, and arbitrary and capricious, all in violation of the APA (Counts I, III, and IV), and *ultra vires* (Count V). *See* Pls.' MSJ.[5] Defendants filed a cross-motion to dismiss contemporaneously with their opposition, *see* Defs.' Cross-Mot. to Dismiss; Defs.' Opp'n, resulting in an extended briefing schedule to accommodate full briefing on both motions. *See* Min. Order (Sep. 11, 2025) (instructing defendants to file their final reply in support of their motion to dismiss by September 26, 2025). Defendants also lodged a notice of contents of the administrative record simultaneously with their motion. *See* Notice of Contents of Admin Record ("AR"), ECF No. 23. Both motions are now ripe for resolution.

## II. APPLICABLE LEGAL STANDARDS

### A. Motion to Dismiss

**1. *Federal Rule of Civil Procedure 12(b)(1)***

***8** To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must demonstrate that the court has subject matter jurisdiction. *See Arpaio v.*

*Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), so they "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Commission on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Absent subject matter jurisdiction, the court must dismiss the case. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)).

If a jurisdictional argument "present[s] a dispute over the factual basis of the court's subject matter jurisdiction, "the court must go beyond the pleadings and resolve" any dispute necessary to resolve the motion to dismiss. *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (alteration in original) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Otherwise, the court accepts as true "material factual allegations in the complaint." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

**2. *Federal Rule of Civil Procedure 12(b)(6)***

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The plaintiff must plead facts not " 'merely consistent with' a defendant's liability" but "that allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 557 (2007)).

In deciding a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true, "even if doubtful in fact," *Twombley*, 550 U.S. at 555, though the court does not "assume the truth of legal conclusions ... or 'accept inferences that are unsupported by the facts set out in the complaint.' " *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

**B. Summary Judgment**

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A fact is considered "material" only "if a dispute over it might affect the outcome of a suit under governing law," and a dispute is only "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). In other words, the central question is whether "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)). The non-movant must "support an assertion that a fact is genuinely disputed with materials in the record." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020) (citing FED. R. CIV. P. 56(c)).

***9** A party may move for summary judgment "at any time," FED. R. CIV. P. 56(b), "even as early as the commencement of the action," *id.* 56(c)(1), committee's note to the 2009 amendment, but "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had," *id.* 56(b) committee's note to 2010 amendment. In such circumstances, the factual record may be underdeveloped, *see id.* 56(c). If, however, "whatever is before the district court," whether presented through stipulated facts, affidavits, or other record evidence, "demonstrates that the standard for the entry of summary judgment ... is satisfied," the movant shall prevail. *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1120 (D.C. Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

**III. DISCUSSION**

Despite defendants' efforts to manufacture sundry barriers to review of the July Policy Notice, plaintiffs have demonstrated that they are entitled to summary judgment on Count IV of their Complaint, asserting that the July Policy Notice is arbitrary and capricious. This Court has jurisdiction to consider plaintiffs' challenges, on both constitutional and statutory grounds, to an agency guidance document that qualifies as a final agency action. The July Policy Notice imposes binding legal obligations on plaintiffs, setting out new requirements in an incomprehensibly vague fashion, inviting arbitrary enforcement in violation of the APA. As a result, the July Policy Notice must be vacated and its

enforcement enjoined, and defendants' motion to dismiss denied.

**A. Standing**

To satisfy the "irreducible constitutional minimum of standing," a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical,' "—that is "trace[able] to the challenged action of the defendant" and likely redressable "by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). Defendants argue that plaintiffs lack standing to assert their claims because they do not suffer an imminent injury and their injury is not fully redressable by the requested remedy of vacatur. *See* Defs.' Opp'n at 11-15. Defendants further argue that plaintiffs' claims lack ripeness because the July Policy Notice is not presently fit for review, describing its scope and application as too unclear at this pre-enforcement stage. *See id.* at 13-14. To the contrary, plaintiffs are presently injured by the July Policy Notice, which injury may be relieved by the vacatur requested, and review is proper at this stage. No constitutional or prudential standing barrier prevents considerations of plaintiffs' claims, so defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

**1. *Injury***

Defendants first argue that because no affirmative enforcement steps against plaintiffs have yet been taken, plaintiffs have only established a "possible future injury," "as opposed to the 'certainly impending' injury necessary for standing purposes." Defs.' Opp'n at 12 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Defendants overlook, however, that even in advance of enforcement, the July Policy Notice presently injures plaintiffs by requiring them to conform to its mandates or face the threat of suspension, termination, and risk of the clawback of any funds plaintiffs may spend, which defendants do not dispute.[6] *See* Pls.' Mem. at 13 (citing 45 C.F.R. §§ 75.403-05 for risk of clawback and other sanctions); TRO Hr'g Tr. at 46:12-47:3, 47:12-48:16 (raising the issue of potential clawback of funds on several occasions, which defendants did not dispute).

***10** As a fundamental principle, regulated entities may challenge the rules that govern them. *See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (" '[T]here is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal rule or statute under which it is regulated." (quoting *Lujan*, 504 U.S. at 561-62)). The July Policy Notice imposes specific requirements on plaintiffs and expressly warns of clear consequences for noncompliance, thereby regulating plaintiffs' conduct. Plaintiffs must expend resources analyzing and modifying their curricula to conform to these new requirements. The Policy Notice thus sufficiently injures plaintiffs to establish their standing. *See Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 484 (D.C. Cir. 2021) (explaining that because the plaintiff was "within the regulated class of persons covered by the disputed directives, which "required[ ] [him] to make significant changes" (internal quotation marks and citation omitted) and exposed him to sanctions if he failed to observe the rules, plaintiff established constitutional standing and his claims were ripe for review).

Defendants' contention that plaintiffs face only a premature, anticipated injury is incorrect. The law clearly recognizes an injury due to a credible threat of enforcement. A regulated entity need not violate requirements or wait for an enforcement action in order to challenge the requirements to which the entity is already subject. *See, e.g., Corbett*, 19 F.4th at 483 ("Because [plaintiff] is the target of TSA regulations, he faces the threat of enforcement and ensuing penalties should he fail to comply," which causes plaintiff injury and thus establishes constitutional standing.); *State Nat'l Bank*, 795 F.3d at 54 ("[R]egulated parties generally need not violate a law in order to challenge the law." (citing *Abbot Lab'ys. v. Gardner*, 387 U.S. 136, 152-53 (1967))).

Defendants compare plaintiffs' situation to that of the plaintiffs in *Clapper*, 568 U.S. at 404, and in *State National Bank*, but in both of those cases, whether the challenged law would *ever* be applicable or relevant to plaintiffs was highly uncertain. *See* Defs.' Reply at 2-3. In *Clapper*, "attorneys and human rights, labor, legal, and media organizations," who sometimes conducted sensitive and privileged telephone calls with individuals abroad, challenged a provision of the Foreign Intelligence Surveillance Act ("FISA") Amendments Act authorizing the government to conduct electronic surveillance of foreign persons abroad without probable cause that the target is a foreign power or agent of a foreign power. 568 U.S. at 404-06. The Supreme Court explained that the alleged injury in fact rested on a "highly speculative fear" relying on a "chain of contingencies"—in particular, that their foreign contacts would be targeted, that the government would invoke the particular challenged provision to justify their surveillance instead of other authorities, that the FISA Court would

conclude the preconditions to using that provision satisfied, and that the government would succeed in intercepting their communications. *See id.* at 410-14. The Supreme Court emphasized that plaintiffs had no basis for thinking their contacts would be targeted and their theory relied on "speculation about the decisions of independent actors," including the FISA Court. *See id.* at 411-14.

Similarly, in *State National Bank*, plaintiffs challenged the Dodd Frank Act's "orderly liquidation authority," which "g[ave] the Government broad power to liquidate failing financial institutions that pose a significant risk to the stability of the U.S. financial system." 795 F.3d at 55-56. Plaintiffs based their standing on their investments in financial companies and the concomitant possibility they could be potential creditors if management of those companies made decisions prompting possible future liquidations or reorganizations, which by operation of this law, could injure their interests. *See id.* at 56. The D.C. Circuit there explained that the statute would only impact plaintiffs "*if* a company in which they are invested is liquidated or reorganized by the Government, and only *if* [they] are then treated differently from other similarly situated creditors." *Id.* (emphasis in original). These preconditions to the application of the statute to them rendered their injury speculative and insufficient for standing. *Id.*

***11** By contrast to the plaintiffs in both *Clapper* and *State National Bank,* here, plaintiffs, as recipients of TPP grants, are presently subject to the requirements imposed on the funding of those grants. There is no prerequisite third-party action —by government entities, as in *Clapper*, or by investment companies, as in *State National Bank*—that needs to occur first to make the July Policy Notice applicable and relevant to plaintiffs. *Cf. Am. First Legal Found v. Greer*, No. 24-5168, slip op. at 6 (D.C. Cir. Oct. 3, 2025) (holding that plaintiff lacked standing where the injury relied on "speculation about choices by two government agencies not party to this lawsuit" because "causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts" (second passage quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024))). Unlike the plaintiffs in those cases, the July Policy Notice forces plaintiffs to take action to comply now. The only uncertainty in plaintiffs' impending injury is wholly within the single-decision-making authority of HHS as to whether, when and how HHS will enforce its own rules. That is far less than the kind of broad speculation and hypotheticals about the series of decisions required as preconditions to the injuries contemplated in *Clapper* and *State National Bank*.

Defendants try to manufacture more uncertainty by stating that the July Policy Notice does not yet actually apply to plaintiffs because they have not drawn down funds and thus are not even subject to the July Policy Notice. *See* Defs.' Reply at 4-5. That technicality makes no difference: Plaintiffs have only refrained from drawing down funds to avoid the funds being clawed back after they have spent them should they be subject to an adverse enforcement action. This kind of uncertainty is akin to a plaintiff not violating a criminal prohibition—though he thinks it violates his constitutional rights—to avoid going to jail. The law generally does not require a plaintiff to incur penalties or directly put himself in the line of fire before bringing suit. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." (emphasis in original) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007))).

Moreover, defendants' argument that plaintiffs' purported "Hobson's choice"—either "accept the terms of their Notices of Award and the potential for future enforcement actions by drawing down funds, or refuse to accept the terms and decline federal funding"—does not give rise to standing, is undermined by recent authority. Defs.' Reply at 3-4. Courts have, in fact, recognized an imminent injury-in-fact where administrative action sets up a kind of "forced choice" between (1) "chang[ing] [plaintiffs'] programming" in a way plaintiffs believe to be unworkable, (2) "certify[ing]" compliance "without changes and risk[ing] false certification," and (3) "giv[ing] up federal funds." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 85 (D.D.C. 2025) (citing *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024)). Plaintiffs were forced into the last option, as evinced by their choice not to draw down funds, which has caused present injury to their programming and finances, an injury so severe, in fact, that PPGNY has ceased providing the programming altogether, pending resolution of this case, and the two other plaintiffs have reallocated limited internal funds in order to continue their TPP programs for a short period of time. Pls.' SMF ¶¶ 51-53; Defs.' SUF ¶¶ 51-53 (not contesting facts but denying materiality as facts are outside the administrative record). This establishes their constitutional injury to bring suit.

**2. *Redressability***

Defendants next argue that "[e]ven if the Court concludes there is a cognizable injury-in-fact in this case," plaintiffs' injuries "are not redressable by the relief they seek in their motion for summary judgment." Defs.' Opp'n at 14. Defendants point out that plaintiffs seek broad relief in their complaint, including enjoining defendants from implementing, giving effect to, or relying on the requirements in the July Policy Notice. Defs.' Opp'n at 14. Yet, because that relief is akin to "enforc[ing] a contractual obligation to pay money," and federal district courts are precluded from enforcing contractual obligations to pay money by the Tucker Act's grant of exclusive jurisdiction to the Court of Federal Claims ("CFC"), plaintiffs in their summary judgment briefing request only vacatur of the July Policy Notice. *Id.* (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025)); Pls.' Mem. at 37-38; Pls.' Proposed Order MSJ, ECF No. 22-10. According to defendants, this slimmed-down relief request to avoid the Tucker Act's jurisdictional barrier nonetheless fails because vacatur "alone would not accomplish anything of substance." Defs.' Opp'n at 14. In defendants' words, the July Policy Notice simply "sets forth HHS's understanding of what the terms and conditions of Plaintiffs' grants already require," so "HHS would still be free to pursue enforcement proceedings against any grantee" even without the July Policy Notice on the books. *Id.* Although recognizing that the recent Supreme Court emergency stay order in *NIH v. American Public Health Association*, 145 S. Ct. 2658, 2661 (2025), preserved federal district courts' jurisdiction over APA claims regarding "agency guidance," while also indicating that claims challenging individual grant terminations may need to be brought before the CFC, defendants nevertheless suggest that claims regarding "agency guidance" are not redressable and therefore not, in fact, reviewable by this Court at all. Defs.' Opp'n at 15.

***12** Defendants, in other words, present plaintiffs with another Hobson's choice that would have the consequence of disallowing federal grant recipients from challenging agency policies under the APA altogether. In defendants' framing of the jurisdictional issue, plaintiffs can bring a suit before the CFC, but because the CFC is limited to review of contractual disputes, they could only obtain review of discrete grant terminations, not APA review of agency decision-making, *see Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (*en banc*) ("[T]he Court of Federal Claims lacks APA jurisdiction."); or, plaintiffs can bring a suit in federal district court, but because this Court cannot order the agency to pay out funds, vacating the Policy Notice gives plaintiffs no effective relief and thus this Court would lack jurisdiction. *See* Defs.' Opp'n at 14-15. Under defendants' reasoning, the July Policy Notice would be wholly immune from review.

Fortunately, the law is not so perverse in restricting any opportunity for judicial review of agency action, as defendants urge. Defendants' framing assumes that the July Policy Notice does not cause plaintiffs any present injury and is not a final agency action, so vacatur offers plaintiffs no relief whatsoever. As explained, however, *supra* Part III.A.1 (regarding injury); *see also infra* Part III.B.1 (regarding final agency action), the July Policy Notice imposes requirements on plaintiffs, causing them a present injury through forcing their compliance. Vacating the July Policy Notice and enjoining its enforcement alleviates that harm, even if, as defendants argue, HHS could enforce the same requirements in its absence, based on the EOs and terms of the grants themselves.[7] Courts have recognized that a plaintiff need not "solve all roadblocks simultaneously." *Corbett*, 19 F.4th at 484 (quoting *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012)). The possibility that HHS may choose to enforce similar requirements through different means does not render this opinion merely "advisory" and plaintiffs' present injury not redressable. *Id.* (explaining that "[m]erely because" plaintiff may be subject to the same requirements through other agency rules, plaintiff is "not preclude[d]" "from challenging" a single set of directives); *see also* Pls.' Opp'n at 9 ("[T]he possibility that HHS could seek to terminate awards on *other* grounds makes no difference. When an agency action—here, the Policy Notice—causes plaintiffs harm, setting that action aside redresses it." (emphasis in original)).[8]

***13** The Supreme Court's fractured decision in *NIH* supports this conclusion. Although the Court had five votes in favor of restricting review of the grant terminations at issue to the CFC, the Court also had five votes in favor of district courts exercising jurisdiction over challenges to agency policies and guidance documents when those embody final agency actions, holding that the Tucker Act did not bar such review. 145 S. Ct. at 2659. The latter five justices, including Justice Barrett as the deciding vote, clearly did not anticipate this to be an empty promise for judicial review, where plaintiffs could never achieve review of agency guidance in federal court for lack of jurisdiction due to inability to redress any injury. They contemplated that courts would be able to vacate unlawful agency policies, despite their inability to force payment of individual grants. *See id.* at 2660-62 (Barrett, J., concurring); *see also id.* at 2671 (Jackson, J., concurring

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

in part) (summarizing the order as holding that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law"). [9]

Finally, defendants' suggestion that an opinion expressed in this case about the legality of the July Policy Notice would amount to an "advisory opinion ... in advance of any actual enforcement decision," Defs.' Opp'n at 15, is clearly contrary to the long line of precedent allowing for pre-enforcement review of agency action. *See supra* Part III.A.1; *infra* Parts III.A.3, III.B.1. Indeed, the entire scheme of arbitrary-and-capricious review established in the APA, 5 U.S.C. § 706(2)(A) (instructing courts to "set aside agency action found to be ... arbitrary [or] capricious"), allows for review of an agency policy on a whole, whether before or in response to enforcement, not piecemeal adjudication of specific applications of agency policy. Vacating the July Policy Notice would meaningful redress plaintiffs' injury caused by that Notice, establishing their constitutional standing to challenge it now.

**3. *Ripeness***

In addition to defendants' constitutional ripeness argument incorporated into their discussion of the lack of imminent injury, defendants make a prudential ripeness argument, contending that the July Policy Notice is not yet fit for judicial review and the "standard process" would be to wait until an enforcement action is brought. Defs.' Opp'n at 13-14.

Ripeness has both constitutional and prudential components. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430-32 (D.C. Cir. 1996). The constitutional ripeness inquiry is captured by the imminence feature of the injury-in-fact requirement. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) ("Constitutional ripeness 'is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending.' " (additional internal quotation marks and citation omitted) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012))). The prudential component considers "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Nat'l Treasury Emps. Union*, 101 F.3d at 1431-32 (quoting *Abbott Lab'ys.*, 387 U.S. at 149). The "rationale underlying the [prudential] ripeness doctrine" is avoiding unnecessarily resolving disputes on the theory that "[i]f we do not decide it now, we may never need to." *Id.* Defendants state that "[p]laintiffs' claims meet both prongs of this test." Defs.' Opp'n at 13. Both plaintiffs and this Court would agree—although with a different outcome than what defendants mean to suggest.

***14** As an initial matter, pre-enforcement challenges to agency policies are commonplace and frequently considered ripe for review. *See, e.g., Abbott Lab'ys.*, 387 U.S. at 148 (permitting pre-enforcement review of an FDA regulation); *Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011) (*en banc*) (explaining that "[t]his court has long understood ... *Abbott Labs* to incorporate a presumption of reviewability" in the context of pre-enforcement action (quoting *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005)); *see also Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) ("Bellion's challenges are fit for judicial decision because they involve final agency action and because 'judicial intervention' would not 'inappropriately interfere with further administrative action.' " (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998))). Applying the two-factor inquiry here, *see National Treasury Employees Union*, 101 F.3d at 1431-32, this dispute is likewise ripe.

Regarding the fitness of issues for judicial decision, defendants argue that the July Policy Notice "is a document of general applicability," so review "is likely to stand on much surer footing in the context of a specific application." Defs.' Opp'n at 13 (second passage quoting *Nat'l Treasury Emps. Union v. Vought ("NTEU")*, 149 F.4th 762, 785-86 (D.C. Cir. 2025)). Plaintiffs' claims are largely, however, purely legal questions that do not require additional factual development or specific factual application to evaluate. *See Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003) (If "the petition for review presents a purely legal question, ... it is presumptively reviewable." (quoting *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739 (D.C. Cir. 1990)). Whether the July Policy Notice is unconstitutionally vague or whether certain of its terms directly contradict the statute can be evaluated outside of the context of examples of agency application. *See* Compl. ¶¶ 129-45, 154-85 (Counts I, III, IV, V); *see infra* Part III.B.2. While the "exact scope" of the agency's planned enforcement certainly is "unclear," as defendants argue, that does not counsel in favor of delaying review in this case. Defs.' Opp'n at 13 (quoting *NTEU*, 149 F.4th at 785). Defendants cannot hide behind their own Policy Notice's vagueness to avoid judicial scrutiny. *See infra* Part III.B.2.

Moreover, defendants do not suggest that they are releasing additional guidance soon or that plaintiffs do not have to

comply with the July Policy Notice's requirements until given specific, individualized directives from the agency, such that the Policy Notice is merely a warning letter with more clarity to come. Concerns animating the ripeness doctrine about "protect[ing] agency ability to 'deliberate and craft policy free of judicial interference,' " when agency policy has not yet crystallized are therefore not present here. *See Nat'l Mining Ass'n*, 324 F.3d at 757-58 (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986)). The first factor therefore indicates review is appropriate now.

Regarding the second consideration—hardship to the parties of withholding court consideration—defendants state perfunctorily that waiting until an actual enforcement action is "par for the course," even where the consequences for plaintiffs may be drastic. Defs.' Opp'n at 13-14 (quoting *NTEU*, 149 F.4th at 786). Since the first factor strongly favors review, the second factor here cannot be dispositive and is ultimately inconsequential. Where "there are no significant agency or judicial interests militating in favor of delay" in the first factor, the D.C. Circuit has held that "[lack] of hardship cannot tip the balance against judicial review." *Nat'l Mining Ass'n*, 324 F.3d at 756-57 (alteration in original) (quoting *Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990)) (explaining that "[i]f we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay" (alteration in original)). Nonetheless, because plaintiffs *would* face serious hardship from delay, this factor further reinforces that review should be conducted now.

***15** Put simply, plaintiffs are presently facing hardship from the July Policy Notice, and that harm will continue to accrue until the July Policy Notice is vacated. Plaintiffs are incurring costs evaluating their programs and determining how they might possibly comply with the July Policy Notice and have had to either dip into their reserves to keep programming running or halt their programming altogether. *See supra* Part I.B.2. Plaintiffs' financial hardship due to the fear of enforcement will only exacerbate with time, even absent any actual enforcement action.

Defendants suggest that plaintiffs will have a later opportunity to bring suit because defendants "must follow its grant regulations in order to take any specific enforcement actions against particular grantees." Defs.' Opp'n at 13. Defendants' point is both irrelevant and wrong. First, whether plaintiffs might have another, later opportunity to bring suit does not matter when plaintiffs are being harmed by the July Policy Notice now and therefore seeking relief now. Second, defendants seem to envision some kind of *pre*-termination process that will essentially invite plaintiffs to bring suit at some time once enforcement is initiated but before termination occurs. Nothing in the grant regulations cited by defendants, however, requires any such formal process prior to the actual termination or suspension of plaintiffs' grants. Section 75.371 of Title 45 of the Code of Federal Regulations allows HHS to "wholly ... suspend or terminate [a] Federal award" if HHS "determines that noncompliance cannot be remedied by imposing additional conditions," but does not require that HHS, in practice, try out imposing additional conditions before making that determination. HHS could reach that drastic conclusion of termination at the outset. Further, while defendants must *notify* recipients of termination and give an opportunity for objection, that opportunity can seemingly follow the elimination of funding. *See id.* § 75.372(b) (instructing reporting on the termination); *id.* § 75.373(a) (instructing HHS to provide a notice of termination); *id.* § 75.374(a) ("Upon taking any remedy for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action."). As a result, plaintiffs will not necessarily have a later opportunity to challenge the new requirements in the July Policy Notice at some initial enforcement stage before suffering serious, additional harm from losing their grants altogether.

Additionally, defendants' suggestion that plaintiffs may "protect all of their rights and claims by returning to court when the controversy ripens" is ironic, Defs.' Opp'n at 13 (quoting *NTEU*, 149 F.4th at 786), considering defendants have insisted that plaintiffs cannot get relief from the terminations of their grants before this Court, *see id.* at 14, so any later suit would suffer the same redressability problem that defendants contend is present now, *id.* at 14-15. The instant suit is clearly an opportune time for plaintiffs to seek relief. Consequently, prudential ripeness considerations weigh in favor of review. [10]

* * *

***16** Plaintiffs have sufficiently demonstrated this Court's jurisdiction over all of their claims and the suitability of this suit for review. Defendants' motion to dismiss based on Rule 12(b)(1) is denied.

**B. APA Claims**

Turning to the substance, then, of the claims at issue, plaintiffs have appropriately challenged a final agency action, making review under the APA available. Plaintiffs have also demonstrated that the July Policy Notice is arbitrary and capricious because the Policy Notice is incomprehensibly vague and lacking sufficient reasoned explanation.

At the outset, defendants take issue with the procedural posture of this case—plaintiffs' filing of a summary judgment motion before the lodging of a complete administrative record. *See supra* n.4. Though applicable procedural rules make clear that parties may move for summary judgment "at any time" before discovery closes, FED. R. CIV. P. 56(b), defendants insist that plaintiffs should have waited since APA cases must be resolved on the record before the agency at the time the agency made its decision, not a record subsequently generated by plaintiffs. *See* Defs.' Opp'n at 15-16. Defendants urge that any extra-record evidence presented by plaintiffs, such as the declaration from Dr. Leslie Kantor, *see* Pls.' MSJ, Ex. A, Decl. of Dr. Leslie Kantor ("Kantor Decl."), ECF No. 22-3, should be deemed improper, especially given that plaintiffs have not even attempted to meet the high standard for supplementation of the administrative record. *See* Defs.' Opp'n at 16-17. [11] This point is, however, essentially moot, since defendants lodged the notice of contents of the administrative record during the briefing of these pending motions. *See supra* n.4. The administrative record is thus before the Court, and the parties had an opportunity to review that record and make relevant arguments. Certainly, any records that defendants intended to use to defend against plaintiffs' arguments on summary judgment should be included in that record and referenced in their briefing. Consideration of plaintiffs' motion for summary judgment is therefore entirely appropriate.

