**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:26-cv-1684-JPW |
| | ) | (Hon. Jennifer P. Wilson) |
| ROBERT F. KENNEDY, JR., *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

QUESTION INVOLVED .......... 1

INTRODUCTION .......... 1

UNDISPUTED MATERIAL FACTS .......... 2

LEGAL STANDARDS .......... 9

ARGUMENT .......... 10

I. Defendants' Arguments Are Premised on a Fundamental Misstatement of Plaintiffs' Case and Reliance on the NOFO's Ineffective Savings Clauses .......... 10

II. Plaintiffs' Claims Are Ripe for Review. .......... 15

A. The Parties Have Adversity of Interests. .......... 17

B. Judgment Will Conclusively Establish the Legal Rights or Relations of the Parties. .......... 20

C. Judgment Will Have Significant Practical Value. .......... 22

III. Plaintiffs' APA Claims are Reviewable and Meritorious. .......... 26

A. The NOFO Constitutes Final Agency Action. .......... 27

B. The Challenged Provisions of the NOFO Are Not Committed to Agency Discretion by Law. .......... 34

C. Plaintiffs Are Entitled to Judgment as a Matter of Law. .......... 37

i. The NOFO's Required Alignment with the Anti-DEI and Anti-Gender Ideology Priorities Is Contrary to the Title X Regulations. .......... 37

ii. Defendants Failed to Undertake Notice and Comment Rulemaking Prior to Issuing a NOFO Requiring Alignment with Priorities That Conflict with the Title X Regulations. ..........43

iii. The NOFO Is Arbitrary & Capricious on Multiple Fronts. ..........44

IV. Plaintiffs Satisfy the Requirements for Obtaining Injunctive Relief. .....50

CONCLUSION ..........51

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ............................................................ 15, 19

*Abington Mem'l Hosp. v. Burwell*,
216 F. Supp. 3d 110 (D.D.C. 2016) ................................................37

*Aerosource, Inc. v. Slater*,
142 F.3d 572 (3d Cir. 1998)........................................................ 27, 29, 30

*Am. Littoral Soc'y v. U.S. EPA Region*,
199 F. Supp. 2d 217 (D.N.J. 2002) ..................................................3

*Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*,
524 U.S. 214 (1998) ..........................................................................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................3

*Atlantic Richfield Co. v. Christian*,
590 U.S. 1 (2020) ...............................................................................12

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................... 27, 30

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ...........................................................................39

*Cal. Hum. Dev. Corp. v. Brock*,
762 F.2d 1044 (D.C. Cir. 1985) .........................................................35

*CEC Energy Co. v. Pub. Serv. Comm'n of V. I.*,
891 F.2d 1107 (3d Cir. 1989).............................................................20

*Cement Kiln Recycling Coal. v. EPA*,
493 F.3d 207 (D.C. Cir. 2007) ....................................................................21

*Chemours Co. FC, LLC v. U.S. EPA*,
109 F.4th 179 (3d Cir. 2024)........................................................................ 29, 30

*Citizens Alert Regarding the Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004) ................................................................31

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018)......................................................................11, 12

*City of Philadelphia v. Sessions*,
280 F. Supp. 3d 579 (E.D. Pa. 2017) ........................................................ 16, 33

*Cmty. Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989).......................................................................35

*Const. Party of Pa. v. Aichele*,
757 F.3d 347 (3d Cir. 2014).............................................................................9

*Doe #1 v. Wolfe*,
No. 1:20-CV-02339, 2021 WL 4149186 (M.D. Pa. Sept. 13, 2021)....................35

*Doe No. 1 v. Noem*,
No. 25-1962, 2025 WL 1224783 (E.D. Pa. Apr. 28, 2025).................................27

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................................... 44, 47

*Felmeister v. Off. of Att'y Ethics*,
856 F.2d 529 (3d Cir. 1988)...........................................................................26

*Freedom Network v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) ............................................... 16, 18, 34

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......................................................................................35

*Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*,
No. 26-CV-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026)......... *passim*

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021)........................................................................ 13, 14

*Illinois v. Fed. Emergency Mgmt. Agency*,
801 F. Supp. 3d 75 (D.R.I. 2025) .................................................. 17, 18, 24, 49

*Khodara Env't, Inc. v. Blakey*,
376 F.3d 187 (3d Cir. 2004).......................................................................... 21, 24

*La. Forestry Ass'n, Inc. v. Solis*,
889 F. Supp. 2d 711 (E.D. Pa. 2012) ..................................................................4

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)............................................................ 12, 43

*Lewis v. Alexander*,
685 F.3d 325 (3d Cir. 2012).......................................................................... 17, 21

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ................................................................................... 35, 36

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
876 F.3d 481 (3d Cir. 2017).................................................................................25

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) .........................................................................................25

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
No. 1:26-CV-10877-AK, 2026 WL 1706963 (D. Mass. June 12, 2026) .............39

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
239 F.3d 333 (3d Cir. 2001)........................................................................*passim*

*NFPRHA v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006)........................................................................42

*Ohio Coal Ass'n v. Perez*,
192 F. Supp. 3d 882 (S.D. Ohio 2016)..............................................................39

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998)...................................................................................19, 26

*Pa. Dep't of Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
241 F. Supp. 3d 506 (M.D. Pa. 2017)..................................................................9

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)............................................................................................44

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025).............................................................13, 38

*Phila. Fed'n of Tchrs. v. Ridge*,
150 F.3d 319 (3d Cir. 1998)..............................................................................25

*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017)........................................................................23, 24

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025)............22, 33, 34, 49

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018)................................................................32

*Planned Parenthood of Wis., Inc. v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018)...................................................................32

*Presbytery of N.J. v. Florio*,
40 F.3d 1454 (3d Cir. 1994)....................................................................23

*Rattlesnake Coal. v. EPA*,
509 F.3d 1095 (9th Cir. 2007)..................................................................31

*RENEW Ne. v. U.S. Dep't of the Interior*,
No. 25-CV-13961-DJC, 2026 WL 1078282 (D. Mass. Apr. 21, 2026)................12

*R.I. Coal. Against Domestic Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025) ..........................................................34

*Sackett v. EPA*,
566 U.S. 120 (2012) ..................................................................................28

*Salvation Army v. Dep't of Cmty. Affs.*,
919 F.2d 183 (3d Cir. 1990)......................................................................19

*Save the South Fork Salmon v. U.S. Forest Serv.*,
No. 1:25-CV-00086-AKB, 2026 WL 1506788 (D. Idaho May 29, 2026) .............3

*Stehney v. Perry*,
101 F.3d 925 (3d Cir. 1996)......................................................................36

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990)................................................................ 16, 21

*Surrick v. Killion*,
449 F.3d 520 (3d Cir. 2006) .............................................................. 20, 24

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) ..................................................................................25

*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148 (3d Cir. 1995)......................................................................17

*TSG Inc. v. U.S. EPA*,
538 F.3d 264 (3d Cir. 2008)....27

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ....36

*United States v. Salerno*,
481 U.S. 739 (1987) ....38

*Wilmac Corp. v. Bowen*,
811 F.2d 809 (3d Cir. 1987)....23

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999) ....18

**Statutes & Acts of Congress**

5 U.S.C § 701(a)(2) ....34

5 U.S.C. § 706(2)....50

5 U.S.C. § 706(2)(A) ....1, 9

5 U.S.C. § 706(2)(D) ....1, 9

42 U.S.C. § 300(a) ....13

Consolidated Appropriations Act,
2026, Pub. L. No. 119-75, § 506, 140 Stat. 173 (2026) ....7

**Rules**

Fed. R. Civ. P. 56(a) ....9

L.R. 56.1.... 3, 4, 50

**Regulations**

42 C.F.R. § 59.2 .......... 13, 41

42 C.F.R. § 59.5(a)(1) .......... 13

42 C.F.R. § 59.5(a)(3) .......... 41

42 C.F.R. § 59.5(a)(4) .......... 41

**Executive Materials**

Exec. Order. No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," 90 Fed. Reg. 8615 (Jan. 20, 2025) .......... 7

## QUESTION INVOLVED

Whether the challenged provisions of Defendants' Notice of Funding Opportunity for fiscal year ("FY") 2027 Title X grant funds (the "NOFO") violate the Administrative Procedure Act ("APA") because they are not in accordance with law, they are without observance of procedure required by law, and they are arbitrary and capricious. 5 U.S.C. § 706(2)(A), (D).

Suggested answer: Yes.

## INTRODUCTION[1]

The resolution of this case is straightforward. The material facts are undisputed: To borrow Defendants' words, both "the NOFO and the priorities are written documents that speak for themselves." *See, e.g.*, Defs.' Resp. to Pls.' Statement of Material Facts ¶ 78 (Doc. 53) ("SUF Resp."). Those documents make plain that: (1) the NOFO's requirement to demonstrate alignment with the Anti-DEI and Anti-Gender Ideology Priorities conflicts with the Title X regulations; (2) the Agency failed to follow the notice and comment procedure required by law to modify the regulations with which those priorities conflict; and (3) the NOFO arbitrarily and capriciously fails to acknowledge or explain that conflict and fails to provide fair notice as to whether

[1] As in Plaintiffs' opening brief, Mot. for Summ. J. or Prelim. Inj. (Doc. 40) ("Pls.' SJ"), the Department of Health and Human Services ("HHS"), Office of the Assistant Secretary for Health ("OASH"), and Office of Population Affairs ("OPA") will be referred to collectively as "the Agency," and the HHS, OASH and OPA priorities collectively as "Agency Priorities."

and how to satisfy its requirement of alignment with those and other priorities, including ones that appear entirely irrelevant to Title X.

In an attempt to avoid these inescapable conclusions, Defendants seek to rewrite Plaintiffs' complaint and mischaracterize their claims as objections to the way that applications will be scored and grants awarded *in the future*, rather than a challenge to the sole agency action Plaintiffs actually seek relief from: Defendants' issuance of a NOFO establishing the specific requirements and criteria that must be followed in applications that Plaintiffs' members are preparing *now* and must submit by January 11. In support of their mischaracterization, Defendants also lean heavily on the NOFO's "savings clauses," but, as already previewed in Plaintiffs' opening brief, those clauses are not the panacea Defendants make them out to be. Accordingly, as detailed below, Defendants' arguments are without merit, and Plaintiffs are entitled to judgment as a matter of law.

