**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.<br><br>Defendants. | No. 1:26-cv-1684-JPW<br><br>(Hon. Jennifer P. Wilson)<br><br>**ORAL ARGUMENT REQUESTED** |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BRIAN D. MILLER.
*United States Attorney*

TIMOTHY S. JUDGE
*Deputy Chief Civil Division,*
*Assistant United States Attorney*

LANDEN P. BENSON
*Special Assistant United States Attorney*

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................1

ARGUMENT ..............................................................................................3

I. Plaintiffs' Own Framing Defeats Their Claims. .............................................3

A. A facial challenge is judged by the document's text; Plaintiffs' case depends on facts outside it. ....................................................................3

B. Plaintiffs plead just two conflicts and establish neither. .............................6

II. *Hennepin County* Illustrates What This Case Lacks. ..................................12

III. Plaintiffs' Claims Are Not Ripe. ..............................................................13

A. Every harm Plaintiffs assert awaits a future application. ..........................14

B. Plaintiffs seek a compliance opinion, not a judgment. .............................17

C. No decision supports pre-award review; the governing decisions foreclose it…………… ..........................................................................18

IV. Plaintiffs' Local Rule 56.1 Arguments Change Nothing. ............................20

V. Defendants Are Entitled to Summary Judgment. ........................................21

CONCLUSION ........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ........ 19

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 21

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ........ 12

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) ........ 22

*Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*,
No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ....... 2, 12, 13

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) ........ 17

*Marathon Petroleum Corp. v. Sec'y of Fin.*,
876 F.3d 481 (3d Cir. 2017) ........ 14

*National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) ........ 16

*National Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) ........ 14

*Niblett v. eXp Realty, LLC*,
No. 1:21-CV-01345, 2026 WL 800961 (M.D. Pa. Mar. 23, 2026) ........ 20

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) ........ 15

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ........ 21

*Planned Parenthood of Wisconsin, Inc. v. Azar*,
942 F.3d 512 (D.C. Cir. 2019) ........ 20

*Planned Parenthood of Wisconsin, Inc. v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018) ........ 20, 21

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952) ........ 4, 13, 18

*Reno v. Catholic Soc. Servs.*,
509 U.S. 43 (1993) .......... 13

*Salvation Army v. Dep't of Cmty. Affairs*,
919 F.2d 183 (3d Cir. 1990) .......... 15

*Stenberg v. Carhart*,
530 U.S. 914 (2000) .......... 7

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990) .......... 14

*Surrick v. Killion*,
449 F.3d 520 (3d Cir. 2006) .......... 18

*Texas v. United States*,
523 U.S. 296 (1998) .......... 4

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......... 19

*Trump v. New York*,
592 U.S. 125 (2020) .......... 5

*Trump v. California*,
609 U.S. ___, 2026 WL 2473573 (2026) .......... 5

*Wilmac Corp. v. Bowen*,
811 F.2d 809 (3d Cir. 1987) .......... 15

**Statutes**

42 U.S.C. § 300(a) .......... 7

**Regulations**

42 C.F.R. § 59.7(a)(3) .......... 8

42 C.F.R. § 59.2 .......... 8, 9, 11

42 C.F.R. § 59.5(a)(1) .......... 7

42 C.F.R. § 59.5(a)(3) .......... 6, 8, 9

42 C.F.R. § 59.5(a)(4) .......... 7, 8, 9, 11

42 C.F.R. § 59.5(b)(3)(iii) .......... 6, 8

## INTRODUCTION

It took three rounds of briefing to reveal what this case is about. That is the ripeness problem in a sentence. Plaintiffs have now answered: pronouns and DEI. Both, they say, conflict with the Title X regulations. But no Title X regulation prescribes pronoun practice, and "health equity" means what the regulations say it means, not what Plaintiffs say. Plaintiffs' theories therefore depend not on what the NOFO requires, but on how they predict HHS might apply it in a competition that has not begun.

Boiled down, Plaintiffs ask this Court to decide which funding priorities applicants may disregard, and to re-weight Merit Review criteria to reflect priorities Plaintiffs would have chosen rather than ones the agency chose—before any application has been written, submitted, or scored. Plaintiffs admit as much. A judgment in their favor, they say, would tell their members "what to address in their applications and how." Dkt. 60 ("Opp'n") at 24. That is a pre-clearance ruling, not a decision on the controversy now before the Court.