In any case, as plaintiffs perhaps anticipated, the administrative record makes little difference in this case, given that the materials included are so sparse and either largely already on the docket or publicly available. Consisting of only twenty-two documents, the majority of these documents (fifteen) are HHS notices directed specifically to plaintiffs or plaintiffs' submissions directly to HHS. [12] Additionally the record includes the 2023 NOFO, the 2025 NCC Guidance from January and March 2024, a document, updated March 2025, titled "Expectations for TPP23 Tier 1 Recipients," the July Policy Notice, an "HHS Grants Policy Statement" in effect from October 2024 to April 2025, and a July 2, 2025, press release about the July Policy Notice. *See* AR; *see also* Pls.' MSJ, Ex. G, July Policy Notice; Defs.' Opp'n to Pls.' Mot. for TRO, Ex. B, Jan. 2025 NCC Guidance, ECF No. 14-2; HHS Grants Policy Statement, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024-archived.pdf; OASH, HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Program Grants (July 2, 2024), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-children-and-ensure-parental-oversight-teen. This record lacks the kinds of comments from interested parties, declarations from decisionmakers, memoranda and analysis describing decision-making considerations and alternatives, email exchanges, scientific studies, and so forth often contained in administrative records. *See, e.g., Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 628 F. Supp. 3d 189, 207 n.10, 213, 214 n.15 (D.D.C. 2022) ("The ... Rule's administrative record totals 11,333 pages and includes regulations; environmental impact statements; reports, analyses, and technical memoranda for the rulemaking; and public comments."). As later discussed, *see infra* Part III.B.2(b), the administrative record is most useful in showing only what reasoning is lacking.

**1. *Final Agency Action***

***17** Defendants argue that the July Policy Notice is not a final agency action and therefore review is not available under the APA. *See* Defs.' Opp'n at 17. [13] The APA only allows for review of agency action that is considered "final." 5 U.S.C. § 704; *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014); *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (explaining that without final agency action, there is no "cause of action under the APA" (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003))). For an agency action to be final, it must be "*both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.' " *Nat'l Mining Ass'n*, 758 F.3d at 250 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Put another way, "[i]f an agency action announces a binding change in its enforcement policy which immediately affects the rights and obligations of regulated parties, then the action is likely final and subject to review." *Nat'l Env't Dev. Ass'n v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014); *see also* *Ciba-Geigy Corp.*,

801 F.2d at 436 ("Once the agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review."). The July Policy Notice is the consummation of the agency's decision regarding applicable changes to the TPP program and imposes binding obligations on plaintiffs with clear legal consequences for noncompliance. The Policy Notice is thus a final agency action under the APA.

*a) Consummation of Agency's Process*

"The consummation prong of the finality inquiry requires [the court] to determine whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue, or is, instead, only the ruling of a subordinate official, or tentative." *POET Biorefining*, 970 F.3d at 404 (quoting *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020)). A final agency action is thus "circumscribed" and "discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). "An agency action may" nonetheless "be final even if the agency's position is 'subject to change' in the future," as all laws are subject to change. *Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1006 (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)). The action may also be final despite taking a more informal form. *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("[W]e [have] rejected the proposition that if an agency labels its action an 'informal' guideline it may thereby escape judicial review under the APA." (citation omitted)). In *Ciba-Geigy Corp.*, the court held that a letter informing a regulated entity of a labeling requirement in response to an inquiry was a final agency action ripe for review. *See* 801 F.2d at 435-38; *cf. CropLife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (considering a press release articulating the agency's bar on considering third-party human studies in evaluating the safety of pesticides was a binding regulation to be reviewable because it "create[d] a 'binding norm' " "directly aimed at and enforceable against petitioners," who "are now barred from relying on third-party human studies" (quoting *Chamber of Commerce v. U.S. Dep't of Lab.*, 174 F.3d 206, 212 (D.C. Cir. 1999)). The crux of the inquiry is whether the action is official and presently in effect. *See Soundboard Ass'n*, 888 F.3d at 1267 (describing the central question as "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue").

***18** Here, the July Policy Notice was formally promulgated by HHS and does not contemplate any further deliberation or subsequent iteration. As plaintiffs put it, the Policy Notice "represent[s] HHS's 'last word on the matter,' " Pls.' Mem. at 10 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)), and reflects a "settled agency position" on the scope of the TPP program and its requirements, *Nat'l Env't Dev. Ass'n*, 752 F.3d at 1007 (quoting *Appalachian Power Co.*, 208 F.3d at 1023).

Defendants describe the July Policy Notice as simply "another interlocutory step in the agency's decision-making process of how to reconcile the directives of recently issued Executive Orders and the Supreme Court's decision in *Mahmoud* with the TPP Program," Defs.' Opp'n at 18, but, notably, they never suggest this Notice is merely tentative or a work-in-progress. Instead, defendants re-direct the focus by pointing to the several steps that must occur as part of the enforcement process. *See id.* Yet, the Supreme Court has held that where formally promulgated requirements are "made effective upon publication" with "compliance ... expected," the agency action is considered final regardless of whether any enforcement has occurred or any preliminary steps for enforcement have been initiated. *Abbott Lab'ys.*, 387 U.S. at 150-51. In short, contrary to defendants' suggestion, enforcement is not the only way to consummate agency decision-making. *See Ciba-Geigy Corp.*, 801 F.2d at 437 ("Having definitively stated its position ..., EPA has provided its final word on the matter '[s]hort of an enforcement action.' " (quoting *Harrison v. PPG Indus., Inc.*, 446 US. 578, 586 (1980))).

On reply, defendants shift to offer a more nuanced argument —an agency action must *either* involve enforcement or "notice-and-comment rulemaking" to be final. Defs.' Reply at 7-8. Defendants may accurately describe the July Policy Notice as "not involv[ing] an agency action even vaguely resembling an informal rulemaking," *id.* at 7, but the fact that the underlying process may be "informal" or otherwise deficient does not make the Notice any less a final agency action. *See Barrick Goldstrike Mines*, 215 F.3d at 48. Defendants' own citations also defy their proposed rule that a final agency action must be either a product of notice-and-comment rulemaking or already enforced. Defs.' Opp'n at 19 (citing *Frozen Food Express v. United States*, 351 U.S. 40 (1956)). In *Frozen Food Express*, the Court considered an APA challenge to an agency "order" issued after a public hearing interpreting a statutory provision exempting "agricultural" commodities from regulation. *See* 351 U.S. at 41. The Court described the agency's classifications of what commodities are "agricultural" as "in substance ...

'declaratory,' " alerting regulated entities of the agency's reading of the statute. *Id.* at 44. This made the action sufficiently final to be "justiciable" even though no enforcement action had been taken.

As a subsequent opinion explaining *Frozen Foods* in the context of final agency actions put it, "[a]lthough the order 'had no authority except to give notice of how the Commission interpreted' the relevant statute, and 'would have effect only if and when a particular action was brought against a particular carrier,' [the Court] held the order was nonetheless immediately reviewable" as it shaped the standard for the trucking business and warned that violators risked criminal penalties. *U.S. Army Corps. of Eng'rs v. Hawkes*, 578 U.S. 590, 599-600 (2016) (quoting *Abbott*, 387 U.S. at 150, and citing *Frozen Foods*, 351 U.S. at 44-45). Neither *Frozen Food* nor its subsequent interpretation in *Hawkes* discussed any formal rulemaking procedure or that its formality was essential to the analysis. The July Policy Notice is akin to the *Frozen Foods* order: It purports to merely interpret other laws, defining acceptable and unacceptable conduct and warning of penalties. That is enough to be the final consummation of agency process.

*b) Legal Consequences*

***19** "Proceeding to the second question under *Bennett*, 'whether an agency action has direct and appreciable legal consequences,' [courts] 'pragmatic[ally]' focus on 'the concrete consequences [the] action has or does not have as a result of the specific statutes and regulations that govern it." *POET Biorefining*, 970 F.3d at 405 (second and third alterations in original) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)). "For a purported guidance document, the basic question is 'whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule.' " *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (quoting *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015)). "Policy statements," as the D.C. Circuit has explained, "are binding on neither the public nor the agency" such that the agency "retains the discretion and the authority to change its position ... in any specific case." *Id.* (alteration in original) (quoting *Ass'n of Flight Attendants*, 785 F.3d at 716). To determine in which category an agency action falls—an inquiry the D.C. Circuit has described as "quite difficult and confused," *Nat'l Mining Ass'n*, 758 F.3d at 251—titles are not dispositive; rather, courts may "consider (1) 'the actual legal effect (or lack thereof) of the agency action in question on regulated entities'; (2) 'the agency's characterization of the guidance'; and (3) 'whether the agency has applied the guidance as if it were binding on regulated parties,' " *Sierra Club*, 873 F.3d at 951 (quoting *Nat'l Mining Ass'n*, 758 F.3d at 252-53).

Though not addressed by the parties, application of this three-part analysis to the July Policy Notice shows clearly that this HHS action constitutes a binding rule, as plaintiffs posit. The first *Sierra Club* factor, which is the "most important," heavily favors plaintiffs. The July Policy Notice here clearly imposes binding legal obligations on TPP grant awardees and formal consequences for not complying. The Policy Notice "tell[s] regulated parties what they must do or may not do in order to avoid" sanctions. *Nat'l Mining Ass'n*, 758 F.3d at 252. For instance, "TPP Program grant recipients are expected to provide parents advance notice ... and the ability to opt out of any content or activities," and "[p]rograms must be aimed at reducing teen pregnancy, not instructing in ... ideological content." July Policy Notice at 3-4. Materials may not include "content that promotes sexual activity for minors," and content must be "medically accurate," which means "materials ... are expected to include information on a full range of health risks." *Id.* at 5. "TPP Program Recipients" are explicitly instructed to "ensure all program materials comply with this [Notice]," revising their "TPP Program curricula and content" as necessary in order to do so. *Id.* at 5-6. The Notice also spells out the legal repercussions under the heading "Compliance": "OASH will not continue to fund materials or activities outside the TPP Program's statutory scope." *Id.* at 6. Such expenditures are "not allowable." *Id.* at 5. The July Policy Notice specifically threatens "grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a)." *Id.* at 6.

These features stand in stark contrast to the EPA guidance found to be non-binding in *National Mining Association*, where the first factor was held to weigh against finding a final agency action. The guidance at issue there instructed EPA staff to recommend limitations on mining projects to state permitting agencies. 758 F.3d at 246. Whereas in *National Mining Association*, the state "permitting authorities" were "free to ignore" the guidance without facing any legal consequences and the guidance could "not be the basis for an enforcement action against a regulated entity," making the guidance wholly advisory in nature, the TPP recipients here are not free to ignore the July Policy Notice. *Nat'l Min. Ass'n*, 758 F.3d at 252; *see also Sierra Club*, 873 F.3d at 952 (explaining the guidance document there was not binding where it merely "invites the affected agencies to consider and

apply improvements”). If recipients do not “revise their TPP Program curricula and content” to comply with the principles in the Policy Notice, “OASH will not continue to fund” their grants. July Policy Notice at 6.

***20** To take another example cited by defendants, Defs.' Opp'n at 19, the “policy guidelines” at issue in *Center for Auto Safety v. National Highway Traffic Safety Administration* are similarly distinguishable. 452 F.3d 798, 809 (D.C. Cir. 2006). The guidelines there involved guidance on regional recalls sent by the agency to motor vehicle manufacturers. *Id.* at 800. The D.C. Circuit determined they were “nothing more than a privileged viewpoint” that did not carry the force of law. *Id.* at 808. The agency used conditional language in offering recommendations, such as “*in general*, it is not appropriate for a manufacturer” to take certain actions and “the agency *may act favorably* upon requests” of a certain kind, emphasizing that the agency's approach “remain[ed] flexible.” *Id.* at 809 (emphasis in original). Here, as explained, the July Policy Notice went beyond recommending approaches or discouraging certain topics, instead spelling out “expectations” and the scope of permissible content as well as revised definitions. *See, e.g.*, July Policy Notice at 4 (“The statute does not require, support, or authorize teaching minors about ... content [such as] the radical ideological claim that boys can identify as girls and vice versa.”); *id.* at 5 (“TPP Program grant recipients are expected to ensure all program materials comply with this PPN.”); *id.* at 4-5 (altering definitions for key terms including “medical accuracy” and “age appropriate”).

Defendants disingenuously try to fabricate “flexibility” in the July Policy Notice, pointing to the use of the word “may” in phrases like grantees “may face grant suspension” or “may impose additional conditions,” July Policy Notice at 5-6, and noting that “HHS did not specifically state that” enforcement actions against plaintiffs or “any other TPP Program grantee” would be pursued. Defs.' Reply at 8-9. All of these permissive “may” statements, however, are framed as different alternatives that the agency might pursue as enforcement mechanisms in the final paragraph of the July Policy Notice, and the fact of enforcement is expressed in the first sentence of that paragraph in no uncertain terms. July Policy Notice at 6 (“OASH will not continue to fund materials or activities outside the TPP Program's statutory scope.”).

The context of the Notice as a whole also belies any suggestion that HHS has exhibited “continued flexibility.” Defs.' Reply at 8. The Notice does not contemplate any deliberation or discussion with the agency, such as in *Center for Auto Safety*, 452 F.3d at 809 (including that manufacturers must discuss all proposals with the agency to diverge from the agency's general policy), nor any exceptions or alternatives. Although defendants are correct that “HHS issued Notices of Awards to Plaintiffs,” despite their “under-protest” applications, nothing in the July Policy Notice suggests those explicit exceptions will be honored going forward. Defs.' Reply at 8.

In a last gasp effort to distinguish the July Policy Notice from agency actions found to be binding in other cases, defendants point out that, unlike in those cases, the Notice does not cabin or constrain HHS's enforcement discretion, Defs.' Reply at 9, a significant feature of the Notice that, ironically, only highlights plaintiffs' concerns about arbitrary enforcement. For example, in a case where an agency announced an action level at which merchants would be subject to enforcement proceedings under a statute, the agency clearly constrained its own enforcement discretion, establishing a bright line for permissible and impermissible behavior that the agency would rely on in enforcement proceedings, and thus the rule qualified as a binding, final agency action. *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1034 (D.C. Cir. 2007) (citing *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987)). Defendants do not cite, however, any case establishing that a cabining of enforcement discretion is *necessary* to find that an agency action is binding on regulated parties and therefore final. The lack of clear guardrails or clarity as to permissible and impermissible content in TPP programming under the new requirements in the July Policy Notice seems to be less an indication of HHS's intent for the Notice to be non-binding and rather reflective of its vague nature and susceptibility to arbitrary enforcement. *See infra* Part III.B.2(a). In any case, HHS's prohibition of certain content in the July Policy Notice does bind the agency to restrict allowable use of funds in the ways described therein and only supports a finding that the Notice constitutes a final agency action.

***21** With respect to the second factor—the agency's own characterization—the July Policy Notice here reads as a formal, binding document. In *National Mining Association*, the court explained that when documents read “from beginning to end” “like a ukase,” using terms such as “command[ing],” “requir[ing],” “order[ing],” and “dictat[ing],” they are considered binding. 758 F.3d at 252-53 (quoting *Appalachian Power Co.*, 208 F.3d at 1023). Even where there is boilerplate language disclaiming the guidance's

compulsory nature, agency guidance may still be considered binding if the whole of the document still appears to give commands. *See id.* (discussing *Appalachian Power Co.*, 208 F.3d at 1023). Similarly, in *CropLife*, the court held the press release to be a "binding regulation" despite taking the form of a letter rather than a formal rule in the Federal Register, because the letter used binding and unequivocal language directed at regulated entities to describe a new agency practice. 329 F.3d at 881.

Here, as explained, the text of the July Policy Notice makes the intent clear to impose obligations and bind TPP grant recipients. Notwithstanding the title of "Policy Notice" and the described purpose as "further clarify[ing] [the] expectations for TPP Program grantees," the Notice has an entire section explicitly focused on "Compliance," referencing consequences for not meeting the requirements set out therein. In contrast to the non-binding guidelines cited as an example by defendants, Defs.' Reply at 19, in *Center for Auto Safety*, 452 F.3d at 808-09, as well as the non-binding guidelines in *Appalachian Power Co.*, 208 F.3d at 1023, the July Policy Notice contains no boilerplate caveat feigning retreat from the text's plainly mandatory character or any advisory or conditional language. HHS instructed immediate compliance, and plaintiffs appropriately understood HHS to be speaking in binding terms. As the D.C. Circuit has explained, "If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, ...., if it leads private parties ... to believe that it will" invalidate permits "unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.' " *Appalachian Power Co.*, 208 F.3d at 1021.

The third factor, considering how the guidance has been applied, is not instructive here. The D.C. Circuit has recognized that "whether the agency has applied the guidance as if it were binding on regulated parties" is a question to which "we will not yet know" the answer in many cases because of the recent issuance of the guidance. *Nat'l Mining Ass'n*, 758 F.3d at 253. Indeed, the parties have not brought to the Court's attention any enforcement actions taken by HHS against TPP recipients since the issuance of the July Policy Notice, whether premised on that Notice or otherwise. Given, however, that the first two factors strongly weigh in plaintiffs' favor and the first is most important, the lack of an enforcement application does not defeat the final nature of the agency action.

Defendants next assert that the July Policy Notice does not actually impose new, binding requirements because the agency simply "seeks to enforce the terms and conditions of Plaintiffs' grant agreements, commitments they renewed when they signed their applications for continued funding," Defs.' Opp'n at 19, presumably reasoning that the Notice does not qualify as a final agency action because no new legal consequences are imposed on TPP grant recipients. Defendants' position about the lack of new requirements is plainly wrong. [14] The July Policy Notice explicitly adopts new interpretations of the statute and what is required of plaintiffs, redefining terms and noting that HHS previously "erred in approving" certain material. July Policy Notice at 5-6. Even if those new interpretations were supposedly divined from EOs and other law to which plaintiffs had generally agreed to abide by as part of their grant agreements, the July Policy Notice sets out explicit expectations not apparent from those sources alone—which do not speak directly to and are generally unrelated to TPP grant recipients. *See, e.g.*, Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (speaking to agencies, not grant recipients, and including the important limitation that the "order shall be implemented consistent with applicable law").

***22** Even if the July Policy Notice "imposes new requirements," defendants discount this consideration as not relevant "[i]n assessing finality," Defs.' Opp'n at 19, relying instead on their argument that enforcement is required for the Policy Notice to be considered final, *see id.* at 19-20. As previously explained, however, that argument is legally flawed. A regulated entity instructed to comply with agency rules need not wait to challenge those instructions until its grants have been terminated—at which point this Court will, according to defendants, not even have jurisdiction to address the terminations. *See supra* Parts III.A.3, III.B.1(a). Nor do plaintiffs need to wait until enforcement is initiated at all. *See* Defs.' Opp'n at 18. Plaintiffs "need not assume ... risks while waiting for EPA to 'drop the hammer' in order to have their day in court. *Hawkes Co.*, 578 U.S. at 600 (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)). The July Policy Notice is a binding agency dictate, with immediate effect on the day-to-day function of plaintiffs' programs, and therefore a final agency action subject to immediate review.

**2. *Arbitrary & Capricious***

Plaintiffs, in Count IV of their Complaint, assert that the July Policy Notice is arbitrary and capricious for several reasons. The APA requires agencies to engage in reasoned decision-making and thus instructs courts to "hold unlawful and set aside agency action ... found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Generally, an agency's action is considered "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The requirement for a "reasoned explanation" means that when an agency is changing its policy, the agency must demonstrate recognition of that change and provide "good reasons for the new policy," and the justification must be "more detailed" when the "prior policy has engendered serious reliance interests" or the "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.* ("*Fox I*"), 556 U.S. 502, 515-16 (2009). [15]

Here, plaintiffs argue that the July Policy Notice is "arbitrary and capricious because it: (1) is so vague that it fails to provide adequate notice and ensure nonarbitrary enforcement; (2) 'relied on factors which Congress has not intended it to consider,' (3) 'entirely failed to consider an important aspect of the problem,' (4) offered an explanation for its decision that runs counter to the evidence before the agency,' " Pls.' Mem. at 19 (quoting *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025), "and (5) failed to provide a sound reason for any changes in the agency's position," *id.* at 20 (citing *Fox I*, 556 U.S. 502). The July Policy Notice's vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque "we-know-it-when-we-see-it" standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application. This Notice is therefore arbitrary and capricious and, for this reason alone, warrants vacatur. The July Policy Notice also suffers from several of the other deficiencies plaintiffs identify, including that it entirely lacks reasoned explanation and justification, which independently requires the Policy Notice to be set aside.

*a) Fatally Vague*

***23** An agency's requirements must be comprehensible and give entities fair notice of what is required of them —a principle so fundamental to reasoned decision-making that this standard is only rarely articulated. The D.C. Circuit has nonetheless established that fair-notice due process vagueness principles are indeed incorporated into administrative law. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context."). "In determining whether a party received fair notice, [courts] consider whether, 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform.' " *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (quoting *Gen. Elec. Co.*, 53 F.3d at 1329). "This 'ascertainable certainty' rule prevents agencies from taking regulated parties by surprise." *Id.* Additionally, other circuit courts have held that agencies cannot set out requirements so vague as to preclude compliance. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1233, 1250-51 (9th Cir. 2001) (explaining that because, among other reasons, "whether there has been compliance with this vague directive is within the unfettered discretion of the Fish and Wildlife Service, leaving no method by which the applicant or the action agency can gauge their performance" the agency action "was arbitrary and capricious"); *Firearms Reg. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520, 525 (8th Cir. 2024) (holding a firearms classification rule arbitrary and capricious due to lacking measurable standards, as evinced by applications "allow[ing] the ATF to arrive at whatever conclusion it wishe[d] without 'adequately explain[ing] the standard on which its decision is based" (third alteration in original)). Vague agency action that invites unreasoned, discriminatory enforcement is arbitrary and capricious. *See Ariz. Cattle Growers*, 237 F.3d at 1250-51. [16]

Virtually every new requirement imposed by the July Policy Notice is fatally vague. Starting with the requirement, repeated from the 2025 March NCC Guidance, that TPP recipients "should revise their projects to align with Executive Orders that are currently in force," the July Policy Notice provides no way for plaintiffs to ascertain their compliance. As plaintiffs point out, EOs are directed toward "*governmental* actors," and many, such as national security EOs or those renaming public sites, have nothing to do with the TPP program. Pls.' Mem. at 24-25 (emphasis in original); *see, e.g.*, Exec. Order No. 14172, 90 Fed. Reg. 8629

(Jan. 20, 2025) ("Restoring Names That Honor American Greatness," such as renaming of Mount McKinley). Even the EOs explicitly listed in the July Policy Notice as relevant do not appear directly applicable to TPP programs, such as the EO titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." July Policy Notice at 1-2. HHS leaves TPP recipients with the impossible task of divining the connection HHS saw between the executive branch priority and teen pregnancy prevention.

Defendants argue that the term "align" is "hardly obscure," stating that this word is used "in the ordinary sense of the term: grantees should 'come into precise adjustment or correct relative position' with the policies set forth in executive orders." Defs.' Opp'n at 27 (quoting Merriam-Webster, *Align*; https://perma.cc/32DJ-EUDH). At the same time, defendants do not venture to suggest how Planned Parenthood entities are to "align" with an EO directed to agencies, for instance, to "combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025). Implicitly acknowledging this interpretive challenge for TPP grant recipients, defendants contend that "vagueness concerns are also ameliorated by the design of the TPP Program itself, which contemplates review and consultation on project adaptations." Defs.' Opp'n at 27 (citing 2023 NOFO at 17, describing "federal agency substantial involvement"). Contrary to that representation, however, the July Policy Notice does not state that plaintiffs will be given warning letters before termination or that they will not have their funds terminated until after some rounds of "review and consultation." The Policy Notice mandates compliance now, without providing plaintiffs with any meaningful standard for achieving that compliance.

***24** That the policies of the EOs are supposedly explained in the July Policy Notice itself does not save defendants. The rest of the July Policy Notice proceeds in an equally vague fashion. In the section on "Ending Radical Indoctrination of Youth and Protecting Parental Rights," the July Policy Notice instructs that "TPP Program-funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," citing to *Mahmoud*. July Policy Notice at 3. Rather than providing any clarification as to necessary steps for compliance, the Notice instead leaves wide open for interpretation precisely what constitutes "undermin[ing]" the "protect[ion of] children from harmful ideologies" or what constitutes a "harmful ideology" that should be removed from the content of teen pregnancy prevention programs. Among the five referenced EOs in the Notice, two provide definitions of terms containing the word "ideology," but none provides a definition of "harmful ideology," *see, e.g.*, Exec. Order No. 14168 § 2(f), 90 Fed. Reg. 8615, 8615 (Jan. 20, 2025) (defining "Gender ideology"); Exec. Order No. 14190 § 2(b), 90 Fed. Reg. 8853, 8853 (Jan. 29, 2025) (defining "Discriminatory equity ideology"), but the Notice is silent as to whether "harmful ideology" is meant to be limited to or broader than those two definitions.