## **UNDISPUTED MATERIAL FACTS**

Notably, Defendants do not raise a genuine dispute as to any of the facts contained in either Plaintiffs' Statement of Undisputed Facts (Doc. 39-1) ("Pls.' SUF") or the two declarations submitted in support of Plaintiffs' Motion for Summary Judgment. *See generally* SUF Resp.; Opposition & Cross-Motion for Summ. J. (Doc. 51) ("Defs.' SJ") 4–8; Decl. Clare M. Coleman for Pls.' Mot. for Summ. J. (Doc. 40-5) ("Coleman Decl."); Decl. Patricia Fonzi for Pls.' Mot. for

Summ. J. (Doc. 40-6) ("Fonzi Decl.").[2] Instead, they ask this Court to deem Plaintiffs' Statement improper, and disregard it in its entirety, because it (1) relies on materials not in the administrative record and (2) cites directly to documents contained within the administrative record (rather than the record itself) that Defendants' claim speak for themselves. *See* SUF Resp.

Defendants' request is entirely unfounded. To start, while review of the *merits* of an APA action is generally limited to the administrative record, many of the facts that Defendants ask this Court to disregard go toward establishing elements *beyond* the merits—namely, Plaintiffs' standing (and other justiciability issues), and their satisfaction of the requirements for obtaining injunctive relief. *See* SUF Resp. ¶¶ 1–19, 64–68, 119–20. Such facts may properly be considered by this Court and should be deemed admitted at this stage. *See*, *e.g.*, *Am. Littoral Soc'y v. U.S. EPA Region*, 199 F. Supp. 2d 217, 228 & n.3 (D.N.J. 2002) (holding that a court may consider extra-record evidence, including declarations, "for purposes of determining jurisdiction"); *Save the South Fork Salmon v. U.S. Forest Serv.*, No. 1:25-CV-00086-

[2] While Defendants assert that "[e]ach statement is disputed unless expressly admitted," SUF Resp. 2, and specifically claim to be disputing a handful of facts, *see id.* ¶¶ 100, 111–18, 120, their responses come nowhere close to satisfying their burden at the summary judgment stage—indeed, their alleged "disputes" are either belied by the administrative record itself, or entirely unsupported. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (party opposing summary judgment cannot rest on mere allegations or denials but must set forth specific facts showing that there is a genuine issue); L.R. 56.1 (at summary judgment stage, facts not concretely controverted by non-movant will be deemed admitted).

AKB, 2026 WL 1506788, at *2 (D. Idaho May 29, 2026) ("Courts may consider extra-record evidence for non-merits issues, including standing, irreparable harm, balance of equities, public interest, and remedy."); L.R. 56.1.

As to the merits, the material facts are all either contained in the administrative record, *see* Administrative Record (Doc. 45) ("A.R.") 068–146, or in government documents, *see* SUF Resp. ¶¶ 35–55 (referencing the Quality Family Planning report ("QFP") and Title X Handbook); *id.* ¶¶ 80, 107 (referencing Executive Orders), of which this Court may take judicial notice. *La. Forestry Ass'n, Inc. v. Solis*, 889 F. Supp. 2d 711, 720 n.7 (E.D. Pa. 2012) (holding that "bills and public law, and . . . government documents . . . are judicially noticeable" and can be considered despite not appearing in the administrative record). Given that the administrative record was not produced until *after* Plaintiffs' motion was filed, the cites in Plaintiffs' Statement were necessarily to the NOFO and Agency Priorities themselves, rather than to a particular page of a record that did not yet exist. *Compare* SUF Resp. ¶¶ 57–59, 61–63, 69–79, 81–106, 108–09, 111–17 (citing the NOFO or Priorities) *with* A.R. 068–146 (NOFO and Priorities). Nevertheless, for ease of this Court's reference, Plaintiffs present those facts again below, with citations to the administrative record:

* * *

In April of 2026, Defendants published a NOFO for Title X funding, soliciting applications to provide Title X services for a five-year term, with an anticipated grant

award date of April 1, 2027. A.R. 001–067; SUF Resp. ¶¶ 57–58. On July 9, 2026, after Plaintiffs filed the instant lawsuit, Defendants published a revised NOFO. A.R. 068–133; SUF Resp. ¶ 57. The deadline to apply for funding is January 11, 2027. A.R. 068.

The NOFO instructs applicants to demonstrate how their proposed projects align with the Agency's Priorities, explains that more than one-third of the total points to be awarded in the Merit Review will be awarded based on the extent to which applicants demonstrate alignment with OPA and HHS priorities, and further instructs that post-Merit Review recommendations for funding will take into account alignment with HHS and OASH priorities. *See, e.g.*, A.R. 077 ("[R]ecipients must align program design and activities with agency priorities where consistent with program authority and the scope of the award . . . ." (citing OASH Priorities)), SUF Resp. ¶ 73; A.R. 080 ("Title X grantees should align their programs with OPA priorities to the extent authorized by law and within the scope of the program . . . ."), SUF Resp. ¶ 81; A.R. 089, 091 (noting that "[s]uccessful proposals should include . . . plans and strategies for providing family planning services that address OPA program priorities" including "[r]educing overmedicalization," "[p]romoting evidence-based care," and "[e]nforcing the Hyde Amendment"), SUF Resp. ¶ 93; A.R. 110 (identifying Merit Review criterion worth 35 of 100 points as "[t]he extent to which the applicant proposes strategies that meaningfully advance OPA's program

priorities as discussed in Section C(a)(4)(i), 'Address OPA Program Priorities' and HHS priorities"), SUF Resp. ¶ 96; A.R. 111 (OPA "will coordinate with a senior appointee to provide recommendations for funding," and "will take into consideration . . . [a]lignment with HHS and OASH priorities, where authorized by law and within the scope of the program"), SUF Resp. ¶¶ 104–05; *see also* A.R. 73; SUF Resp. ¶ 71 (instructing applicants "to review [the] . . . information in th[e] funding announcement to ensure that their application complies with all requirements and instructions"). The NOFO includes savings clause language in some places indicating that alignment with Agency Priorities is only required, *inter alia*, "to the extent authorized by law and within the scope of program," *see, e.g.*, A.R. 080, but omits similar language in other places where alignment with Agency Priorities is discussed, *see, e.g.*, A.R. 091, 110.

Among the Agency Priorities with which applicants must align is the priority to end diversity, equity, and inclusion ("Anti-DEI Priority"). A.R. 134–135, 143; SUF Resp. ¶¶ 74–77, 96–97, 104–05. Under this priority, OASH instructs that it will "prioritize efforts that go beyond the use of ideologically laden concepts" like "health equity," which OASH claims "has not translated into measurable improved health for minority populations." A.R. 135; SUF Resp. ¶¶ 75–76.

Another Agency Priority with which applicants must align is ending support for, or combating, what the Agency calls "gender ideology" ("Anti-Gender Ideology

Priority").[3] A.R. 083, 135, 144; SUF Resp. ¶¶ 74, 78–79, 83, 89, 96, 98, 104–05. OASH states that it is "an OASH priority to ensure OASH programs accurately reflect science, including the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology." A.R. 135; SUF Resp. ¶¶ 78–79; *see also* A.R. 144; SUF Resp. ¶ 98 (HHS priority to "[c]ombat gender ideology"). Under the "Promoting evidence-based care through the delivery of Title X services" OPA priority, the NOFO further states that "HHS will prioritize funding for grantees who maintain a science-driven approach to healthcare, including by . . . respecting biological reality." A.R. 083; SUF Resp. ¶ 89.

The NOFO also states that applicants are expected to "contribute to broader HHS efforts to safeguard life-affirming, lawful, and ethical program delivery" A.R. 083–084; SUF Resp. ¶¶ 91–92. This phrase is used under the Agency's "Enforcing the Hyde Amendment" priority, which relates to restrictions on the use of certain federal funds to pay for abortions. A.R. 083–084; SUF Resp. ¶ 91; Consolidated

---

[3] In Executive Order No. 14168, entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," the administration defines "gender ideology" as an ideology that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa . . . [and that] there is a vast spectrum of genders that are disconnected from one's sex." Exec. Order. No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); SUF Resp. ¶ 80 (contending that the Executive Order speaks for itself).

Appropriations Act, 2026, Pub. L. No. 119-75, § 506, 140 Stat. 173, 317 (2026). The term "life-affirming" is not defined. A.R. 083–084; SUF Resp. ¶¶ 91–92.

The NOFO also requires alignment with the Agency's Priority to "reduc[e] overmedicalization in health care" ("Reducing Overmedicalization Priority"). A.R. 081–082, 135; SUF Resp. ¶¶ 83–88. The NOFO's only mention of contraception is under this heading. A.R. 081; SUF Resp. ¶ 88. The NOFO says that "OPA recognizes the overreliance on pharmaceutical and surgical treatments" and notes that there has been "a decrease in females' current use of any contraception" and that "the most common reason women reported discontinuing use related to dissatisfaction was side effects." A.R. 081; SUF Resp. ¶ 84. The NOFO says that a key strategy for advancing this priority includes "expanding access to fertility-awareness–based methods (often referred to as natural family planning)." A.R. 082; SUF Resp. ¶ 87.

The NOFO also requires alignment with "HHS Priorities" that seem to be outside the scope of the Title X program, including "[f]urther[ing] our understanding of autism," "[t]oxins," "[i]nvestigat[ing] and car[ing] for those with Long COVID," "[a]dvanc[ing] the scientific understanding of the aging process," "[p]romot[ing] work and self-sufficiency," "[e]nd[ing] crime and disorder on America's streets," "[i]mprov[ing] oversight of foreign funded institutions," and "[e]nding dangerous gain-of-function research." A.R. 110–111, 138–146; SUF Resp. ¶ 99.