Plaintiffs insist their challenge is "facial." Defendants agree. A facial challenge is judged by the document's text, and this text defeats it. The NOFO repeatedly directs compliance with the Title X statute and regulations and disqualifies no one. To manufacture a conflict, Plaintiffs must treat the agency's

qualifications as surplusage and convert a scoring emphasis into a substantive command. But a prediction about future implementation is not a facial defect.

The opposition rests on the premise that aligning with the challenged priorities while complying with the regulations is "impossible." Opp'n 12, 40. Not so. Plaintiffs plead a conflict as to only two priorities and establish neither. Articulable tension is always available: agencies of every administration routinely announce program priorities in competitive funding notices; Title X notices have done so for decades, Dkt. 51 ("Defs.' SJ") 5–8, and any priority can be set in tension with some regulation. But ripeness requires an actual controversy, not an articulable one, and this NOFO doesn't presently impose a conflicting legal obligation

*Hennepin County v. U.S. Department of Health & Human Services*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026), on which Plaintiffs rely throughout, sharpens the contrast. It involved what this case lacks: notices that categorically disqualified non-aligned applications from receiving funding and, three days later, HHS terminated nearly every existing grant under the same policy. Here, by contrast, no application has been submitted or scored, no award has been denied, no grant has been terminated, and the NOFO contains no comparable categorical bar. *Hennepin County* does not cure Plaintiffs' ripeness problem; its facts illustrate it.

The Court should dismiss this action as unripe or, alternatively, grant the Defendants' cross-motion for summary judgment.

## ARGUMENT

### I. Plaintiffs' Own Framing Defeats Their Claims.

#### A. A facial challenge is judged by the document's text; Plaintiffs' case depends on facts outside it.

Plaintiffs commit to a facial challenge: they "are not challenging score deductions, award decisions, or any specific application of the challenged NOFO provisions," but "the NOFO's unlawful requirements on their face." Opp'n 10. Their claims must therefore be resolved from the four corners of the NOFO and the priorities it references, not from predictions about review panels.

Reading the document is the jurisdictional inquiry, not a detour: where the alleged injury is that a NOFO commands unlawful conduct, the Court cannot ascertain whether a controversy has a fixed character without examining the specific provisions of the NOFO. If the text supplies no conflict, what remains is a forecast about the agency's administration—and forecasts are inherently speculative and unripe for judicial review.

Yet adversity turns on what Defendants have "refused to foreclose" about future scoring, Opp'n 19; hardship on how members "fear" the priorities will be applied, Opp'n 22–24; and fair-notice on how applicants will "guess" at what the agency "is actually asking," Opp'n 13–14. Each argues about the NOFO's future

administration or application. A claim that "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all" is not ripe, *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up), and does not ripen because the plaintiff attributes its predictions to a document that does not contain them, *see Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242–43 (1952) (no opinion "upon a hypothetical state of facts").

The face of this document explicitly states three key points, repeatedly. First, applicants and recipients must comply with the Title X statute and regulations. A.R. 073, 077, 080, 110. Second, alignment with agency priorities is only required "where authorized by law and within the scope of the program," "to the extent authorized by law and within the scope of the program," and "when authorized by law according to the Title X statute, regulations, [and] legislative mandates." A.R. 111, 080, 077. Third, alignment functions as a consideration in Merit Review and funding recommendations—not as a condition of eligibility. A.R. 109–11. The NOFO's disqualification rule is a closed set—"eligibility, responsiveness, formatting, and submission requirements," A.R. 076—and priority alignment is not explicitly included.

Plaintiffs argue that the qualifiers do not appear "in all places where alignment . . . is required," singling out the 35-point Merit Review criterion and the "successful proposals" instruction. Opp'n 15. But the 35-point criterion awards points for

strategies advancing "OPA's program priorities as discussed in Section C(a)(4)(i)"—a cross-reference to the section whose first sentence confines alignment "to the extent authorized by law and within the scope of the program." A.R. 110, 080. Similarly, the "successful proposals" instruction directs applicants to the same defined, qualified priorities. A.R. 089, 091. While the criterion also encompasses "HHS priorities," the NOFO has specifically enumerated the priorities applicants must address, A.R. 080–84, and does not enumerate HHS's; it confines alignment with "HHS and OASH priorities" to what is "authorized by law and within the scope of the program." A.R. 111. A document defining a qualified obligation once does not automatically repeal the qualification each time it uses the defined term.