Later in this same section, the July Policy Notice requires recipients "to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise," again relying on *Mahmoud*. July Policy Notice at 3. That broad statement gives no guidance as to what is considered to burden religious exercise or how the opt-out mechanism should function with respect to recipients' programs, which take place in various types of settings. *Mahmoud* concerned constitutionally required opt-outs as part of "free public education," 145 S. Ct. at 2342, and focused on the moral vulnerability of impressionable "very young children," even explicitly acknowledging that "[e]ducational requirements ... may be analyzed differently ... for high school students," *id.* at 2353, but plaintiffs' programming is not limited to public schools and is exclusively targeted toward older children ("*Teenage* Pregnancy Prevention Program"). *See, e.g.*, 2023 NOFO at 9 ("We expect recipients to replicate [evidence-based programs] to scale in 3 or more settings ... [such as] schools, clinics, community-based organizations, houses of worship, detention centers, and group and residential care programs."); PPGNY Decl. ¶ 16 (describing the program taught in schools, community-based organizations, and residential settings). *Mahmoud* thus seems to have, at best, only limited relevance, if at all, to the necessity for parental opt-out opportunities for older adolescents, particularly outside the public school setting. Further, the July Policy Notice does not suggest how such parental opt-outs, which could result in partial participation in programming by teenagers, might be implemented in a way that would not diminish effectiveness or diverge from the statutory "replication" requirement.

Defendants retort that *Mahmoud* itself provides "explanation of the types of 'ideological content' that the TPP Program statute does not authorize." Defs.' Opp'n at 26. To repeat, however, *Mahmoud* was not about teen pregnancy prevention,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

but rather about LGBTQ+-inclusive storybooks in elementary school classrooms. The kind of extrapolation and mind-reading the defendants contemplate does not provide the necessary advance notice or clarity for TPP grant recipients to avoid arbitrary enforcement. Defendants further explain that the "opt outs from instruction that *Mahmoud* held to be constitutionally required in some circumstances are not unusual" and are already required under some state laws. *Id.* Yet, the July Policy Notice does not say to employ opt-outs akin to particular state laws. While defendants suggest that the vagueness is necessary to reflect "an agency's high-level policy objectives" to be "followed by potential specific future enforcement decisions," Defs.' Opp'n at 25, the July Policy Notice does not even make at the most general level any connection between the topics discussed in *Mahmoud* and teen pregnancy prevention that can then be further elaborated on a case-by-case basis, nor does the Notice provide a single illustrative example of how a parental opt-out for teenagers would be implemented and still preserve the effectiveness of a replicated program, as statutorily required.

***25** The next section, titled "Scope of the TPP Program," provides requirements that suffer similar flaws. The July Policy Notice excludes from TPP programs "ideological content such as the content at issue in *Mahmoud*, gender ideology, or discriminatory equity ideology," again without providing definitions of any of those terms in a workable way connected to TPP programming. For example, the Notice expressly incorporates the definition of one of those terms, "discriminatory equity ideology," from EO 14190 ("Ending Radical Indoctrination in K-12 Schooling"), *see* July Policy Notice at 4, where this term is defined as an "ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations" and gives several examples, Exec. Order No. 14190 § 2(b). If the Notice's content prohibition were limited to racial discrimination prohibited by federal statutes, plaintiffs could implement such a directive, but the sweep of a ban on "discriminatory equity ideology" is entirely unclear. For example, does recognition of a TPP grant beneficiaries' membership in a particular demographic or language-speaking group in order to conduct culturally sensitive pregnancy-prevention programs constitute "discriminatory equity ideology"? The July Policy Notice certainly offers no insight.

The lack of agreed-upon meaning of terms like "diversity, equity, and inclusion" ("DEI") have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein. *See, e.g., Am. Pub. Health Ass'n v. NIH*, ––– F. Supp. 3d ––––, 2025 WL 1822487, at *18-19 (D. Mass. July 2, 2025) (invalidating NIH grant terminations premised on implementation of DEI-related EOs); *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 187 (D.N.H. 2025) (holding that plaintiffs were likely to succeed in showing that a "Dear Colleague Letter" prohibiting DEI-programs was "impermissibly vague"); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 175-76 (D.D.C. 2025) (finding void for vagueness an EO directing government activity against law firm based on impermissible "DEI policies," and collecting cases).

The section goes on to prohibit "content that encourages, normalizes, or promotes sexual activity for minors." July Policy Notice at 4. Plaintiffs point out the intractability of this requirement given the lack of clarity as to the meaning of "normalize." Pls.' Mem. at 22-23. If the "normalize" prohibition in the Notice includes discussing sexual activity, then plaintiffs are concerned that the Notice prohibits any teen pregnancy prevention programming except abstinence-only instruction, and, since such instruction has not proven effective, the Notice would make deliver of effective sexual education impossible. *Id.* at 23. Yet, perhaps in context, "normalize" simply means touting or promoting sexual activity as preferable to alternatives like abstinence, and such an interpretation would be far less problematic. Defendants insist that the July Policy Notice gave examples of the kind of content that might fall into the prohibited category: discussion of "anal and oral sex, or masturbation, including through sexually themed roleplay. This also may include content on the eroticization of birth control methods, creating more pleasurable sexual experiences, or foreplay techniques." July Policy Notice at 4; *see* Defs.' Opp'n at 26. Unfortunately, those examples are not exhaustive and are not suggestive of the outer bounds of these categories, so are insufficient to assuage plaintiffs' concerns about the potential breadth of the Notice's prohibition.

Defendants later posit that the "Policy Notice is not a prohibition on discussing sex," and explain that there is "space between" " 'content that encourages, normalizes or promotes sexual activity' ... and the sort of 'medically accurate' and 'age appropriate' pregnancy prevention education materials," Defs.' Opp'n at 28, and further offer that "the Policy Notice does not impose an 'abstinence-only requirement,' " *id*. at 30. [17] This guidance from defendants'

briefing is enlightening and helpful to plaintiffs, though is not at all obvious or even apparent from the July Policy Notice. Defendants do not point to anything in the Notice itself or in the administrative record reflective of those clearer statements in briefing as to the scope of the prohibitions intended in the July Policy Notice. The "space" for permissible discussions is exactly the kind of concept the July Policy Notice should have described and defined to give recipients meaningful direction. *See, e.g., Firearms Regul. Accountability Coal.*, 112 F.4th at 526 (describing the APA as making it "necessary to give guidance on how the [agency] is likely to apply [the rule] in future instances"). Its absence makes compliance and fair enforcement impossible.

***26** Finally, the section of the July Policy Notice clarifying "definitions" is also ambiguous. Recipients are instructed to ensure that they "include information on a full range of health risks" when providing "health-related recommendations" in order for programming to be "medically accurate." July Policy Notice at 5. That directive is up to interpretation. Is a "disclaimer-style disclosure akin to the fine print in a pharmaceutical advertisement" required? Pls.' Mem. at 23. Each of these other definitions is similarly perplexing. According to the Notice, "[t]he terms 'health equity,' 'equitable environment,' 'inclusivity,' and 'adolescent-friendly services' should not be construed to exceed the statutory scope of the TPP program, as described above, or to permit unlawful diversity, equity, or inclusion-related discrimination." July Policy Notice at 5. Again, what kind of programming this provision excludes is entirely unclear.

Defendants strain to find a safe harbor from vagueness concerns in the requirement that "HHS's procedures require it to provide appropriate written notice in conjunction with taking enforcement measures." Defs.' Opp'n at 27. The cited regulations, however, as discussed previously, *see supra* Parts I.A.1, III.A.3, do not require HHS to issue *advanced* notice. That HHS will send plaintiffs a letter notifying them of their termination—rather than just silently cutting off access to funds—does nothing to mitigate concerns about arbitrary enforcement or vagueness. The agency also has not provided any additional guidance to the plaintiffs in the *three months* since the July Policy Notice has been in effect. *See* Pls.' Opp'n at 22 (noting that no further guidance about enforcement has been provided). As this Court previously put it, the agency "provides no ... guidance as to what ... is considered unlawful discrimination" or otherwise prohibited activity "by the Trump administration, leaving plaintiff[s] to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing." *Perkins Coie*, 783 F. Supp. 3d at 177; *see also* Pls.' Opp'n at 23 ("These vague standards create uncertainty so severe that Plaintiffs must either overcomply or risk arbitrary enforcement."). That is antithetical to reasoned decision-making.

Each part of the July Policy Notice, excepting the section repeating "statutory language" verbatim and the compliance section, contains impermissibly vague language that binds plaintiffs. In other words, none of its substantive directives pass muster. The Policy Notice therefore shall be vacated in full.

*b) Lack of Reasoned Decision-Making*

The vagueness of the new requirements imposed by the July Policy Notice renders this Notice arbitrary and capricious and justifies vacatur without considering the other APA defects raised by plaintiffs. The Notice is nevertheless also arbitrary and capricious because HHS did not provide any reasoning or evidence in support of its approach, seemingly relied on irrelevant ideological factors, and did not justify its change in position.

The July Policy Notice itself and the listed contents of the administrative record do not reveal any analysis, studies, or reports supporting HHS's determination that the July Policy Notice's requirements were logical or consistent with achieving the statutory goals for the TPP program. This program is evidence-based: Tier 1 programs implement programs proven effective in reducing teen pregnancy, and Tier 2 programs are designed to test new approaches to determine additional effective options. *See* Further Consolidated Appropriations Act of 2024, 138 Stat. at 671 (allocating funds for "medically accurate and age appropriate programs that reduce teen pregnancy" and specifically for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors"). Nothing in the administrative record, however, shows consideration of the impact of the July Policy Notice's requirements on the programs' implementation or effectiveness. *See* AR; *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018) (observing that the TPP program "appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use funds to support proven or innovative medically accurate methods

of preventing teenage pregnancy."). Nor does anything in the administrative record or Notice itself suggest that HHS evaluated how these changes would affect the statutory requirement that Tier 1 programs be "replicated," without significant changes, in order to ensure their effectiveness. *See* *Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 333 (S.D.N.Y. 2018) (" '[R]eplicating' requires the prior existence of something that is to be duplicated, repeated, copied, or reproduced."). Even more fundamentally, the July Policy Notice offers no explanation as to why the new requirements are appropriate, save for its *ipse dixit.*

***27** The administrative record also shows no indicia of reasoned decision-making at all, consisting solely of the NOFO application, the plaintiffs' notice of awards, the NCC applications and Guidance, the plaintiffs' NCC awards, a press release summarizing the July Policy Notice, and a "HHS Grants Policy Statement" effective until April 2025. *See* AR. HHS therefore seemingly "ignore[d]" the most "important aspect[s] of the problem," *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43), and failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

This conclusion is reinforced by certain of the July Policy Notice's directives, such as the exclusion of teaching involving "the radical ideological claim that boys can identify as girls and vice versa" and "information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," which appear incongruous with the reduction of teen pregnancy. July Policy Notice at 4, 5. This is because, while ambiguous, those statements appear to reject the existence of intersex and transgender individuals, which would be not only scientifically false (and thus contrary to the statutory requirement of "medically accurate" programming) but also would seem to inhibit—or at least not advance—the goal of reducing unwanted teen pregnancies. [18] Neither HHS in the Policy Notice or in the administrative record, nor defendants in their briefing, offer any evidence or reasoning to the contrary. Those directives therefore exhibit a lack of reasoned decision-making.

Plaintiffs relatedly argue that the July Policy Notice's "explanation runs counter to [the] evidence" before the agency. Pls.' Mem. at 30. This argument appears compelling, given the July Policy Notice's statements that, for instance, seem to deny the existence of intersex or transgender individuals by discounting the "claim that boys can identify as girls and vice versa," and by deeming "not 'medically accurate'...information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." July Policy Notice at 4, 5. While plaintiffs argue these denials are contrary to reality and well-accepted scientific knowledge, Pls.' Mem. at 31, defendants face a much larger problem on APA review: From the administrative record, there was apparently *no* evidence before the agency to support the denials reflected in the Notice. In other words, HHS did not come to a conclusion contrary to the evidence; it just developed a policy without considering evidence at all. *See, e.g.*, Pls.' Opp'n at 26 ("[T]he record does not include *any* peer-reviewed articles, program evaluation data, or internal agency memoranda or communication explaining why previously approved curricula are suddenly deficient." (emphasis in original)).

HHS instead seemed to make the decision based solely on ideological and political preferences contrived out of thin air with inspiration derived from the referenced EOs. Such ideological considerations are irrelevant to the statutory program established by Congress, which targets effective, evidence-based programming. The July Policy Notice itself acknowledges that "ideological" content is beyond the statute's scope, but then ironically injects ideological considerations into TPP programming by cutting material—that was approved as part of an evidence-backed, proven-effective program—for political, rather than scientific or effectiveness, reasons. July Policy Notice at 3-4. Neither the July Policy Notice nor the administrative record suggests any explanation as to why the "normaliz[ation]" of sexual activity or discussion of "boys ... identif[ying] as girls" (nor any other content) must be removed from approved replicable, evidence-based programs in order to ensure program effectiveness, leaving the obvious conclusion that HHS's motivation was ideological. If ideology is not contemplated as relevant under the TPP statutory provision, ideological preferences should not be part of the agency's dictates at all.

***28** HHS also failed to justify the changes in its position in light of the substantial reliance interests. Although more justification than usual is not "demanded by the mere fact of policy change," a "more detailed justification" is needed when "its prior policy has engendered serious reliance interests that must be taken into account." *Fox I*,

556 U.S. at 515-16. Specifically, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. HHS identified existing definitions of six key terms—adolescent-friendly services, age appropriateness, equitable environment, health equity, inclusivity, and medical accuracy—that "include[d] deficiencies based on the statutory language and Congressional intent of the TPP program." July Policy Notice at 4-5. The Policy Notice then sought "to clarify these definitions," noting for instance that "age appropriate programs" "do not contain material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content" and "health equity" "should not be construed to exceed the statutory scope of the TPP program ..., or to permit unlawful diversity, equity, or inclusion-related discrimination." *Id.* at 5. Yet, HHS made no effort to explain with any precision why the existing definitions were "deficient." The same is true for several of the other requirements in the July Policy Notice: HHS never suggests why the TPP Program must now exclude content that "normalizes ... sexual activity for minors." *Id.* at 4. The administrative record is devoid of any new evidence, studies, or factual development that would warrant a change.

Moreover, although the July Policy Notice superficially recognizes the significant reliance interests at stake for Tier 1 grant recipients with multi-year grants, HHS discounts those interests without sufficient explanation. Plaintiffs and other recipients, in receipt of multi-year grants to implement Tier 1 programs, are mid-way through these grants and have schools and community partners that rely on their programming. *See* Pls.' Mem. at 29 ("Plaintiffs are entering year three of their five-year grant cycle."). The July Policy notice states that HHS is "aware that curricula and other program materials—including content disqualified herein as not 'medically accurate' or not 'age appropriate' or unrelated to reducing teen pregnancy—were previously approved by OASH, and we have taken that into account in weighing factors relating to this policy notice." July Policy Notice at 5. The Notice goes on to say, "[h]owever, for the reasons described above, the prior administration erred in approving such materials and that approval exceeded the agency's authority to administer the program consistent with the legislation as enacted by congress." *Id.* at 5-6. Except for the suggestion that federal awards should generally be consistent with EOs, the July Policy Notice does not explain why aspects of the approved programs are inconsistent with the statute. The invocation of an EO is an insufficient justification for any policy change and especially insufficient to justify an interpretation of a statute, considering that EOs do not supersede but are rather subject to statutory provisions—with every order containing the explicit caveat that it "shall be implemented consistent with applicable law and subject to the availability of appropriations," *see, e.g.*, Exec. Order No. 14190 § 6(b); *cf. State v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (explaining that "just because an agency's regulations are based on an executive order, this 'hardly seems to insulate them from judicial review under the APA' ... [a]nd we have subjected agency actions that incorporate a presidential directive to APA review (and specifically to arbitrary-or-capricious review)" (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996))).

The Notice goes on to recognize that recipients may have to revise their curricula and content—notwithstanding the replication requirement—and that "the need to comply with statutory requirements ..., Executive Orders, and the U.S. Constitution outweighs such burdens," July Policy Notice at 6, but that boilerplate language cannot substitute for actual analysis. Again, the reason why the elusive "statutory requirements" outweigh the recipients' interests in applying certified Tier 1 programs, as approved in their particular grants, remains a mystery. "In light of the serious reliance interests at stake, [HHS's] conclusory statements do not suffice to explain its decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

***29** Defendants make three remaining arguments in response. First, defendants contend that they did not ignore Congress's directives about replicating effective programming or rely on impermissible factors, pointing to "an entire section of the Policy Notice ... directed to nothing but the statutory scope of the TPP program and a consideration of what types of content is, and is not, authorized by it." Defs.' Opp'n at 29; *see also id.* at 27. They further emphasize that the "replicat[ion]" requirement does not forbid making *all* changes and "does not force HHS to fund a program that cannot be replicated consistent with the lawful terms and conditions of [p]laintiffs' grants." *Id.* at 29. The section of the July Policy Notice describing the "scope of the TPP program" indeed acknowledges that the statute requires implementation of programs that have been proven effective and are "medically accurate" but then goes on to make conclusions completely divorced from those statutory provisions. Though stating that the conclusions are premised on the statute, the July Policy Notice misses the essential link—the explanation as to why removing content related to, for instance, "boys ... identify[ing] as girls" and "normaliz[ing] ... sexual activity for minors" protects and

furthers the goal of implementing evidence-based effective teen pregnancy programs. That section also does not consider —even implicitly—how the changes required in the approved curricula will be sufficiently minor to satisfy the statutory criterion of "replicat[ing]" Tier 1 programs.

Second, defendants insist that they offered sufficient explanation for their change in policy because "[a]mong the 'good' reasons for changing policies" accepted by courts "are that 'new administrations are entitled to reevaluate and modify agency practices, even longstanding ones.' " Defs.' Opp'n at 30 (quoting *People for the Ethical Treatment of Animals v. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019)). That does not give the agency *carte blanche* to change its policy just because the agency feels like it. The new administration must still provide a rationale and explain how the policy goals are consistent with the statute and supported by evidence or relevant considerations. *See, e.g., State Farm*, 463 U.S. at 43 (holding that the "agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made' "). No such analysis was conducted here.

Third, defendants contend that although HHS already sufficiently considered reliance interests—to which they "are not required to accede"—the agency may further "consider the reliance interests of specific grantees" in the context of a particular enforcement action. Defs.' Opp'n at 29. Yet, as explained, the conclusory consideration given to reliance interests in the July Policy Notice is insufficient, and defendants' argument that reliance interests may be later considered in enforcement proceedings is inconsistent with the purported rationale for all of the new requirements —that they are *mandated* by the statute. *See* July Policy Notice at 6 ("[T]he need to comply with the statutory requirements of the TPP Program ... outweighs such burdens" as grantees having "to revise their TPP Program curricula and content"); *id.* ("OASH will not continue to fund materials or activities outside the TPP Program's statutory scope."); *id.* at 4 ("The statute does not require, support, or authorize teaching minors about such content ...."). As plaintiffs put it, "[t]he inconsistency is clear—either the statute ties its hands or it does not." Pls.' Opp'n at 25-26. The administrative record likewise contains no indication that HHS meaningfully considered reliance interests.

The July Policy Notice reflects agency decision-making motivated solely by political concerns, devoid of any considered process or analysis, and ignorant of the statutory emphasis on evidence-based programming. Just because a pronouncement comes from the President does not make it true, even if expressed in the form of an executive order, and even then, does not supersede the law—particularly in the context of a statutory scheme for evidence-based grant funding. Yet, the Policy Notice points to little more than these orders for justification.

For this additional reason, the July Policy Notice is arbitrary and capricious and must be held unlawful and set aside. *See* 5 U.S.C. § 706(2); *see St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 38 (D.D.C. 2019) ("Vacatur is the presumptive remedy for arbitrary and capricious agency action[.]"). Plaintiffs are granted summary judgment on Count IV. None of plaintiffs' other claims would entitle plaintiffs to any additional requested relief, so they are not considered here.

## IV. CONCLUSION

***30** Taxpayer funded programming for this country's youth to prevent teen pregnancy is statutorily required to be medically accurate, age appropriate, and effective according to rigorous, evidence-based analysis. That is what Congress required when funding Teen Pregnancy Prevention grants. In July 2025, HHS issued a Policy Notice imposing on grant recipients binding requirements to change their teen pregnancy prevention curricula, as a condition for their ongoing receipt of funds, but expressed these requirements in such vague generalities as to leave recipients like plaintiffs entirely in the dark as to how to implement or apply them in practice and in accordance with the statute. HHS has also given no indication that the new requirements in the July Policy Notice were the product of reasoned decision-making and analysis of evidence, with the sole source cited for the new requirements the general policy directions outlined in several recent EOs. The administrative record supplied by HHS reveals zero effort by the agency to conduct any evaluation of how those general directions in the EOs may be best implemented to comply with statutory requirements for the TPP program or to accommodate the reliance interests of the multi-year grantees, like plaintiffs.

For these reasons, the challenged July Policy Notice imposes new requirements on TPP program grant recipients that are arbitrary and capricious, in violation of the APA, 5 U.S.C. § 702(2)(A). The July Policy Notice is therefore vacated, and defendants are enjoined from applying it. Plaintiffs' motion

for summary judgment is granted, and defendants' motion to dismiss denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

**All Citations**

Slip Copy, 2025 WL 2840318

## Footnotes

1 PPH is owned by parent company Planned Parenthood North Central States ("PPNCS"). *See* Pls.' MSJ, Ex. E, Decl. of Christine Cole, Sr. Dir. of Educ. of PPCNCS ("PPH Decl.") ¶ 1, ECF No. 22-7.

2 Although the July Policy Notice is dated July 1, 2025, plaintiffs assert that the publication date was the day after, and defendants do not dispute that fact. *See* Pls.' SMF ¶¶ 26-27; Defs.' Resp. ¶¶ 26-27.

3 That separate case was randomly assigned to different judge in this district.

4 Notably, defendants repeat a refrain expressing concerns about resolving this APA case on summary judgement without an administrative record, Defs.' Opp'n at 15-17, 21, but such concerns were ameliorated by the filing of the certified contents of the administrative record, *see* Defs.' Notice of Contents of Admin Record ("AR"), ECF No. 23, simultaneously with the filing of defendants' cross-motion to dismiss and opposition to plaintiffs' motion for summary judgment, such that both sides had ample time to incorporate the AR into their briefing, even with plaintiffs' expedited filing of their summary judgement motion.

5 Defendants state that "[p]laintiffs have dropped Count II of the[ir] Complaint," Defs.' Opp'n at 9, when plaintiffs merely have not moved for summary judgment on that Count.

6 Although the injury-in-fact standing inquiry may seem similar to the irreparable harm inquiry at the TRO stage, the two standards meaningfully differ such that a plaintiff may satisfy standing requirements without meeting the imminent, irreparable harm requirement to obtain a TRO. To obtain a TRO, plaintiffs must demonstrate that an alleged injury is "certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm," *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (internal quotation marks and citations omitted), which requires "proof indicating that the harm is certain to occur in the near future," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). In other words, plaintiffs must show injunctive relief is necessary and that relief must be granted *now*. That standard is a high bar, which is appropriate given the extraordinary nature of preliminary injunctive relief. *See* *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In the extremely expedited posture in July, plaintiffs fell short of showing that termination of their grants, or even the risk of arbitrary enforcement, was certain, imminent, and would injure plaintiffs in an irreparable way. *See* TRO Hr'g Tr. at 63:6-65:9.

By contrast, to establish standing to allow for a suit for prospective relief to proceed, plaintiffs need only show a "concrete, particularized," and "certainly impending" injury, *Clapper*, 568 U.S. at 409 (first quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) and then quoting *Lujan*, 504 U.S. at 564 n.2), elsewhere described as a "substantial probability of injury," *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (cleaned up) (quoting *Chamber of Com. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)). As a result, a risk of enforcement due to being within a regulated class of persons is generally sufficient to establish injury to challenge an agency action, even though that enforcement might not subject plaintiffs to as urgent irreparable harm. *See* *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483-84

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(D.C. Cir. 2021); *see also* *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (holding that threatened enforcement of an unconstitutional law may satisfy the injury-in-act requirement). Plaintiffs' ability to demonstrate an injury-in-fact here is thus a distinct question from that analyzed in the TRO proceeding. *See* *Cal. Ass'n of Private Postsecondary Schls. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing ... does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."). Notably, defendants did not even raise the issue of plaintiffs' injury-in-fact to satisfy standing at the TRO stage. *See, generally*, Defs.' Opp'n to Pls.' Mot. for TRO.

7 Although defendants portray plaintiffs as eschewing any request for injunctive relief, little distinction exists between vacating or enjoining application of the July Policy Notice, and plaintiffs request both in their Opposition. Pls.' Opp'n at 2, 9 n.2. Whether termed a vacatur or injunction, such relief "targets agency action distinct from grant terminations" and does not enforce the payment of plaintiffs' grants, so is not prohibited by the Tucker Act jurisdictional bar defendants contemplate. *Id.* Vacatur (or injunction) of the July Policy Notice eliminates the July Policy Notice—in form and substance—from defendants' enforcement toolkit providing relief to plaintiffs.