## LEGAL STANDARDS

Defendants filed a 12(b)(1) motion to dismiss "before [they] filed any answer to the Complaint or otherwise presented competing facts," and, accordingly, the motion is "by definition, a facial attack" on this Court's jurisdiction. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). "[A] facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party" to determine whether a claim is "insufficient to invoke the subject matter jurisdiction of the court." *Id.*

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an APA action, summary judgment is the mechanism for deciding, as a matter of law, whether the agency action is consistent with the APA's standard of review. *See, e.g.*, *Pa. Dep't of Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 241 F. Supp. 3d 506, 511 (M.D. Pa. 2017). Pursuant to the APA, a court must declare unlawful and set aside any agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) *id*. § 706(2)(D).

# ARGUMENT

## I. Defendants' Arguments Are Premised on a Fundamental Misstatement of Plaintiffs' Case and Reliance on the NOFO's Ineffective Savings Clauses.

Defendants' arguments largely rest on a fundamental misstatement of Plaintiffs' challenge and a misguided reliance on savings clauses that do nothing of the sort. *See generally* Mot. to Dismiss (Doc. 47) ("MTD") & Defs.' SJ; *see also* MTD 9, 12–13; Defs.' SJ 17–19, 25. Once these faulty premises are rejected—as they must be—the jurisdictional and merits arguments that rest upon them collapse.

To start, Defendants repeatedly mischaracterize Plaintiffs' lawsuit as one challenging the Agency's decision to penalize applicants via Merit Review score deductions and/or deny funding to support their argument that this case is premature. *See, e.g.*, MTD 7–8, 12–13, 15–16; Defs.' SJ 12–13. But as Plaintiffs' First Amended Complaint and opening brief make clear, Plaintiffs are not challenging score deductions, award decisions, or any specific application of the challenged NOFO provisions. Rather, Plaintiffs take issue with, and seek relief from, the NOFO's unlawful requirements *on their face*—live requirements that Plaintiffs' members must actively demonstrate that they satisfy in applications they must write and submit by January 11. First Am. Compl. (Doc. 35) ¶¶ 147–63; *see generally* Pls.' SJ 10–36. Thus, the only question before this Court is whether the challenged provisions of the NOFO—which are clear from the face of the document, and bear

on grant applications that some of Plaintiffs' members are preparing *now*—violate the APA. To answer this question, this Court need only look to the text of the NOFO itself and the applicable law, including the Agency's own regulations; no further factual development is warranted or necessary, and accordingly, as will be discussed below, Defendants' contention that more facts are needed fails.

In keeping with their mischaracterization of Plaintiffs' case, Defendants repeatedly invoke the NOFO's savings clauses as an alleged stopgap. *See, e.g.*, MTD 9, 12–13; Defs.' SJ 17–19, 25. Their argument here is as follows: because the NOFO contains some savings clauses, Plaintiffs' claims are not justiciable and fail on the merits unless and until the Agency *actually* scores applications or makes awards in a manner that penalizes applicants for complying with the Title X statute and regulations over priorities that conflict with them, or for failing to demonstrate alignment with irrelevant priorities. But as previously explained, these clauses do not undermine Plaintiffs' claims, or the justiciability of this action. Pls.' SJ 34–36.

First, the savings clauses' qualifying language cannot "override [the NOFO's] clear and specific language" that "commands action"—namely, alignment with Anti-DEI and Anti-Gender Ideology Priorities—that directly conflicts with the Title X regulations. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018). The savings clauses—and Defendants—seem to suggest that there could be *some* lawful means of reconciling the Anti-DEI Priority's clear instruction to

abandon health equity with the regulations' requirement to advance health equity, and reconciling the Anti-Gender Ideology Priority's direction to "end support" for the concept that a person's gender identity may differ from their sex assigned at birth with the regulations' requirement to provide fully inclusive, client-centered, non-discriminatory care to transgender people. But as Plaintiffs have explained, and as is clear from those examples, it is simply not possible for an entity to align itself with those priorities in a manner that is consistent with the regulations. Pls.' SJ 13–17. Indeed, numerous cases analyzing savings clauses in the context of legislation, Executive Orders, and agency action make clear that where, as here, a challenged action "cannot possibly be implemented consistent with applicable law, a command to do so in a saving clause is meaningless." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025); *see also Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 23 (2020) (noting that courts have "long rejected interpretations of sweeping saving clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found" (quoting *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 228 (1998))); *City & Cnty. of San Francisco*, 897 F.3d at 1240 (where an executive order "unambiguously commands action," a "savings clause does not and cannot override its meaning," and cannot "preclude[] a court from examining whether the Executive Order is consistent with law"); *RENEW Ne. v. U.S. Dep't of the Interior*, No. 25-CV-13961-DJC, 2026

WL 1078282, at *26 (D. Mass. Apr. 21, 2026) (agency directive that conflicted with applicable statutes could not "be shielded by the [] saving clause"), *appeal filed*, No. 26-1731 (1st Cir. June 24, 2026); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 437 (D. Md. 2025) (holding that "courts have repeatedly rejected the argument that simply including 'consistent with applicable law' or a similar boilerplate phrase inoculates an otherwise" unlawful action from judicial review).

Second, the savings clauses do not resolve the tension and confusion that give rise to Plaintiffs' arbitrary and capricious claim. Nowhere does the NOFO explain how an entity is to determine that alignment with a particular priority is or is not "authorized by law," or is or is not "within the scope of the program." *See* A.R. 068–133. The lack of any mechanisms for "invoking the savings clause[s] or any standards for applying [them]," renders them "purely theoretical," *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), and does nothing to resolve Plaintiffs' claim that applicants lack fair notice as to how Defendants expect them to comply with the NOFO's directions. For instance, although the Title X statute, regulations, and guidance mandate that Title X projects offer "a *broad range* of acceptable and effective family planning methods and services," 42 U.S.C. § 300(a) (emphasis added), including FDA-approved contraceptive products, 42 C.F.R. §§ 59.2, 59.5(a)(1), the NOFO directs applicants to align with the Agency's Reducing Overmedicalization Priority—a priority under which the Agency disparages FDA-

approved methods of contraception and emphasizes the expansion of access to natural family planning methods. A.R. 081. Applicants faced with these seemingly competing mandates are left without any guidance as to whether the Agency is *actually* asking them to de-prioritize FDA-approved contraception methods in favor of non-medical "natural" contraception methods, and, if so, whether it considers such an ask to be "authorized by law" or not. The NOFO's cursory savings clauses do nothing to remedy this confusion.

Likewise, the NOFO instructs applicants to align themselves with HHS Priorities, many of which appear patently irrelevant to the Title X program. A.R. 110–111, 138–146. While the NOFO says in some places that entities need only align with Agency Priorities in a manner "consistent with . . . the scope of the award" or "within the scope of the program," it sets forth no standards that would give applicants any indication which priorities the Agency considers to be outside "the scope." *See* A.R. 068–133. This leaves applicants in the same position they would be without the savings clauses: forced to hazard a guess and hope the Agency agrees. In short, "without a procedure for invoking the savings clause[s] or any standards for applying [them], [this Court] cannot conclude that the clause[s] 'save[]' the [NOFO] from the infirmities," and Defendants' arguments to the contrary must be rejected. *HIAS, Inc.*, 985 F.3d at 325.

Finally, the savings clauses are not even included in all places where alignment with the Agency's Priorities is required by the NOFO. Pls.' SJ 34–35. For example, the NOFO instructs applicants to "[d]escribe plans and strategies for providing family planning services that address OPA program priorities," A.R. 091, and informs applicants that 35% of their Merit Review points will be based on the extent to which they propose strategies that meaningfully advance "'OPA Program Priorities' and HHS's priorities," *id.* at 110, *without* qualification. It is unclear whether the absence of any "savings clauses" alongside these provisions means that the "where authorized by law" and "within the scope" caveats do not apply to these aspects of the review process. The NOFO again provides no answers, and thus, in the end, the savings clauses do nothing to resolve—and in fact compound—the harm and confusion that Plaintiffs' members currently face. *See* Pls.' SJ 34–35.

## II. Plaintiffs' Claims Are Ripe for Review.

In determining prudential ripeness, courts consider: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). The Third Circuit has refined this test, directing courts to assess: (1) the adversity of the parties' interests; (2) the conclusiveness of the judgment with respect to the legal relationship

between the parties; and (3) the practical help or utility of the judgment. *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990).[4]

As detailed below, Plaintiffs' claims are prudentially ripe under either formulation of the test, and Defendants' arguments to the contrary are without merit.[5] Indeed, while Defendants attempt to paint Plaintiffs' suit as something unprecedented, courts regularly recognize the ripeness of challenges to grant conditions before they have been applied, including those imposed via notices of funding opportunity. *See, e.g.*, *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 614 (E.D. Pa. 2017) (challenge to agency decision to impose conditions on grants was ripe and final notwithstanding the fact that the "grant process [was] still unfolding, without any ultimate decision as to whether [the plaintiff] [would] be awarded . . . funds"); *Freedom Network v. Trump*, 830 F. Supp. 3d 681, 698–99 (N.D. Ill. 2026) (rejecting government's argument that challenge to funding conditions in

---

[4] Although the *Step-Saver* test differs from *Abbott*'s two-prong approach, it is simply "a distillation of the factors most relevant to the *Abbott Labs* considerations," where "[a]dversity and conclusiveness apparently are subsumed under the 'fitness' prong of the *Abbott Labs* test, while utility is relevant both to 'fitness' and 'hardship.'" *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 n.9 (3d Cir. 2001).

[5] Defendants' ripeness argument also ignores Plaintiffs' arbitrary and capricious claim arising from the NOFO's deprivation of fair notice. *Compare, e.g.*, MTD at 7 ("*Each* of Plaintiffs' claims turns on the premise that the NOFO's call for alignment with agency priorities *conflicts with the Title X regulations*.") (emphasis added) *with* First Am. Compl. ¶¶ 156–63. Their failure to address that claim is a tacit admission that it is, in fact, ripe, as the analysis below confirms.

a NOFO was unripe "until [plaintiff] receives and accepts a grant offer" because it "omits a key harm that [plaintiff] faces now," namely that "the conditions will influence the process by which grant applications are selected for a grant offer"); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 89 (D.R.I. 2025) (finding challenge to immigration-related conditions on receipt of federal funds ripe even before a NOFO was released, noting that "the decision to attach the condition can be final even if the final decision to award the funds and issue the NOFOs is still pending."). This Court should follow suit and hold the same here.