The Supreme Court just recently gave the same kind of qualifier controlling weight . In *Trump v. California,* the Executive Order that authorized agency action only "[t]o the extent feasible and consistent with applicable law" was deemed insufficient to support a pre-implementation challenge, because "[a]ny prediction how the Executive Branch might eventually implement" that directive was "'no more than conjecture.'" 609 U.S. ___, 2026 WL 2473573 (2026) (per curiam) (slip op. at 4) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). The NOFO's alignment duty is qualified in the same way. A.R. 077, 080, 111.

Weight is not a command. The NOFO still requires proposals to describe the statutory broad range of methods, still funds "according to the criteria set forth in …

§ 59.7(a)," and still conditions alignment on legal authorization. A.R. 089, 111, 077. How many points attach to lawful emphasis does not create a conflict the text lacks.

**B. Plaintiffs plead just two conflicts and establish neither.**

Plaintiffs claim a conflict with the regulations as to two priorities: Anti-DEI and Anti-Gender Ideology. Dkt. 39 ("Pls.' SJ") 13–17. Every other challenge is pleaded only as arbitrary and capricious, Pls.' SJ 18–34, and the notice-and-comment count is derivative: the NOFO "repeals" regulations only "to the extent" it conflicts. Pls.' SJ 17–18; Opp'n 43. Two claims thus carry the facial theory.

Plaintiffs must identify what text in the NOFO actually conflicts with what text in statute or regulations. Questions are not conflicts, and conditionals are not commands. Their Anti-DEI claim is conclusory paraphrase—an applicant "cannot simultaneously align" with a "demand that it reject 'health equity.'" Pls.' SJ 14–15. Everywhere else, their operative sentences are conditional or interrogative: the NOFO creates "tension"; applicants lack notice "whether they are being asked to downplay" contraception; "[i]f the NOFO signals" a shift; alignment "may require" certain conduct, "although it is unclear." Pls.' SJ 16, 29–31.

| **Priority** | **Regulations** | **Plaintiffs' claim** | **What the texts say** |
| --- | --- | --- | --- |
| Anti-DEI | 42 C.F.R. §§ 59.5(a)(3), (b)(3)(iii); 59.7(a)(3); 59.2 | Applicants "cannot simultaneously align" with a "demand" to "reject 'health equity.'" Pls.' SJ 14–15. | § 59.2 defines the term. The priority says that "OASH will prioritize efforts that go beyond the use of ideologically laden concepts and focus on solution-oriented approaches," A.R. 135. |

| Priority | Regulations | Plaintiffs' claim | What the texts say |
|---|---|---|---|
| Anti-Gender Ideology | §§ 59.5(a)(3), (a)(4); 59.2 | "[A]lthough it is unclear," alignment "may require" refusing to use patients' pronouns. Pls.' SJ 16. | Neither text mentions pronouns. The regulations govern nondiscriminatory service delivery; the priority governs program design and materials. |
| "Life-affirming" (Hyde) | None, conflict claim abandoned. Opp'n 38 n.17. | Term undefined; no fair notice. | Phrase sits beside "lawful, and ethical," under "[t]o the extent permitted by applicable law." A.R. 083–84. Plaintiffs "presume" its meaning. Pls.' SJ 26. |
| Over-medicalization | § 59.5(a)(1); 42 U.S.C. § 300(a) | "Tension"; NOFO raises "the question of whether" applicants must "downplay" contraception. Pls.' SJ 29–30. | The NOFO ("appropriately," in Plaintiffs' word) requires every proposal to describe the statutory "broad range" of methods. Pls.' SJ 29. The priority is additive: "*expanding* access" to a category § 59.5(a)(1) commands projects to offer. A.R. 081–82. |
| Out-of-scope HHS priorities | None claimed. | No notice how to align with irrelevant priorities. | Alignment applies "within the scope of the program." A.R. 080, 111. |

**Anti-DEI.** The conflict Plaintiffs assert turns on a term the regulations define and an equation the regulations never make. Section 59.7(a)(3) directs the Secretary to consider "[t]he ability of the applicant to advance *health equity*," and § 59.2 defines *health equity* as "when all persons have the opportunity to attain their full health potential and no one is disadvantaged . . . because of social position or other socially determined circumstances." Plaintiffs quote the definition, Pls.' SJ 14, but then treat "health equity" as shorthand for DEI principles because the priority calls it "ideologically laden." The definition governs. *Stenberg v. Carhart*, 530 U.S. 914,

942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").