8 Whether the terms of plaintiffs' grant awards alone would, as defendants contend, provide a basis for termination on the same grounds as outlined in the July Policy Notice, such that vacating the Notice would not actually reduce the risks to plaintiffs of enforcement actions or risk of termination, *see* Defs.' Opp'n at 14, is not the legal challenge presented and thus no view on this separate legal question is offered. To be sure, though not cited or discussed by the parties, the D.C. Circuit has previously held that where a first regulation was developed jointly with and imposes the same standards and same costs as a second, such that the first could not be said to cause a discrete injury, a challenge brought only against the first was not redressable. *See* *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015). Plaintiffs' injury, however, is not caused by the broad principles described in the EOs, which are directed toward agency officials and constrained by the caveat that they "shall be implemented consistent with applicable law," *see, e.g.*, EO 14190 § 6(b), 90 Fed. Reg. 8853, but rather by the concrete dictates directly imposed on plaintiffs in the July Policy Notice. *See infra* Part III.B.1(b) (comparing the EOs to the July Policy Notice). Defendants cannot defeat redressability by a mere representation that HHS will exercise the same enforcement authority with or without the challenged July Policy Notice on the books. A simple assertion by defendants that "we're going to do it anyway" under some other authority—real or imagined—cannot serve as the basis to skirt judicial review of the agency action presently challenged.

9 While Justice Barrett's decision does set up a complex scheme for grantees to get *complete* relief if their grants have already been terminated—indicating that they would have to pursue relief sequentially in both federal district court, with respect to the agency policy, and before the CFC, for their individual grants—plaintiffs' grants have not yet been terminated and *complete* relief is not required for redressability, so that two-track arrangement is not at issue here. *See NIH*, 145 S. Ct. at 2661-62 (Barrett, J., concurring). Again, however, that scheme presumes that some task is left for the district court—to evaluate the APA claim—reinforcing that defendants' attempt to avoid district court jurisdiction entirely is not compelling.

10 Notably, the primary case on which defendants rely, *National Treasury Employees Union*, arises from a very disparate factual scenario and is inapposite. There, plaintiffs had challenged a putative decision to shut down the CFPB, which decision had been "infer[red]" from "various discrete 'actions' taken by agency leadership to downsize the bureau." *NTEU*, 149 F.4th at 782. The D.C. Circuit held that no discrete shutdown decision had been made; plaintiffs were simply referring to a "constellation of then-ongoing actions," which they attempted to "dress up" "as a single decision to challenge all of them at once." *Id.* at 784. In the Circuit panel's view, the agency actions allegedly constituting the "shutdown" were ongoing, with no final decision about the CFPC's future made. *Id.* Given that there was no discrete action "fit for review," the court characterized the dispute as "unripe." *Id.* at 785-86. Here, in contrast to such a "moving target[ ]"or abstractness problem resulting

from a constellation of related changes, *id.* at 786, HHS clearly made a decision to adopt new TPP program requirements, dictated them concretely in the July Policy Notice, and put them into effect immediately.

11 Defendants' concern about the use of extra-record materials introduced by plaintiffs is easily dispatched since those materials play no part in evaluation of plaintiffs' claims; this evaluation is based solely on materials in the administrative record, admitted facts, and the law.

12 These fifteen documents are: plaintiffs' 2023 Notices of Awards, plaintiffs' 2025 NCC applications, plaintiffs July 2025 NCC awards, and plaintiffs' SF-424 and SF-424B certification forms filed with their 2023 NOFO applications and 2025 NCC applications. *See* AR; *see also* Pls.' MSJ, Ex. B, NOFO 2023; *id.* Ex. F, Mar. 2025 NCC Guidance; Defs.' Opp'n to Pls.' Mot. for TRO, Ex. A, PPCC 2023 Notice of Award, ECF No. 14-1.

13 While significant overlap is present between the prudential ripeness inquiries for justiciability described in Part III.A.3 and the APA's "final agency action" requirement, the two are not coextensive. "Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007-08 (D.C. Cir. 2014); *cf. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (explaining that "the requirement of finality is not jurisdictional" but without final agency action, there is no "cause of action under the APA" (second passage quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003))).

14 Defendants reiterate this point on reply, Defs.' Reply at 9 ("HHS is [not] altering the terms of the TPP Program; rather HHS 'seeks to enforce the terms and conditions of Plaintiffs' grant agreements.' "), but do not explain its significance to the analysis of whether the July Policy Notice qualifies as final agency action under the APA.

15 Defendants suggest, in their "standard of review," a different standard for evaluation of plaintiffs' claims, citing *Bondi v. VanDerStok*, 145 S. Ct. 857, 869-70 (2024): "[I]n the context of a facial challenge[, t]o prevail, they must demonstrate that any and all potential applications of the Policy Notice to their grant programs are unlawful." Defs.' Opp'n at 11. That case considered an APA pre-enforcement "contrary to-law" claim that a gun regulation was inconsistent with a statute, so that standard is irrelevant to the arbitrary-and-capricious claim considered here. In any case, the Court in *Bondi* merely assumed, based on the parties' agreement, that plaintiffs had such a burden to demonstrate that all applications of the regulation would be unlawful, without deciding whether that was indeed the proper standard. *See id.* at 866 & n.2 ("The dissents raise a number of questions about what test courts should apply when a party contends that an agency has acted in excess of its statutory authority in a pre-enforcement challenge under the APA.... But the theories the dissents proceed to advance were not pressed or passed upon below, nor did the parties make them before this Court.").

16 As plaintiffs explain, their vagueness argument is premised on the APA prohibition on arbitrary and capricious decision making, not the Fifth Amendment of the Constitution, despite the overlap here with void-for-vagueness principles. *See* Pls.' Mem. at 21 n.6. As a result, no showing of a constitutionally protected property interest is required for this claim.

17 Defendants separately suggest that if the July Policy Notice did, in fact, restrict recipients to implementing abstinence-only programs, that would not be problematic because "[t]he TPP Program statute does not prohibit abstinence-only programs, and HHS has historically made those programs eligible for replication if they otherwise met the criteria for Tier 1 TPP Program funding," citing an academic journal article stating that Tier 1 programs include abstinence education programs. Defs.' Opp'n at 22. Defendants do not, however, specifically identify any of these approved, replicable programs, or anything in the AR to support this proposition.

18 Though not essential to this Court's decision, plaintiffs' declarations offer well-accepted scientific support for the fact "that some individuals identify on a spectrum of gender identity," *see, e.g.*, PPCCC Decl. ¶ 62; Kantor Decl. ¶ 58, in contrast to defendants' administrative record which reveals absolutely no analysis of medical science to support the directives contained in the July Policy Notice.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 1899186
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division,
EASTERN DIVISION.

FREEDOM NETWORK USA, Plaintiff,
v.
President Donald J. TRUMP, Office of Management and Budget, Director of the Office of Management and Budget Russell Vought, U.S. Department of Justice, Office of Justice Programs, Office for Victims of Crime, Attorney General of the U.S. Department of Justice Pamela Bondi, Defendants.

Case No. 25 C 12419
|
Signed March 23, 2026

**Synopsis**
**Background:** Non-profit organization brought action against President, Office of Management and Budget (OMB), its Director, Department of Justice (DOJ), Attorney General, Office of Justice Programs (OJP), and Office for Victims of Crime (OVC) alleging that Executive Order ordering agencies to terminate equity-related grants or contracts, Executive Order ordering Office of Management and Budget (OMB) and Attorney General to terminate all "diversity," "equity," "equitable decision-making" and similar programs and activities, and funding conditions in DOJ's Notices of Funding Opportunities (NOFOs) under Trafficking Victims Protection Act (TVPA) violated First Amendment, Fifth Amendment, separation of powers, Spending Clause, and Administrative Procedure Act (APA) and seeking declaratory and injunctive relief. Non-profit moved for preliminary injunction.

**Holdings:** The District Court, Matthew F. Kennelly, J., held that:

[1] non-profit organization faced genuine threat of enforcement of Executive Order ordering agencies to terminate equity-related grants or contracts, as cognizable injury to establish Article III standing to challenge Executive Order as unconstitutional;

[2] organization was likely to succeed on its claim that provision of Executive Order requiring agency heads to include in every grant award term requiring recipient to certify that it does not operate programs promoting "diversity, equity, or inclusion" violated First Amendment, as factor for whether preliminary injunction was warranted;

[3] organization was likely to succeed on its claim that immigration enforcement condition in NOFO for grant under TVPA violated separation of powers and Spending Clause, as factor for whether preliminary injunction was warranted;

[4] organization was likely to succeed on its claims that immigration enforcement and discrimination conditions in NOFOs for grants under TVPA were arbitrary and capricious under APA, as factor for whether preliminary injunction was warranted;

[5] organization demonstrated that it would suffer irreparable harm absent preliminary injunction to enjoin enforcement of Executive Orders terminating equity-based grants and programs and funding conditions in related NOFOs for grants under TVPA;

[6] balance of equities and public interest weighed in favor of preliminary injunction; and

[7] preliminary injunction to enjoin enforcement of provision of Executive Order, which required certification for grant applications that applicant did not promote equity-based programs, against all recipients of federal funds awarded by the Department of Justice (DOJ) was warranted.

Motion granted in part and denied in part.

Opinion, 825 F.Supp.3d 638, corrected and superseded.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (69)

**[1]** **Federal Civil Procedure** In general; injury or interest
**Federal Courts** Case or Controversy Requirement

A dispute is a case or controversy appropriate for resolution by a federal court only if a plaintiff has a personal stake in the matter, i.e., Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[2] **Federal Civil Procedure** In general; injury or interest

**Federal Civil Procedure** Causation; redressability

To establish Article III standing, a plaintiff must show that it has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent, fairly traceable to the challenged action, and redressable by a favorable ruling. U.S. Const. art. 3, § 2, cl. 1.

[3] **Federal Civil Procedure** In general; injury or interest

A plaintiff must demonstrate Article III standing for each claim it presses, and for each form of relief that it seeks, and it must do so with the manner and degree of evidence required at the successive stages of litigation. U.S. Const. art. 3, § 2, cl. 1.

[4] **Injunction** Persons entitled to apply; standing

At the preliminary injunction stage, a plaintiff must make a clear showing that it is likely to establish each element of Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[5] **Federal Civil Procedure** Pleading

Where the parties have not yet taken discovery, allegations of injury resulting from the defendant's conduct may suffice to establish Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[6] **Federal Civil Procedure** In general; injury or interest

Self-censorship is a cognizable harm that can confer Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[7] **Federal Civil Procedure** In general; injury or interest

Monetary harm, e.g., from loss of grant funding or chilled stakeholders, readily qualifies as a cognizable harm to confer Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[8] **Associations** Government action or inaction in general

**Declaratory Judgment** Subjects of relief in general

Non-profit organization faced genuine threat of enforcement of Executive Order ordering agencies to terminate equity-related grants or contracts, as cognizable injury to establish Article III standing to seek declaratory and injunctive relief to challenge Executive Order as unconstitutional, although organization had retained its grants; organization wished to include equity-related messaging in its programming, which was conduct that was at least arguably protected by First Amendment but was at least arguably proscribed by Executive Order, and fact that organization's grants had not been terminated could have reflected that Executive Order was effective in chilling organization to remove equity-related messaging. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1; Executive Order 14151.

More cases on this issue

[9] **Federal Civil Procedure** In general; injury or interest

Article III standing may be predicated on a risk of future enforcement if the threatened enforcement is sufficiently imminent; that requirement is satisfied if a plaintiff's intended course of conduct is arguably protected and is arguably proscribed by the challenged provision. U.S. Const. art. 3, § 2, cl. 1.

[10] **Associations** Government action or inaction in general


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Declaratory Judgment** Subjects of relief in general

Non-profit organization faced genuine threat of enforcement of provision of Executive Order requiring agency heads to include in every grant award term requiring recipient to certify that it does not operate programs promoting equity programs as cognizable injury to establish Article III standing to seek declaratory and injunctive relief to challenge provision as unconstitutional; organization alleged that certification provision had been and would continue to be enforced against conduct that fit government's vision of illegal diversity, equity, and inclusion, even if conduct did not in fact violate civil rights laws, and government had not defined how scope of civil rights laws, creating ambiguity in how Executive Order would be enforced, including against organization's conduct. U.S. Const. art. 3, § 2, cl. 1; Executive Order 14173.

More cases on this issue

[11] **Associations** Government action or inaction in general

**Declaratory Judgment** Subjects of relief in general

Non-profit organization did not face genuine threat of enforcement of Executive Order provision ordering termination of all federal "diversity," "equity," "equitable decision-making" and similar programs and activities, as cognizable injury to establish Article III standing to seek declaratory and injunctive relief to challenge Executive Order as unconstitutional; provision was not likely to affect organization, as organization was private party and not government agency, and organization did not allege that it conducted government-wide programming. U.S. Const. art. 3, § 2, cl. 1; Executive Order 14173.

More cases on this issue

[12] **Associations** Government action or inaction in general

**Declaratory Judgment** Subjects of relief in general

Non-profit organization alleged concrete injury to establish Article III standing to seek declaratory and injunctive relief to challenge funding conditions in Notices of Funding Opportunities (NOFOs) for grant under Trafficking Victims Protection Act (TVPA) that organization intended to apply for, as unconstitutional and in violation of Administrative Procedure Act (APA); organization did not wish to have conditions attached to any grant award, and because conditions would influence process by which grant applicants were selected for grant offer, forcing organization to choose between applying with project ideas and running risk of being disqualified by conditions or giving up on its mission and tailoring application in accordance with conditions to preserve its chance at funding. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 551 et seq.; 22 U.S.C.A. § 7105(b)(2)(A).

More cases on this issue

[13] **Associations** Government action or inaction in general

**Declaratory Judgment** Subjects of relief in general

Non-profit organization did not allege concrete injury to establish Article III standing to seek declaratory and injunctive relief to challenge funding conditions in Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) that organization did not intend to apply for, as violative of First Amendment and Administrative Procedure Act (APA); conditions in grants that organization did not intend to apply for did not affect its ability to apply for grants, and conditions did not harm organization by chilling others' association with organization. U.S. Const. art. 3, § 2, cl. 1; 5 U.S.C.A. § 551 et seq.; 22 U.S.C.A. § 7105(b)(2)(A).

More cases on this issue

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**[14]** **United States** Equitable and nonmonetary relief

Under Tucker Act, non-profit organization's challenge to funding conditions in Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) was not required to be brought before Court of Federal Claims, where organization sought to enjoin enforcement of funding conditions to define organization's obligations going forward, not to recover money from government. 22 U.S.C.A. § 7105(b)(2)(A); 28 U.S.C.A. § 1491(a)(i).

More cases on this issue

**[15]** **United States** Equitable and nonmonetary relief

Court of Federal Claims lacks jurisdiction to award equitable relief.

**[16]** **Federal Courts** Claims against United States in general

Where Court of Federal Claims lacks jurisdiction, it cannot have exclusive jurisdiction.

**[17]** **Injunction** Grounds in general; multiple factors

To obtain a preliminary injunction, the movant must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.

**[18]** **Injunction** Injunctions Sought by Government in General

**Injunction** Injunctions against government entities in general

When the government is a party to the suit, assessing the harm to the opposing party and weighing the public interest merge, as factors to obtain a preliminary injunction.

**[19]** **Injunction** Presumptions and burden of proof

The party seeking a preliminary injunction carries the burden of persuasion on each of the factors to obtain an injunction.

**[20]** **United States** Spending

The government can, without violating the Constitution, selectively fund a program to encourage certain activities without at the same time funding an alternative program which seeks to deal with the problem another way.

**[21]** **United States** Recipients, Terms, and Conditions in General

The government may not impose a condition on its funding that affects protected conduct outside the scope of the federally funded program.

**[22]** **Constitutional Law** Government funding

The government may not attempt to use its funding power to regulate beyond the scope of the funded program and avoid First Amendment free speech scrutiny in the process. U.S. Const. Amend. 1.

**[23]** **Injunction** Public funds; grants and loans

Non-profit organization was likely to succeed on its claim that provision of Executive Order requiring agency heads to include in every grant award term requiring recipient to certify that it does not operate programs promoting “diversity, equity, and inclusion” violated First Amendment, as factor for whether preliminary injunction to enjoin enforcement of provision was warranted; provision used sweeping language signaling expansion in types of conduct that Executive believed violated federal civil rights laws, and provision did

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

not provide guidance on what programs were included in provision, requiring organization to revise its programs to comply with certification requirement, to decline to make certification and lose its grants, or to risk making certification that government would deem false. U.S. Const. Amend. 1; Executive Order 14173.

More cases on this issue

[24] **Constitutional Law** Vagueness

Laws and regulations may run afoul of First Amendment free speech principles as unconstitutionally vague when their scope is uncertain and they tend to produce large chilling effects. U.S. Const. Amend. 1.

[25] **Constitutional Law** Law Enforcement; Criminal Conduct

The concern with vagueness is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected under the First Amendment to refrain from exercising their rights for fear of criminal sanctions. U.S. Const. Amend. 1.

[26] **Injunction** Public funds; grants and loans

Non-profit organization was not likely to succeed on claim that Executive Order ordering agencies to terminate equity-related grants or contracts and related Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) violated First Amendment, as factor for whether preliminary injunction to enjoin enforcement of Order was warranted; on record, it appeared that only government entities, non-profit organizations, and other units of local governments could apply for TVPA grant funding, funding thus flowed through entities that historically were used to communicate messages from government, such that organization's speech related to funding was governmental speech, and it was less likely that speech would be stifled due to vagueness of funding criteria. U.S. Const. Amend. 1; 22 U.S.C.A. § 7105(b)(2)(A); Executive Order 14151.

More cases on this issue

[27] **Constitutional Law** Government funding

Under the First Amendment, the general rule is that the government may choose not to subsidize speech. U.S. Const. Amend. 1.

[28] **United States** Recipients, Terms, and Conditions in General

When the government establishes a subsidy for specified ends, certain restrictions may be necessary to define the limits and purposes of the program.

[29] **Constitutional Law** Certainty and definiteness; vagueness

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. U.S. Const. Amend. 5.

[30] **Constitutional Law** Certainty and definiteness; vagueness

An enactment may be void for vagueness under the Due Process Clause if it contains terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its applications. U.S. Const. Amend. 5.

[31] **Constitutional Law** Certainty and definiteness; vagueness

To avoid triggering the void-for-vagueness doctrine under due process, an enactment must articulate terms with a reasonable degree of clarity to reduce the risk of arbitrary enforcement and allow individuals to conform their behavior to the requirements of the enactment. U.S. Const. Amend. 5.

[32] **Constitutional Law** Certainty and definiteness; vagueness

The due process void-for-vagueness doctrine is concerned with lack of notice and may be overcome in any specific case where reasonable persons would know that their conduct is at risk. U.S. Const. Amend. 5.

[33] **Injunction** Public funds; grants and loans

Non-profit organization was not likely to succeed on its claim that Executive Order ordering agencies to terminate equity-related grants or contracts and related Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) were vague in violation of Fifth Amendment, as factor for whether preliminary injunction to enjoin enforcement of Order was warranted, where Order and NOFOs funding conditions did not invoke criminal or regulatory penalties, and Order and conditions solely concerned whether organization would receive certain grant funding. U.S. Const. Amend. 5; 22 U.S.C.A. § 7105(b)(2)(A); Executive Order 14151.

More cases on this issue

[34] **United States** Spending

When the only impact of an enactment is federal funding, the consequences of imprecision are not constitutionally severe.

[35] **Injunction** Public funds; grants and loans

Non-profit organization was likely to succeed on its claims that Executive Orders terminating equity-related grants and programs and related Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) violated separation of powers and Spending Clause, as factor for whether preliminary injunction to enjoin enforcement of Orders and NOFOs was warranted; aims of TVPA and its grant-related provisions had no relationship to conditions that Department of Justice (DOJ) sought to attach to grants through NOFOs, Congress did not include in its conditions on federal grants under TVPA same conditions required under Order and NOFOs, and Congress did not provide Executive with discretion to condition grants under TVPA on any factors not listed in TVPA. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. art. 3, § 1; 22 U.S.C.A. § 7105(b)(2)(A); Executive Orders 14151, 14173.

More cases on this issue

[36] **United States** In general; necessity

Congress exercises its power to legislate and power of the purse when it enacts appropriations statutes to allocate federal funding. U.S. Const. art. 1, § 8, cl. 1.

[37] **United States** Spending

**United States** In general; necessity

The Spending and Appropriations Clauses ensure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of government agents or the individual pleas of litigants. U.S. Const. art. 1, § 8, cl. 1.

[38] **Administrative Law and Procedure** Statutory basis and limitation

Although executive agencies administer Congressional appropriations, executive agencies' power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires.

[39] **Constitutional Law** Encroachment on legislature

Unless delegated authority by Congress, the Executive Branch may not condition the payment of federal funds on adherence to its political priorities.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

[40] **Injunction** Aliens, immigration, and citizenship

Non-profit organization was likely to succeed on its claim that immigration enforcement condition in Notices of Funding Opportunity (NOFO) for grant under Trafficking Victims Protection Act (TVPA) violated separation of powers and Spending Clause, as factor for whether preliminary injunction to enjoin enforcement of NOFO was warranted; NOFO immigration enforcement condition sought to ensure full enforcement of immigration law, including against victims of human trafficking, which was contrary to Congress' intent in TVPA, and, thus, NOFO condition ran afoul of separation of powers and Spending Clause. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. art. 3, § 1; 22 U.S.C.A. § 7105(b)(2)(A).

1 Case that cites this headnote
More cases on this issue

[41] **Constitutional Law** Encroachment on legislature

The power of the purse is not a tool for the Executive Branch to enforce the law absent authorization from Congress.

[42] **United States** Recipients, Terms, and Conditions in General

Under Congress' spending power, funding conditions imposed by Congress must still bear some relationship to the purpose of the federal spending. U.S. Const. art. 1, § 8, cl. 1.

[43] **United States** Review of presidential actions

Claims simply alleging that the President has exceeded his statutory authority are not "constitutional" claims.

[44] **Constitutional Law** Separation of Powers

**United States** Spending

A regulation cannot cure a violation of the separation of powers or the Spending Clause. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. art. 3, § 1.

[45] **Constitutional Law** Encroachment on legislature

Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted would be inconsistent with the Constitution's meticulous separation of powers. U.S. Const. art. 3, § 1.

[46] **Human Trafficking and Slavery** Administrative agencies and proceedings

**United States** Decisions reviewable; finality

Funding conditions in Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) were final agency action, and, thus, court could review non-profit's claim that conditions violated Administrative Procedure Act (APA); NOFO stated that activities violating conditions were unallowable costs that would not be funded, non-profit anticipated that its grant application would risk violation of conditions in discussing client population that it intended to serve, non-profit could not alter its applications without recalling them, after which it would have no other opportunity to describe its work, and non-profit may not receive grant funding based on evaluation of its grant application, and, thus, conditions required immediate change in non-profit's conduct. 5 U.S.C.A. § 704; 22 U.S.C.A. § 7105(b)(2)(A).

More cases on this issue

[47] **Administrative Law and Procedure** What constitutes finality in general

A final agency action has two qualities: it marks the consummation of the agency's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

decisionmaking process and is an action by which rights or obligations have been determined, or from which legal consequences will flow, for purposes of judicial review of the agency action under the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

[48] **Administrative Law and Procedure** 🔑 What constitutes finality in general

As for the second quality of a final agency action, an action is final when its impact is sufficiently direct and immediate and has a direct effect on day-to-day business, for purposes of judicial review of the agency action under the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

[49] **Administrative Law and Procedure** 🔑 Rules, regulations, and other policymaking

**Declaratory Judgment** 🔑 Officers and official acts in general

Where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act (APA) provision allowing review of final agency actions and the Declaratory Judgment Act must be permitted. 5 U.S.C.A. § 704.

[50] **Administrative Law and Procedure** 🔑 What constitutes finality in general

**Administrative Law and Procedure** 🔑 Preliminary, procedural, or intermediate actions

An agency's action may be final notwithstanding the agency's characterization of the action as an interim one and despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency, for purposes of judicial review of the agency action under the Administrative Procedure Act (APA). 5 U.S.C.A. § 704.

[51] **Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

The Administrative Procedure Act's (APA) arbitrary-and-capricious standard of review requires that agency action be reasonable and reasonably explained. 5 U.S.C.A. § 706(2)(A).

[52] **Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Under the Administrative Procedure Act (APA), a reviewing court must consider whether the agency's action was based on the relevant statutory factors. 5 U.S.C.A. § 706(2).

[53] **Administrative Law and Procedure** 🔑 Deference given to agency in general

**Administrative Law and Procedure** 🔑 Wisdom, judgment, or opinion in general

Judicial review under the arbitrary and capricious standard of the Administrative Procedure Act (APA) is deferential, and a court may not substitute its own policy judgment for that of the agency. 5 U.S.C.A. § 706(2)(A).