**A. The Parties Have Adversity of Interests.**

As to the first prong of the *Step-Saver* framework, "[a]dversity requires opposing legal interests." *Lewis v. Alexander*, 685 F.3d 325, 341 (3d Cir. 2012). "Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995).

Defendants' attempt to defeat adversity rests entirely on their misrepresentation of Plaintiffs' case. *See* MTD 12–13. Again, Plaintiffs are not challenging how applications have been scored, or the grant or denial of awards—they are challenging provisions of a NOFO that has already been issued, given the conflict, confusion, and harm those provisions create *now*, as Plaintiffs' members

attempt to prepare responsive applications.[6] Pls.' SJ 37–39; *see also Illinois*, 801 F. Supp. 3d at 89; *Freedom Network*, 830 F. Supp. 3d at 699. This harm is not based on any "contingency" and, as already discussed, the NOFO's savings clauses, *see* MTD 9–10, 12–13, do not indicate otherwise. *Supra* 11–15. Indeed, while Defendants suggest that the existence of the savings clauses means that there may be some way to reconcile the Anti-DEI Priority's direction to *abandon* health equity with the regulation's requirement to *advance* health equity, MTD 9, they do not specify what that reconciliation might look like, nor do they attempt to assuage Plaintiffs' members' concerns by expressly stating that under no circumstances will an applicant be penalized for complying with the law over contradictory priorities, or for failing to demonstrate alignment with irrelevant priorities.[7] Thus, Defendants'

---

[6] Thus, Defendants' assertion that this Court should wait to review this case until the Agency is able to provide a "record of the priorities being applied to an applicant," MTD 15, is inapt. Because Plaintiffs are challenging the NOFO's requirements on their face, the administrative record need include "only the materials underlying the NOFO's issuance." *Id.* In any event, claiming that Plaintiffs should wait to file suit until after they see the scoring results ignores the NOFO's explicit admonition that the Agency "do[es] not provide scores." A.R. 041.

[7] Defendants' claim that the Anti-DEI Priority "does not purport to repeal" the regulations' requirement of advancing health equity, MTD 9, does not resolve Plaintiffs' notice-and-comment claim. To the extent there is a conflict between the priority and regulations, notice and comment was required, and there is no basis to delay review of this pure legal question. Indeed, where, as here, the agency has "fail[ed] to comply with [some procedural requirement]" and "there no longer exists the possibility that further agency action will alter the claim in any fashion," the claim "can never get riper." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43,

attempt to liken this case to *Salvation Army v. Department of Community Affairs*, 919 F.2d 183, 192 (3d Cir. 1990)—where adversity was found to be lacking given the defendant's "express assurance that there will be no enforcement," MTD 13—is ineffective, as no similar "express assurance" has been provided here.[8] To the contrary, Defendants have refused to foreclose the possibility that applicants may be penalized for complying with the regulations over the Agency's conflicting priorities. *See, e.g.*, MTD 9 ("Whether a panel will so depart, and whether any deduction would change the award, cannot be known until applications are scored."); *id.* at 9–10 ("Whether the Secretary in fact declines to credit a showing under [the regulations], and whether any such deduction proves decisive, can be known only from a scored application . . . ."); *id.* at 14 ("Applicants scored down for doing what regulations require may seek review on a record showing what the agency did . . . ."). This refusal only exacerbates the confusion and hardship Plaintiffs' members face, reinforces their credible fears, and confirms that the requisite adversity is present here.

---

51 (D.C. Cir. 1999) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)) (internal quotation marks omitted).

[8] In any event, mid-litigation assurances from Defendants would not resolve the issues in this case. *See Abbott Labs.*, 387 U.S. at 154 ("This action at its inception was properly brought and this subsequent representation of the [defendant] should not suffice to defeat it.").

### B. Judgment Will Conclusively Establish the Legal Rights or Relations of the Parties.

The second *Step-Saver* factor requires courts to consider "the fitness of the issue for adjudication to ensure that the declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts." *Surrick v. Killion*, 449 F.3d 520, 528 (3d Cir. 2006). In assessing conclusiveness, courts generally ask "[w]hether issues are purely legal (as against factual)," and "[w]hether further factual development would be useful." *NE Hub Partners*, 239 F.3d at 342 n.9.[9]

Defendants' attack on conclusiveness mirrors its attack on adversity and fails for much the same reasons. Again, Defendants appeal to the NOFO's savings clauses, MTD 12, but, as already explained, those do not resolve the conflict. *See supra* 11–15. And, again, they refer to "contingencies," MTD 12–13, but, as also explained, there are no contingencies here, given that Plaintiffs are not challenging scoring or award decisions but the requirements set forth on the face of a final, published NOFO that govern the competitive application process now. *Supra* 17–19.

[9] As is relevant here, the Third Circuit has held that "[f]inal agency actions involving purely legal questions satisfy the fitness requirement" of *Abbott Labs*' two-part ripeness test. *CEC Energy Co. v. Pub. Serv. Comm'n of V. I.*, 891 F.2d 1107, 1110 (3d Cir. 1989). This is a case challenging final agency action, *see infra* 27–34, involving a purely legal question where Plaintiffs would suffer hardship if the Court were to withhold consideration, *see supra* 17–19 & *infra* 22–26 & 50–51. For this reason, Plaintiffs also satisfy the requirements under the ripeness test as laid out in *Abbott Labs*.

With those arguments aside, Plaintiffs easily satisfy the conclusiveness factor. First, a decision in this case will "define and clarify the legal rights or relations of the parties," including by delineating the scope of the NOFO and what Plaintiffs' members must write to in their applications now. *Step-Saver*, 912 F.2d at 648; *see also Lewis*, 685 F.3d at 341 ("A decision here would establish whether the statute can be enforced against the Plaintiffs, so it would define and clarify Plaintiffs' legal rights.").

Second, the issues raised here are "purely legal." *NE Hub Partners*, 239 F.3d at 342 n.9. All this Court needs to do to resolve the issues is to assess the plain text of the NOFO and Agency Priorities, as set forth in the administrative record. Whether the NOFO's requirement to align with certain of the Agency's Priorities conflicts with the text of the Title X regulations is purely a legal inquiry. The same is true of Plaintiffs' claims that the conflicting priorities were passed without observance of the required notice and comment procedure and that the NOFO fails to acknowledge or explain the conflict and tension it creates and to provide fair notice to applicants. These purely legal issues can, and should, be conclusively resolved now, before Plaintiffs' members submit applications to Defendants. *See Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 198 (3d Cir. 2004) (claim ripe where material facts are "simple and undisputed" and "[t]he crux of the issue on the merits . . . is purely legal"); *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C.

Cir. 2007) ("It is well-established that claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues." (cleaned up)).

In fact, in *Planned Parenthood of Greater New York v. U.S. Department of Health & Human Services*, the court rejected the same argument Defendants advance here. No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025). The defendants there asserted that the challenged agency Policy Notice was "'a document of general applicability,' so review '[was] likely to stand on much surer footing in the context of a specific application.'" *Id.* at *14 (citing Defs.' Opp'n). The court disagreed, holding that "Plaintiffs' claims are largely . . . purely legal questions that do not require additional factual development or specific factual application to evaluate." *Id.* As in that case, whether the NOFO is "vague or whether certain of its terms directly contradict the [regulations] can be evaluated outside of the context of examples of agency application," *id.*, and an order from this Court so declaring is thus capable of conclusively determining the parties' rights. *See also id.* (noting that "Defendants cannot hide behind their own Policy Notice's vagueness to avoid judicial scrutiny").

**C. Judgment Will Have Significant Practical Value.**

Finally, as to utility, courts consider "whether the parties' plans of actions are likely to be affected by a declaratory judgment," "the hardship to the parties of withholding judgment," and "whether entry of judgment 'would be useful to the

parties and others who could be affected.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 543–44 (3d Cir. 2017) (quoting *NE Hub Partners*, 239 F. 3d at 344–45; *Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1470 (3d Cir. 1994)).

Defendants' attempt to undermine Plaintiffs' hardship—and, in turn, the practical utility of a decision in their favor here—is also unavailing. They claim Plaintiffs' members experience no hardship other than that associated with the "ordinary condition" of "[t]ailoring an application to announced criteria," which is insufficient to justify judicial review. MTD 14. But that is not the hardship that Plaintiffs' members face. Rather, the record shows that Plaintiffs' members face hardship in having to prepare an application according to and in line with requirements in the NOFO that are *unlawful, vague, and/or irrelevant* to Title X. *See* Pls.' SJ 37–39; Coleman Decl. ¶¶ 75–78; Fonzi Decl. ¶¶ 62–70. Thus, unlike the plaintiff in *Wilmac Corporation v. Bowen*, MTD 14, Plaintiffs' members *are* "faced with . . . a Hobson's choice," 811 F.2d 809, 813 (3d Cir. 1987), because the NOFO requires something of them "directly," *id.*: It forces them to choose between demonstrating alignment with Agency Priorities that contradict or are in tension with the requirements of the Title X regulations and other governing documents or are irrelevant to Title X—at the expense of their missions and limited resources—or to refuse to do so, at the expense of their applications' competitiveness. *See* Pls.' SJ 37–

39; SUF Resp. ¶ 120 (introducing nothing to genuinely dispute the fact that applicants are held to representations made in their application).

With the hardship properly articulated, it is clear that a judgment "will affect the parties' plans of actions by alleviating legal uncertainty," *Surrick*, 449 F.3d at 524, and will thus "have significant practical value." *Khodara*, 376 F.3d at 198. If Plaintiffs obtain a judgment declaring, *inter alia*, that applicants need not demonstrate alignment with priorities that directly conflict with the regulations and are irrelevant to Title X, and need not demonstrate alignment with priorities in a manner that would create tension with the Title X statute or other governing documents, their members would then know what to address in their applications and how to do so in line with both the NOFO's requirements and the law, and thus their "plans of actions" with respect to their applications will be "affected." *Plains All Am. Pipeline*, 866 F.3d at 543 (quoting *NE Hub Partners*, 239 F.3d at 344–45). Conversely, if judgment is withheld, confusion and uncertainty will persist, and Plaintiffs' members will be forced to "either certify compliance with contested [Agency Priorities] or risk losing critical . . . funding." *Illinois*, 801 F. Supp. 3d at 89.