Nothing in the priority instructs reviewers to disregard § 59.7(a)(3). The priority does not mention the criterion, and the NOFO applies it explicitly: OPA sets funding levels "according to the criteria set forth in Title X regulations at 42 C.F.R. § 59.7(a)." A.R. 111. That criterion asks whether an applicant can advance health equity as § 59.2 defines it, and a "solution-oriented approach" directed at "measurable improved health," A.R. 135, is a means of advancing health equity, not a repudiation of it. Announcing emphasis among lawful award considerations is hardly a repeal.

Plaintiffs' theory, however, requires more. Their claim is that an applicant "cannot simultaneously align" and comply. Pls.' SJ 14–15. That is a claim about what grantees must do. Section 59.7(a)(3) is an award-review criterion directed at the agency, one unweighted factor among eight, and directs applicants to do nothing. The grantee-facing provisions Plaintiffs cite—§§ 59.5(a)(3), (a)(4), (b)(3)(iii)—command nondiscriminatory service delivery, and the priority reaches only "discriminatory or otherwise illegal practices." A.R. 134. A directive confined to illegal practices cannot conflict with a regulation.

Plaintiffs' own brief concedes the point: while arguing for fair notice, they say the priority's language "seems to apply to federal agencies rather than prospective

grantees." Pls.' SJ 22. An agency-facing and indeterminate directive cannot also be a determinate command that grantees violate regulations.

**Anti-Gender Ideology.** Plaintiffs' entire textual bridge from priority to regulation is a single sentence: "For example, although it is unclear, alignment with the Anti-Gender Ideology Priority may require a Title X grantee to refuse to respect and use a Title X patient's pronouns." Pls.' SJ 16. That sentence fails three times over.

*First*, "although it is unclear . . . may require" concedes speculation, and speculation does not establish conflict.

*Second*, no text says anything about pronouns. Nothing in § 59.5(a)(3), § 59.5(a)(4), or § 59.2 prescribes pronoun practice or any vocabulary at all. "Inclusive" turns on whether "all people are fully included and can actively participate in and benefit from family planning," 42 C.F.R. § 59.2—an access standard, not a mandate to adopt a conceptual framework or vocabulary. And § 59.5(a)(4) prohibits discriminating "against any client" in providing services but codifies no practice of address.

Plaintiffs' own briefing confirms the regulatory silence: the only Title X document they could find that mentions pronouns is the 2024 Quality Family Planning ("QFP") guidance, which recommends asking patients their "preferred name, gender identity, and pronouns." Pls.' SJ 24. The QFP is *sub-regulatory*

*guidance*—which is why Plaintiffs cite it in their change-of-position argument, not their conflict claim. A NOFO cannot conflict with regulations by departing from a recommendation they nowhere contain.

The priority is equally silent: neither commitment—deprioritizing pediatric medical interventions, and ensuring that "programs accurately reflect science" in design and materials—mentions pronouns, forms of address, or any client interaction, and each operates only "to the extent permitted by applicable law." A.R. 135. So is the HHS priority Plaintiffs pair with it, Opp'n 7: that priority addresses "gender ideology"—a set of propositions—and directs nothing about how any client is served. A.R. 144. The claimed conflict is located between two silences.

*Third*, their own brief asks: "Does this mean that applicants and eventual Title X grantees are prohibited from respecting patients' pronouns? The NOFO does not clearly answer this question." Pls.' SJ 25. Yet their proposed order would bar the priority "in any respect," Proposed Order ¶ 5(a), relief resting on a conflict they call "unclear," and enforced by contempt. Unclear and facially conflicting cannot be reconciled.

**The remaining notice claims are weak.** Plaintiffs' "life-affirming" reading would make one adjective repeal the word "lawful" beside it, in a priority that begins "[t]o the extent permitted by applicable law." A.R. 083–84. As to the out-of-scope priorities, the in-scope qualifier is the answer.

Plaintiffs also say Defendants have not posited a scenario in which an applicant could satisfy both. Opp'n 40. Two suffice.