[54] **Administrative Law and Procedure** 🔑 Change of policy; reason or explanation

Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. 5 U.S.C.A. § 706(2)(A).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

[55] **Administrative Law and Procedure** 🔑 Amendment, repeal, expiration, or change of policy

A court reviewing an agency action under the Administrative Procedure Act (APA) must ask whether an agency changed existing policy and whether the agency displayed awareness that it is changing position and offered good reasons for the new policy. 5 U.S.C.A. § 706(2)(A).

[56] **Injunction** 🔑 Public funds; grants and loans

**Injunction** 🔑 Aliens, immigration, and citizenship

Non-profit organization was likely to succeed on its claims that immigration enforcement and discrimination conditions in Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA) were arbitrary and capricious under Administrative Procedure Act (APA), as factor for whether preliminary injunction to enjoin enforcement of NOFOs was warranted; challenged conditions represented new and undefined understandings of anti-discrimination law, record did not show previous requirements to certify compliance with all federal anti-discrimination law to receive grants under FVRA, government provided no explanation for why its position on conditions at issue changed, and organization had strong reliance interest, as grants funded substantial portion of its budget. 5 U.S.C.A. § 706(2)(A); 22 U.S.C.A. § 7105(b)(2)(A).

More cases on this issue

[57] **United States** 🔑 Recipients, Terms, and Conditions in General

Under the Administrative Procedure Act (APA), there is nothing new nor arbitrary and capricious about prohibiting grantees from using federal funds to violate applicable federal law. 5 U.S.C.A. § 706(2)(A).

[58] **Injunction** 🔑 Public funds; grants and loans

Non-profit organization demonstrated that it would suffer irreparable harm absent preliminary injunction to enjoin enforcement of Executive Orders terminating equity-based grants and programs and funding conditions in related Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA); organization established likelihood of success on its claim that certification provisions of Orders and NOFOs conditions violated organization's First-Amendment rights, and enforcement of Orders and NOFOs conditions would violate separation of powers. U.S. Const. art. 3, § 1; U.S. Const. Amend. 1; 22 U.S.C.A. § 7105(b)(2)(A); Executive Orders 14151, 14173.

More cases on this issue

[59] **Civil Rights** 🔑 Preliminary Injunction

Loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of preliminary injunction. U.S. Const. Amend. 1.

[60] **Civil Rights** 🔑 Preliminary Injunction

When First Amendment rights are at stake, quantification of injury is difficult and damages are therefore not adequate remedy for purposes of preliminary injunction. U.S. Const. Amend. 1.

[61] **Constitutional Law** 🔑 Purposes of separation of powers

By protecting against the concentration of power that would allow tyranny to flourish, separation of powers is one of the most vital of the procedural protections of individual liberty found in the United States Constitution. U.S. Const. art. 3, § 1.

[62] **Injunction** 🔑 Injunctions against government entities in general

The balance of harms and the public interest merge when the government is the opposing party, as factors for a preliminary injunction.

[63] **Civil Rights** Preliminary Injunction

Preliminary injunctions protecting First Amendment freedoms are always in the public interest. U.S. Const. Amend. 1.

[64] **Injunction** Injunctions against government entities in general

Preliminary injunctions protecting the separation of powers are always in the public interest. U.S. Const. art. 3, § 1.

[65] **Injunction** Public funds; grants and loans

Balance of equities and public interest weighed in favor of preliminary injunction to enjoin enforcement of Executive Orders terminating equity-based grants and programs and funding conditions in related Notices of Funding Opportunities (NOFOs) for grants under Trafficking Victims Protection Act (TVPA); organization was likely to succeed on its claims that Orders and funding conditions violated First Amendment, separation of powers, Spending Clause, and Administrative Procedure Act (APA), and injunction would not prevent government from considering grant applications and disbursing federal funding to grant applicants, as government remained free to process grant applications and disburse funding as long as it did so within limits set by Constitution and APA. U.S. Const. art. 1, § 8, cl. 1; U.S. Const. art. 3, § 1; U.S. Const. Amend. 1; 5 U.S.C.A. § 706(2)(A); 22 U.S.C.A. § 7105(b)(2)(A); Executive Orders 14151, 14173.

More cases on this issue

[66] **Injunction** Administrative Agencies and Proceedings in General

In a case challenging an executive agency action as unconstitutional, the balance of harms normally favors granting preliminary injunctive relief, because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.

[67] **Injunction** Public funds; grants and loans

Preliminary injunction to enjoin enforcement of provision of Executive Order, which required certification for grant applications that applicant did not promote equity-based programs, against all recipients of federal funds awarded by the Department of Justice (DOJ) was warranted, to provide complete relief for non-profit organization; organization relied on network of nationwide collaborators who provided services for trafficking victims, provision of Order acted as barrier to organization's collaboration with those other organizations, because other organizations were likely to avoid any association with speech that could violate provision, and organization's work focused on training and programs for other organizations, which inherently required collaboration among stakeholders. Executive Order 14173.

More cases on this issue

[68] **Administrative Law and Procedure** Scope and Extent of Review in General

The most natural reading of the scope of review language in the Administrative Procedure Act (APA) is that courts act on the agency action, findings, and conclusions themselves. 5 U.S.C.A. § 706.

[69] **Administrative Law and Procedure** Supersedeas or stay of proceedings

**Injunction** Administrative Agencies and Proceedings in General

Language of the section of the Administrative Procedure Act (APA) governing interim relief is naturally read to authorize courts to postpone or stay the agency action itself pending review, rather than enjoining its enforcement as to particular plaintiffs. 5 U.S.C.A. § 705.

**Attorneys and Law Firms**

Aneel Lachman Chablani, Chicago Lawyers' Committee for Civil Rights, Chicago, IL, Kathryn Youker, Pro Hac Vice, Sabrina Asgari Talukder, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Keith J. Harrison, Pro Hac Vice, Crowell & Moring LLP, Washington, DC, Parker S. Warrington III, Pro Hac Vice, Crowell & Moring LLP, San Francisco, CA, Rachel Stevens, Pro Hac Vice, Crowell & Moring LLP, New York, NY, Jason Patrick Stiehl, Crowell & Moring LLP, Chicago, IL, for Plaintiff.

Jelena Kolic, AUSA, Patrick Walter Johnson, Thomas P. Walsh, DOJ-United States Attorney's Office, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, United States District Judge

***1** Freedom Network USA, a non-profit coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors, alleges that several provisions of Executive Orders 14151 and 14173 and other provisions of the Notices of Funding Opportunities (NOFOs) for certain grants under the Trafficking Victims Protection Act (TVPA) violate the First Amendment, the Fifth Amendment, the separation of powers, and the Spending Clause. Freedom Network also alleges that the NOFO conditions violate the Administrative Procedure Act (APA). Freedom Network filed an emergency motion for a temporary restraining order on February 23, 2026, which the Court granted after a hearing on February 24, 2026. The Court then extended that order through March 24, 2026. Freedom Network has filed a motion for a preliminary injunction. For the reasons below, the Court grants Freedom Network's motion for a preliminary injunction in part.

**Background**

Freedom Network USA describes itself as "the nation's largest non-profit coalition of advocates, service providers, and survivors working to end human trafficking and protect survivors ... by providing equity-driven training and technical assistance to thousands of private and public stakeholders ... as well as direct services to thousands of survivors each year[.]" Am. Compl. ¶ 2 (footnote omitted). Freedom Network provides these services across the nation to thousands of survivors each year and trains thousands of private and public stakeholders nationwide. Its programs include the Housing Training and Technical Assistance program, which provides "immigration-focused training and technical assistance to housing providers serving immigrant survivors[,]" and the Survivor Reentry Project, "the only national program providing criminal record relief for survivors of human trafficking" and serving those with criminal charges in multiple jurisdictions. *Id.* ¶¶ 50–51. Freedom Network is also researching and developing National Standards of Care for service providers regarding the needs of trafficking survivors.

The TVPA defines "sex trafficking" as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act." 22 U.S.C. § 7102(12). The TVPA defines "severe forms of trafficking in persons" as "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age" or "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." *Id.* § 7102(11).

Under the TVPA, "[s]ubject to the availability of appropriations, the Attorney General may make grants to States, Indian tribes, units of local government, and nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking[.]" *Id.* § 7105(b)(2)(A). Grants may be made for victims who are either "between 12 and 24 years of age" and "homeless, in foster care, or involved in the criminal justice system;" "transitioning out of the foster care system;" or "women or girls in underserved populations." *Id.* The statute defines "underserved populations" as those who "face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age)[.]" 34 U.S.C. § 12291(a)(46). The TVPA further provides that "[o]f amounts made available for grants under this paragraph, there shall be set aside" specific percentages: "three percent for research, evaluation, and statistics;" "[five] percent for training and technical assistance, including increasing capacity and

expertise on security for and protection of service providers from intimidation or retaliation for their activities;" and "one percent for management and administration." 22 U.S.C. § 7105(b)(2)(B).

***2** In fiscal year 2025, Congress appropriated $88 million for services for trafficking victims under 22 U.S.C. § 7105(b). The Office for Victims of Crime (OVC) of the Department of Justice (DOJ) administers grants under the TVPA.

The TVPA has a variety of other provisions. These include provisions relating to immigration benefits for immigrants who have been subject to severe trafficking and may serve as witnesses, *id.* § 7105(c)(3), and others relating to the prevention, investigation, and prosecution of trafficking. *Id.* §§ 7104, 7104b, 7109.

Seventy percent of Freedom Network's funding comes through federal funding appropriated by Congress pursuant to the TVPA and awarded through the OVC. Freedom Network has consistently applied for and been awarded federal funding since 2017. It receives federal grant funding of $800,000 for the Survivor Reentry Project, $1.2 million for its National Standards of Care project, and about just under $2 million for the Housing Training and Technical Assistance Project. Freedom Network is also a subrecipient of $150,000 to a federal grant to the Coalition Against Slavery and Trafficking under the Human Trafficking Training and Technical Assistance Program. Freedom Network was previously a subcontractor to the Inner City Fund on its Technical Assistance Collective awarded by the OVC.

In this suit, Freedom Network challenges three provisions of two executive orders and three funding conditions included in DOJ's NOFOs for grants under the TVPA.

**A. Executive orders**

In January 2025, President Trump promulgated two executive orders related to diversity, equity, and inclusion (DEI). *See* Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Executive Order 14151 (the J20 Order) declares a policy of ending "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1. Executive Order 14173 (the J21 Order) similarly denounces a perceived practice of "critical and influential institutions of American society" adopting "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called [DEI] or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws[.]" Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1. The J21 Order further commands "all executive departments and agencies ... to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements ... [and] to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* § 2.

Freedom Network challenges three provisions implementing these policies. First, Freedom Network challenges section 2(b)(i) of the J20 Order (the J20 termination provision). That section provides:

> Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB [Office of Management and Budget], and the Director of OPM [Office of Personnel Management], as appropriate, shall take the following actions within sixty days of this order: ... terminate, to the maximum extent allowed by law, all ... "equity-related" grants or contracts[.]

***3** Exec. Order 14151, 90 Fed. Reg. 8339, § 2(b)(i).

Freedom Network also challenges two provisions of the J21 Order. Section 3(c)(iii) of the J21 Order (the J21 termination provision) provides:

> The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall: ... Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Exec. Order 14173, 90 Fed. Reg. 8633, § 3(c)(iii). Section 3(b)(iv) of the J21 Order (the J21 certification provision) states that "[t]he head of each agency shall include in every contract or grant award: ... A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv).

**B. Funding conditions**

Federal agencies must announce funding opportunities in NOFOs describing the available grant funding. *See* 2 C.F.R. § 200.204. In December 2025, pursuant to the TVPA, DOJ released seven NOFOs related to anti-trafficking work. *See, e.g.*, "OVC FY25 Services for Victims of Human Trafficking," Pl.'s Mot. to Suppl., Ex. A. Freedom Network intends to apply for two of the grants under the NOFO entitled "Services for Victims of Human Trafficking." It will not apply for grants issued under the other NOFOs. It will use the funding to hire more attorneys for its Survivor Project and reduce its waitlist of 100 survivors seeking criminal record relief.

Freedom Network challenges three conditions present in this NOFO. First, the NOFO's so-called immigration enforcement condition defines as unallowable costs that will not be funded:

> any program or activity, at any tier that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents.

Pl.'s Mot. to Suppl., Ex. A at 11. Second, the NOFO's discrimination condition defines as unallowable costs:

> any program or activity, at any tier that violates any applicable Federal civil rights or nondiscrimination law. This includes violations that—(1) indirectly violate the law, including by promoting or facilitating violations; or (2) unlawfully favor individuals in any race or protected group, including on majority or minority, or privileged or unprivileged, basis, within a given area, population, or sector.

*Id.* Finally, the NOFO includes a certification provision, which mirrors the J21 certification provision and states that:

> Compliance with Federal civil rights and nondiscrimination laws is material to the government's decision to make any award and payment under this program, including for purposes of the False Claims Act, and each recipient will be required to certify (in its acceptance of the conditions of the award) that it does not operate any programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

***4** *Id.* at 30. The False Claims Act, 31 U.S.C. § 3729, provides that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(G).

Parties that apply for and are awarded grant funding will be required to comply with certain terms and conditions. As best as the Court can tell, the final grant conditions related to the NOFO have not been released and are not part of the record in this case.

**C. Impact of the Executive Orders and NOFO conditions**

On January 31, 2025, Freedom Network received an email from a DOJ subcontractor, Inner City Fund, containing

a list of words that "cannot appear in any Office for Victim of Crime materials (i.e. web pages, training content, presentations, etc.)" because they are "terms or words in conflict with recent Executive Orders." *See* Am. Compl., Ex. C (listing words including DEI, diversity, gender, identity, LGBTQ, minority populations, race/racial, pronouns, and trans). The list was entitled "DOJ-Office of Justice Programs (OJP) Guidance." *Id.* Freedom Network submits that all its federally funded work is prohibited from using these words, some of which appear in its mission statement and "in every single training it provides as a national training and technical assistance provider." Am. Compl. ¶ 93.

Freedom Network alleges that OVC ordered it to remove specific terms, including "colonial systems," "oppression," and "restorative justice," from a privately funded, survivor-led presentation. Mot. for Prelim. Inj. at 8. OVC also asked Freedom Network to remove the terms "ethnic groups," "disabilities," "hearing and/or vision loss," and "cultural responsiveness" from a form assessing grants provided under Freedom Network's Housing Training and Technical Assistance Project. *Id.* at 8–9. OVC sought to approve the attendees, goals, group discussion questions, and language of the invitation and save-the-date for Freedom Network's May 2025 Housing Summit. OVC also told Freedom Network it could not host a webinar on housing for immigrant survivors that would address race and gender equity.

Freedom Network explains that stakeholders pulled out of its annual Anti-Trafficking Conference to avoid having their own federal funding withdrawn. As a result, the conference generated half the revenue of prior conferences. Potential attendees are similarly concerned about the risk to their funding if they attend Freedom Network's upcoming 2026 conference. Two members of Freedom Network's board of directors have resigned due to concerns about their employers' federal funding, and two subcontractors have terminated subcontracts with Freedom Network.

Looking forward, Freedom Network plans to apply for two grants under the NOFO entitled Services for Victims of Human Trafficking to support its Survivor Reentry Project. It has already submitted an SF-424 form (a prerequisite to a funding application describing the nature of its project) and its co-Executive Director submitted in the present case a sworn declaration explaining that it intended to submit a second SF-424 and applications for two grants, due on March 18, 2026. *See* Second Suppl. Bruggerman Decl. ¶¶ 6, 8. The grant application requires Freedom Network to submit a proposal abstract explaining the proposed project's purpose, geographic scope, target population, activities, and expected outcomes. Freedom Network contends that it cannot submit an effective grant application without describing that its "projects will serve women, immigrants, and persons of color because statistically they are disproportionately arrested as a direct result of their trafficking victimization." *Id.* ¶ 10. Freedom Network maintains that, to apply for these grants, it must use some of the terms that OVC has prohibited under the Executive Orders. An applicant cannot modify its application after submission and must certify that it "will comply with all award requirements and all federal statutes and regulations applicable to the award[,]" including the NOFO conditions. *Id.* ¶ 19.

***5** Freedom Network says that its grant application will proceed through a peer review process, which "will have to consider the extent to which an application is consistent with DOJ's requirements as reflected in the New Funding Conditions." *Id.* ¶ 22. It claims that it faces a choice between altering its speech in its application to attempt to comply with the NOFO conditions or risking negative assessment in the peer review process.

With or without federal grant funding, Freedom Network anticipates that it will close its doors in 2026. Without federal funding, the organization will exist for a mere six weeks on private funding. With federal grant funding under the NOFO conditions, Freedom Network maintains that it will still face serious financial uncertainty because of the potential for denied reimbursement requests or False Claims Act investigations, requiring it to reserve private funding in the case of denied reimbursements, reduce its staff, and serve fewer trafficking survivors.

**D. Procedural history**

On October 10, 2025, Freedom Network filed the present lawsuit seeking declaratory and injunctive relief under the Constitution and the APA. OVC issued the Services for Victims of Human Trafficking NOFO in December 2025. Freedom Network moved for a preliminary injunction that same month. Freedom Network amended its complaint and motion for a preliminary injunction in February 2026.

Under the First Amendment, Freedom Network challenges the Executive Orders and funding conditions as overbroad and discriminating on the basis of viewpoint. It also alleges that the J21 certification provision and the NOFO certification condition infringe on free speech and create

an unconstitutional condition on protected speech. Freedom Network additionally claims that the executive orders and the NOFO conditions are unconstitutionally vague and run afoul of the Due Process Clause. Freedom Network also asserts claims under the Spending Clause and the separation of powers regarding the Executive Orders and NOFO conditions. And it challenges the NOFO conditions under the APA, contending that they are contrary to law, in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right.

In February 2026, Freedom Network moved for a temporary restraining order and a preliminary injunction. On February 24, 2026, after a hearing in which both sides presented argument, the Court granted motion for a temporary restraining order. Dkt. 74. At the conclusion of the March 11 hearing on the preliminary injunction motion, the Court extended its temporary restraining order until March 24, 2026 to permit consideration of the arguments and issues.

## Discussion

### A. Jurisdiction

The Court begins, as it must, with jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

**[1]** The government primarily argues that Freedom Network lacks Article III standing to bring its challenges. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021). A dispute is a case or controversy appropriate for resolution by a federal court only if a plaintiff has a "personal stake" in the matter, *i.e.*, Article III standing. *Id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**[2]** **[3]** **[4]** To establish standing, a plaintiff must show that it has "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.' " *Murthy v. Missouri*, 603 U.S. 43, 57, 144 S.Ct. 1972, 219 L.Ed.2d 604 (2024). A plaintiff must demonstrate standing for each claim it presses, and for each form of relief that it seeks. *Id.* at 61, 144 S.Ct. 1972. And it must do so "with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 58, 144 S.Ct. 1972. At the preliminary injunction stage, a plaintiff must make a "clear showing" that it is "likely" to establish each element of standing. *Id.*

***6** **[5]** In this case, Freedom Network must demonstrate that it likely has standing to seek an injunction against each of the provisions that it challenges. Because the parties have not yet taken discovery, allegations of injury resulting from the government's conduct may suffice. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. In support of its standing to challenge the Executive Order provisions, Freedom Network contends that the threat of enforcement has forced it to self-censor or risk losing grant funding and has chilled others from collaborating with Freedom Network or attending its events, causing further monetary harm. Freedom Network advances a similar theory of standing to challenge the NOFO conditions, alleging that they force it to choose between self-censorship or forfeiting the opportunity for millions of dollars in critical funding.

**[6]** **[7]** Self-censorship is a cognizable harm that can confer standing. *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023). Monetary harm, *e.g.*, from loss of grant funding or chilled stakeholders, readily qualifies, too. *See TransUnion*, 594 U.S. at 425, 141 S.Ct. 2190. Under Freedom Network's theory, these claimed injuries are also fairly traceable to the government's challenged conduct and likely to be redressed by the injunction sought. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*NADOHE*), 167 F.4th 86, 99 (4th Cir. 2026). The Court's analysis thus focuses on the government's responses.

**[8]** **[9]** The government contends that Freedom Network lacks standing to challenge the J20 termination provision because it does not face a "genuine threat" of enforcement. Defs.' Resp. at 8. That is so, the government says, because Freedom Network has retained its grants, and even had some extended, even though the J20 termination provision has been in place for over a year. The Court does not agree. Standing may be predicated on a risk of future enforcement if the threatened enforcement is sufficiently imminent. *See Brown*, 86 F.4th at 761 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014)). That requirement is satisfied if a plaintiff's intended course of conduct is arguably protected and is arguably proscribed by the challenged provision. *See id.* at 762; *cf. Steel Co.*, 523 U.S. at 89, 118 S.Ct. 1003 (stating that jurisdiction is not defeated by the possibility that the plaintiff ultimately lacks a cause of action, unless the claim is wholly insubstantial and frivolous). That is the case here: Freedom Network wishes to include equity-related messaging in its programming, conduct that is

at least arguably protected by the First Amendment but at least arguably proscribed by the J20 termination provision.

The government seeks to infer otherwise from the fact that Freedom Network's grants have not yet been terminated, but that may merely reflect that the Executive Orders have been effective in chilling Freedom Network. Indeed, though Freedom Network may rely on its pleadings at this stage, it has produced evidence of OVC requiring it to remove equity-related messaging in several recent programs to avoid violating the Executive Orders. The government argues that OVC was entitled to do this regardless of the Executive Orders because it has independent supervisory authority under the terms of the grant, but that is beside the point. Regardless of whether OVC acted within its authority under the terms of the grant, its invocation of the Executive Orders supports Freedom Network's concern that continuing with its desired equity-related messaging risks running afoul of the Executive Orders and losing its grants. The Court therefore concludes that Freedom Network has established that it likely has standing to challenge the J20 termination provision.

**[10]** The government advances a similar argument regarding the J21 certification provision. According to the government, the certification provision only requires Freedom Network to certify compliance with the federal civil rights laws. And because Freedom Network does not intend to violate those laws, the government says that any risk of enforcement is speculative.

***7** Freedom Network, however, alleges otherwise. According to Freedom Network, the J21 certification provision has been and will be enforced against conduct that fits the government's vision of illegal DEI, even if the conduct does not in fact violate the civil rights laws. It is possible that the government is right and that Freedom Network is wrong, but that goes to the merits of Freedom Network's challenge. For purposes of standing, it is sufficient if the J21 certification provision *arguably* reaches beyond the federal civil rights laws and proscribes Freedom Network's desired conduct.

It does. The J21 certification provision's text requires a grantee "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order 14173, 90 Fed. Reg. 8633, § 3(b)(iv)(B). If that were all, a straight-faced argument could be made that the provision proscribes "programs promoting DEI" only when such programs violate the federal anti-discrimination laws. *See* *NADOHE*, 167 F.4th at 103. But context muddies that interpretation. The Executive Orders contain sweeping language condemning a perceived widespread practice of "illegal DEI" that, according to the Executive Orders, violates the civil rights and anti-discrimination laws but has so far avoided scrutiny. And the government acknowledged at oral argument that it has not defined how the scope of the federal civil rights and anti-discrimination laws have changed or what "illegal DEI" means. Mar. 3, 2026 Tr. 47:13–49:11. That suggests that the Executive Orders may be operating on a particular vision of the anti-discrimination laws. If so, then a grantee would have to ask whether its conduct violates the Executive's understanding of the civil rights and anti-discrimination laws going forward. After all, that is what would trigger enforcement.

This ambiguity presents a dilemma for a grantee like Freedom Network, which risks losing federal funding as well as liability under the False Claims Act. As the Fourth Circuit has noted, "[a] 'person of ordinary firmness faced with this situation would steer clear of any speech or activities arguably promoting [DEI].' " *NADOHE*, 167 F.4th at 98. Moreover, regardless of the best interpretation of the text of the Executive Orders, Freedom Network has plausibly alleged that the government has taken a wider enforcement posture that might sweep in Freedom Network's desired course of conduct. That suffices to establish that it likely has standing to challenge the J21 certification provision.

**[11]** The government presents a different argument regarding the final Executive Order provision at issue—the J21 termination provision. According to the government, that provision only affects government agencies and "government-wide DEI 'programming for the government.' " Defs.' Resp. at 8. Because Freedom Network is not a government agency and does not allege that it conducts government-wide programming, the J21 termination provision does not apply to it.

This Court agreed with that reading in a preliminary assessment in another case. Though the text of the J21 termination provision does not itself contain a clear limitation to internal government affairs, it is nested within a section titled "Terminating Illegal Discrimination in the Federal Government," alongside provisions "focus[ed] on internal government agency processes and programs." *See* *Chi. Women in Trades v. Trump* (*CWIT I*), 773 F. Supp. 3d 592, 601 (N.D. Ill. 2025); Exec. Order 14173, 90 Fed. Reg. 8633, § 3. The Court therefore concluded, in ruling on a motion


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

for a temporary restraining order, that this provision likely did not reach private parties. *CWIT I*, 773 F. Supp. 3d at 601. As a result, the Court concluded, the plaintiffs in that case likely lacked standing to challenge the provision. *Id.* The Court later adopted that same interpretation and conclusion in its preliminary injunction ruling in the same case, noting that the parties had not raised any new arguments regarding the issue. *Chi. Women in Trades v. Trump* (*CWIT II*), 778 F. Supp. 3d 959, 977 (N.D. Ill. 2025).