Given all of this, Plaintiffs' suit is ripe, and none of Defendants' cases counsel otherwise. MTD 8–15. Indeed, in all those cases, the courts concluded that the matter at hand was unripe upon finding that the legality of the challenged action could turn

on the facts of a particular case and that deferring judicial review would not cause hardship. *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (challenge to agency regulation deeming Contract Disputes Act inapplicable to concession contracts unripe where agency acknowledged that some concession contracts may fall under the Act and plaintiffs relied on "specific characteristics of certain types of concession contracts to support their positions" and where deferring review would cause no hardship because regulation was merely the agency's policy view and would not impact conduct); *Phila. Fed'n of Tchrs. v. Ridge*, 150 F.3d 319, 324–25 (3d Cir. 1998) (procedural due process challenge to appeals process for disability status change unripe where there existed "a great deal of uncertainty" as to how process would operate and where deferring review would cause no hardship because those aggrieved would have 500 weeks to bring suit before being deprived of benefits); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967) (challenge to regulation imposing penalties for refusal to permit FDA inspection unripe where it was uncertain whether and when an inspection would even occur and what reason would be given to justify it, no advance action was required of the regulated entities, and deferring review would cause no hardship); *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 496–97 (3d Cir. 2017) (challenge to scope and intensity of escheat audit unripe where validity of audit could turn on how it was enforced, deferring review would cause no hardship because plaintiffs could refuse

to cooperate with audit, and existence of state law remedies counseled in favor of declining jurisdiction regardless of ripeness); *Ohio Forestry Ass'n*, 523 U.S. at 733–37 (challenge to land management plan that could increase logging unripe where provisions imposed no obligations and forced no behavioral modifications, review could hinder agency efforts to refine policies, review would benefit from facts specific to a particular logging proposal, and deferring review would cause no hardship because plaintiffs would have time to challenge any site-specific decision before logging could commence).[10] As detailed above, the opposite is true here: Additional facts would not aid in this Court's resolution of the purely legal questions presented, the NOFO is imposing obligations on Plaintiffs' members *now*, and deferring review would cause hardship as it would force Plaintiffs' members into a Hobson's choice as to the content of their applications. Pls.' SJ 37–39. Thus, for all the reasons herein, Defendants' motion to dismiss should be denied.

## III. Plaintiffs' APA Claims are Reviewable and Meritorious.

Having failed to undermine this Court's jurisdiction, Defendants turn to attacking Plaintiffs' ability to proceed and succeed under the APA, asserting that (1)

---

[10] And unlike the plaintiffs in *Felmeister v. Office of Attorney Ethics*, MTD 13, Plaintiffs' members do not have a process through which to obtain a formal "advisory opinion" as to how to demonstrate alignment in the face of these issues. 856 F.2d 529, 538 (3d Cir. 1988). Indeed, as discussed *infra* n.18, the NOFO states that "[o]ut of fairness to all applicants, we do not provide one-on-one consultation on the specific content development for any applications." A.R. 105.

there is no final agency action, (2) their action is committed to agency discretion by law; and (3) Plaintiffs cannot succeed on the merits. *See generally* Defs.' SJ. As detailed below, these arguments again ignore what this lawsuit is *actually* about and are otherwise flawed. Accordingly, Defendants' summary judgment motion should be denied, and Plaintiffs' cross-motion granted.

**A. The NOFO Constitutes Final Agency Action.**

Defendants contend that Plaintiffs' APA claims are not justiciable because they do not challenge final agency action. Defs.' SJ 11–15. This argument fails alongside Defendants' ripeness argument for many of the same reasons.

First, in disclaiming that the NOFO "mark[s] the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), and, relatedly, Plaintiffs' satisfaction of the *Aerosource* considerations of "definitive position," "status of law," and "pure question of law," *Aerosource, Inc. v. Slater*, 142 F.3d 572, 579 (3d Cir. 1998),[11] Defendants repeat their argument that because no application has been scored, and no funds have been awarded, we do not yet know

[11] The Third Circuit has identified five pragmatic considerations that courts may consider when determining whether agency action is "final." *Aerosource*, 142 F.3d at 579. While, as detailed below, the challenged action here easily satisfies all those factors, courts in the Third Circuit routinely conduct the final agency action analysis using the two-prong *Bennett* test alone. *See, e.g.*, *TSG Inc. v. U.S. EPA*, 538 F.3d 264, 267 (3d Cir. 2008); *Doe No. 1 v. Noem*, No. 25-1962, 2025 WL 1224783, at *4 (E.D. Pa. Apr. 28, 2025); *see also* Defs.' SJ 12 n.5.

whether the Agency will actually credit "priority alignment over regulatory compliance in practice." Defs.' SJ 12–13.

This falls flat for reasons already explained. Again, Plaintiffs are not challenging the Agency's application of the NOFO's criteria and requirements to a specific entity's funding request, or its decisionmaking as to the distribution of funds. They are challenging the Agency's establishment of the specific requirements and criteria that will be used to evaluate Title X grant applications, as set forth in the published NOFO. *See supra* 10–11. The decision as to the content of those requirements and criteria is undisputedly fully effectuated and final. A.R. 068–113; SUF Resp. ¶ 109; *see also* Pls.' SJ 10–11; *Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*, No. 26-CV-2460 (CRC), 2026 WL 2426300, at *18 (D.D.C. Aug. 19, 2026) (holding that challenged NOFOs requiring alignment with specified priorities "mark the consummation of the agency's decision-making process as to how it will allocate funds in the next round of [] grant-making. Although the awardees are yet to be chosen, there is nothing remotely 'tentative' or 'interlocutory' about the *rubric* that the agency will use to select awardees.").[12] In other words, the NOFO "represents the agency's definitive position on the question" of which specific

[12] Even if Defendants *were* to suggest that they might further modify the NOFO before reviewing applications for FY2027 Title X funds, that would not matter: The law is clear that "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

requirements and criteria will govern the Title X grantmaking process, and this decision carries with it "the expectation of immediate compliance," *Aerosource*, 142 F.3d at 579; indeed, the NOFO instructs all "applicants to review [the] . . . information in th[e] funding announcement to ensure that their application complies with all requirements and instructions." A.R. 073; SUF Resp. ¶ 71. Moreover, as already explained *supra*, no "further factual development," *Aerosource*, 142 F.3d at 579, is required, because Plaintiffs challenge the NOFO's unlawful provisions on their face, no material facts are in dispute, and the issues at hand are solely legal ones.

Second, in contesting Plaintiffs' satisfaction of *Bennett*'s "rights, obligations or legal consequences" prong—and *Aerosource*'s related "impact on the day-to-day operations" and "immediate review" considerations, 142 F.3d at 579—Defendants cursorily assert that "only an award decision" could impact Plaintiffs' members. Defs.' SJ 13. Not so.

To begin, the sole case Defendants cite in support of this argument—*Chemours Co. FC, LLC v. U.S. EPA*, 109 F.4th 179 (3d Cir. 2024), Defs.' SJ 13—is inapposite. There, the Third Circuit applied *Bennett*'s finality test and concluded that the challenged EPA advisory failed the second prong because it merely provided guidance but imposed no obligations, prohibitions, or restrictions on anyone, and "establishe[d] no direct consequence[s] for parties who ch[o]se to disregard EPA's

advice." *Chemours*, 109 F.4th at 184–85. By contrast, the NOFO is not guidance—it imposes obligations on prospective applicants that they must satisfy to be competitive for Title X grants, and compliance (or lack thereof) with those obligations has "direct and appreciable consequences" for any applicant for FY27 Title X funding. *Bennett*, 520 U.S. at 178; Pls.' SJ 11–13, 36–40; *see also Hennepin Cnty.*, 2026 WL 2426300, at *18 (holding legal consequences flow from challenged NOFOs' issuance where plaintiffs could not seek funding under the NOFOs "without transforming programming that HHS previously found to be effective and evidence-based" to "conform to HHS's new-imposed requirements").

Moreover, "immediate review," *Aerosource*, 142 F.3d at 579, is appropriate here because, contrary to Defendants' claims, Defs.' SJ 13, there *is* "unlawful conduct to enforce against" *now:* the unlawful requirements imposed on applicants by the NOFO, including the requirement to demonstrate alignment with Agency Priorities that *on their face* conflict with and undermine the Title X regulations. Thus, review would ensure that the regulations' purpose is not frustrated without disrupting Defendants' FY27 Title X grant application and award process, as—in accordance with this Court's scheduling order (Doc. 44)—a decision clarifying the legality of the challenged provisions and, in turn, the requirements Plaintiffs' members must write to in their applications, will be issued before applications are due.

Having nothing to show under the *Bennett* and *Aerosource* factors, Defendants next assert that a notice of funding opportunity for a grant can *never* constitute final agency action on the basis that such "finality" only materializes upon an agency's issuance of grant awards. Defs.' SJ 13–14. But the three out-of-circuit cases Defendants cite to support this claim do not stand for such an expansive rule.

*Rattlesnake Coalition v. EPA* is entirely inapposite. 509 F.3d 1095 (9th Cir. 2007). There, the court rejected the plaintiff's argument that "where Congress has earmarked federal funds for a particular project via an appropriations act, the funds should be considered dispersed and qualify as a final agency action," *id.* at 1103, because 1) Congress is not an agency and 2) the agency itself had not done anything, *id.* at 1103–04. By contrast, Plaintiffs here are not challenging a *congressional* appropriation or earmark, but a specific action *already taken* by the Agency itself: the issuance of the NOFO.

*Citizens Alert Regarding the Environment v. EPA* is similarly distinguishable. 102 F. App'x 167 (D.C. Cir. 2004). There, the plaintiffs sued the EPA to block the construction of a grant-funded sewer line on the basis that the project failed to comply with a federal statute. *See id.* at 168. But in that case, the agency was in the process of conducting the review required by the statute and had not yet made a final determination "as to the environmental effects of the sewer line, or on whether to award the grant." *Id*. Here, again, there is no further action, discretionary or

otherwise, that the Agency must engage in before the subject of Plaintiffs' challenge—the NOFO—becomes "final." *See, e.g.*, SUF Resp. ¶¶ 109–10.