An applicant documents that clients in a rural portion of its service area obtain contraceptive services at markedly lower rates than clients near its main site, and proposes extended evening hours, a satellite clinic, and transportation support, with utilization data reported by site. That project advances "health equity" precisely as § 59.2 defines it—working so that no one is disadvantaged in attaining full health potential "because of social position or other socially determined circumstances"—and it is what the priority asks for: a "solution-oriented approach" directed at "measurable improved health." A.R. 135. It extends no preferential treatment based on race or gender identity, so it does not approach the "discriminatory or otherwise illegal practices" the priority reaches. A.R. 134.

An applicant serves every client who presents, without discrimination, 42 C.F.R. § 59.5(a)(4), and provides care responsive to each client's own preferences, needs, and values, *id.* § 59.2—while designing counseling protocols and printed materials around reproductive anatomy and pregnancy risk, so that a client is offered the methods and screenings his or her body requires. The regulations govern who is served and how; the priority governs program design and materials. A.R. 135.

* * *

Three conclusions follow. *First*, each challenged priority admits plausible lawful courses of compliance, so no facial conflict claim survives. *Second*, the parties' *Salerno* dispute need not be resolved: Plaintiffs plead impossibility, and impossibility fails under any standard if a lawful course of compliance exists. *See Bondi v. VanDerStok*, 604 U.S. 458, 467–68 & n.2 (2025) (reserving proper test). *Third*, the derivative claims fall with the premise: the NOFO "repeals" regulations only if it conflicts with them, and the agency "changed position" only if the priorities displace rules that remain fully binding.

## II. *Hennepin County* Illustrates What This Case Lacks.

The Court need not decide whether *Hennepin County* was correctly decided. It does not help Plaintiffs.

There, HHS issued new Teen Pregnancy Prevention Program ("TPP") NOFOs and, three days later, terminated nearly every existing TPP grant, expressly invoking the new priorities. *Hennepin Cnty.*, 2026 WL 2426300, at *5. The court defined the challenged action to include both—a "2026 Policy" evidenced by the NOFOs and "the termination of almost all existing TPP programs." *Id.* at *7–8. Those terminations ran through the decision—standing, *id.* at *9–11; vagueness, *id.* at *20–21; irreparable harm, from programs already "winding down," *id.* at *24-26. Here, HHS has terminated nothing, scored nothing, and penalized no one; every current grantee operates uninterrupted, and the deadline is months away. That posture

explains why the opinion contains no ripeness analysis: the word appears once. *Id.* at *6 ("[T]he motion is ripe for adjudication.").

The court in that case also held that the TPP NOFOs were gates. *E.g.*, *id.* at *18 ("If an application does not align […], the application will not receive funding."). This NOFO has no comparable command. Indeed, it once had one—the April version's "Alignment Review," under which a senior appointee would render a final, non-appealable eligibility determination based on priority alignment, A.R. 041—and the agency removed it in the July revision, a deletion Plaintiffs themselves emphasize. Dkt. 61, Resp. to Statement No. 15.

Finally, *Hennepin County* refused caveats "proposed by counsel, not the agency," 2026 WL 2426300, at *23, and condemned an overhaul undertaken "sub silentio," *id.* at *24. Here the qualifications are the agency's own, A.R. 077, 080, 111, and the drafting history runs the other way.

## III. Plaintiffs' Claims Are Not Ripe.[1]

A controversy fit for decision "must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding." *Wycoff*, 344 U.S. at 244. A funding notice that commands violation of binding regulations might meet that description the day it is issued. But where, as

[1] Pursuant to the Court's Order (Dkt. 62), Defendants will address *Reno v. Catholic Soc. Servs.*, 509 U.S. 43 (1993) in a supplemental brief.

Part I demonstrates, a document can be followed lawfully, a conflict materializes (if ever) only in its application.[2]

That is why Plaintiffs' claim must be pitched where it is. Quoted against the regulations, the priorities conflict with nothing. The conflict appears only in their characterizations—for example, that the agency demands grantees "abandon" health equity and combat "the very idea of their gender identities," Opp'n 37–38—propositions no document states. A claim that survives only above the text is not a purely legal question ripe for resolution. *See Marathon Petroleum Corp. v. Sec'y of Fin.*, 876 F.3d 481, 494–95 (3d Cir. 2017) (challenge to authority ripe; challenge to "the scope or means" not).