***8** Here, too, Freedom Network offers no reason for the Court to depart from its previous understanding of the J21 termination provision. And other courts that have addressed the issue have agreed with this Court's reading, at least on the limited records available in those cases. *See, e.g.*, *Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025); *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1209 (N.D. Cal. 2025) (noting that reading the J21 termination provision "to apply externally would render it duplicative" of the J20 termination provision). [1] The Court therefore remains of the view, at this preliminary stage and with minimal briefing on this specific point, that the provision is unlikely to affect private parties like Freedom Network. That understanding may change later in the case if, for example, targeted briefing or evidence provides a reason to read the provision differently. At this time, however, Freedom Network has not met its burden to show that it likely has standing to challenge the J21 termination provision.

**[12]** Turning to the funding conditions, the government contends that Freedom Network lacks standing to challenge them because they do not apply, and therefore cannot harm Freedom Network, until it receives and accepts a grant offer. According to the government, it is uncertain whether Freedom Network will even receive a grant offer and be confronted with the funding conditions in the first place. Moreover, the government says, OVC has not yet decided whether to impose two of the funding conditions—the discrimination condition and the immigration-enforcement condition—as conditions in the final grant awards. As a result, the government argues, Freedom Network's alleged injuries are too speculative to support standing and that the claim is not yet ripe for adjudication. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (explaining that the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Both issues in this case "boil down to the same question." *See Susan B. Anthony List*, 573 U.S. at 157 n.5, 134 S.Ct. 2334.

The problem with the government's argument is that it omits a key harm that Freedom Network faces now. Freedom Network seeks to enjoin the funding conditions not only because it does not wish to have them attached to any grant award it receives, but also because the conditions will influence the process by which grant applicants are selected for a grant offer. According to Freedom Network, it faces a dilemma now: (a) apply with the project ideas that it wants to pursue, thus running the risk of being disadvantaged or disqualified by the funding conditions during the review process, or (b) give up on its desired mission and tailor its application in accordance with the funding conditions to preserve its chance at receiving federal funding. *See* Suppl. Bruggerman Decl. ¶ 36.

The government does not dispute that Freedom Network is forced to choose between these harms now. It instead justifies the situation as the product of the government's right to "favor certain views in selecting who to award [funding]... without violation the [C]onstitution." Defs.' Resp. at 23. That is a serious argument on the merits, but it does not deprive Freedom Network of standing or render its claims unripe.

**[13]** There is another wrinkle. Freedom Network seeks to enjoin the funding conditions in seven NOFOs, but it only intends to apply for grants under one—the Services for Victims of Human Trafficking NOFO. The funding conditions in the other NOFOs do not affect Freedom Network's ability to apply for grants. And unlike the Executive Orders, they do not harm Freedom Network by chilling others' association with it. If one of Freedom Network's collaborators receives a grant under one of the other NOFOs, the funding conditions may discourage the would-be collaborator from using those funds in a joint project with Freedom Network. But that chilling effect—and the accompanying harm to Freedom Network—would happen only if and when the prospective collaborator receives and accepts the grant. This possibility, at this stage, is too speculative to support Freedom Network's standing to challenge the funding conditions in NOFOs that will not directly affect its grant applications.

***9** In short, Freedom Network has standing to challenge the funding conditions in the Services for Victims of Human Trafficking NOFO—the one NOFO that will affect Freedom Network's grant applications according to its allegations—but it lacks standing to challenge the funding conditions in the other NOFOs.

**[14]** Finally, the government asserts that Freedom Network's challenges to the funding conditions must be brought before the Court of Federal Claims. The Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over claims against the United States for more than $10,000 that are "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(i); *E. Enters. v. Apfel*, 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). The government reasons that any issues with the funding conditions are contractual in nature and therefore fall within the scope of the Tucker Act.

**[15]** **[16]** The government's position overlooks an important limitation: the Court of Federal Claims lacks jurisdiction to award equitable relief. *See, e.g.*, *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973). And where the Court of Federal Claims lacks jurisdiction, it cannot have exclusive jurisdiction. *See Tootle v. Sec'y of the Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). Freedom Network seeks to enjoin enforcement of the funding conditions to define its obligations going forward, not to recover money from the government. That is a claim for equitable relief, *see Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), that is appropriately filed before this Court, not the Court of Federal Claims.

In sum, Freedom Network has established that it likely has standing to seek an injunction against the J20 termination provision, the J21 certification provision, and all the funding conditions in the Services for Victims of Human Trafficking NOFO. Freedom Network has not established that it likely has standing to challenge the J21 termination provision or the funding conditions in other NOFOs. The claims for which Freedom Network has established it likely has standing are ripe for adjudication now, and those claims seek equitable relief within this Court's jurisdiction.

### B. Standard for motion for a preliminary injunction

**[17]** **[18]** **[19]** To obtain a preliminary injunction, the movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest ... merge." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). The party seeking an injunction "carries the burden of persuasion" on each of these points. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

#### 1. Likelihood of success on the merits

##### a. First Amendment

###### i. Certification provisions

Freedom Network challenges two certification provisions that apply to TVPA grants awarded by OVC. [2] First, Freedom Network argues that section 3(b)(iv) of the J21 Order—the J21 certification provision—unconstitutionally infringes on its First Amendment rights because the provision regulates its conduct outside of the contours of federal grant funding. Second, Freedom Network advances the same argument against the NOFO certification provision. [3]

***10** **[20]** **[21]** **[22]** "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities ... without at the same time funding an alternative program which seeks to deal with the problem another way." *Rust v. Sullivan,* 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). But the government may not impose a condition on its funding that affects "protected conduct outside the scope of the federally funded program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 218, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013). And the government may not attempt to use its funding power to regulate beyond the scope of the funded program and avoid First Amendment scrutiny in the process. *Id.* at 214–15, 133 S.Ct. 2321 (noting the government cannot "seek to leverage funding to regulate speech outside the contours of the program itself").

**[23]** The Court addressed the J21 certification provision in *CWIT II*. As the Court explained in its preliminary injunction ruling in that case, the government may not "reach outside" the federal program to influence speech. *CWIT II*, 778 F. Supp. 3d at 983 (quoting *AID*, 570 U.S. at 214, 133

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

S.Ct. 2321). The government acknowledges that the J21 certification provision and NOFO certification provision are not limited to grantees' speech within their federally funded programs. Mar. 3, 2026 Tr. 35:14–35:17.

**[24]** **[25]** Perhaps recognizing that it cannot rely on its broad discretion that applies within the ambit of federal funding decisions, the government instead argues that both certification provisions are permissible because they only require a grantee to certify that it is not breaking the law. Laws and regulations may run afoul of the First Amendment as unconstitutionally vague when "their scope is uncertain and ... they tend to produce large chilling effects." *Brown,* 86 F.4th at 771. The concern with vagueness is "predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions." *Id.* (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 581, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989)).

As the Court noted in *CWIT II*, how to comply with the requirement that a grantee "not operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws" is left entirely to the grantee's imagination. *CWIT II*, 778 F. Supp. 3d at 984. The J21 Order includes sweeping language that "Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1. This language, and other similar language in the J21 Order, signals an expansion in the types of conduct that the Executive now believes violates the federal civil rights and discrimination laws. The problem is that grantees are left without any information to shed light on the types of conduct that may now constitute "illegal DEI." The government has had multiple opportunities in this case and others to explain on what the J21 Order means when it refers to "illegal DEI" and "programs promoting DEI." Rather than do so, the government acknowledged at oral argument that it has not defined how the scope of the federal civil rights and anti-discrimination laws has changed or what "illegal DEI" means. Mar. 3, 2026 Tr. 47:13–49:11.

Freedom Network and other grantees are thus put in a difficult and perhaps impossible position. Without any guidance on what programs may "promote DEI," Freedom Network must attempt to revise its programs to comply with the certification provisions, decline to make a certification and thus lose its grants (and not receive any grants in the future), or risk making a certification that the government will deem false, subjecting Freedom Network to liability under the False Claims Act.

***11** For these reasons, the Court concludes that Freedom Network is likely to succeed on its claims that the J21 certification provision and NOFO certification provision violate its First Amendment rights.

### ii. Other challenged provisions

**[26]** Freedom Network also argues that the J20 termination provision, the NOFO discrimination condition, and the NOFO immigration enforcement condition violate the First Amendment because they are overbroad and regulate viewpoints. The government responds that these provisions are constitutional because the government is acting as patron to subsidize speech and may selectively fund a program to encourage certain activities to the exclusion of others.

**[27]** The Court acknowledges that cases governing the "constitutionality of government programs that subsidize[ ] speech expressing a particular viewpoint" "implicate a notoriously tricky question of constitutional law." *Matal v. Tam*, 582 U.S. 218, 239, 137 S.Ct. 1744, 198 L.Ed.2d 366 (2017). In *Rust, supra*, the plaintiffs challenged a federal statute that provided federal funding for family-planning services. The statute stated that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Rust*, 500 U.S. at 178, 111 S.Ct. 1759. The agency determined that this prohibition required a ban on "counseling, referral, and advocacy" within the project. *Id.* at 184, 111 S.Ct. 1759. The restriction was intended to ensure that the grant funds would "be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Id.* at 178–79, 111 S.Ct. 1759 (quoting H.R. Conf. Rep. No. 91–1667, p. 8 (1970)). The plaintiffs challenged the facial validity of the regulation. *Id.* at 183, 111 S.Ct. 1759. The Court overruled the plaintiffs' challenge. It concluded that the statutory restriction and related regulations did not violate the First Amendment because they were "designed to ensure that the limits of the federal program [were] observed." *Id.* at 193, 111 S.Ct. 1759. The Court stated that the government had not

discriminated on the basis of viewpoint but instead "merely chose[ ] to fund one activity to the exclusion of the other." *Id.* at 193, 111 S.Ct. 1759. Thus the "general rule" is that "the Government may choose not to subsidize speech[.]" *Id.* at 193, 111 S.Ct. 1759.

**[28]** The Court later explained that *Rust* relied on the rationale that the counseling activities of the doctors under the relevant statute amounted to government speech. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). The Court stated in *Velazquez* "that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker or instances, like *Rust*, in which the government used private speakers to transmit specific information pertaining to its own program." *Id.* (internal citations omitted). "[W]hen the government establishes a subsidy for specified ends[,]" "certain restrictions may be necessary to define the limits and purposes of the program." *Id.* at 543, 121 S.Ct. 1043.

The key question for this Court is whether TVPA-related speech, even if undertaken as part of a federally funded grant, is governmental or private speech. The Supreme Court has identified three primary factors for courts to consider when answering this question: (1) whether the medium has historically been used to "communicate[ ] messages from the States"; (2) whether the medium is "often closely identified in the public mind with the State," *i.e.*, whether it is reasonably interpreted as "conveying some message on the [Government's] behalf"; and (3) whether the government maintains direct, editorial control over the message's content. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210–13, 135 S.Ct. 2239, 192 L.Ed.2d 274 (2015) (internal quotations and alterations omitted).

***12** The government argues that the relevant grant funding promotes government speech because it maintains editorial control over materials that are presented to the public. The government appears to rely on funding condition 39 of the grant award for an OVC FY 2023 Services for Victims of Human Trafficking grant. This condition requires the grant recipient to "submit to OJP for review and approval any product (e.g., curricula, training materials, publications, reports, videos, or any other written, web-based, or audio-visual, or other materials) that will be developed and published under this award, 60 days before its intended publication." Defs.' Resp., Ex. 2 at 16. The condition also states that all such products must also include a statement that includes the following language: "The opinions, findings, and conclusions or recommendations expressed in this _______ are those of the contributors and do not necessarily represent the official position or policies of the U.S. Department of Justice." *Id.* at 17. This condition appears to give the government direct editorial control over the message's content. Although the government has expressly stated that any speech published by Freedom Network or its collaborators is private, not governmental, speech, the Court does not think that this disclaimer alone can support finding TVPA related speech is private. Additionally, the government asserts that it does not know what provisions will be included in the final grant awards. Thus it would be logically inconsistent for the Court to now rely on a provision that may or not be in the final grant award as the determinative factor on whether the speech at issue is governmental or private.

Based on the current record, it appears that only government entities, educational organizations, public housing organizations, nonprofit organizations, and other units of local government may apply for TVPA grant funding. *See* Pl.'s Mot. to Suppl., Ex. A at 9. TVPA funding thus flows through entities that have historically been used to communicate messages from the government and that are reasonably interpreted as conveying a message on the government's behalf. Although Freedom Network is a nonprofit organization, it is stepping into a similar role when conducting trainings and programs to share the government's TVPA-related message with other individuals and organizations. The Court thus concludes, for purposes of the present motion for preliminary injunction, that Freedom Network's speech related to TVPA grant funding is governmental speech.

The Court also addressed the J20 termination provision in *CWIT* and found that the plaintiff was unlikely to succeed on its contention that the provision violated its First Amendment rights. As the Court explained, at this juncture, it appears that the provision concerns a decision to no longer fund equity-related programs. *CWIT II,* 778 F. Supp. 3d at 985–87. The provision requires agencies to terminate all "equity-related" federal grants, but it does not prohibit equity-related activities outside of a grantee's federally funded programs. Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i). The First Amendment does not prohibit the government from choosing to no longer support equity-related programs, as it did in the Executive Order and NOFO. *Rust*, 500 U.S. at 193, 111 S.Ct. 1759.

Because the Court has concluded that the J20 termination provision, NOFO discrimination provision, and NOFO immigration enforcement condition are funding decisions that involve governmental speech, any vagueness concerns are "not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). Freedom Network is correct that that the provisions may cause the organization to conform its "speech to what [it] believe[s] to be the decisionmaking criteria in order to acquire funding." *Id.* at 588–89, 118 S.Ct. 2168. But, unlike the certification provisions, these provisions do not invoke a criminal or other regulatory penalty; thus any vagueness concerns are not akin to the chill that occurs from a vague "criminal statute or regulatory scheme." *Id.* Because the consequences of grant funding decisions are significantly less severe than a criminal or regulatory sanction, it is less likely that speech will be stifled. *Id.* at 588, 118 S.Ct. 2168.

For these reasons, the Court concludes that Freedom Network is not likely to succeed on its First Amendment claims related to the J20 termination provision, the NOFO discrimination condition, and the NOFO immigration enforcement condition.

**b. Fifth Amendment**

**[29] [30] [31] [32]** "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). An enactment may be void for vagueness if it contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its applications." *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). To avoid triggering the void-for-vagueness doctrine, an enactment "must articulate terms 'with a reasonable degree of clarity' to reduce the risk of arbitrary enforcement and allow individuals to conform their behavior to the requirements of the [enactment]." *Id.* (quoting *Roberts*, 468 U.S. at 629, 104 S.Ct. 3244). The Fifth Amendment's void-for-vagueness doctrine is concerned with "lack of notice" and "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

***13 [33] [34]** The Supreme Court's discussion in *Finley*, analyzed in the previous section, applies with equal force to Freedom Network's Fifth Amendment claim. If the J20 termination provision, NOFO discrimination condition, and NOFO immigration enforcement condition invoked criminal or regulatory penalties, the Court would face a different case. Instead, these provisions solely concern whether Freedom Network will receive certain grant funding. When the only impact is federal funding, "the consequences of imprecision are not constitutionally severe." *Finley,* 524 U.S. at 589, 118 S.Ct. 2168. Although the lack of clarity in the J20 termination provision, NOFO discrimination condition, and NOFO immigration condition is concerning, and all these provisions certainly include vague language, the Court must follow binding authority stating that such vagueness is less "constitutionally severe" in the context of government funding. *See Finley*, 524 U.S. at 589, 118 S.Ct. 2168 ("In the context of selective subsidies, it is not always feasible ... to legislate with clarity."); *see also Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025) ("The degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982))).

For these reasons, the Court concludes that Freedom Network is not likely to succeed on the merits of its claim that the J20 termination provision, NOFO discrimination condition, and NOFO immigration condition violate the Fifth Amendment. Given this determination, the Court need not address the parties' arguments regarding whether Freedom Network holds an underlying property right to its grants.

**c. Separation of powers and Spending Clause**

**[35]** Freedom Network challenges the J20 termination provision, the J21 certification provision, and the three contested NOFO conditions as violating the separation of powers and the Spending Clause. [4] Freedom Network argues that Congress drafted the TVPA to address human trafficking and specified that the primary victims of trafficking are underserved populations, women, and girls. It contends that the Executive Branch may not modify Congress's expressed intent to benefit these populations, including by adding grant conditions that prohibit equity-related activities. More broadly, Freedom Network says that Congress did not specify that funding could be withheld from TVPA grantees because their activities relate to equity and diversity or might

indirectly promote violations of immigration laws, so the Executive may not require grantees to certify that they will not engage in these activities.

**[36] [37] [38] [39]** The Constitution provides for the separation of powers, the structural division of "the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). Within this structural division, the Constitution vests in Congress the power to legislate and the power of the purse. U.S. Const. art. I, §§ 1, 8. Congress exercises these powers when it enacts appropriations statutes to allocate federal funding. The Spending and Appropriations Clauses ensure "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Although executive agencies administer Congressional appropriations, executive agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). In particular, unless delegated authority by Congress, the Executive Branch may not "condition the payment of ... federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018); *see City of Chicago v. Barr*, 961 F.3d 882, 892 (2020).

***14** As explained above, Congress provided that "the Attorney General may make grants" to state, local, and nonprofit entities "to develop, expand, or strengthen victim service programs for victims of human trafficking [.]" 22 U.S.C. § 7105(b)(2)(A). These grants must provide services to victims who are either "between 12 and 24 years of age" and "homeless, in foster care, or involved in the criminal justice system;" "transitioning out of the foster care system;" or "women or girls in underserved populations." *Id.*

Congress did not provide the Executive with the discretion to condition these grants on any other factors. It is true, as the government contends, that the grant funding provisions of the TVPA and related appropriations statutes are relatively broad. *See id. Compare* Consolidated Appropriations Act, Pub. L. No. 118-42, Div. C, Title II, 138 Stat. 25, 147 (2024) (providing "$88,000,000 for victim services programs for victims of trafficking, as authorized by section 107(b)(2) of the Victims of Trafficking Act, by the TVPRA of 2005, or programs authorized under Public Law 113–4 [Violence Against Women Reauthorization Act of 2013] [.]"), *with City of Chicago v. U.S. Dep't of Homeland Sec.*, 815 F.Supp.3d 727, 753–54 (N.D. Ill. 2025) (Kennelly, J.) (discussing mandatory language in appropriations provision for "sheltering and related activities provided by non-Federal entities" (quoting Consolidated Appropriations Act, Pub. L. No. 117-328, Div. F, Title II, 136 Stat. 4459, 4730 (2022)). But "[i]f Congress meant to incorporate [compliance with] all" federal immigration and anti-discrimination law as a condition for funding under the TVPA, Congress would have to say something to that effect. *Barr*, 961 F.3d at 899. Congress did not state in the TVPA or elsewhere that DOJ could withhold funding to entities that engage in DEI-related activities or whose activities directly or indirectly promote the violation of immigration laws.

The TVPA provides an example of exactly how Congress makes clear that it wishes to condition federal grants on compliance with specific conditions. The TVPA orders the Executive Branch to ensure that it does not fund projects involving human trafficking:

> The President shall ensure that any grant, contract, or cooperative agreement provided or entered into by a Federal department or agency under which funds are to be provided to a private entity, in whole or in part, shall include a condition that authorizes the department or agency to terminate the grant, contract, or cooperative agreement, or take any of the other remedial actions authorized under section 7104b(c) of this title, [monitoring and investigation of trafficking in persons,] without penalty, if the grantee or any subgrantee, or the contractor or any subcontractor, engages in, or uses labor recruiters, brokers, or other agents who engage in—(1) severe forms of trafficking in persons; (2) the procurement of a commercial sex act

> during the period of time that the grant, contract, or cooperative agreement is in effect; (3) the use of forced labor in the performance of the grant, contract, or cooperative agreement; or (4) acts that directly support or advance trafficking in persons, including the following acts ....”

22 U.S.C. § 7104(g); *see also id.* § 7104a(a) (providing that agencies may not “enter into a grant, contract, or cooperative agreement if the estimated value of the services required to be performed under the grant, contract, or cooperative agreement outside the United States exceeds $500,000” unless the recipient creates a plan for compliance with section 7104(g) and certifies compliance on an annual basis).

***15** Clearly, Congress knew how to specify that no federal grant funding should be provided to entities engaging in particular types of activity: in the instance just quoted, it did so by requiring inclusion of a trafficking termination condition in *every federal grant to a private entity*. Congress also prohibited the use of funds appropriated under the TVPA “to promote, support, or advocate the legalization or practice of prostitution,” and it required organizations providing certain services to certify “in either a grant application, a grant agreement, or both, that it does not promote, support, or advocate the legalization or practice of prostitution.” *Id.* § 7110(g); *see* Mar. 3, 2026 Tr. 20:11–21:5. By contrast, the government has not shown that Congress, in the TVPA or another statute, similarly required the J20 termination condition, the J21 certification condition, or any of the three challenged NOFO conditions.

The Court concludes that Freedom Network is likely to succeed on its claims that the J20 termination condition, the J21 certification condition, and the NOFO discrimination and certification conditions violate both the separation of powers and the Spending Clause. The aims of the TVPA and its grant-related provisions have no relationship to the conditions that DOJ seeks to attach to the grants. The government identifies no authority in the TVPA or another statute that requires the certifications at issue here, conditions grants on compliance with anti-discrimination laws, or prohibits federal grant recipients from engaging in equity-related work. Rather, in the TVPA, Congress did not reference federal anti-discrimination laws or employ the term “DEI” at all; did not specify that grant recipients should or should not conduct DEI; and did not prohibit “ ‘equity-related’ grants.” Exec. Order 14151, 90 Fed. Reg. 8339, § 2(b)(i); *see* Exec. Order 14173, 90 Fed. Reg. 8633, §§ 3(c)(iii), 3(b)(iv). Indeed, the TVPA expressly recognizes that trafficking “victims are predominantly women and girls[,]” 22 U.S.C. § 7101(b), and it provides grants to support victims who are “women or girls in underserved populations[,]” *id.* § 7105(b)(2)(A)(iii). But even if Congress had been silent on the identity of trafficking victims, the challenged provisions of the Executive Orders and the discrimination and certification provisions of the NOFOs “have nothing to do with the grant programs, as established by Congress,” to which DOJ seeks to attach the conditions. *City of Chicago v. Noem*, No. 25 C 12765, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025) (Shah, J.). The imposition of conditions that are not authorized by Congress in the enabling acts for the grants or any other federal statute violates the separation of powers and the Spending Clause. *See id.* at *8 (holding that similar grant conditions in DHS's Standard Terms and Conditions likely violated the separation of powers).

**[40]** Freedom Network has similarly demonstrated a likelihood of success on its separation-of-powers and Spending Clause claims with respect to the NOFO immigration enforcement condition. The condition purports to prohibit funding that “directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law ... or impedes or hinders the enforcement of federal immigration law—including by failing to ... give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents.” Pl.’s Mot. to Suppl., Ex. A at 11. The TVPA, on the other hand, notes that “[e]xisting laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves.” 22 U.S.C. § 7101(b)(17). Congress stated that “[v]ictims of severe forms of trafficking should not ... [be] penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation.” *Id.* § 7101(b)(19). And Congress acknowledged that traffickers exploit their victims by “[d]estroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents.” *Id.* § 7104(g)(4)(A).

***16** Congress stated in mandatory language that “[f]ederal agencies shall expand benefits and services to victims of severe forms of trafficking in persons in the United States,

and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of title 8, without regard to the immigration status of such victims." 22 U.S.C. § 7105. That provision sits in tension with the NOFO immigration enforcement condition's restriction on direct or indirect promotion or facilitation of violation of immigration laws, which could be understood to prohibit providing services to undocumented immigrants. The NOFO immigration enforcement condition seeks to ensure full enforcement of immigration law, including against victims of human trafficking, which is contrary to Congress's intent in the TVPA and thus runs afoul of the separation of powers and the Spending Clause.[5] Again, other courts have reasoned similarly. *See also, e.g.*, *City of Chicago v. U.S. Dep't of Just.*, 822 F.Supp.3d 873, 886–87 (N.D. Ill. 2026) (holding that immigration condition placed on grants under the COPS Act violated the separation of powers and the Spending Clause); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 322 (D.R.I. 2025) ("Congress did not authorize or grant authority to the Secretary of Transportation to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes.").