Finally, *Planned Parenthood of Wisconsin, Inc. v. Azar* does nothing to undermine finality here. 316 F. Supp. 3d 291 (D.D.C. 2018), *vacated and remanded on other grounds*, 942 F.3d 512 (D.C. Cir. 2019). At the outset, as demonstrated by the numerous cases finding that agency decisions to impose requirements and conditions on grants that have not yet been awarded—including in the context of notices of opportunities for funding—are "final" and reviewable under the APA,[13] this outlier, vacated case was wrongly decided. As explained herein, a final, published notice of funding opportunity that gives no indication that it is interim or temporary constitutes "consummated" agency action under the first *Bennett* prong. Additionally, where—as here and in *Planned Parenthood of Wisconsin*—that notice requires adherence to requirements and criteria, it gives rise to obligations and legal consequences that amply satisfy the second prong of the test. *See supra* 27–30.[14]

---

[13] *See* Pls.' SJ 10–13; *see also Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 330 (S.D.N.Y. 2018) (finding funding opportunity announcement to be final agency action); *Hennepin Cnty.*, 2026 WL 2426300, at *18.

[14] In addition to being wrongly decided, *Planned Parenthood of Wisconsin* is distinguishable. There the plaintiffs were challenging, and the court's final agency action analysis thus focused on, the altered Merit Review scoring criteria. 316 F. Supp. 3d at 300 (noting that the plaintiffs there had "frame[d] the agency decision at issue as the altered scoring criteria"). Conversely, while Plaintiffs here do not concede the legality of Merit Review criteria, they are not affirmatively challenging

Defendants' attempt to distinguish some of the cases cited in Plaintiffs' opening brief, Defs.' SJ 14–15, is equally unavailing. Contrary to Defendants' claims, the NOFO here *is* akin to the conditions challenged in *City of Philadelphia*, 280 F. Supp. 3d 579, because it *does* announce that all applicants must align themselves with the Agency's Priorities and demonstrate as much in their applications, *see supra* 5–6; as in that case, the Agency has "decided to impose the Challenged Conditions on applicants for [Title X] Program funds, and [] the decision is one from which legal consequences flow." *City of Philadelphia*, 280 F. Supp. 3d at 615. Moreover, the NOFO's "qualifying language," Defs.' SJ 15, is irrelevant for reasons already stated, as is the fact that its requirements have not yet been applied, *id.* Indeed, nowhere in its finality analysis did the *City of Philadelphia* court indicate that either the absence of savings clauses or the prior application of the challenged conditions had any impact—let alone a dispositive one—on its conclusion.

Similarly, the minor differences Defendants identify between the plaintiffs' posture in *Planned Parenthood of Greater New York*, 2025 WL 2840318, at *18, and Plaintiffs' posture here are far from "dispositive." Defs.' SJ 15. Indeed, when applying the finality test, the *Planned Parenthood* court discussed the fact that funds had already been awarded only in the context of rejecting HHS's argument that

---

those criteria. Rather, they are challenging the NOFO's requirement that applications align with unlawful, vague, and irrelevant priorities—a decision that is impacting Plaintiffs' members ability to prepare applications *now*.

awards somehow signaled "flexibility" on the challenged conditions. 2025 WL 2840318, at *20. Here, like in *Planned Parenthood*, "the [NOFO] was formally promulgated by HHS and does not contemplate any further deliberation of subsequent iteration," *id.* at *18, and goes "beyond recommending approaches or discouraging certain topics, instead spelling out 'expectations' and the scope of permissible content" for applications that some of Plaintiffs' members are preparing now, *id.* at *20. Accordingly, as in that case, Plaintiffs need not wait for HHS to "drop the hammer in order to have their day in court." *Id.* at *22 (cleaned up).[15]

**B. The Challenged Provisions of the NOFO Are Not Committed to Agency Discretion by Law.**

In further attempt to escape this Court's review, Defendants invoke the APA's exception to judicial review for "agency action [that] is committed to agency discretion by law." 5 U.S.C § 701(a)(2); Defs.' SJ 16–17. But that exception is "very narrow," and applies only when "a court would have no meaningful standard against

[15] Defendants' attempt to distinguish *Freedom Network*, 830 F. Supp. 3d 681, and *Rhode Island Coalition Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58 (D.R.I. 2025), Defs.' SJ n.7, fares no better. Again, Plaintiffs are not challenging the "scoring of priorities," so the fact that those cases did not involve such scoring is irrelevant. So too is Defendants' (unsupported) claim that alignment with the Agency's Priorities will not be "outcome determinative." Defs.' SJ 15. As in *Rhode Island Coalition*, what matters here is that "[w]ithout agreeing to the challenged conditions," Plaintiffs' members' ability to obtain a grant is compromised, and that "the challenged conditions will potentially change the lawful scope of activities permitted with grant funds," and may lead to the termination of awards. 794 F. Supp. 3d at 68 ("[T]he Court sides with courts that have found that agency placement of new conditions on grant funding amounts to final agency action.").

which to judge the agency's exercise of discretion," and thus there is "no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also Doe #1 v. Wolfe*, No. 1:20-CV-02339, 2021 WL 4149186, at *3 (M.D. Pa. Sept. 13, 2021) (noting that the APA creates a strong presumption in favor of the reviewability of unlawful agency action). That is not the case as to any of Plaintiffs' claims here.

First, there is clear law to apply to Plaintiffs' claim that the NOFO's requirement of alignment with the Anti-DEI and Anti-Gender Ideology Priorities conflicts with the Title X regulations: the regulations themselves. Once again, Defendants' arguments to the contrary are premised on a fundamental mischaracterization of the case. Unlike the plaintiffs in *Lincoln v. Vigil*—and the other cases Defendants cite—Plaintiffs are not challenging the agency's "allocation of funds from a lump-sum appropriation," from which there arises a clear inference that "Congress . . . does not intend to impose legally binding restrictions" on agency decisions as to how to allocate the funds. 508 U.S. 182, 192 (1993).[16] Rather, Plaintiffs are challenging the Agency's decision to impose requirements on

[16] Like *Lincoln*, the other two cases cited by Defendants, Defs.' SJ 16—one of which is a concurrence—are inapposite because the plaintiffs there were challenging agency decisions related to the allocation of funds. *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) (challenge to grant termination); *Cal. Hum. Dev. Corp. v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring) (challenge to formula for distributing funds). If anything, *Bowen* only *supports* Plaintiffs in confirming that "HHS failure to follow its own regulations [] may be challenged under the APA." 866 F.2d at 352.

applicants competing for Title X funds that directly conflict with binding regulatory provisions. *See* First Am. Compl. ¶¶ 107–12, 147–50; *infra* 37–42. In other words, far from committing the decision at hand to agency discretion, the law here—the Agency's own "existing valid regulations," *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)—"circumscribe[s] agency discretion" by imposing certain responsibilities and restrictions on the Agency that it is "not free simply to disregard," *Lincoln*, 508 U.S. at 193. *See also Stehney v. Perry*, 101 F.3d 925, 933 (3d Cir. 1996) ("But whether or not [certain] decisions are committed to [agency] discretion, the agency must still follow its own regulations and may be sued for failure to do so.").

Second, Plaintiffs' claim that the Agency was required to undergo notice-and-comment rulemaking before imposing requirements that conflict with and subvert the regulations is fit for judicial review. Here, Plaintiffs contend that the NOFO's requirement of alignment with the Agency's Anti-DEI and Anti-Gender Ideology Priorities conflicts with and, therefore, is an indirect attempt to amend the Title X regulations that were promulgated via notice-and-comment rulemaking. First Am. Compl. ¶¶ 113–15, 151–55; *infra* 43–44. If Defendants are attempting to change those regulations, those changes are a legislative rule that was also required to undergo notice-and-comment rulemaking. While Defendants may disagree about the legal consequences of the NOFO and its implications for the notice-and-comment

requirement of the APA, resolution of that dispute is a matter well within the courts' competence. *See, e.g.*, *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 130 (D.D.C. 2016) ("[T]he question of whether an agency action required notice-and-comment rulemaking is a pure question of law. . . .").

Finally, as to Plaintiffs' arbitrary and capricious claims, "meaningful standards" abound. The arbitrariness and capriciousness of the NOFO's requirement to align with the Anti-DEI and Anti-Gender Ideology Priorities, the priority to "safeguard life-affirming program delivery," the Over-Medicalization Priority, and priorities that are seemingly irrelevant to Title X can be assessed by reviewing the Title X statute, regulations, legislative mandates and/or guidance, in conjunction with the NOFO and Priorities themselves and applicable case law. *See* Pls.' SJ 18–34. Accordingly, Plaintiffs claims are reviewable under the APA.

### C. Plaintiffs Are Entitled to Judgment as a Matter of Law.

#### i. The NOFO's Required Alignment with the Anti-DEI and Anti-Gender Ideology Priorities Is Contrary to the Title X Regulations.

As explained in Plaintiffs' opening brief, the NOFO's requirement that applicants demonstrate alignment with the Agency's Anti-DEI and Anti-Gender Ideology Priorities conflicts with Title X regulations that compel the opposite: namely, that Title X grantees *advance*, as opposed to *abandon*, health equity, and that they include, center, respect, and do not discriminate against transgender

persons, as opposed to "combatting" the very idea of their gender identities. Pls.' SJ 13–17. Unable to dispute the clear text of the NOFO, the Agency's Priorities, and the regulations, Defendants raise three arguments in attempt to defeat Plaintiffs' conflict claim. Defs.' SJ 17–20. Each is equally unavailing.

First, Defendants' once again hide behind the NOFO's savings clauses, disclaiming conflict on the basis that those clauses "expressly subordinate every priority to existing law." Defs.' SJ 17. But as set forth *supra*, the savings clauses provide no escape hatch. In short, Defendants may not "simply includ[e] 'consistent with applicable law' or a similar boilerplate phrase [to] inoculate[] an otherwise" blatantly unlawful provision of the NOFO from judicial review. *PFLAG*, 769 F. Supp. 3d at 437.