**A. Every harm Plaintiffs assert awaits a future application.**

**Adversity.** Defendants' motion candidly acknowledged that how review panels will score applications "cannot be known until applications are scored." Defs.' SJ 9. Plaintiffs recast that candor as a "refus[al] to foreclose the possibility" of unlawful penalization, Opp'n 19, and derive present adversity from it. But adversity requires *present* opposing legal interests, not the government's inability to predict a process that has not begun. *See Step-Saver Data Sys., Inc. v. Wyse Tech.*,

---

[2] Final agency action may still present an unripe challenge, and "further factual development would "significantly advance our ability to deal with the legal issues presented." *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003).

912 F.2d 643, 647–48 (3d Cir. 1990). On Plaintiffs' theory, adversity exists anytime an agency cannot "foreclose" how it might grade a hypothetical paper.

Nor is *Salvation Army* distinguishable. The assurance there mattered because it removed any credible threat of the feared application. 919 F.2d 183, 192 (3d Cir. 1990). Here, the operative document is the assurance: it directs regulatory compliance and conditions alignment on legal authorization. That answers Plaintiffs' footnote on mid-litigation assurances, Opp'n 19 n.8: the qualifications are not counsel's representations but the text Plaintiffs chose to challenge.

**Hardship.** Plaintiffs' hardship is bootstrapped from their merits theory. The claimed "Hobson's choice" of aligning "at the expense of their missions" or refusing "at the expense of their applications' competitiveness," Opp'n 23, exists only if alignment requires abandoning regulatory compliance. Remove the assumed conclusion, and the residual hardship is preparing an application responsive to announced criteria—not the "direct" compulsion *Wilmac* requires. 811 F.2d 809, 813 (3d Cir. 1987). The Supreme Court rejected a similar claim in *Ohio Forestry*, holding that a forest plan which did "not command anyone to do anything" worked no cognizable hardship even though it obliged the plaintiff to expend resources preparing for site-specific proceedings to follow. 523 U.S. 726, 733–34 (1998).

Plaintiffs' two textual cites change nothing. That the agency does "not provide scores," A.R. 107, does not immunize award decisions from review; the same page

provides for reviewer comments once awards issue. Nor does the NOFO foreclose inquiry, Opp'n 42 n.18: it declines only one-on-one consultation on application *content*, A.R. 105, while directing applicants with questions about "program requirements" to the program office and scheduling a technical-assistance webinar in November. A.R. 121.[3]

This course has been commended to this plaintiff before. When NFPRHA sued two decades ago over a perceived conflict between a Title X amendment and the regulations, the D.C. Circuit noted that the association "could inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot." *NFPRHA v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). The channel they were told to use twenty years ago is still open. A.R. 105, 121.

**Fair notice.** Plaintiffs say Defendants' motion "ignores" their fair-notice claim and thereby concedes its ripeness. Opp'n 16 n.5. But a claim that applicants lack notice of *how alignment will be assessed* is a claim about the assessment, which cannot be adjudicated on a record containing no application, no score, and no funding decision. Plaintiffs' authorities policed mandates backed by penalties or

[3] Prospective applicants may submit questions to the Agency and the Agency will respond to each applicant's questions prior to the application deadline in the form of an FAQ. *See, e.g.*, https://opa.hhs.gov/grant-programs/funding-opportunities#TitleX (prior Title X FAQs). This ensures that all applicants have access to the same information.

termination. *See, e.g.*, *Illinois v. FEMA*, 801 F. Supp. 3d 75, 94 (D.R.I. 2025). If the eventual assessment is arbitrary, the APA will supply review.

**B. Plaintiffs seek a compliance opinion, not a judgment.**

Plaintiffs' own framing creates the ripeness problem. They explicitly disclaim any challenge to "score deductions, award decisions, or any specific application of the challenged NOFO provisions." Opp'n 10. Their claims thus rise or fall solely on the NOFO's text. But the conflict they allege appears only in how priorities might be applied to applications not yet submitted or scored, as their own hedges concede. *See supra* Part I.B. A facial challenge cannot be sustained by predicting the unlawful applications Plaintiffs have expressly disclaimed challenging.