**[41]** The Court does not discount the President's duty and authority to enforce the federal anti-discrimination and immigration laws. *See* U.S. Const. art. II § 3. But the power of the purse is not a tool for the Executive Branch to enforce the law absent authorization from Congress. *Barr*, 961 F.3d at 887 ("The executive branch has significant powers over immigration matters; the power of the purse is not one of them."). In dozens of similar cases challenging conditions placed on federal funding, no court has cited a broad authority in the U.S. Code allowing the Executive Branch to condition funding on compliance with anti-discrimination laws. Nor has the government identified an authorization from Congress for conditioning funding in the manner of the Executive Order provisions or the NOFO conditions.

**[42]** The government contends that Freedom Network's Spending Clause claims fail because the challenged conditions are reasonably related to the purpose of the funding, a low threshold that the Supreme Court has never used to strike a condition on a federal grant. *See* *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019). But funding conditions must still "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Each of the challenged conditions are completely unrelated to, and indeed are at odds with, the TVPA. The TVPA does not use the terms equity or DEI. And, in contrast to the immigration enforcement condition's prohibition on any costs that may indirectly promote the violation of immigration laws, the TVPA provides that victims of trafficking should receive benefits regardless of their immigration status. In short, the challenged conditions are not reasonably related to the TVPA grants.

***17** The government reminds the Court that it rejected a facial challenge to the J20 termination provision in *Chicago Women in Trades* and urges the Court to reject a facial challenge to the J20 termination provision for the same reason here. *CWIT II*, 778 F. Supp. 3d at 990. The Court agrees that Freedom Network has not shown that this provision "conflicts with *every* statute that appropriates funds for grants," as a facial challenge requires. *Id.* *(citing* *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). Yet Freedom Network has established a likelihood of success on its challenge related to its grants under the TVPA, as explained above.

**[43]** The government asserts that Freedom Network's claims are foreclosed by *Dalton v. Specter*, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). The Court recently summarized *Dalton* and related cases from the Ninth and D.C. Circuits. *See* *City of Chicago*, 815 F.Supp.3d at 749–50. In the context of a challenge to the President's decision to close a naval shipyard, *Dalton* held that "not ... every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472, 114 S.Ct. 1719. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473, 114 S.Ct. 1719. Yet much like the separation-of-powers claim in *City of Chicago v. United States Department of Homeland Security*, Freedom Network does not merely claim that the government violated the TVPA. Rather, it cites the TVPA in claiming that the Executive Branch usurped Congress's power of the purse and violated the separation-of-powers. Operating from the position that Freedom Network's claims are statutory rather than constitutional, the government argues that Freedom Network has not identified a statute violated by the challenged Executive Order and NOFO provisions. Freedom Network need not do so; it asserts claims under the Constitution that are not foreclosed by *Dalton*.

Finally, the government notes that agencies have a longstanding practice of requiring funding recipients to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award[.]" 2 C.F.R. § 200.303(b). But Freedom Network

is understandably unsure of what it needs to do to comply with federal anti-discrimination law in this moment. The Executive Orders seem to drastically modify the meaning of "discrimination," contending that "[t]he Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI) ... [resulting in] shameful discrimination. That ends today." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1. And although the J21 Order cites the Civil Rights Act of 1964, the President appears to have a different understanding of civil rights laws from past administrations. As other courts have concluded, "it does not appear that any other President has attempted to comprehensively override understanding of federal anti-discrimination law in the way this Administration seeks to through Executive Orders." *County of Santa Clara v. Noem*, 815 F.Supp.3d 979, 1037 (N.D. Cal. 2025); *see, e.g.*, *City of Chicago*, 822 F.Supp.3d at 887 ("[T]he Administration's anti-DEI interpretation does not further federal anti-discrimination law but is actually 'inconsistent with well-established legal precedent.' " (quoting *City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1216 (W.D. Wash. 2025)). "Plaintiffs are at the mercy of Defendants' interpretation of federal antidiscrimination laws, regardless of how those laws are interpreted by the courts." *Martin Luther King, Jr. County v. Turner*, 798 F. Supp. 3d 1224, 1249 (W.D. Wash. 2025).

***18** **[44]** Moreover, the government's citation to regulations that require agencies to ensure grant recipients do not discriminate cannot save the J21 certification provision or NOFO certification condition from a constitutional challenge. *See* 2 C.F.R. § 200.300 (providing that an agency administering a grant must ensure the funding is "implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations—including ... those prohibiting discrimination"); 42 U.S.C. § 2000d (prohibiting discrimination under federally funded programs). A regulation cannot cure a violation of the separation of powers or the Spending Clause. *See, e.g.*, *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1054 n.11 (D. Colo. 2020) (holding that 2 C.F.R. § 200.300 could not give DOJ the authority to impose conditions on grants that the Court held to be in violation of the separation of powers). These laws do not require the certification conditions, and even if they did, could not save them from a constitutional challenge.

**[45]** "Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.' " *W. Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021)). The Court concludes that Freedom Network has shown that it is likely to succeed on its separation-of-powers and Spending Clause claims.

### d. APA

Freedom Network challenges the NOFO conditions for violating the APA because they are contrary to law, in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right. *See* 5 U.S.C. § 706(2)(A)–(C). The NOFO conditions are arbitrary and capricious, Freedom Network says, because the government has not explained why DEI-related activities are prohibited and has not explained the shift in DOJ's policy. Freedom Network also argues that, by requiring certifications and placing conditions on funding that are unrelated to the TVPA, the NOFO conditions are contrary to law and in excess of statutory authority. Finally, Freedom Network reprises its argument regarding the conflict between the NOFO conditions and the First Amendment, Fifth Amendment, Spending Clause, and separation of powers, arguing that the NOFO conditions are contrary to constitutional right.

#### i. Final agency action

**[46]** The APA permits courts to review only "final agency action for which there is no other adequate remedy in court[.]" 5 U.S.C. § 704. Courts may not review a "preliminary, procedural, or intermediate agency action or ruling[.]" *Id.* Freedom Network maintains that the NOFO conditions are final agency action because the government has "made a final decision to impose the New Funding Conditions on all Office for Victims of Crime grants this year." Am. Compl. ¶ 110. The government contends that the NOFO immigration enforcement and discrimination conditions are not final agency actions, as OVC has not released the conditions that will be included in its awards and has not yet determined whether grant recipients will be required to certify compliance with these two conditions. The NOFO certification provision, however, is required by Executive Order 14173 § 3(b)(iv) and will be included in every TVPA grant award. *See* Suppl. Bruggerman Decl. ¶ 5 (stating that the NOFO certification

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

provision is incorporated into the Office of Justice Programs' General Terms and Conditions for all grantees).

**[47] [48] [49]** A final agency action has two qualities. It " 'mark[s] the consummation of the agency's decisionmaking process' and is '[an action] by which rights or obligations have been determined, or from which legal consequences will flow.' " *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808, 144 S.Ct. 2440, 219 L.Ed.2d 1139 (2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281, (1997)). "In other words, § 704 asks whether a 'terminal event' has occurred." *Dubey v. Dep't of Homeland Sec.*, 154 F.4th 534, 537 (7th Cir. 2025) (quoting *Salinas v. R.R. Retirement Bd.*, 592 U.S. 188, 194–95, 141 S.Ct. 691, 208 L.Ed.2d 608 (2021)). The Supreme Court has explained that it takes a " 'pragmatic' approach ... to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 591, 136 S.Ct. 1807, 195 L.Ed.2d 77 (2016) (quoting *Abbott Lab'ys,* 387 U.S. at 149, 87 S.Ct. 1507). As for the second quality of a final agency action, "an action is final when 'its impact is sufficiently direct and immediate and has a direct effect ... on day-to-day business.' " *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003) (quoting *W. Ill. Home Health Care v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998)). "[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted." *Abbott Lab'ys.*, 387 U.S. at 153, 87 S.Ct. 1507.

***19** All three NOFO conditions amount to final agency action. First, the NOFO demonstrates the consummation of OVC's decision-making process regarding its priorities and considerations in evaluating grant applications. The NOFO states in no uncertain terms that activities violating the immigration enforcement and discrimination conditions are "unallowable costs and [that] certain activities that are out of the program scope and will not be funded." Pl.'s Mot. to Suppl., Ex. A at 11. The NOFO (as well as the Office of Justice Programs' General Terms and Conditions) also makes clear that grant recipients will have to certify that they do not operate programs "having components related to diversity, equity, and inclusion[.]" *Id.* at 30. Freedom Network explains that grant applicants must explain "how they will comply with the requirements and conditions in the NOFOs ... [or else] risk denial of their proposal by losing points during the peer review process or being downgraded by the Office of Justice Programs staff for failing to align with the NOFOs' strategic priorities." Suppl. Bruggerman Decl. ¶ 36. Freedom Network anticipates that its grant application will risk a violation of the challenged NOFO conditions in discussing the client population it intends to serve and the problems it seeks to remedy. *See, e.g.*, Second Suppl. Bruggerman Decl. ¶ 14 (describing how Freedom Network's Survivor Reentry Project serves people of color and immigrants, as these are the survivors of human trafficking most "in need of criminal record relief"). Freedom Network's applications cannot be altered without recalling the applications, and it will not have another opportunity to describe its work to OVC. And the government does not dispute that the NOFO conditions will impact the grant review process.

Based on the evaluation of its grant application under the NOFO conditions, Freedom Network may not receive federal funding, which comprises about three-quarters of its budget. If it does receive the funding, it faces looming uncertainty regarding whether to modify its activities or risk a False Claims Act action and termination of its funding. The NOFO conditions thus require an "immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," both with respect to the grant applications and the organization's activities. *Abbott Lab'ys*, 387 U.S. at 153, 87 S.Ct. 1507.

"As numerous other courts have likewise explained, the decision to attach the conditions can be final even if the final decision to award the funds and issue the NOFOs is still pending[.]" *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 89 (D.R.I. 2025) (footnote omitted). "Without agreeing to the challenged conditions, the [plaintiffs] are effectively barred from applying for and receiving funds which they are legally entitled to seek. And the challenged conditions will potentially change the lawful scope of activities permitted with grant funds, lead to the termination of grant awards," and result in civil or criminal liability under the False Claims Act. *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 68 (D.R.I. 2025); *see also* *Hous. Auth. of S.F. v. Turner*, No. 25 C 8859, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025) (holding that plaintiffs challenged final agency action of grant conditions enacted in HUD Policy Terms to which plaintiffs were required to certify compliance under penalty of perjury in SF-424 and other forms).

Although the Court joins the other federal courts that have concluded that recent challenges to federal funding

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

conditions involve final agency action, this case is distinct for two reasons. First, here, unlike in some prior cases, the government has not waived its argument regarding final agency action. *See, e.g.*, *Martin Luther King, Jr. County*, 798 F. Supp. 3d at 1252 n.10. Second, two of the challenged conditions in this case, the discrimination and immigration enforcement conditions, appear in a NOFO rather than an agency's standard terms and conditions, which apply to all grants administered by that agency in a given fiscal year, or in conditions for plaintiffs who have already been awarded funding. *See, e.g.*, *Noem*, 2025 WL 3251222, at *6 ("The decision to include the challenged conditions in the DHS Standard Terms and Conditions is a final agency [.]"); *City of Chicago*, 822 F.Supp.3d at 891–92 (agency did not contest final agency action for challenge to grant condition where grants were already awarded to recipients); *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 731, 740–41 (N.D. Cal. 2025) (describing as final agency action grant conditions that gave "grant recipients three choices: (1) self-certify that their award is compliant; (2) amend the grant to move [the] program into compliance with the executive orders; or (3) relinquish the grant."). Compared to these cases, Freedom Network challenges the discrimination and immigration enforcement conditions at an earlier stage of the funding process. But even so, OVC's action is a final agency action because it marks the consummation of the agency's decision regarding the evaluation criteria for grant applications and has an immediate effect on Freedom Network.

***20** **[50]** The government contends that the NOFO conditions may not ultimately attach to the awards, so they cannot be considered final agency action. But an agency's action may be final "notwithstanding the agency's characterization of the [action] as an interim" one and "despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The government has issued the NOFO to govern the grant application process. Nowhere does it suggest that the NOFO will be withdrawn or reissued. The NOFO has shaped Freedom Network's response to the grant applications. In other words, the inclusion of the conditions in the NOFO is a final agency action regardless of whether these conditions attach to the grants themselves. On that separate issue, the government has presented nothing to indicate that DOJ intends to remove the conditions from final awards, which seems unlikely given that these or similarly worded conditions have become commonplace in federal grants of many types. *See, e.g.*, *Noem*, 2025 WL 3251222, at *2 (summarizing similar conditions regarding use of grants for activities related to DEI and programs benefitting undocumented immigrants in the DHS Standard Terms and Conditions for Fiscal Year 2025).

**ii. Merits of APA claims**

Freedom Network has demonstrated a likelihood of success on several of its claims under the APA.

**[51]** **[52]** **[53]** The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S.Ct. 1150, 209 L.Ed.2d 287 (2021). A reviewing court must consider whether the agency's action was based on the relevant statutory factors. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Agency action may be arbitrary and capricious when the agency relied on factors not contemplated by Congress, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423, 141 S.Ct. 1150.

**[54]** **[55]** "[A]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change[.]" *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568, 145 S.Ct. 898, 221 L.Ed.2d 436 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016)). A court must ask "whether an agency changed existing policy" and whether the agency " 'display[ed] awareness that it *is* changing position' and offer[ed] 'good reasons for the new policy[.]' " *Id.*

**[56]** **[57]** Regarding the NOFO immigration enforcement and discrimination conditions, the government contends that "[t]here is nothing new nor arbitrary and capricious about prohibiting grantees from using federal funds to violate

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

applicable federal law." Defs.' Resp. at 23. At a general level, that is true, but that statement obscures the government's shifting interpretation of anti-discrimination law. Although Freedom Network and other federal grantees were previously required to comply with federal law, as the Court has explained, the challenged conditions represent new and undefined understandings of anti-discrimination law. And the record does not reflect a previous requirement to certify compliance with all federal anti-discrimination law to receive grants under the TVPA. Likewise, no certification regarding False Claims Act liability relating to DEI or any condition related to immigration enforcement was previously required of Freedom Network. The government makes the same argument with respect to the NOFO certification provision, *see* Defs.' Resp. at 28 n.16, and it fails for the same reasons.

The government has provided no explanation for why its position on these matters has changed. And Freedom Network has strong reliance interests, as these grants fund a substantial portion of its budget. The new conditions and uncertainty as to how these conditions will be enforced require the organization to consider how it will operate without federal funding, which Freedom Network says (and the government offers nothing to dispute) would cause it to cease operations in six weeks.

***21** Freedom Network has established a likelihood of success on its contention that each of the challenged NOFO conditions is arbitrary and capricious. Additionally, as the Court explained in its analysis of the separation-of-powers, Spending Clause, and certain First Amendment claims above, Freedom Network has shown a likelihood of success on its contention that the challenged conditions are contrary to constitutional right. [6]

**2. Irreparable harm**

**[58]** **[59]** **[60]** The government argues that Freedom Network's alleged harm is purely economic and thus does not qualify as irreparable for purposes of a preliminary injunction. This contention does not carry the day given the Court's finding that Freedom Network has established a likelihood of success on its claim that the J21 certification provision and NOFO certification provision violate its First Amendment rights. "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). When First Amendment rights are at stake, the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Id.* (citation omitted).

The Court also finds that Freedom Network is likely to suffer irreparable harm if the certification provisions, J20 termination provision, NOFO discrimination condition and NOFO immigration enforcement condition are enforced because the Court has concluded such enforcement would violate the separation of powers. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Ezell*, 651 F.3d at 699 (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). This is especially true when the right in question "protects ... intangible and unquantifiable interests." *Id.*

**[61]** The separation of powers is one such interest. By protecting against "the concentration of power" that "would allow tyranny to flourish," it is "one of the most vital of the procedural protections of individual liberty found in our Constitution." *Barr*, 961 F.3d at 892 (quoting *Gundy v. United States*, 588 U.S. 128, 173, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019) (Gorsuch, J., dissenting)). No further showing of irreparable harm is needed.

**3. Balance of equities and public interest**

**[62]** **[63]** **[64]** The balance of harms and public interest merge when the government is the opposing party. *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 589 (citation omitted). The same may be said of injunctions protecting the separation of powers. *See Barr*, 961 F.3d at 918 (affirming the lower court's conclusion that "the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers").

**[65]** **[66]** Accordingly, in a case of this sort, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90. The Court has also concluded that Freedom Network is likely to succeed on its APA claims, and "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

***22** Furthermore, the issuance of a preliminary injunction will not prevent the government from considering grant applications and disbursing federal funding to grant applicants. The government remains free to process the grant applications and disburse federal funding as long as it does so within the limits set by the Constitution and APA.

For these reasons, the Court concludes that the balance of harms and public interest weighs in favor of granting a preliminary injunction.

**C. Scope of relief**

**[67]** Freedom Network urges the Court to issue a nationwide injunction because "entities and persons across the country have indicated that they fear continued association and collaboration with Freedom Network as a result of the Executive Orders." Pl.'s Mot. at 28. Freedom Network also argues that nationwide relief is warranted on the NOFO conditions.

The Court concludes that its reasoning from *CWIT* applies to the scope of the remedy in this case. *Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 3034056, at *4–7 (N.D. Ill. Oct. 30, 2025) ("*CWIT III*"). Freedom Network relies on a network of nationwide collaborators who provide services for trafficking victims. The J21 certification provision acts as a barrier to Freedom Network's collaboration with these other organizations because the organizations are likely to avoid any association with speech that could violate the provision.

As in *CWIT III*, the Court keeps in mind that "complete relief" is a narrower concept than "universal relief." *CWIT III,* 2025 WL 3034056 at *6. Freedom Network's work focuses on training and programs for organizations that assist trafficking survivors as well as direct services. This work inherently requires collaboration among stakeholders. Thus the Court concludes that Freedom Network, as a plaintiff, presents special considerations for crafting the remedy in this case.

The Court therefore concludes that to afford Freedom Network complete relief, it is necessary, based on the facts of this case, to enjoin enforcement of the J21 certification provision against all recipients of federal funds awarded by the DOJ.

**[68]** In its most recent filing, Freedom Network expressly argues that it seeks relief with respect to the NOFO conditions under sections 705 and 706 of the APA. Dkt. 86 at 2. The Court recently addressed the relief available under the APA in another case. *See City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3171302, at *2 (N.D. Ill. Nov. 13, 2025) (Kennelly, J). A similar analysis applies here. The text of APA section 706—titled "Scope of review"—provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions" found to be arbitrary and capricious or contrary to law. 5 U.S.C. § 706. The most natural reading of that language is that courts act on the "agency action, findings, and conclusions" themselves. Courts have thus long understood section 706 to authorize "vacatur"—vacating the agency action itself, rather than enjoining enforcement of the action against specific plaintiffs. *See Corner Post*, 603 U.S. at 830–31, 144 S.Ct. 2440 (Kavanaugh, J., concurring).

**[69]** APA section 705 relates to interim relief. That provision states that "a reviewing court[ ] may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Like with section 706, this language is naturally read to authorize courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 873, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025) (Kavanaugh, J., concurring) (noting that courts after CASA may still "preliminarily set[ ] aside or declin[e] to set aside an agency rule under the APA"). The Court thus concludes that APA section 705 authorizes a stay of the OVC's decision to include the Services for Victims of Human Trafficking NOFO conditions. [7]

***23** In sum, the Court enjoins enforcement of the J21 certification provision against all recipients of federal funding awarded by DOJ and orders a stay under APA section 705 of OVC's decision to include the NOFO certification provision, NOFO discrimination condition, and NOFO immigration enforcement condition in the Services for Victims of Human Trafficking NOFO. [8]

## Conclusion

For the reasons stated in the accompanying Memorandum Opinion and Order, the Court grants, in part, the plaintiffs' amended motion for a preliminary injunction [dkt. no. 70] and will separately enter an order embodying the relief the Court has ordered. The Court grants defendant's motion for leave to file response to court's inquiry at oral argument [dkt. no. 83] and plaintiff's motion for leave to file a response [dkt. no.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

85]. The Court denies as moot defendants' motion to clarify the scope of the temporary restraining order [dkt. no. 84] and plaintiff's motion to file a memorandum in opposition [dkt. no. 86] because the preliminary injunction order supersedes the temporary restraining order. The Court sets the case for a telephonic status hearing on April 29, 2026 at 9:00 a.m., using call-in number 650-479-3207, access code 2305-915-8729. The parties are directed to file a joint status report on April 24, 2026.

**All Citations**

--- F.Supp.3d ----, 2026 WL 1899186

## Footnotes

1 The Fourth Circuit has applied the same reasoning to a reporting requirement in the same section, but it is plausible that the termination provision could be more likely to reach private parties. *See NADOHE*, 167 F.4th at 97–98.

2 Freedom Network asserts claims under both the Constitution and the APA. The Court addresses the APA claims, including claims of agency action contrary to the Constitution, below. Freedom Network has demonstrated a likelihood of success on the merits of the APA claims. Still, to ensure a complete record in the event of an appeal, the Court also addresses each claim under the Constitution in its own right except for Freedom Network's Fifth Amendment claim related to the certification provisions. Because Freedom Network has demonstrated that it is likely to succeed on the merits of its First Amendment claim challenging the certification provisions, the Court need not address the unsettled law regarding whether grantees have a property interest in federal grants.

3 The NOFO certification provision reflects OVC's implementation of the J21 certification provision. Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv). The NOFO certification provision requirements also state that the grant recipient must certify that it "does not operate any programs (including programs having components related to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." Pl.'s Mot. to Suppl., Ex. A at 30.

4 The Court addresses these two constitutional claims in tandem because Freedom Network and the government have done the same, presenting nearly identical arguments on both claims.

5 Freedom Network also argues that the immigration enforcement condition would require it to violate the Violence Against Women Act's (VAWA) confidentiality provision, which states that "grantees and subgrantees under this subchapter shall protect the confidentiality and privacy of persons receiving services" and shall not disclose personally identifying information collected through the provision of services, or shall only disclose this information with "informed, written, reasonably time-limited consent" by the individual. *See* 34 U.S.C. § 12291(b)(2). The TVPA allows the Attorney General or the Secretary of Health and Human Services to subject grants under the TVPA to this condition. 22 U.S.C. § 7115(b)(1). The VAWA confidentiality provision is incorporated into the NOFOs. *See* Defs.' Resp. at 15–16 n.16. Because Freedom Network prevails on other arguments regarding the unconstitutionality of the immigration enforcement condition, the Court will not reach this argument, in part because a challenge based on VAWA confidentiality hinges on a chain of arguably speculative events, including a request for information from the government regarding a Freedom Network service recipient.

6 Given the likely success of Freedom Network's other APA claims, the Court need not address at this time Freedom Network's claims that the challenged conditions are contrary to law and exceed DOJ's statutory authority under the TVPA.

7 As discussed, Freedom Network likely lacks standing to challenge the funding conditions in NOFOs other than the Services for Victims of Human Trafficking NOFO—the one NOFO under which Freedom Network will apply for grants. Thus the analysis of the scope of potential injunctive relief for the funding conditions would likely differ from the analysis of APA vacatur.

8 The stay of OVC's decision to include the funding conditions in the NOFO includes a stay on any action by OVC to consider the funding conditions when evaluating applications for grants submitted under the Services for Victims of Human Trafficking NOFO.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1990808
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Reginald L. SYDNOR, pro se Plaintiff,
v.
OFFICE OF PERSONNEL MANAGEMENT, Defendant.

Civil Action No. 06-0014.
|
May 7, 2008.

**Attorneys and Law Firms**

Reginald L. Sydnor, Haverford, PA, pro se.

Richard Mentzinger, Jr., U.S. Attorney's Office, Philadelphia, PA, for Defendant.

***MEMORANDUM AND ORDER***

PRATTER, District Judge.

**INTRODUCTION**

***1** In January 2006, Mr. Sydnor filed a four-count Complaint endeavoring to allege, *inter alia,* a cause of action under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA"). This action stems from the Office of Personnel Management's ("OPM") determination a decade ago that Mr. Sydnor was unsuitable for federal employment, and subsequent decisions terminating him from his position as an Administrative Law Judge for the Social Security Administration, and debarring him from federal employment for a period of three years.

OPM moved to dismiss all of Mr. Sydnor's claims, and on January 22, 2007, the Court granted OPM's motion in part and denied it part. *Sydnor v. OPM,* No. 06-0014, 2007 U.S. Dist. LEXIS 4586 (E.D.Pa. Jan. 22, 2007). [1] The Court dismissed Mr. Sydnor's Complaint in its entirety except for Count Four, which encompassed Mr. Sydnor's APA claim. Based on the allegations in his Complaint, the Court concluded that Mr. Sydnor had stated a claim under the APA sufficient to survive a motion to dismiss.