Second, Defendants invoke *United States v. Salerno*, 481 U.S. 739 (1987), to contend that Plaintiffs' challenge is doomed because they cannot show that every conceivable application of the requirement to align with the Anti-DEI and Anti-Gender Ideology Priorities is unlawful. Defs.' SJ 18.[17] This argument fails for a plethora of reasons. First, it is far from clear that *Salerno* even applies to a challenge

[17] While Defendants' argument focuses on the Anti-DEI and Anti-Gender Ideology Priorities, their claim that no conflict exists with respect to the "Enforcing the Hyde Amendment" priority further underscores their misreading of Plaintiffs' complaint, as Plaintiffs have never claimed a conflict between this priority and the Title X regulations and statute. Rather, Plaintiffs challenge the requirement to align with that priority on the grounds that it is arbitrary and capricious. *See* First Am. Compl. ¶¶ 123–27, 159.

grounded in the APA, and Defendants supply no case law suggesting that it does. Indeed, the Supreme Court recently acknowledged that there were "a number of questions about what test courts should apply" in challenges under the APA. *Bondi v. VanDerStok*, 604 U.S. 458, 467 n.2 (2025). Because the parties in that case had litigated under the assumption that *Salerno*'s no-set-of-circumstances test *did* apply, the Court determined that "the better course [was] to leave further analysis of the proper test for another day and address the parties' dispute as they have chosen to frame it." *Id.* However, as both the dissenters in *VanDerStok* and other federal courts have recognized, applying *Salerno* in the APA context would have the effect of undermining the APA's bases for challenging agency action. *See, e.g.*, *id.* at 496 (Thomas, J., dissenting) ("it is difficult to understand how an agency would ever promulgate an invalid" regulation if *Salerno* applied to APA challenges); *id.* at 515–16 (Alito, J., dissenting) (noting that the "threat to legislative authority" animating *Salerno*'s application when "a *statute* is challenged as [facially] unconstitutional" is not present "when a *regulation* is challenged") (emphasis added); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 904 (S.D. Ohio 2016) ("[I]f the no-set-of-circumstances test applied to APA challenges, it would gut the APA causes of action of their power, rendering them useless."); *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 1:26-CV-10877-AK, 2026 WL 1706963, at *19 (D. Mass.

June 12, 2026) (noting that "courts have expressly declined to apply *Salerno* to APA claims").

In any event, even if *Salerno* applied, it would present no barrier to this Court granting summary judgment for Plaintiffs. As an initial matter, Plaintiffs do not seek invalidation of the entire NOFO. Rather, the relief they seek is limited to a declaration that discrete portions of the NOFO are unlawful under the APA. First Am. Compl. 53–55. Further, as to those discrete portions, as already explained, there is simply *no* set of circumstances in which an entity could simultaneously *advance* and *abandon* health equity or simultaneously "combat" the notion that one's gender can diverge from one's sex assigned at birth while also fully including and respecting transgender people. The impossibility of meaningfully advancing the Anti-DEI and Anti-Gender Ideology Priorities while also complying with regulations that demand the exact opposite of those priorities is the gravamen of Plaintiffs' conflict claims, and Defendants have not even attempted to posit a scenario in which a grantee could satisfy both.

Defendants, instead, attack a host of strawmen, claiming—without citation to Plaintiffs' briefing—that Plaintiffs have asserted a conflict between the Anti-DEI Priority and the Title X regulations' prohibition of racial discrimination and that Plaintiffs have suggested that the Anti-DEI Priority requires the "exclusion of various races." Defs.' SJ 18. Plaintiffs' claim is much simpler: The NOFO demands

alignment with a priority that the Agency itself admits is calculated to *abandon* "concepts like health equity," while the governing regulations require that Title X grantees *advance* health equity. As a matter of plain language, the NOFO's requirement of alignment with the Anti-DEI Priority unavoidably conflicts with the regulations and, accordingly, must be set aside.

Similarly, Defendants argue that the Anti-Gender Ideology Priority is "consistent" with the Title X statute because, they claim, "[i]nterventions like sex-rejecting procedures fall outside [the] scope" of the statute's focus on funding for family planning services, and, therefore Plaintiffs' claim somehow fails under *Salerno*. *Id.* But Plaintiffs are not alleging a conflict with the Title X *statute*, and nowhere do Defendants explain how Plaintiffs can simultaneously comply with the *regulations*' mandate that care be "client-centered," "fully inclu[sive]" and not discriminate on the basis of "gender identity" or "sex characteristics," 42 C.F.R. § 59.5(a)(3); *id.* § 59.2; *id.* § 59.5(a)(4), and the Anti-Gender Ideology Priority's mandate of ensuring programs reflect "the biological reality that a person's sex, as either male or female, is unchangeable and determined by objective biology," A.R. 135; *see also id.* at 083, 144.

Third, Defendants contend that the NOFO's inclusion of "a number of Title X specific interventions grantees might make to promote Agency priorities" somehow ameliorates the conflict between the NOFO and the regulations. Defs.' SJ 19. But

this too ignores Plaintiffs' challenge. As is abundantly clear from Plaintiffs' Amended Complaint, Plaintiffs' conflict claim arises from the irreconcilable differences between the Title X regulations, on the one hand, and the Anti-DEI and Anti-Gender Ideology Priorities, on the other. *See* First Am. Compl. ¶¶ 107–12, 149. What Defendants have plainly misunderstood is that the Anti-DEI and Anti-Gender Ideology Priorities *are the priorities of HHS and OASH*. That the NOFO contains some information regarding how a grantee might address *OPA*'s Priorities—which do not, for example, even include the Anti-DEI Priority—does absolutely nothing to clarify how applicants ought to align with these *HHS* and *OASH* Priorities when they plainly conflict with the regulations. While Plaintiffs do not expect the NOFO to "account for every hypothetical," Defs.' SJ 19, they *do* expect the Agency to issue a NOFO that complies with the text of binding regulations, and where—as here—it does not, those conflicting provisions should be vacated.[18]

[18] Defendants' uncited claim that "Plaintiffs have not submitted any questions to the program concerning the FY27 NOFO at issue," Defs.' Statement Material Facts (Doc. 52) ("Defs.' SUF"); Defs.' SJ 19–20, does not counsel otherwise. Plaintiffs have no obligation to informally petition Defendants to explain their unlawful conduct prior to seeking judicial relief, and *NFPRHA v. Gonzales*, 468 F.3d 826 (D.C. Cir. 2006), does not stand for such a broad rule. That is particularly true here, where the NOFO itself forecloses individual inquiries. A.R. 105. ("We do not provide one-on-one consultation on the specific content development for any application.").

### ii. Defendants Failed to Undertake Notice and Comment Rulemaking Prior to Issuing a NOFO Requiring Alignment with Priorities That Conflict with the Title X Regulations.

As set forth in Plaintiffs' opening brief, to the extent the NOFO demands that applicants align with priorities in direct conflict with the Title X regulations, it effectively operates as a repeal of the regulatory language and is thus independently unlawful on the basis that it was not the product of notice and comment rulemaking. Pls.' SJ 17–18. In their effort to side-step this, Defendants protest once more that, since the NOFO includes boilerplate language requiring compliance with the Title X regulations, it could not possibly constitute a repeal necessitating notice and comment. Defs.' SJ 20. But, as discussed at length above, because the NOFO demands alignment with priorities that "cannot possibly be implemented consistent with applicable [regulations], a command to do so in a saving clause is meaningless." *League of United Latin Am. Citizens*, 780 F. Supp. 3d at 176.[19]

The inescapable conflict also renders meritless Defendants' argument that the NOFO's alignment requirement is an "interpretative rule." Defs.' SJ 21–22. Indeed,

---

[19] Despite arguing that the NOFO "affirms" and "reaffirms" "the existing Title X regulations," Defs.' SJ 20–21—which necessarily include the command to "advance health equity"—Defendants' brief goes on to quote from the OASH Priorities' *denunciation of health equity* in an apparent attempt to offer a reasoned explanation for the Anti-DEI Priority. *Id.* at 24. If, as Defendants openly admit in their brief, "the Agency's view" is to abandon health equity and "instead prioritize" other approaches, *id.*, this is an express concession that the Agency *has* changed positions. There is, therefore, no doubt that the NOFO and regulations are in irreconcilable conflict and the former was intended to repeal the latter.

the NOFO's demand that applicants align with a priority that requires Title X grantees to "go beyond the use of ideologically laden concepts" "like health equity," A.R. 077, 111, 135, does not even purport to *interpret* the regulations requiring Title X projects to "advance health equity"—nor could it, as it directly undermines it.[20]

**iii. The NOFO Is Arbitrary & Capricious on Multiple Fronts.**

In arguing that the NOFO is not arbitrary and capricious, Defendants once more misrepresent Plaintiffs' claims.

To begin, Defendants largely ignore that the conflict constitutes an independent basis for setting aside Defendants' requirements as arbitrary and capricious, yet again attempting to wield the savings clauses as a shield against all judicial scrutiny. Defs.' SJ 25. But as explained, the savings clauses do not ameliorate the direct conflict, and demanding applicants satisfy contradictory requirements is inherently arbitrary, as is an agency's attempt to reverse a prior position without any "display [of] awareness that it is changing position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), or an explanation for the change, let alone a reasoned one. *See* Pls.' SJ 19–20.

[20] Defendants try to avoid this by citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015), but that case merely reinforces Plaintiffs' position. As the Supreme Court explained, "the APA . . . mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Id.* at 101. Since there is no dispute that Title X regulations are legislative, any provisions of the NOFO that expressly contradict and undermine those regulations are legislative as well, and notice and comment rulemaking was required. Pls.' SJ 17–18.

Next, Defendants incorrectly assert that the "central premise" of Plaintiffs' arbitrary and capricious claim is that the Agency's Priorities appear "without explanation," full stop. Defs.' SJ 23. But Plaintiffs are not arguing that the Agency has failed to explain its Priorities *at all*. Rather, they argue that the Agency has: (1) failed to acknowledge or explain its *change in position* away from the regulations and other governing Title X documents towards alignment with certain priorities that conflict or are in tension with those regulations and documents, and (2) failed to provide fair notice as to *how* applicants are meant to comply with certain priorities, including seemingly irrelevant ones, in the context of Title X. *See* Pls.' SJ 18–34; *see also Hennepin Cnty.*, 2026 WL 2426300, at *24 (holding plaintiffs likely to succeed on claim that NOFOs are arbitrary and capricious where agency entirely failed to acknowledge "that the substance and administration of the [grant] program will change dramatically under the auspices of the new NOFOs—let alone provide *any* kind of 'reasoned explanation for the change'").