Neither can Plaintiffs solve the problem by asking for narrower relief. Their proposed order would bar the challenged priorities "in any respect," Proposed Order ¶ 5(a)—facial relief unsupported by any facially unlawful requirement. Their alternative request to enjoin a priority only "to the extent" a future evaluation departs from the statute or regulations, *id.* ¶ 5, is narrower only because it incorporates the future application into the injunction itself. Whether an evaluation so departs depends on what an applicant submits, how reviewers evaluate it, and what the agency then does. None of those facts exists today. The narrower the relief, the more it depends on a future application (not ripe); the broader, the less the NOFO's text can justify it.

Plaintiffs' proposed vacatur confirms the point. They seek vacatur of "discrete portions" of a live rubric months before applications are due but identify no present award decision to vacate, and no explanation of how competitions would be scored if the 35-point criterion disappears.

Declaratory judgments must "determine the parties' rights," not resolve a "hypothetical set of facts." *Surrick v. Killion*, 449 F.3d 520, 528 (3d Cir. 2006). And the Supreme Court has cautioned against issuing "preliminary findings and conclusions intended to fortify the litigant against future regulation." *Wycoff*, 344 U.S. at 246–47. Plaintiffs ask this Court to decide, before any application is submitted, what applicants may ignore, what approaches reviewers may penalize, and how the agency must apply its announced priorities.

The line is straightforward. If the NOFO itself required a violation of the Title X regulations, Plaintiffs could challenge that facial conflict now. If the agency instead applies the NOFO unlawfully to a particular application, that claim must await an agency action that creates the alleged violation. Plaintiffs cannot obtain as-applied relief before any application, nor broad facial relief without identifying a facial conflict.

### C. No decision supports pre-award review; the governing decisions foreclose it.

Each case Plaintiffs cite involved mandatory conditions on funds—certifications required, clawbacks threatened, or grants terminated. Opp'n 16–17. So

did *Hennepin County*. Plaintiffs cite no decision holding a competitive funding announcement reviewable before applications were due, where the announcement disqualified no applicant, conditioned no funds already received, and terminated no award. That consistency marks the line the cases draw: between an instrument that alters legal rights or obligations  and one that merely announces an agency's future funding discretion.

*Toilet Goods Ass'n v. Gardner*, the companion case to *Abbott Laboratories v. Gardner*, is the decision this one most resembles, and it found no ripe controversy. A rule providing that the Commissioner "may" suspend certification services was unfit for review because "we have no idea whether or when" he would act "and what reasons the Commissioner will give," and because "primary conduct" was unaffected—no "contracts must be negotiated, ingredients tested or substituted, or special records compiled." 387 U.S. 158, 163–64 (1967). What made *Abbott* different was command: the regulation there "require[d] an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." 387 U.S. 136, 153 (1967). This case is even weaker than *Toilet Goods*: the manufacturer there at least faced potential service suspension if it refused; in contrast, Plaintiffs' members face lost points in a competition that no one is obligated to participate in.

The one case involving a Title X funding announcement is *Planned Parenthood of Wisconsin, Inc. v. Azar*, 316 F. Supp. 3d 291 (D.D.C. 2018), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019), and it rejected the challenge. The parallel is palpable: same 35 of 100 points for priority alignment, and the court explained that scoring alignment "makes explicit what has been implicit for years." 316 F. Supp. 3d at 297, 306–07. Pressing the same theory against the same 35-point criterion, which that court rejected, Plaintiffs say in a footnote that the decision was vacated and "wrongly decided." Opp'n 32 & n.14. It was vacated as moot after the grant cycle closed—a disposition saying nothing about its reasoning. *See* 942 F.3d at 519.

Their remaining distinction that they "are not affirmatively challenging" scoring criteria is refuted by their own brief, where the 35-point criterion is their proof of coercion and serves as their measure of harm, Opp'n 5–6, 49 n.23. A challenge whose only operative mechanism is scoring is a challenge to scoring criteria under a different name.

**IV. Plaintiffs' Local Rule 56.1 Arguments Change Nothing.**

Even if Defendants accept every declarant averment, Plaintiffs still lose. What they need are legal conclusions—that priorities "conflict," that alignment is "impossible," that members face a "Hobson's choice"—which Local Rule 56.1 does not admit. *See Niblett v. eXp Realty, LLC*, No. 1:21-CV-01345, 2026 WL 800961, at *5 (M.D. Pa. Mar. 23, 2026). These conclusions are resolved from the operative

documents. Nor does the rule touch the merits, reviewed on the administrative record. Opp'n 3.