Without seeking the Court's leave to amend his Complaint, on January 30, 2007, Mr. Sydnor filed an Amended Complaint alleging two additional claims as Counts Five and Six. Thereafter, OPM moved for summary judgment with respect to Counts Five and Six, and on July 11, 2007, the Court granted OPM's motion as to both of these claims. *Sydnor v. OPM,* No. 06-0014, 2007 U.S. Dist. LEXIS 49931, 2007 WL 2029300 (E.D.Pa. July 11, 2007). [2] Count Four-Mr. Sydnor's APA claim-once again was Mr. Sydnor's only remaining claim.

Then, on December 12, 2007, almost two years after he initiated this action, Mr. Sydnor sought the Court's leave to further amend his Amended Complaint. Mr. Sydnor does not seek to assert any additional claims. Instead, he wants to add two remedies, namely, back pay under 5 U.S.C. § 5596, and declaratory relief under 28 U.S.C. §§ 2201 and 2202. In addition, Mr. Sydnor seeks to join the Social Security Administration as a "necessary" party pursuant to Rule 19 of the Federal Rules of Civil Procedure.

On January 28, 2008, before the Court ruled on Mr. Sydnor's motion to amend, OPM once again moved for summary judgment with respect to Mr. Sydnor's APA claim. OPM filed with the Court the complete administrative record of Mr. Sydnor's debarment proceedings. [3] Mr. Sydnor opposes OPM's motion, and also submitted his own motion for summary judgment.

For the reasons discussed below, OPM's motion for summary judgment will be granted, and Mr. Sydnor's motion for summary judgment will be denied. In addition, Mr. Sydnor's motion to further amend his Amended Complaint will be denied.

**FACTUAL BACKGROUND**

The following facts are undisputed. [4]

On March 2, 1997, Mr. Sydnor was appointed to the position of Administrative Law Judge ("ALJ") with the Social Security Administration ("SSA"). (A.R. at OPM00321.) On August 19, 1997, OPM's Investigative Services sent a letter to Mr. Sydnor informing him that, at the request of SSA, OPM had conducted a background investigation and that the results "raise a serious question as to your current suitability for competitive Federal employment." (A.R. at OPM00321.) On September 2, 1997, SSA relieved Mr. Sydnor of his ALJ

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

duties and placed him on administrative leave with pay. (A.R. at OPM00523.)

***2** In its investigation, OPM found that Mr. Sydnor had intentionally falsified information in his ALJ application and related forms. (A.R. at OPM00495.) Specifically, OPM determined that Mr. Sydnor had provided "inaccurate information about the reason for [his] separation [from the Equal Employment Opportunity Commission where he worked from September 18, 1978 through August 20, 1993], show[ed] an incorrect supervisor, and omitted any reference to [his] compensation claim or disability retirement." (A.R. at OPM00502.) [5] Consequently, on January 13, 1998, after considering Mr. Sydnor's response to the charges against him, OPM issued a negative suitability letter to Mr. Sydnor which, among other things, debarred Mr. Sydnor from federal employment for three years. (A.R. at OPM00494-OPM00506.)

On February 11, 1998, Plaintiff filed an appeal with the Merit Systems Protection Board ("MSPB") to challenge his debarment. (A.R. at OPM00528.) After Mr. Sydnor appealed his debarment to the MSPB, SSA placed him on indefinite suspension without pay. (A.R. at OPM00523.) [6] On June 11, 1998, the MSPB affirmed OPM's negative suitability determination, including OPM's decision to debar Mr. Sydnor from federal employment for a period of three years. (A.R. at OPM00528-OPM00549.) On December 30, 1998, the MSPB denied Mr. Sydnor's petition for review and dismissed his case against OPM. (A.R. at OPM00556.) The SSA removed Mr. Sydnor from its rolls, i.e., formally terminated his employment, effective December 30, 1998. (A.R. at OPM00557.) [7]

Mr. Sydnor's debarment from federal service terminated on January 13, 2001. (A.R. at OPM00494.) Mr. Sydnor never requested a suitability determination from OPM pursuant to 5 C.F.R. § 731.601. Mr. Sydnor never requested that OPM perform a suitability determination between January 13, 2001, the time that his debarment ended, and March 30, 2001, the date that the new regulations went into effect and 5 C.F.R. § 731.601 was eliminated. Mr. Sydnor never submitted to OPM a sworn statement that set forth fully and in detail the facts surrounding his removal for a suitability determination.

**LEGAL STANDARD**

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.,* 843 F.2d 139, 143 (3d Cir.1988). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it could affect the result of the suit under governing law. *Id.*

***3** Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir.2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.,* 812 F.2d 81, 83 (3d Cir.1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. *Celotex,* 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.,* 323 F.Supp.2d 637, 642 (E.D.Pa.2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976)).

On cross motions for summary judgment, the same standards and burdens apply. *See Applemans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir.1987); *Peters Twp. School Dist. v. Hartford Accident and Indem. Co.,* 833 F.2d 32, 34 (3d Cir.1987). Cross motions for summary judgment

are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims

> does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material face exist.

*Transportes Ferreos de Venezuella II Ca v. NKK Corp.,* 239 F.3d 555, 560 (3d Cir.2001) (*quoting* *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968)). Of course, when presented with cross motions for summary judgment, the Court must consider the motions separately. *See* *Williams v. Phila. Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd,* 27 F.3d 560 (3d Cir.1994).

**DISCUSSION**

**I. THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Mr. Sydnor's sole claim is brought pursuant to the APA. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. In order to state a claim under the APA, Mr. Sydnor must challenge an "agency action," since it is only review "thereof" that the APA permits. Where no other statute provides a private right of action, the "agency action" challenged must be the *"final* agency action." 5 U.S.C. § 704 (emphasis added). [8]

In response to OPM's first motion to dismiss, Mr. Sydnor described his APA claim as follows: "whether OPM violated its own regulations by failing to make a suitability determination with respect to his reinstatement to federal employment after his debarment period expired in January 2001." *Sydnor,* 2007 U.S. Dist. LEXIS 4586, at *P 6-7 (*quoting* Pl. Mem. Opp'n to Def. Mot. Dismiss 5). Liberally construing Mr. Sydnor's Complaint, the Court found that the only potential "agency action" at issue actually referred to OPM's alleged "inaction," namely, its alleged failure to make a suitability determination and reinstate him to federal employment after his three-year disbarment from federal employment had expired. The discrete issue presented for the Court's resolution now is whether OPM failed to make a suitability determination in violation of its own regulations.

***4** In order to state a claim for "agency inaction" under the APA, a plaintiff must assert "that an agency failed to take a *discrete* agency action that it is *required to take." Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). In its January 22, 2007 Memorandum, the Court reviewed the potential regulations at issue, some of which the parties did not bring to the Court's attention, in light of Mr. Sydnor's allegations, and concluded that in order to succeed on his APA claim, Mr. Sydnor must establish that (1) OPM was or is required to make a suitability determination of an individual upon that individual's request, (2) Mr. Sydnor actually requested OPM to conduct a suitability determination, (3) OPM refused his request; and (4) OPM's refusal was a final agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). *See Sydnor,* 2007 U.S. Dist. LEXIS 4586, at *18-30.

OPM now argues that Mr. Sydnor never requested that OPM conduct a suitability determination (prior to filing this lawsuit) and, accordingly, that OPM never refused any such request. OPM argues that there is no "final agency action" at issue here, and, therefore, Mr. Sydnor's APA claim must fail. For the reasons discussed below, the Court agrees.

None of the regulations that Mr. Sydnor relied upon, when he first asserted his APA claim, *required* OPM to conduct a suitability determination upon an applicant's request. Without the input of the parties, the Court considered a regulation, 5 C.F.R. § 731.601 (1991), [9] that, for a period of less than three months following the date Mr. Sydnor's debarment concluded on January 13, 2001, would have required OPM to redetermine Mr. Sydnor's suitability for federal employment, upon his request, as long as Mr. Sydnor met certain conditions. Section 731.601(a) stated that "OPM shall consider the request only if the former employee: (1) Has completed any required probationary period; (2) Has basic eligibility for reinstatement; and (3) Includes a sworn statement with the request which sets forth fully and in detail the facts surrounding the removal or resignation." § 731.601(a). However, Mr. Sydnor concedes that he did not request a suitability determination from OPM pursuant to 5 C.F.R. § 731.601. (*See* Pl. Resp. & Mot. Summ. J. 7.) [10] Because Mr. Sydnor did not properly request OPM to redetermine his eligibility pursuant to 5 C.F.R. § 731.601, while that regulation was effective, OPM was not required to redetermine his eligibility pursuant to § 731.601 at that time. Therefore, absent another regulation requiring OPM to redetermine Mr. Sydnor's suitability for federal employment, OPM cannot be held liable under the APA for "fail[ing] to

take a *discrete* agency action that it [was] *required to take." Norton,* 542 U.S. at 64. Mr. Sydnor has not referred the Court to any such regulation. *See also Sydnor,* 2007 U.S. Dist. LEXIS 4586, at *18-30.

On March 31, 2001, just over two months after Mr. Sydnor's debarment ended, new regulations became effective which superceded § 731.601. The "new" regulations, 5 C.F.R. Part 731 (2001), eliminated the provisions in § 731.601 governing suitability determinations, and, instead, provided that "[o]n expiration of a period of debarment, OPM or an agency *may redetermine* a person's suitability for appointment in accordance with the procedures of this part." 5 C.F.R. § 731.204(b) (2001) (emphasis added). While § 731.601(a) provided that OPM "shall" determine a former employee's suitability for federal employment, indicating that OPM was required to comply with an employee's request as long as the employee met certain requirements, § 731.204(b) revised these regulations to vest discretion with OPM (or another administrative agency) to determine whether to "redetermine a person's suitability" for federal employment. To the extent that Mr. Sydnor claims that he requested OPM to redetermine his suitability for federal employment under § 731.204(b), and OPM improperly refused, Mr. Sydnor cannot state a claim under the APA because he has failed to identify an "agency action" or "inaction," and has not established that OPM failed "to take a *discrete* agency action that it [was] *required to take." Norton,* 542 U.S. at 64. Accordingly, Mr. Sydnor's APA claim must fail as a matter of law and OPM's motion for summary judgment will be granted. Mr. Sydnor's motion for summary judgment will be denied. [11]

## II. MR. SYDNOR'S MOTION TO AMEND/CORRECT HIS AMENDED COMPLAINT

***5** Mr. Sydnor seeks to amend his Amended Complaint to include a remedy for backpay under 5 U.S.C. § 5596, a remedy for declaratory relief under 28 U.S.C. §§ 2201 and 2202, and to join the Social Security Administration as a "necessary" party pursuant to Rule 19 of the Federal Rules of Civil Procedure.

The Court has already determined that Mr. Sydnor's sole remaining claim, Count Four of his Amended Complaint, must fail. Because he has no viable claims, the Court need not determine whether he is entitled to amend his Amended Complaint to plead any additional remedies for that claim.

In addition, the Court will deny Mr. Sydnor's request to join the SSA as a party to this law suit. As explained above, Mr. Sydnor's only claim is under the APA. In his proposed Second Amended Complaint, which is attached as an exhibit to his motion to amend, he does not assert any additional claims, jurisdictional bases for suit, or causes of action of any sort. Mr. Sydnor does plead certain additional facts, but these facts merely further describe his original claim against OPM. As pleaded, Mr. Sydnor's claim is that "Defendant's unsuitability and debarment policy and practice has the cause and effect to expel Plaintiff from Federal employment without any administrative remedy." (Pl. Proposed 2d. Am. Compl. 5.) In his own words, Mr. Sydnor defined his APA claim as whether OPM violated its own regulations by failing to determine his suitability for federal employment. As alleged, and as candidly explained by Mr. Sydnor, this claim does not implicate the SSA.

Mr. Sydnor is now attempting to broaden his claim. Since he commenced this action, Mr. Sydnor has claimed that he is caught in a "catch-22" situation, whereby OPM has informed him that it will not determine his suitability for federal employment until SSA expresses an interest in hiring him, while SSA states that it cannot hire him until OPM determines that he is suitable for federal employment. Mr. Sydnor now claims SSA is a "necessary" party because, in order to resolve this "catch-22," SSA's participation is required. However, Mr. Sydnor has not alleged facts or a recognized legal theory, either in his Amended Complaint or in his proposed Second Amended Complaint that support a cause of action under the APA, or under any other federal statute, against SSA. Accordingly, Mr. Sydnor's motion to amend will be denied.

## CONCLUSION

For the reasons discussed above, Mr. Sydnor has not established facts that support a claim under the Administrative Procedures Act. OPM correctly argues that Mr. Sydnor has failed to establish that OPM took any "final agency action," or failed to take any such action, that is entitled to judicial review. Accordingly, OPM's motion for summary judgment will be granted, and Mr. Sydnor's motion for summary judgment will be denied.

## *ORDER*

**AND NOW,** this 7th day of May, 2008, upon consideration of Mr. Sydnor's Motion to Amend/Correct his

Amended Complaint (Docket No. 44), Office of Personnel Management's response (Docket No. 45), Mr. Sydnor's reply (Docket No. 47), Office of Personnel Management's Motion for Summary Judgment (Docket No. 50), Mr. Sydnor's Response to Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment (Docket No. 55), Office of Personnel Management's reply (Docket No. 56), Mr. Sydnor's surreply (Docket No. 57), Mr. Sydnor's Motion to Amend/Correct his Declaration (Docket No. 58), and Office of Personnel Management's response (Docket No. 60) **IT IS ORDERED** that:

***6** 1. Mr. Sydnor's Motion to Amend/Correct his Declaration (Docket No. 58) is **GRANTED.**

2. Office of Personnel Management's Motion for Summary Judgment (Docket No. 50) is **GRANTED.**

3. Mr. Sydnor's Motion for Summary Judgment (Docket No. 55) is **DENIED.**

4. Mr. Sydnor's Motion to Amend/Correct his Amended Complaint (Docket No. 44) is **DENIED.**

5. The Clerk of Court shall **CLOSE** this case for all purposes, including statistics.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1990808

## Footnotes

1 OPM's motion was styled as a motion to dismiss, or, in the alternative, for summary judgment. The Court determined that summary judgment was not appropriate at that time and, accordingly, decided the motion as one to dismiss. *Sydnor,* 2007 U.S. Dist. LEXIS 4586, at *10-11.

2 OPM's second motion was also styled as a motion to dismiss, or, in the alternative, for summary judgment. With respect to the two additional claims that Mr. Sydnor alleged, which were the subject of the defense motion, the Court determined that summary judgment was appropriate.

3 In a typical APA case, the reviewing court examines the "administrative record" of the "agency action" challenged by the complaining party. The applicable federal agency will submit to the reviewing court a complete administrative record of the agency action, and the court's review will encompass only that record. *See* 5 U.S.C. § 706. As explained below, in this case, Mr. Sydnor is challenging agency "inaction," which, he claims, violated the APA. In other words, Mr. Sydnor is not challenging a particular legislative or adjudicative action for which the applicable agency, here, OPM, would have maintained an official record. In this case, OPM submitted a record of Mr. Sydnor's 1998 debarment proceedings, his subsequent appeals, and correspondence between Mr. Sydnor and OPM and other federal agencies.

4 OPM followed the Court's procedures and submitted a numbered, paragraph-by-paragraph recitation of facts, with citations to the record, to support its argument. Mr. Sydnor did not comply with the Court's procedures in that he did not state in similar paragraph form whether he agreed or disagreed that the facts as stated by the OPM were undisputed. He merely noted that he conceded facts as presented in certain of OPM's numbered paragraphs, and disputed others. He also contended that certain of OPM's numbered paragraphs were irrelevant or immaterial to the resolution of Count Four of his Amended Complaint. However, the facts presented below, which largely mirror OPM's presentation of facts in its motion for summary judgment, are consistent with the allegations presented in Mr. Sydnor's Amended Complaint, the statement of facts he presented in his own motion for summary judgment, and are supported by the numerous documents contained in the administrative record in this case.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

5 OPM dropped two other charges-negligence or misconduct in prior employment and criminal, dishonest conduct-due to insufficient evidence. (A.R. at OPM00494.)

6 In addition, on March 3, 1998, Mr. Sydnor filed an appeal with the MSPB challenging his indefinite suspension without pay. (A.R. at OPM00523-OPM00527.) On June 3, 1998, the MSPB dismissed Mr. Sydnor's appeal of his suspension by the SSA for lack of jurisdiction. (A.R. at OPM00523-OPM00527.) Mr. Sydnor appealed the MSPB's decision, and on December 30, 1998, the MSPB denied Mr. Sydnor's petition for review and dismissed his appeal. (A.R. at OPM00556.)

7 In 1999, Mr. Sydnor appealed his claim against OPM (and his claim against SSA) to the U.S. District Court for the District of Maryland. Mr. Sydnor challenged the SSA's action in placing him on administrative leave and later on indefinite suspension, the information that OPM used to support its final determination that Plaintiff had falsified documents, and certain procedural defects in the MSPB's actions. Mr. Sydnor alleged, among other things, that the SSA's actions were based on racial discrimination in violation of Title VII of the Civil Rights Act of 1964, and that OPM's actions violated the Rehabilitation Act of 1972. Mr. Sydnor further asserted in the district court that the actions of both OPM and the SSA were: (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or fact; (b) obtained without procedures required by law, rule, or regulation having been followed; and © unsupported by substantial evidence.

On October 25, 1999, the district court dismissed Mr. Sydnor's claims. Mr. Sydnor appealed, and the U.S. Court of Appeals for the Fourth Circuit affirmed the district court decision. The Supreme Court denied Mr. Sydnor's petition for a writ of certiorari.

8 The Court's review of Mr. Sydnor's APA claim is limited to a review of the administrative record of Mr. Sydnor's debarment proceedings, his administrative appeals, and his subsequent attempts to reinstate his employment with the SSA. The parties dispute whether the Court is restricted to a review of the administrative record in evaluating Mr. Sydnor's APA claim, and what constitutes a complete and appropriate "record." OPM asserts that in an action under the APA, the reviewing court only reviews the administrative record of the pertinent administrative agency decision, subject to certain exceptions which are not applicable here. In that regard, OPM filed with the Court an administrative record of Mr. Sydnor's debarment proceedings. Mr. Sydnor counters that the administrative record submitted by OPM is incomplete, and must be supplemented with certain additional material facts contained in a declaration that he filed along with his motion for summary judgment. In that regard, Mr. Sydnor submitted the following additional materials: a 1979 MSPB decision in an unrelated case, addressing claims of an ALJ employed by the SSA; Mr. Sydnor's personal telephone records; a list, compiled by Mr. Sydnor, of the federal positions for which he has applied; and Mr. Sydnor's handwritten caller ID log and voice record notes.

The APA explicitly directs a reviewing court to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Thus, "[i]n a challenge to administrative action under the APA, the administrative record cannot normally be supplemented." *NVE Inc. v. HHS,* 436 F.3d 182, 189 (3d Cir.2006) (*citing* *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("In applying [the arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Horizons Int'l, Inc. v. Baldrige,* 811 F.2d 154, 162 (3d Cir.1987) (describing review of the existing administrative record as one of "the traditional limits of judicial review applied under section 10 of the APA")). In noting that there is a "strong presumption against discovery into administrative proceedings born out of the objective of preserving the integrity and independence of the administrative process," the Court of Appeals for the Third Circuit has carved out an exception to the general rule prohibiting discovery in cases involving alleged agency bias. *NVE Inc.,* 436 F.3d at 195 (*citing* *Grant v. Shalala,* 989 F.2d 1332, 1344 (3d Cir.1993); *Hummel v. Heckler,* 736 F.2d 91 (3d Cir.1984)). If agency bias is alleged, courts have permitted the administrative record to be supplemented on that issue. However, Mr. Sydnor does not contend that "bias" is an issue here. Moreover, the documents

Mr. Sydnor submitted, described above, to "supplement" the administrative record, are inappropriate even if agency bias was at issue. Therefore, the Court must consider only the administrative record filed by OPM.

9 5 C.F.R. § 731.601 is entitled, "Reemployment eligibility of certain former Federal employees." It states:

> (a) Request for suitability determination. When an employee has been removed by an agency on charges (other than security or loyalty) or has resigned on learning the agency planned to prefer charges, or while charges were pending, the former employee may request OPM to determine his or her suitability for further employment in the competitive service. OPM shall consider the request only if the former employee:
>
> (1) Has completed any required probationary period;
>
> (2) Has basic eligibility for reinstatement; and
>
> (3) Includes a sworn statement with the request which sets forth fully and in detail the facts surrounding the removal or resignation.
>
> (b) Action by OPM. (1) OPM, after appropriate consideration, including any investigation OPM deems necessary, shall inform the former employee of his or her current suitability for employment in the competitive service.
>
> (2) If the former employee is found unsuitable and has had an opportunity to comment on the reasons for this finding, or has furnished comments to OPM, then OPM may cancel his or her reinstatement eligibility if that eligibility was obtained through fraud. In addition, OPM may prescribe a period of debarment from the competitive service not to exceed 3 years from the date of determination of unsuitability.

5 C.F.R. § 731.601 (1991).

10 It is unclear whether, in the two and a half months after January 13, 2001, Mr. Sydnor complied with the first two requirements listed in § 731.601(a). However, Mr. Sydnor concedes that he did not comply with the third requirement, i.e, he admitted that he failed to submit to OPM "a sworn statement with the request which sets forth fully and in detail the facts surrounding the removal or resignation." (*See* Pl. Resp. & Mot. Summ. J. 7.)

11 Mr. Sydnor's motion for summary judgment does not describe any "final agency action" upon which to base an APA claim and generally fails to articulate any intelligible argument warranting summary judgment. For example, he argues that OPM failed to notify him of the procedure for requesting a suitability redetermination delineated in § 731.601, but he fails to refer to any regulation (or other premise) requiring OPM to provide such notice. In addition, Mr. Sydnor contends that OPM violated 5 C.F.R. § 731.304 (1991), which was in effect on the date Mr. Sydnor's debarment period expired but was amended and superceded within a few weeks thereafter. This regulation stated that "[o]n expiration of a period of debarment, a person who has been debarred may not be appointed to any position in the competitive service until OPM has redetermined that person's suitability for appointment." 5 C.F.R. § 731.304 (1991). However, this regulation did not *require* OPM to redetermine a person's suitability for federal appointment. Rather, it makes OPM's redetermination that a person is suitability for appointment a prerequisite for any appointment following debarment. Moreover, Mr. Sydnor has not established that he requested a suitability determination prior to the date this regulation was superceded.

On March 30, 2001, less than two months after Mr. Sydnor's debarment period ended, 5 C.F.R. § 731.204(b) (2001) became effective, superceding 5 C.F.R. § 731.304 (1991), and provided that "[o]n expiration of a period of debarment, OPM or an agency may redetermine a person's suitability for appointment in accordance with the procedures of this part." 5 C.F.R. § 731.204(b) (2001). In addition, at

all times referenced herein, 5 C.F.R. § 930.207 (1991), was, and still is, in effect. This regulation states that an agency may reinstate a former ALJ “only after they have established their eligibility in accordance with all current [OPM] examination requirements,” and that “[r]einstatement is subject to investigation by, and the prior approval of, OPM.” 5 C.F.R. § 930.207 (1991).

Throughout this litigation, OPM steadfastly has maintained that OPM retains the discretion to evaluate an applicant's suitability for federal employment, and that OPM typically investigates an applicant's suitability only *after* an administrative agency hires the applicant for a position. This is precisely what occurred in Mr. Sydnor's case when he was first appointed as an ALJ in 1997: the SSA hired him; by regulation, his appointment was subject to an OPM investigation as to his suitability; thereafter, OPM conducted its investigation, found that Mr. Sydnor was unsuitable for federal employment, and subsequently debarred him from federal employment.

There is no dispute that no administrative agency has appointed Mr. Sydnor to a position, or extended Mr. Sydnor an offer of employment at this time. However, in the course of a conference among the Court and the parties on the record before the Court, OPM expressed its willingness to consider circumventing its typical procedures and conducting an investigation of Mr. Sydnor's suitability even though no federal agency had extended him an offer of employment. (Hr'g Tr. 37, Sept. 18, 2007.) At that time Mr. Sydnor decided instead to pursue his claims in this litigation, seeking to recover benefits and back pay retroactive to 2001. (Hr'g Tr. 37, Sept. 18, 2007.)

Throughout the two years Mr. Sydnor has pursued this litigation, he has expressed his frustration in dealing with OPM and the SSA, and his despair from being treated, in his view, differently than any other ALJ under similar circumstances. Mr. Sydnor clearly wants the SSA to reinstate him as an ALJ, a position that he enjoyed for a period of 6 months, almost 10 years ago, before his employment was terminated. He appears to believe that “reinstatement” to his former position is (or should be) automatic, contingent only upon meeting certain eligibility requirements (which he claims he has met). He also appears to believe that, until OPM conducts a suitability determination, he will forever be viewed by the SSA as “unsuitable” for federal employment, based on the fact that he was disciplined and debarred previously. Until he is determined to be “suitable,” he believes, the SSA will not hire him. However, Mr. Sydnor has conceded multiple times before the Court that he understands that even if OPM were to conduct a suitability investigation, and even if OPM were to find that he was “suitable” for federal employment, that determination does not guarantee Mr. Sydnor any job, much less his sought-after position at SSA.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.