As to the former, Defendants point to a series of "explanations" that they assert "supply detailed justifications for every priority," Defs.' SJ 23, and "transparent[ly]" document what they characterize as merely a "shift in emphasis," Defs.' SJ 25–26. But none of their examples resolve Plaintiffs' claim. For instance, while Defendants invoke a "comprehensive review of the evidence" regarding medical interventions for youth with gender dysphoria to support their Anti-Gender

Ideology Priority, *see* Defs.' SJ 24, 26 (citing A.R. 144), the mere mention of that review under the "Combat[ting] gender ideology" priority on HHS's website does not constitute an acknowledgment of (let alone a sufficient explanation for) the Agency's sudden departure from the Title X regulations' requirements to provide inclusive, client-centered and non-discriminatory care. *See* Pls.' SJ 13–17. Indeed, Title X is not mentioned at all in either the review or on HHS's website discussing it. *See* A.R. 144.

So too with the Anti-DEI Priority; Defendants' conclusory statement that "concepts like health equity" have not "translated into measurable improved health," Defs.' SJ 24 (quoting A.R. 134), fails to acknowledge or sufficiently explain the Agency's departure from its *own regulations'* requirement that health equity be *advanced* and that equitable and inclusive care be provided to diverse populations. And the NOFO's citation to two (mischaracterized) studies under its Reducing Overmedicalization Priority, Defs.' SJ 23, 26, comes nowhere close to acknowledging, explaining, or justifying that priority's tension with the requirements of the Title X statute, regulations, *and* guidance. *See* Pls.' SJ 31–33.

These failures are all the more problematic because, when an agency action reverses a prior policy, it must provide a "*more* detailed justification than what would suffice for a new policy created on a blank slate" where the new policy "rests upon factual findings that contradict those which underlay its prior policy" or where the

"prior policy has engendered serious reliance interests," as is the case here. *FCC*, 556 U.S. at 514–15 (emphasis added); *see also* Pls' SJ 18–32; *Hennepin Cnty.*, 2026 WL 2426300, at *24.[21]

Finally, as to the lack of fair notice—one of the most arbitrary components of the NOFO, *see* Pls.' SJ 18–34—Defendants also misstate what the NOFO does. They falsely claim that "[f]or *each* priority, the NOFO identifies concrete, illustrative '[k]ey strategies,'" Defs.' SJ 27 (emphasis added) (quoting A.R. 081–084), and, equally falsely, that the Merit Review criterion is tied *only* to Title X-specific priorities, "*not* to every HHS-wide priority referenced" in the NOFO, Defs.' SJ 28. In reality, the NOFO suggests strategies *only* for OPA priorities, *see* A.R. 080–084, notwithstanding that applicants must *also* demonstrate alignment with HHS and OASH priorities, *see* A.R. 077, 110. Moreover, the Merit Review criterion explicitly states that points will be awarded for "meaningfully advanc[ing] OPA's program priorities . . . *and HHS priorities*," the latter of which the NOFO does not discuss in detail at all, let alone provide any key strategies for within the context of Title X. *See*

---

[21] Defendants' effort to rid themselves of a "*Fox* problem" by disclaiming any change to "the underlying legal standard," Defs.' SJ 25—by which Plaintiffs presume they mean the regulations—fails for reasons already discussed. As does Defendants' claim that they demonstrated reasoned deliberation by "streamlin[ing]" the list of priorities applicants must advance when they revised the NOFO in July. Defs.' SJ 26. That is simply false; the priorities that were deleted from the NOFO still persist on OASH's and HHS's websites, and applicants are still evaluated based on their alignment with those priorities. *See* A.R. 110–111.

A.R. 110 (emphasis added); *id.* at 080 (OPA priorities are "informed by" OASH priorities); *id.* at 111 ("[T]he program office will take into consideration . . . [a]lignment with HHS and OASH priorities").

In any case, Defendants have failed to adequately explain what is required of applicants under *any* of the challenged Agency Priorities. As discussed, the Anti-DEI and Anti-Gender Ideology Priorities' plain conflict with the Title X regulations leaves it wholly unclear what a Title X project could do, if anything, to advance those priorities without running afoul of regulatory obligations. Meanwhile, the NOFO does not make clear whether its disparagement of FDA-approved contraception under the Reducing Overmedicalization Priority, including via cites to two misinterpreted studies, *see* A.R. 081; Pls.' SJ 31–33, should be taken to mean that applicants must de-emphasize those methods in favor of "natural" methods—despite the statutory and regulatory mandates to provide a *broad* range of family planning methods. Similarly, the NOFO demands that applicants "contribute to broader HHS efforts to safeguard life-affirming . . . program delivery," A.R. 084, but never says what "life-affirming" means,[22] and does not explain how an applicant is meant to so "contribute" given the already-existing parameters on abortion provision with federal funds and the statutory and regulatory non-directive pregnancy counseling

[22] Though Plaintiffs presume, based on context clues, that it reflects an anti-abortion position. Pls.' SJ 26.

mandates, which together require counseling on abortion as an option and referrals for such care upon request. *See id.* 26–27. Finally, the NOFO does not provide any guidance as to how other OASH and HHS priorities are to be operationalized within the Title X program—or even say whether they need to be, given the apparent irrelevance of several of the HHS priorities to family planning. *See, e.g.*, A.R. 139–46. This violates a "principle so fundamental to reasoned decision-making that [it] is only rarely articulated,"—that the Agency must "give entities fair notice of what is required of them." *Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *23—and renders the challenged requirements arbitrary and capricious.[23] *See also Illinois*, 801 F. Supp. 3d at 94 (funding conditions arbitrary and capricious where "vague and confusing language" made "compliance a nearly impossible-to-achieve moving target" and left entities "to guess at what conduct satisfies the requirements under threat of losing billions in essential funding"); *Hennepin Cnty.*, 2026 WL 2426300, at *20 (holding plaintiffs likely to succeed on claim that NOFOs' requirement to align with agency priorities, including those "eschewing DEI policies and practices, [and] support for 'gender ideology,'" is arbitrary and capricious where

[23] The uncertainty as to what the NOFO's alignment requirement demands of applicants is all the more pernicious because alignment with Agency Priorities constitutes the most significant component of an application's potential score. *See* A.R. 110. However, as explained, *supra* 10–11, 18 n.6, Plaintiffs do not challenge the point allocation, *contra* Defs.' SJ 26–27; they refer to it simply to demonstrate the significant harm applicants face given the issues with the challenged requirements.

HHS made no effort "to cabin or clarify these prohibitions" and "nothing in the challenged policy documents reveals how regulated parties could meaningfully conform their behavior to the requirement that they 'align' with vague agency priorities").

## IV. Plaintiffs Satisfy the Requirements for Obtaining Injunctive Relief.

Finally, Plaintiffs satisfy all four factors for injunctive relief. *See generally* Pls.' SJ.[24] As detailed above, Plaintiffs succeed on the merits of their claims. *See supra*; *see also* Pls.' SJ 10–36. As to irreparable harm, contrary to Defendants' suggestion, Plaintiffs do not cite "[m]oney damages and failure to obtain a grant," Defs.' SJ 28, but rather their members' inability to comment on procedurally flawed changes to the regulations, and the Hobson's choice they face between attempting to align with priorities that subvert the core purpose of Title X and the regulations and, in turn, risking harm to their missions, or refusing to do so, and jeopardizing their ability to obtain funds and serve their communities. Pls.' SJ 36–40. Because Defendants have raised no genuine dispute as to any of the facts documenting these harms, they should be deemed admitted. *See* Defs.' SUF; SUF Resp.; Defs.' SJ; L.R. 56.1. Lastly, the balancing of the equities and public interest weigh heavily in favor of injunctive

[24] Defendants seem to forget that Plaintiffs seek permanent injunctive relief in addition to preliminary injunctive relief in the alternative. Moreover, Plaintiffs have separately requested—and are entitled to—a declaratory judgment and vacatur of the challenged provisions pursuant to the APA. 5 U.S.C. § 706(2).

relief for reasons already stated: Rather than "inflict uncertainty, confusion, and delay," Defs.' SJ 29, an injunction here would clarify the NOFO's requirements and ensure that the competition is conducted in accordance with law, which causes no harm to Defendants and is clearly in the public interest. Pls.' SJ 40–41.[25]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment and deny Defendants' motion to dismiss and cross-motion for summary judgment.

August 20, 2026

Respectfully submitted,

*/s/ Meagan Burrows*

Meagan Burrows*
NY Bar # 5341094
Brigitte Amiri*
NY Bar # 3017167
Ryan Mendias*
NY Bar # 5742242
Chelsea Tejada*
NY Bar # 5845300
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2500
mburrows@aclu.org
bamiri@aclu.org
rmendias@aclu.org

[25] Contrary to Defendants' claims, Defs.' SJ 28–29, Plaintiffs were under no obligation to ask the Agency clarifying questions before suing, *see supra* n.18, and brought this lawsuit in a timely fashion—well in advance of the application deadline.

ctejada@aclu.org

Sara J. Rose
Pa. Bar # 204936
Witold J. Walczak
Pa. Bar # 62976
American Civil Liberties Union of Pennsylvania
P.O. Box 23058
Pittsburgh, PA 15222
Tel: (412) 681-7736
srose@aclupa.org
vwalczak@aclupa.org

*Attorneys for Plaintiffs*

Robin Summers*
D.C. Bar No. 219473
National Family Planning & Reproductive Health Association
1025 Vermont Ave. NW, Suite 800
Washington, D.C. 20005
T: (202) 293-3114
rsummers@nfprha.org

*Attorney for Plaintiff NFPRHA*

**Special admission approved*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2026, I filed the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment and Reply in Support of Their Motion for Summary Judgment electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means.

*/s/ Meagan Burrows*
Meagan Burrows