## V. Defendants Are Entitled to Summary Judgment.

Should the Court reach the merits, Defendants prevail for the reasons in their cross-motion, Defs.' SJ 11–29, which the opposition does not overcome.

**No final agency action.** Under *Bennett*'s second prong, the action must determine "rights or obligations" or carry "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Weighing discretionary factors in a funding competition without an application does not meet either requirement. Every authority Plaintiffs invoke involved determinate consequences. *See supra* Part III.C. The one decision addressing a Title X funding announcement held otherwise, *Planned Parenthood of Wis.*, 316 F. Supp. 3d at 300–07.

**No conflict, no repeal, no unacknowledged change.** The two conflict claims fail for the reasons in Part I.B. The NOFO introduces priorities as operating "*in addition to* the statute, regulations, legislative mandates, and additional program guidance that apply to Title X," A.R. 080 (emphasis added), and recites those regulations section by section, A.R. 079. An instrument that repeals regulations does not present itself as an addition to them. The notice-and-comment claim is expressly derivative, Opp'n 43: no conflict, no repeal. Also, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015), requires rulemaking to amend a rule, not to emphasize priorities

within one. The change-of-position claim rides on the same premise: the regulations remain unamended, and the program's structure, review process, and project periods are unchanged. Plaintiffs answer that deleted priorities "still persist" on agency websites, Opp'n 47 n.21, but web-published priorities reach applicants only through the NOFO's alignment obligation, qualified by law and program scope at every step. A.R. 077, 080, 111.

**No fair-notice violation.** Fair notice is a shield against enforcement, not a right to advance clarity. The Third Circuit's "ascertainable certainty" standard measures what an agency may enforce against a party who guessed wrong. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 251 (3d Cir. 2015). Nothing is enforced against anyone here, and no decision converts the doctrine into an entitlement to know, before competing, how an agency will score.

The imprecision Plaintiffs identify is the imprecision inherent in merit review itself. The criteria they do not challenge turn on "[t]he extent to which the applicant substantiates, using current and relevant data," the local need for services, and "[t]he degree to which the project plan adequately provides for" statutory requirements. A.R. 109–10. Plaintiffs have competed under similar language for decades. The NOFO supplies what notice the doctrine would require: it identifies key strategies for each OPA priority and confines the rest to what law authorizes and program scope allows. A.R. 080–84, 111, 077. Plaintiffs' declarants, grantees of decades'

standing, do not assert they cannot comprehend these criteria; they merely disagree with them—while their conflict claims assert they know exactly what alignment demands. *See supra* Part I.B. A rubric does not fail for vagueness because applicants cannot score their own papers in advance.

**No injunctive relief.** Plaintiffs cannot show irreparable harm from drafting an application months before its deadline. And vacating portions of a live rubric would inject into the competition the very "uncertainty, confusion, and delay" Plaintiffs claim to oppose.

## CONCLUSION

The Court should dismiss this action without prejudice as unripe. Alternatively, it should grant Defendants' cross-motion and enter judgment against Plaintiffs.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

September 3, 2026

BRIAN D. MILLER

United States Attorney

s/ Timothy S. Judge
TIMOTHY S. JUDGE
Deputy Chief, Civil Division
PA Bar No. 203821
William J. Nealon Federal Building
U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18507
Tel: (570) 348-2827
timothy.s.judge@usdoj.gov

LANDEN P. BENSON
Special Assistant United States Attorney
GA Bar No. 863909
William J. Nealon Federal Building
U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18507
landen.benson@hhs.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.<br><br>Defendants. | No. 1:26-cv-1684-JPW<br><br>(Hon. Jennifer P. Wilson)<br><br>**ORAL ARGUMENT REQUESTED** |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2026, I caused the foregoing Defendants' Reply In Support of Their Motion to Dismiss and Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, together with this Certificate of Compliance and Certificate of Service, to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, each of whom is a registered CM/ECF participant. Service on any party who is not a registered CM/ECF participant has been made by first-class mail, postage prepaid, addressed to that party's last known address.

September 3, 2026

*/s/ Timothy S. Judge*
TIMOTHY S. JUDGE
Deputy Chief, Civil Division