**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.<br><br>Defendants. | No. 1:26-cv-1684-JPW<br><br>(Hon. Jennifer P. Wilson) |

# APPENDIX OF UNPUBLISHED CASES


BRIAN D. MILLER.
*United States Attorney*

TIMOTHY S. JUDGE
*Deputy Chief Civil Division,*
*Assistant United States Attorney*

LANDEN P. BENSON
*Special Assistant United States Attorney*

**Appendix of Unpublished Cases**

1. *Trump v. California,* 609 U.S. ___, 2026 WL 2473573 (2026)

2. *Hennepin Cnty. v. U.S. Dep't of Health & Hum. Servs.*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026)

3. *Niblett v. eXp Realty, LLC*, No. 1:21-CV-01345, 2026 WL 800961 (M.D. Pa. Mar. 23, 2026)

Respectfully submitted,

September 3, 2026

BRIAN D. MILLER

United States Attorney

s/ Timothy S. Judge
TIMOTHY S. JUDGE
Deputy Chief, Civil Division
PA Bar No. 203821
William J. Nealon Federal Building
U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18507
Tel: (570) 348-2827
timothy.s.judge@usdoj.gov

LANDEN P. BENSON
Special Assistant United States Attorney
GA Bar No. 863909
William J. Nealon Federal Building
U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18507
landen.benson@hhs.gov

*Counsel for Defendants*

--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

Donald J. TRUMP, President of the United States, et al.
v.
CALIFORNIA, et al.
Alabama, et al.
v.
California, et al.

No. 26A124, No. 26A139
|
August 24, 2026

**Synopsis**
**Background:** Twenty-three States and District of Columbia filed suit against President and federal agencies and officials, seeking declaratory and injunctive relief based on allegations that President's Executive Order (EO) directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, and directing United States Postal Service (USPS) to issue a notice of proposed rulemaking, was ultra vires and facially unconstitutional in violation of separation of powers, Elections Clause, Electors Clauses, and Tenth Amendment's anti-commandeering doctrine. After several other States intervened as defendants, defendants and intervenors moved to dismiss for lack of subject matter jurisdiction and for failure to state claim, and plaintiffs moved for summary judgment. The United States District Court for the District of Massachusetts, Indira Talwani, J., 2026 WL 1826490, dismissed without prejudice, on prudential-ripeness grounds, claims regarding federal elections occurring after upcoming general election, but otherwise denied motions to dismiss and granted summary judgment to plaintiffs as to upcoming general election and earlier federal elections, granted declaratory judgment, and permanently enjoined defendants, other than President, from implementing or enforcing directives. Defendants and intervenors filed separate motions to stay the injunction pending appeal. The United States Court of Appeals for the First Circuit, 183 F.4th 52, denied the motions. Defendants and intervenors applied to stay the injunction pending appeal.

**Holdings:** The Supreme Court held that:

[1] defendants were likely to succeed on merits of claim that States lacked concrete injury and therefore lacked Article III standing as to directive to Secretary of Homeland Security;

[2] defendants were likely to succeed on merits of claim that States lacked concrete injury as to directive to Attorney General;

[3] defendants were likely to succeed on merits of claim that States lacked concrete injury as to directive to USPS;

[4] defendants were likely to suffer irreparable harm without stay pending appeal; and

[5] balance of equities did not counsel against awarding stay pending appeal.

Stay granted.

Justice Sotomayor filed a dissenting opinion, in which Justice Kagan joined.

Justice Jackson filed a dissenting opinion.

**Procedural Posture(s):** Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion for Permanent Injunction; Motion for Stay.

West Headnotes (22)

[1] **Federal Courts** Supersedeas or Stay of Proceedings

To secure a stay pending appeal, a party must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without a stay, and that the balance of equities does not counsel against relief.

1 Case that cites this headnote
More cases on this issue

[2] **Federal Courts** Supersedeas or Stay of Proceedings

Of the factors for granting a stay pending appeal, the likelihood of success on the merits and the likelihood of irreparable harm are the most critical.

More cases on this issue

[3] **Federal Civil Procedure** In general; injury or interest
**Federal Courts** Nature of dispute; concreteness

Article III standing, as a doctrine of justiciability, requires an injury that is concrete, particularized, and imminent, rather than conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

[4] **Federal Courts** Nature of dispute; concreteness

Ripeness, as a doctrine of justiciability, forbids federal courts to adjudicate disputes that are dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all.

More cases on this issue

[5] **Federal Civil Procedure** In general; injury or interest
**Federal Courts** Justiciability in general

Article III standing, as a doctrine of justiciability, is not dispensed in gross. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

[6] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Secretary of Homeland Security to take

appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, on claim that States challenging directive's constitutionality lacked a concrete injury and therefore lacked Article III standing; internal directive from President to a subordinate imposed no obligations on States, EO stated that directive could be implemented only to the extent feasible and consistent with applicable law, and any prediction of how Executive Branch might eventually implement directive while balancing feasibility and lawfulness was no more than conjecture. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 2(a).

More cases on this issue

[7] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, on claim of lack of ripeness of States' challenge to directive's constitutionality, for purposes of Article III standing; EO stated that directive could be implemented only to the extent feasible and consistent with applicable law, and any prediction of how Executive Branch might eventually implement directive while balancing feasibility and lawfulness was no more than conjecture. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 2(a).

More cases on this issue

[8] **Federal Civil Procedure** In general; injury or interest

The concrete-injury requirement for Article III standing prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

[9] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, on issue of States' alleged injury, from being required to begin planning on how to comply with EO, not satisfying concrete-injury requirement for Article III standing to challenge directive's constitutionality; States could not manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that was far from certainly impending. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 2(a).

More cases on this issue

[10] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, on issue of States' alleged injury, from infringement of their sovereign authority to create election rules, not satisfying concrete-injury requirement for Article III standing to challenge directive's constitutionality; EO simply directed Secretary to take certain actions if appropriate, feasible, and lawful, without regulating States’ voter registration processes and without impinging on States’ authority to create and enforce a legal code for elections. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 2(a).

More cases on this issue

[11] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, on claim that States challenging directive's constitutionality lacked a concrete injury and therefore lacked Article III standing; setting prosecutorial priorities was within President's Article II power, his decision to prioritize the prosecution of certain offenses did not inflict a traditionally recognized harm on the States, and assuming that pursuant to another directive in EO States received from Secretary of Homeland Security lists of citizens eligible to vote in upcoming federal elections, EO did not require States to use the lists. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 2(a, b).

More cases on this issue

[12] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, on issue of States, which challenged directive's constitutionality, lacking concrete injury and therefore lacking Article III standing, based on threat of prosecution if they delivered a ballot to a 17-year-old who was eligible to vote in a primary under state law; EO required directive to be implemented consistent with applicable law, and directive was limited to “appropriate” prosecutions, so Government unsurprisingly disavowed any intention to prosecute state officials for lawfully providing ballots to 17-year-olds. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, §§ 2(b), 7(b).

More cases on this issue

[13] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, on issue of lack of ripeness of States' challenge to directive's constitutionality, for purposes of Article III standing, based on threat of prosecution if they delivered a ballot to a 17-year-old who was eligible to vote in a primary under state law; EO required directive to be implemented consistent with applicable law, and directive was limited to “appropriate” prosecutions, so Government unsurprisingly disavowed any intention to prosecute state officials for lawfully providing ballots to 17-year-olds. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, §§ 2(b), 7(b).

More cases on this issue

[14] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing United States Postal Service (USPS) to issue a notice of proposed rulemaking, including a proposed rule requiring outbound ballot envelopes to contain a unique barcode to facilitate tracking, on claim that States challenging directive's constitutionality lacked a concrete injury and therefore lacked Article III standing; internal directive did not demand that States overhaul their existing election procedures, directive was not a proposed rule or final rule, it imposed no legal requirements on States, and it was speculative whether a rule would be proposed, how comments received by USPS would be weighed, whether a final

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

rule would be issued and what it would say, and whether it would harm States. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 3.

2 Cases that cite this headnote
More cases on this issue

[15] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing United States Postal Service (USPS) to issue a notice of proposed rulemaking, including a proposed rule requiring outbound ballot envelopes to contain a unique barcode to facilitate tracking, on claim of lack of ripeness of States' challenge to directive's constitutionality, for purposes of Article III standing; it was speculative whether a rule would be proposed, how comments received by USPS would be weighed, whether a final rule would be issued and what it would say, and whether it would harm States. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 3.

2 Cases that cite this headnote
More cases on this issue

[16] **Federal Civil Procedure** In general; injury or interest

Article III standing is measured when a suit is filed. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

[17] **Federal Courts** Injunction and temporary restraining order cases

Government was likely to succeed on merits, as factor for obtaining stay pending appeal from permanent injunction against implementation of President's Executive Order (EO) directing United States Postal Service (USPS) to issue a notice of proposed rulemaking, including a proposed rule requiring outbound ballot envelopes to contain a unique barcode to facilitate tracking, on issue of States, which challenged directive's constitutionality, lacking concrete injury and therefore lacking Article III standing, based on States spending money to hedge against a speculative threat; States could not preemptively concretize their injury by expending funds before USPS finalized a rule. U.S. Const. art. 3, § 2, cl. 1; Exec. Order No. 14399, § 3.

More cases on this issue

[18] **Administrative Law and Procedure** Persons who may challenge rules, regulations, or other policies

Though it may sometimes be a reasonable reaction to incur certain costs in advance of an agency's final rule, those costs cannot establish concrete injury, as would be required for Article III standing, when the final rule remains a hypothetical future harm that is not certainly impending. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

[19] **Administrative Law and Procedure** Rules, regulations, and other policymaking

Federal courts review final agency rules, not proposed rules.

1 Case that cites this headnote
More cases on this issue

**[20]** **Federal Courts** Injunction and temporary restraining order cases

Government was likely to suffer irreparable harm without stay pending appeal of permanent injunction against implementation of President's Executive Order (EO), challenged by States on constitutional grounds, directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, and directing United States Postal Service (USPS) to issue a notice of proposed rulemaking; injunction interfered with internal operations of Executive Branch, preventing it from even trying to lawfully implement the EO, and reversal of district court's judgment would come too late for midterm federal election, dealing a serious setback to Executive's goals while litigation unfolded. Exec. Order No. 14399, §§ 2(a,b), 3.

More cases on this issue

**[21]** **Federal Courts** Supersedeas or Stay of Proceedings

An applicant for a stay pending appeal can show irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits.

More cases on this issue

**[22]** **Federal Courts** Injunction and temporary restraining order cases

Balance of equities did not counsel against awarding Government interim relief through stay pending appeal from permanent injunction against implementation of President's Executive Order (EO), challenged by States on constitutional grounds, directing Secretary of Homeland Security to take appropriate action to create and distribute lists of citizens eligible to vote in upcoming federal elections, directing Attorney General to prioritize the investigation and prosecution of those who violated existing federal election laws by issuing ballots to ineligible voters, and directing United States Postal Service (USPS) to issue a notice of proposed rulemaking; EO made no demand of States, so staying district court's injunction would not concretely harm them. Exec. Order No. 14399, §§ 2(a,b), 3.

More cases on this issue

**Opinion**

Per Curiam.

***1** The President recently issued an Executive Order regarding election integrity. A group of States sued the Government in the District of Massachusetts, contending that the Order unconstitutionally infringes on their authority to administer elections. The District Court agreed and enjoined the Government from implementing the Order. In doing so, the District Court rejected the Government's argument that it lacked jurisdiction over the States' claims because the States lack standing to bring them. The Government has asked us to stay the injunction, arguing that it is likely to succeed on the merits of its jurisdictional argument, that the injunction is causing it irreparable harm, and that the equities do not favor leaving the injunction in place while the Government's appeal is pending. We agree and grant the stay.

I

About five months ago, President Trump issued an Executive Order designed to maintain public confidence in federal elections. See Exec. Order No. 14399, 91 Fed. Reg. 17125 (2026). The Order is an internal directive from the President to his subordinates mandating that certain agencies pursue certain policies. It neither requires nor forbids anything of anyone outside the Executive Branch. Three sections of the Order are relevant here.

*First*, § 2(a) orders the Secretary of Homeland Security to "take appropriate action to" create and send "State Citizenship List[s]" to each State. *Ibid.* These Lists will catalog the residents of each State who are U. S. citizens and "who will be above the age of 18 at the time of an upcoming Federal election." *Ibid.* States are not required to use the Lists, and the Secretary may compile and transmit them only "[t]o the extent feasible and consistent with applicable law." *Id.*, at 17125–17126.

*Second*, § 2(b) requires the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others" who issue federal ballots to ineligible voters. *Id.*, at 17126.

*Third*, § 3(b) directs the Postal Service to "initiate a proposed rulemaking" that includes several "[p]roposed provisions." *Ibid.* One such provision is that outbound ballot envelopes must contain a unique barcode to facilitate tracking. *Ibid.* The Order does not demand that any proposed provision appear in the final rule. *Id.*, at 17126–17127.

All provisions of the Order must "be implemented consistent with applicable law." *Id.*, at 17127.

A few days after the Order was issued, a group of States and the District of Columbia (hereinafter "States") filed suit in the District of Massachusetts. As relevant here, the States argued that §§ 2 and 3 are unconstitutional and sought to enjoin their implementation; the Government countered that the States' suit is not justiciable because the Order does not injure them. The District Court largely agreed with the States and entered a final judgment forbidding the Government to implement §§ 2 and 3 as to them for the upcoming midterms. After the First Circuit denied the Government's request for a stay, the Government sought a stay from this Court.

***2** **[1]** **[2]** To secure a stay pending appeal, the Government must show that it is likely to succeed on the merits and that it is likely to suffer irreparable harm without a stay. See *Trump v. Cook*, 609 U. S. ––––, ––––, 146 S.Ct. 2234, 2246, 225 L.Ed.2d 738 (2026). It must also demonstrate that the balance of equities does not counsel against relief. See *ibid.* Of these factors, the likelihood of success on the merits and the likelihood of irreparable harm "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). [1]

## II

As to the first factor: The Government is likely to prevail on the merits of its argument that the District Court lacked jurisdiction to enter the judgment.

**[3]** **[4]** **[5]** Two related doctrines of justiciability block the States' suit. One is standing, which requires "an injury that is concrete, particularized, and imminent rather than 'conjectural or hypothetical.' " *Carney v. Adams*, 592 U.S. 53, 60, 141 S.Ct. 493, 208 L.Ed.2d 305 (2020). The other is ripeness, which forbids federal courts to adjudicate disputes that are "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Trump v. New York*, 592 U.S. 125, 131, 141 S.Ct. 530, 208 L.Ed.2d 365 (2020) (*per curiam*). Because "standing is not dispensed in gross," we address each challenged provision of the Order separately. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021).

### A

**[6]** Section 2(a) directs the Secretary of Homeland Security to take appropriate action to create and distribute State Citizenship Lists. This provision is an internal directive from the President to a subordinate. It imposes no obligations on the States, so they "suffer no concrete harm from" it. *Trump v. New York*, 592 U.S., at 134, 141 S.Ct. 530. And without concrete harm, there is no standing. *TransUnion*, 594 U.S., at 442, 141 S.Ct. 2190.

**[7]** The true "source of any injury" to the States would be the downstream action that the Secretary "*might* take in the future" to implement § 2(a). *Trump v. New York*, 592 U.S., at 133–134, 141 S.Ct. 530. Emphasis on might. Section 2(a) can be implemented only "[t]o the extent feasible and consistent with applicable law." 91 Fed. Reg. 17125. And as the Court explained in another case involving a Presidential directive with a similar qualifier: "Any prediction how the Executive Branch might eventually implement" § 2(a) while balancing feasibility and lawfulness "is 'no more than conjecture' at this time." *Trump v. New York*, 592 U.S., at 131, 141 S.Ct. 530. The Secretary's "eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." *Id*., at 133, 141 S.Ct. 530; see 91 Fed. Reg. 17125.

**[8]** To see why, consider the unduly long "chain of inferences" necessary to support the States' supposedly concrete injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414–415, n. 5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). The District Court first had to speculate about whether it would be "feasible" for the Secretary to create and transmit the Lists before the midterms. 91 Fed. Reg. 17125. But § 2(a) "may not prove feasible to implement in any manner whatsoever." *Trump v. New York*, 592 U.S., at 132, 141 S.Ct. 530. The court then had to guess how the Secretary might tailor his implementation to be "consistent with applicable law." 91 Fed. Reg. 17125. Next, the court had to predict what "action" the Secretary would deem "appropriate" for implementing § 2(a). *Ibid.* After all that, the court still had to estimate whether those actions would be taken "in a manner substantially likely to harm" the States. *Trump v. New York*, 592 U.S., at 132, 141 S.Ct. 530. But Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize. *Clapper*, 568 U.S., at 414–415, n. 5, 133 S.Ct. 1138. Adjudicating this claim requires a prediction not only about *whether* the Secretary will act before the midterms, but also about the shape that any such action might ultimately take. Article III demands more certainty.

***3** **[9]** The lower courts saw it differently, concluding that the States suffered "a present injury" from § 2(a) because it required them "to begin planning now on how to comply with" it. App. to Application in No. 26A124, pp. 7a–8a. But the States "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S., at 416, 133 S.Ct. 1138. And the hypothetical future harm that the States fear—the Secretary's implementation of § 2(a)—is far from "certainly impending." *Ibid.* By allowing the States "to bring this action based on costs they incurred in response to a speculative threat," the District Court "improperly water[ed] down the fundamental requirements of Article III." *Ibid.*

**[10]** Perhaps recognizing the weakness of that standing rationale, the Court of Appeals added another: § 2(a) infringes the States' sovereign authority to create election rules. But § 2(a) does no such thing. Instead, it simply directs the Secretary to take certain actions if appropriate, feasible, and lawful. 91 Fed. Reg. 17125–17126. This internal directive does *not* regulate the States' voter registration processes. Nor does it impinge on the States' authority " 'to create and enforce a legal code' for elections." Contra, App. to Application in No. 26A124, p. 13a.

B

**[11]** The States lack standing to challenge § 2(b) for much the same reason: It does nothing to them. This provision directs the Attorney General to "prioritize" the investigation and prosecution of those who violate existing federal laws by issuing ballots to ineligible voters. 91 Fed. Reg. 17126 (collecting statutes). Setting prosecutorial priorities lies within the President's Article II power. And his decision to prioritize the prosecution of certain offenses does not inflict a traditionally recognized harm on the States. See *TransUnion*, 594 U.S., at 424–425, 141 S.Ct. 2190.

The States try to avoid this straightforward analysis by misreading the Order. They insist that § 2(b) credibly threatens them with prosecution if they do not use the Citizenship Lists from § 2(a). See Opposition to Applications 21–22, 29–30; see also *post*, at ––––––––––– (SOTOMAYOR, J., dissenting); *post*, at ––––––––––– (JACKSON, J., dissenting). But that view is inconsistent with the text of § 2. The States concede that § 2(a) does not require them to use the Lists at all (assuming they receive them in the first place). Opposition to Applications 21. So it is logically impossible for a State to "violate" § 2(a)—and § 2(b) does not suggest otherwise. Section 2(b) directs the Attorney General to "prioritize" prosecutions of those who violate federal election laws. It then provides an array of *existing statutes* for the Attorney General to enforce. 91 Fed. Reg. 17126. Absent is any reference to Citizenship Lists. Without a textual basis for their concerns, the States lack a "well-founded fear" that they will be prosecuted for not using the Lists. *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

**[12]** **[13]** The States' reference to certain state laws allowing 17-year-olds to vote in primary elections is a red herring. See Opposition to Applications 29–30. Because § 2(b) defines eligible voters as otherwise qualified citizens who are "18 years of age or older," 91 Fed. Reg. 17126, the States insist that they face a real threat of prosecution if they deliver a ballot to a 17-year-old who is eligible to vote in a primary under state law. Not so. Section 7(b) of the Order requires § 2(b) to "be implemented consistent with applicable law." *Id.*, at 17127. And on top of that, § 2(b) limits itself to only "appropriate" prosecutions. *Id.*, at 17126. Given these provisions, the Government has unsurprisingly disavowed any intention to prosecute state officials for lawfully providing ballots to 17-year-olds.

C

***4** **[14]** **[15]** Last is the States' challenge to § 3, which directs the Postal Service to issue a notice of proposed rulemaking. According to the States, this internal directive demands that they overhaul their existing election procedures. See Opposition to Applications 24–26; see also *post*, at ––––, ––––, –––– (opinion of JACKSON, J.). It does not. Section 3 orders the Postal Service to initiate the process of proposing a rule that might bind the States in the future. It is not a proposed rule, let alone a final rule. And it imposes no legal requirements on the States (or, for that matter, on anyone outside the Executive Branch).

**[16]** The District Court's conclusion that this internal directive inflicts an Article III injury on the States necessarily rests on an "attenuated chain of inferences." *Clapper*, 568 U.S., at 414–415, n. 5, 133 S.Ct. 1138. At the time this suit was filed—the time when standing is measured—the District Court had to engage in a string of speculations to find this suit justiciable. It first had to speculate about whether the Postal Service would propose a rule. Then it had to speculate about how the agency would weigh the comments it received. Cf. *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 96, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015) (emphasizing that agencies typically "must consider and respond to significant comments"). Then it had to speculate about whether the agency would issue a final rule. See *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) (explaining that a proposed rule is "simply a proposal," and an agency "might choose to adopt the proposal or to withdraw it"). Then it had to speculate about what the final rule would say. Cf. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016) (noting that the final rule "took the opposite position from the proposed rule"). Finally, after all that, the District Court still had to speculate about whether the text of a hypothetical final rule would harm the States. It should go without saying that the District Court made a decision "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Trump v. New York*, 592 U.S., at 131, 141 S.Ct. 530.

**[17]** **[18]** **[19]** The States cannot preemptively concretize their injury by expending funds before the Postal Service finalizes a rule. Spending money to hedge against a "speculative threat" does not constitute an Article III injury. *Clapper*, 568 U.S., at 416, 133 S.Ct. 1138. Though it may sometimes be "a reasonable reaction" to "incu[r] certain costs" in advance of a final rule, those costs cannot establish standing when the final rule remains a "hypothetical future harm that is not certainly impending." *Ibid.* Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule. If the Postal Service's final rule harms the States, they may challenge that rule.

III

**[20]** The remaining stay factors also favor relief. The Government is likely to suffer irreparable harm without a stay. The District Court's breach of Article III interferes with the internal operations of the Executive Branch. See *INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1306, 114 S.Ct. 422, 126 L.Ed.2d 410 (1993) (O'Connor, J., in chambers). The injunction bars Homeland Security from trying to compile Citizenship Lists for about half the States in the Union. It purports to forbid the Attorney General to implement the President's enforcement priorities as to those same States. [2] And it prevents the Postal Service from so much as initiating a rulemaking that could yield a rule applicable to these States. Because reversal of the District Court's judgment would come too late for the 2026 midterms, the District Court's errors deal "a serious setback" to the Executive's "goals" while this litigation unfolds. *Coleman v. Paccar Inc.*, 424 U.S. 1301, 1307, 96 S.Ct. 845, 47 L.Ed.2d 67 (1976) (Rehnquist, J., in chambers). When a federal court "improperly intrudes on a coordinate branch" in this way, interim relief is justified. *Trump v. CASA, Inc.*, 606 U.S. 831, 859, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025) (alterations and internal quotation marks omitted).

***5** **[21]** Fighting this Court's precedent, Justice JACKSON maintains that "[t]he Government is not injured in the slightest" because the Order contemplates that the Government will engage in "patently unlawful conduct." *Post*, at ——. That, however, remains to be seen. And though Justice JACKSON wishes it were otherwise, an applicant can show "irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits." *CASA*, 606 U.S., at 860, 145 S.Ct. 2540. Such harm exists here because the injunction meddles in "the workings of " the Executive Branch, preventing it from even trying to lawfully implement the Order. *Legalization Assistance Project*, 510 U.S., at 1306, 114 S.Ct. 422.

**[22]** Finally, "the balance of equities does not counsel against awarding the Government interim relief." *CASA*, 606 U.S., at 861, 145 S.Ct. 2540. The Executive Order makes no demand of the States, so staying the District Court's injunction will not concretely harm them. That is why this suit was not justiciable in the first place.

* * *

The Court's disposition of this application does not mean that any measure taken by the Government to implement the Order will necessarily be lawful. On that score, time will tell. But the Order itself does not harm the States, so the District Court lacked jurisdiction to bar the Government from trying to implement it. And for the reasons discussed, that injunction is likely to irreparably harm the Government if it remains in place while the appellate process runs its course.

Accordingly, the application for stay presented to Justice JACKSON in No. 26A124 and by her referred to the Court is granted. The injunction entered by the United States District Court for the District of Massachusetts in case No. 1:26–cv–11581 is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari in this Court, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court. The application for stay presented to Justice JACKSON in No. 26A139 and by her referred to the Court is denied as moot.

Justice SOTOMAYOR, with whom Justice KAGAN joins, dissenting.

Today's decision does not address whether the President's attempts to interfere with States' administration of the November 2026 elections are lawful. Nor does it suggest that the Executive Branch has any constitutional or statutory authority to implement the President's directives. Instead, today's decision merely postpones adjudication of those challenges. Nonetheless, because I believe the respondent States' challenges are justiciable now, I respectfully dissent.

A commonsense reading of the Executive Order, corroborated by the Government's own representations, makes clear that the respondent States face a sufficiently concrete and imminent injury to satisfy Article III. Section 2 of the Executive Order has two subsections. Subsection 2(a) orders the Secretary of Homeland Security to create state Citizenship Lists of "confirmed" citizens who will be over the age of 18 as of an upcoming federal election. Subsection 2(b) then directs the Attorney General to prioritize the investigation and prosecution of state and local officials who provide ballots to individuals who are not eligible to vote, citing statutes prohibiting non-citizens from voting. The majority accepts the Government's invitation to divorce 2(a) from 2(b), parsing the text of each subsection individually but refusing to read § 2 as a unified whole. According to the majority, the investigations and prosecutions that subsection 2(b) prioritizes might have nothing to do with the citizenship lists that the immediately preceding subsection 2(a) orders to be created. The clear import of § 2, however, is that the Federal Government will use its lists of "confirmed" citizens, which it has conceded will be incomplete, App. to Application for Stay 5a, to initiate those investigations and prosecutions.

***6** Far from disclaiming such intention, the Government has admitted that the lists "might be used solely to facilitate this sort of post-election law-enforcement activity," Govt. Brief in Opposition in No. 1:26–cv–11581 (D Mass.), ECF Doc. 157, p. 47, and that a State's "refusal to consider" the Federal Government's list "could conceivably, depending on the circumstances, be relevant evidence of an intent to violate, or to facilitate the violation of, the federal laws prohibiting non-citizen voting that the Attorney General is directed to prioritize for enforcement under Section 2(b)," Reply Brief in No. 26A124, p. 13. To pretend that the lists assembled pursuant to 2(a) bear no relation to the prosecutions directed by 2(b) is to ignore the structure of the Executive Order and the Government's words alike. As this Court has long recognized, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), and the respondent States have standing based on the credible threat that the Government will initiate investigations and prosecutions because they refuse to use the lists. See *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U. S. 174, 183, 146 S.Ct. 1114, 224 L.Ed.2d 672 (2026) ("Because this standard tolerates suits involving 'actual or imminent' injuries, a party need not always wait for the government to take coercive action against it before filing suit to challenge the government's conduct. Instead, a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.' " (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014))).

Nor can I agree that the Government suffers irreparable harm from the portion of the District Court's injunction tailored to these threatened prosecutions. The majority suggests that the injunction "purports to forbid the Attorney General to implement the President's enforcement priorities as to those same States." *Ante*, at ––––––––. But this portion of the injunction prohibits the Department of Justice and the Attorney General only from "initiating any investigation or prosecution of Plaintiff States ... stemming from violations or purported violations of the unconstitutional provisions in Sections 2 and 3 of the EO." Final Judgment in No. 1:26–cv–11581 (D Mass.), ECF Doc. 207, p. 4, ¶2.C. If, as the majority explains, it is "logically impossible for a State to 'violate' § 2(a)," and § 3 "imposes no legal requirements on the States," *ante*, at ––––––––, this portion of the injunction would be toothless. If that is true, it is hard to see how the Government suffers any harm at all, much less irreparable harm, from this portion of the injunction.[*]

The same is true for the § 2(a) injunction. If, as the Government insists, § 2(a) "simply give[s] States a valuable tool that can help in vetting their own lists of registered voters if they wish to use it," Reply Brief in No. 26A124, p. 4, the Government suffers no harm if it cannot provide that "tool" to the States who do not want it and will not use it.

As to § 3, the respondent States assert that *any* interference with the States' "authority to create and administer a mail voting program" is unlawful. Amended Complaint in No. 1:26–cv–11581 (D Mass.), ECF Doc. 65, ¶169; see *id.*, ¶¶167–178. If that is true, then no future implementation could be "consistent with applicable law," and the States need not wait to challenge the precise contours of a final rule.

The majority says it was speculative to think there would be a final rule at all when this suit was filed, seemingly accepting the Government's representation that it may not actually implement the Executive Order. Yet even as the Government represents

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

that it may not implement the Executive Order at all for purposes of defeating standing, it insists that it seeks to implement the Executive Order immediately for purposes of establishing irreparable harm. See Application 28–29 ("The irreparable harm is the government's inability to implement the order as to the *November 2026* election in the respondent States"). The Government cannot have it both ways.

Because I believe the structure of the Executive Order, the Government's representations, and the equities counsel against emergency relief requiring the States to wait to bring their serious challenges to the Executive Order, I respectfully dissent.

Justice JACKSON, dissenting.

***7** The President has issued an Executive Order demanding changes to the standard vote-by-mail systems that the States have traditionally administered. The District Court held that the President's Order is unlawful, the Government does not defend the lawfulness of the Order before this Court, and no judge or Justice has held (or holds today) that the Order comports with the Constitution. Still, the Court sees fit to grant the Government equitable relief to proceed with implementing the challenged Order on the grounds that, because the Government had not yet issued a final rule at the time the complaint was filed, the Plaintiff States lacked a concrete injury for Article III purposes.

This ruling violates well-established precedents concerning this Court's equitable discretion and needlessly injects chaos and uncertainty into the upcoming midterm elections. It also lets another shoe drop in the Kafkaesque nightmare that our precedents have been steadily creating for certain plaintiffs who seek to bring election-related challenges. The Court has held for a while now that even valid election-related legal claims can come too late. See *Purcell v. Gonzalez*, 549 U.S. 1, 4–6, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*). Today's revelation is that such claims can also *come too early*—never mind that an election is looming and related harms are presently occurring. Never mind, too, that the Government (which controls the timing of proposed and final rules) can easily game the system.

To be sure, the Court has not foreclosed States from challenging this blatantly unconstitutional Order. But it declines to explain *when*, exactly, is the right time to bring a meritorious election-rule claim challenging unconstitutional interference with electoral processes. The majority just signals that *these* claimants had to wait—even though the election cycle had started and despite facing pocketbook costs, threats of prosecution, and an affront to their sovereignty—before receiving the relief to which they are likely entitled.

I respectfully dissent. States administering elections and the voting public that relies on them to do so deserve clarity, not caginess or confusion. The Court does a disservice to all concerned by distorting Article III standing and ripeness principles to issue a ruling that contributes to pre-election chaos instead of quashing it, and by using its equitable authority to facilitate a patently inequitable result.

## I

### A

Our Constitution expressly delegates the power to conduct federal elections to the States. See U. S. Const., Art. I, § 4; see also *Watson v. Republican National Committee*, 609 U. S. ––––, ––––, 146 S.Ct. 2165, 2169–2170, 225 L.Ed.2d 841 (2026); *U. S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). Accordingly, "elections in this country" have long been "administered at the state and local level." H. R. Rep. No. 107–329, pt. 1, p. 31 (2001). This "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." *Id.*, at 32. State-run elections are thus both foundational to democracy and a key part of the self-governance scheme our Constitution establishes.

On March 31, 2026, President Trump attempted to alter this longstanding, constitutionally assigned structure by issuing Executive Order No. 14399, 91 Fed. Reg. 17125. This mandate is entitled "Ensuring Citizenship Verification and Integrity in Federal Elections." The Order states (without citing evidence) that, "[t]o enhance election integrity via the United States Mail," "additional measures are necessary." *Ibid*. It then lays out a series of directives, three of which are relevant here.

***8** Section 2(a) directs the Secretary of Homeland Security to compile lists of the U. S. citizens who reside in each State (Citizenship Lists), and send those lists to the States prior to any federal election. Section 2(b) directs the federal investigation and prosecution of state and local election officials who issue federal ballots to individuals not eligible to vote in federal elections. Section 3 mandates proposed rule-making requiring both that "all outbound ballot mail" sent by States and localities to voters "must be mailed" in envelopes with new federal markings and barcodes, and that the United States Postal Service (USPS) "shall not transmit mail-in or absentee ballots from any individual" voter unless a State has successfully managed to "enrol[l]" that voter with USPS such that the individual's name appears on the appropriate list. *Id.*, at 17126.

The Order thus requires a fundamental overhaul of the States' existing mail-in ballot systems—changing from a state-administered process to one in which the Federal Government controls who gets a ballot and whose vote counts. Under the regime the Order envisions, States can only offer ballots to citizens whose names appear on the appropriate lists, forcing States to give their voter lists to the Federal Government in order to have their voters' ballots processed by USPS. *Ibid*. And USPS can interdict and refuse to transmit mail-in ballots submitted by individuals who are not on the right list. See *ibid.*; see also A. Sella, Postmaster General Confirms Plan to Hold Back Mail Ballots Under Proposed Rule, N. Y. Times, June 24, 2026.

Moreover, and notably, due to the Order, a State's election officials face possible federal investigation and prosecution if they fail to compile and use the new Citizenship Lists for administering federal elections. The Government admits this. See, *e.g.*, Reply in Support of Application for Stay 13 (stating that "a State's refusal to consider" a Citizenship List could "be relevant evidence of an intent to violate, or to facilitate the violation of, the federal laws prohibiting non-citizen voting that the Attorney General is directed to prioritize for enforcement under Section 2(b)").

B

Four days after President Trump signed Executive Order No. 14399, 23 States and the District of Columbia (collectively, the Plaintiff States) filed a lawsuit challenging the Order as unlawful and seeking to enjoin its implementation. They alleged that §§ 2 and 3 of the Executive Order are ultra vires and also violate the Constitution's Elections and Electors Clauses, the Tenth Amendment's anticommandeering doctrine, and the separation of powers.

On June 25, 2026, the District Court granted the Plaintiff States' motion for summary judgment and issued a permanent injunction, narrowly barring implementation of §§ 2 and 3 only as to the Plaintiff States and only for the 2026 election cycle. ––– F. Supp. 3d ––––, ––––, 2026 WL 1755833 (Mass. 2026), App. to Application for Stay 28a–64a (App.). The District Court found that election officials in the Plaintiff States faced actual and imminent harm because, even in advance of any final rule, their "statutory obligations" to train local election officials, create new legal-guidance documents, and communicate with voters required immediate action in response to the Executive Order. *Id*., at 42a.[1] The District Court also concluded that the President lacked legal authority to implement §§ 2 and 3, and that his mandate impermissibly interfered with the Plaintiff States' constitutionally assigned duty to administer elections. *Id*., at 45a–61a.

***9** The Government appealed the District Court's summary judgment ruling and permanent injunction to the U. S. Court of Appeals for the First Circuit; it also requested that the District Court's injunction be stayed while the appeal was pending. In a 2-to-1 panel decision, the appeals court denied the stay request, concluding that the Plaintiff States had shown imminent injuries from resource diversion, pocketbook losses, the risk of prosecution, and federal interference with the Plaintiff States' sovereign interests in conducting elections. See 183 F.4th 52, –––– – ––––, 2026 WL 2144084 (CA1 2026), App. 7a–14a. The First Circuit

further determined that the balance of the equities favored the Plaintiff States, given the significant harms those sovereigns would face due to the Order while attempting to administer the November election in an orderly fashion. *Id*., at 15a–16a. [2]

II

The Government now asks us for a stay of the District Court's injunction. This Court is obligated to hold the Government (just like any other party) to a high bar when seeking a stay under these circumstances. See *Edwards v. Hope Medical Group for Women*, 512 U.S. 1301, 1302, 115 S.Ct. 1, 129 L.Ed.2d 903 (1994) (Scalia, J., in chambers) ("[W]hen a district court judgment is reviewable by a court of appeals that has denied a motion for a stay, the applicant seeking an overriding stay from this Court bears an especially heavy burden" (internal quotation marks omitted)).

At a minimum, the successful stay applicant must make a "strong showing" that it is likely to succeed on the merits, that it will suffer irreparable harm while the case proceeds, and that, on balance, the equities—including the public's interest—favor a stay. *Nken v. Holder*, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009); see also *Hollingsworth v. Perry*, 558 U.S. 183, 190, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010) (*per curiam*). The Government has not come anywhere close to carrying this burden here.

A

Begin with irreparable harm. The President is only conceivably harmed by an injunction barring executive action if that court order is preventing him from doing something *the law permits him to do*. But here the Government has not even bothered to assert, much less demonstrate, that the President has the constitutional authority to issue an order that directs the manner in which the mail-in ballot aspect of federal elections is to be administered. This means that the Government has failed to establish irreparable harm. And, to be clear, contrary to the majority's contentions (*ante*, at —— (citing *Trump v. CASA*, 606 U.S. 831, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025))), the District Court's injunction is not harming the Government.

The Constitution plainly assigns the power to conduct federal elections *to the States*. See Art. I, § 4. The President does not have any legal authority to require that elections be conducted in accordance with his preferences, or to withhold delivery of mail-in ballots that are not formatted consistent with the President's wishes. "The action [Executive Order No. 14399] contemplates would involve the President, *whom the Constitution vests with no express authority over the conduct of elections*, undertaking a substantial and unfunded overhaul of election procedures—including the implementation of a nationwide reform to Postal Service mail-handling processes—on the threshold of the November election." *DSCC v. Trump*, 2026 WL 2168617, *5 (CADC, July 28, 2026) (emphasis added). The Government is not injured in the slightest by an injunction stopping it from engaging in this patently unlawful conduct. [3]

***10** Ironically, as presented here, the Government's ripeness and standing arguments contradict its contention that the District Court's injunction causes irreparable harm. The Government says that it does not know "whether and to what extent it may compile the relevant lists" or "[w]hat role, if any, a State's future decision to disregard its Citizenship List may play in a future investigation and prosecution"; it insists that "much remains uncertain as to what a final USPS rule might include or what the contents or uses of any DHS lists might be." Application for Stay 3 (first and third quotations); Reply in Support of Application for Stay 5 (second quotation). But if implementation of Executive Order No. 14399 was hypothetical and uncertain at the time the Plaintiff States filed this lawsuit, how can it be that a limited injunction narrowly preventing implementation harmed the Government? When the Government is unsure of what action it intends to take or whether it is even lawful to take any action, an injunction limiting such action is (by the Government's own admission) irrelevant, not harmful.

That straightforward analysis is enough to dispose of, and dispense with, today's misguided stay request. [4] At bottom, the Government's irreparable-harm argument is "just another species of the far-fetched contention that the President must be injured

whenever he is prevented from doing as he wishes." *Trump v. Orr*, 607 U. S. ——, ——, 146 S.Ct. 44, 51, 223 L.Ed.2d 180 (2025) (JACKSON, J., dissenting from grant of stay). But the majority proceeds to probe the justiciability of the Plaintiff States' complaint (as if *the States* were the ones seeking our intervention), and thereby inappropriately transforms our discretionary emergency docket into a forum for mandatory review of this Administration's arguments.

The Court should have remained focused on what matters under our stay precedents: whether the District Court's injunction is harming the Government in a manner that warrants equitable relief. Where a significant underlying dispute as to the lawfulness of the Government's behavior is pending in the lower courts, allowing the Government to obtain interim relief based on isolated, threshold concerns about the justiciability of the plaintiffs' claims facilitates a patently inequitable Catch-Me-If-You-Can approach to pursuing the President's policy agenda. [5]

B

***11** Even assuming *arguendo* that the Executive suffers some harm due to the District Court's injunction, the balance of the equities and the public's interest strongly favor maintaining this injunction. Properly evaluating these stay factors requires comparing the real-world impact of granting a stay versus the practical consequences of denying one. See *Barnes v. E-Systems, Inc. Group Hospital Medical & Surgical Ins. Plan*, 501 U.S. 1301, 1305, 112 S.Ct. 1, 115 L.Ed.2d 1087 (1991) (Scalia, J., in chambers). That comparison yields a strikingly straightforward answer here.

Denying a stay permits the Plaintiff States to prepare for the rapidly approaching election cycle per usual, without undue interference or unjustified threats of prosecution against state officials attempting to carry out their duties. These election officials are busy finalizing the equipment and materials that will be used for the upcoming election, cross-checking the registration and qualifications of eligible voters, and training the staff and volunteers who will be distributing ballots and otherwise conducting the election in those particular localities. [6] A denial of this stay request would greatly reduce the risk that these critical electoral processes will be disrupted. Denying this stay would also allow USPS to implement new rules regarding the mail-in ballot procedures applicable to election cycles occurring after the November 2026 election.

Granting the stay, by contrast, risks severe disruption of the upcoming midterm elections. Indeed, even before a final rule, the Order and proposed rule had already caused significant friction. See, *e.g*., Opposition to Applications 26 (describing the "challenging and costly" tasks of having to "compile and convert voluminous data for submission to USPS, train election officials, educate voters, and change" the format of mail-in ballots, at the expense of other "important election-preparation work"); Plaintiffs' Statement of Undisputed Material Facts, ECF Doc. 105, ¶¶22–30, 47–57, 60–63; ECF Doc. 100–4, ¶¶32–41. [7] A stay grant puts the Plaintiff States in a precarious position: Their election officials would have to scramble in the coming weeks to challenge or attempt to take on the potentially impossible task of complying with the President's new mail-in ballot regime. See 183 F. 4th at 67, App. 9a–10a ("[I]f the district court's injunction is lifted, the Plaintiff States will promptly be forced to divert staff resources and incur costs flowing from the EO in the coming days and weeks"). The Plaintiff States have secured an injunction to stave off those potential harms—lifting that relief keeps this Sword of Damocles dangling over them, threatening to undo the complicated work that election officials are currently undertaking to protect their citizens' electoral interests. [8]

***12** Granting this stay also risks the kinds of on-the-ground chaos this Court has previously decried in the elections context but does not even address today. See *Purcell*, 549 U.S., at 4–5, 127 S.Ct. 5; see also *Democratic National Committee v. Wisconsin State Legislature*, 592 U. S. 1039, 1043, 141 S.Ct. 28, 31, 208 L.Ed.2d 247 (2020) (KAVANAUGH, J., concurring in denial of application to vacate stay) (acknowledging that "running a statewide election is a complicated endeavor" involving "a massive coordinated effort" of "thousands of state and local officials"). The Court's concerns about judicial interventions that stress election officials and confuse the voting public seem to have inexplicably vanished, for today's ruling requires the Plaintiff States to bring their legal challenges *closer in time* to the upcoming elections despite any resulting confusion. Forget tamping

down the chaos by ensuring that claims are resolved well before Election Day; the majority now delays resolution of potentially meritorious challenges, compounding the uncertainties. [9]

The Court's ruling imposes needless harms on the Plaintiff States in the interim (before they can again obtain relief) and does nothing to promote the public's interest in well-ordered elections practices and the institutions the Constitution tasks with safeguarding democratic norms. Our precedents require balancing the equities precisely to avoid this kind of damaging and pointless outcome.

III

Because the harm-related stay factors weigh heavily against granting these stay applications (see Part II, *supra*), the Government—and the Court itself—focuses almost exclusively on the merits of the Government's threshold arguments about standing and ripeness. But under this Court's precedent, the Government's likelihood-of-success effort also fails.

A

"[T]o establish [Article III] standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Ripeness and standing originate from the same Article III case-or-controversy requirement, and those two concepts often "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, n. 5, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (internal quotation marks omitted).

Here, the Plaintiff States have both actual and imminent injuries due to the Executive Order. Each suffices to make the present controversy justiciable. See *TransUnion*, 594 U.S., at 423, 141 S.Ct. 2190.

***13** First and foremost, the undisputed record evidence shows that the Order is injuring state and local officials *right now*, as the lower courts found. See 183 F. 4th at –––– – ––––, App. 7a–8a; ––– F. Supp. 3d at ––––– – –––––, App. 41a–42a. The facts establish that the Order has already placed "an incredible strain" on state election officials who, due to their obligations to plan and prepare for elections well in advance, must devote time and resources *today* to "coordinate the implementation of the changes articulated in the [Order]," on "compressed timelines" and with "limited resources." See 183 F. 4th at ––––, App. 8a. And the Government does not, and cannot, contest this. The majority reaches the opposite conclusion by simply ignoring the District Court's findings of fact and the record developed below. See n. 7, *supra*.

The Court's suggestion that these realities do not matter for standing purposes because the Order constitutes a mere "internal directive," *ante,* at ––––, is both factually wrong and legally irrelevant. The Order explicitly directs federal officials to transmit the Citizenship Lists to the States, who are then threatened with prosecution if they fail to use those lists. And the legal test for justiciable harm is not whether the injury was caused by an outward-facing order as opposed to an "internal" one. Instead, the relevant inquiry is whether a plaintiff has been, or will imminently be, injured by the directive they seek to challenge. [10] See *Lujan*, 504 U.S., at 560–561, 112 S.Ct. 2130.

Officials in the Plaintiff States are also presently impacted by an existing "credible threat of criminal prosecution." 183 F. 4th at ––––, App. 13a. That threat of prosecution burdens the Plaintiff States' "sovereign interests" and has already facilitated "unprecedented levels of involvement by federal officials in how [S]tates administer elections" as directed by the Order. *Ibid.* (internal quotation marks omitted). But the majority contends that "[w]ithout a *textual* basis for their concerns,"—meaning apparently that there is no basis for prosecuting state officials in the Order's language or the text of any statute—"the States

lack a well-founded fear that they will be prosecuted for not using the Lists." *Ante,* at —— (internal quotation marks omitted). Yet even if prosecution is textually unfounded, the Government has made it explicitly clear, *including before this Court*, that it might well prosecute any state officials who resist implementing the Citizenship Lists regardless. See Reply in Support of Application for Stay 13. Such threats clearly suffice for standing purposes, for we have long held that, "where threatened action by *government* is concerned," plaintiffs need not wait and expose themselves to prosecution "before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (emphasis in original). [11]

***14** The Plaintiff States also had Article III standing because, in addition to their current injuries, they faced a significant risk of harm in the immediate future due to the President's Order. See *TransUnion*, 594 U.S., at 423, 141 S.Ct. 2190. These Plaintiffs had "certainly impending pocketbook injuries from [the Order's] direction that USPS control the design of envelopes in all federal voting-by-mail processes," given that "several states had already purchased mail-ballot envelopes" for the 2026 elections. 183 F. 4th, at ——, App. 11a. The States would also almost certainly have had to bear other "significant" financial "costs" from having to "update training materials for local election officials and their staffs." *Ibid.* And the on-the-ground chaos that would indisputably follow from last-minute implementation of the President's directives risked imminent harm to these States' sovereign interests in conducting orderly elections.

In short, although the Order had yet to be formalized into a final rule when the complaint was filed, "the specificity of [its] stated timelines and the inescapable legal requirements and impending deadlines that States currently face in facilitating mail-in and absentee balloting for immediately upcoming elections together establish sufficient concrete injury from the [Order] in this unusual case." 183 F. 4th at 75, App. 18a (Dunlap, J., concurring in part and dissenting in part).

B

1

For its part, the Court has opted to take a blinders-on approach to evaluating the merits of the Government's arguments about the Order's directives, present impact, and anticipated effects, despite this Court's admonition that courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce v. New York*, 588 U.S. 752, 785, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019) (internal quotation marks omitted). The majority's assertion that the courts below had to "stac[k] hypothetical on hypothetical to speculate that harm will eventually materialize," *ante,* at ——, for example, blinks reality. It also unfairly characterizes the lower courts' careful factfinding and written opinions.

Consider the Court's strained attempt to establish that the District Court relied on a "chain of inferences," *ante*, at ——, an effort that begins with the contention that the District Court "first had to speculate about whether the Postal Service would propose a rule," *ibid.* Quite to the contrary, the record reveals that the District Court just looked at the facts. No speculation about whether USPS would "propose a rule" was needed because the Executive Order explicitly directs the Postmaster General "*to initiate a proposed rule-making* ... within 60 days." 91 Fed. Reg. 17126 (emphasis added). The Order further details the content of that rule, stating that the proposed rule "shall include, at minimum," "[p]roposed provisions specifying that all outbound ballot mail must be mailed in an envelope that ... bears a unique Intelligent Mail barcode." *Ibid.* The Order also demands that the proposed rule expressly provide "that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." *Ibid.* So, the Court's conclusion that the District Court engaged in sheer speculation about whether a proposed rule would issue and what it might say, *ante,* at ——, is a stunning misinterpretation of the factual record.

That USPS *actually proposed a rule* in response to the Order further demonstrates that the District Court did not, in fact, speculate about the Order's effects. On these facts, the Order's impact was not even remotely hypothetical. The proposed rule,

which USPS promulgated on June 2, 2026, lays out new standards for ballot envelope design—exactly as the Order directs—and incorporates the Order's mandate "limit[ing] the distribution of mail-in ballots to individuals included in" lists submitted by States and overseen by the Federal Government. 183 F. 4th, at ——, App. 18a (opinion of Dunlap, J.).

***15** There was also no need for the District Court to prognosticate when the Government's own evidence demonstrates its intent to proceed full steam ahead with implementing the Order; nothing in this record portrays any hesitation.[12] This very stay application is a testament to imminent action: The Government asked us to lift the District Court's injunction *precisely because* it insisted that it must be permitted to implement the Order by promulgating a final rule ahead of the November election. See Application for Stay 2. There is simply no factual basis for the Court's contention that the lower courts were engaged in speculation or its suggestion that the Government might yet abandon the full court press the President's Order has prompted.

The majority's analysis thus fails to draw obvious inferences about the Order's downstream effects from the undisputed facts in this record. It also sidesteps a key factual finding: that the Plaintiff States are imminently injured by an Order directing *any* changes to their balloting materials or systems before the November elections. See 183 F. 4th, at 68, App. 11a ("[T]he summary judgment record reflects that *any* change to the kind of envelopes state and local officials must use for voting by mail will necessarily force the Plaintiff States to incur monetary and operational costs" (emphasis in original)). The Court chastises the District Court for "guess[ing]" and "speculat[ing]" regarding the exact "shape" of the final rule. *Ante,* at —— – ——. But such precision is immaterial when well-supported findings of fact indicate that any alteration is injurious.

2

The Court applies language from our precedents to these misconstrued facts, primarily relying on two cases: *Trump v. New York*, 592 U.S. 125, 141 S.Ct. 530, 208 L.Ed.2d 365 (2020) (*per curiam*), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). But the reasoning of those cases is not applicable here.

Start with *New York*. There, the implications of the challenged memorandum were distant in time, and the plaintiffs conceded that its effect had dissipated by the time the case reached this Court. See 592 U.S. at 129–133, 141 S.Ct. 530. Here, by contrast, Executive Order No. 14399 sets strict deadlines for implementation, and the effects of that government action on election planning are already upon us. The *New York* plaintiffs' standing argument was further complicated by the fact that the Government conceded that it could not "feasibly implement the memorandum" as written. 592 U.S. at 133, 141 S.Ct. 530. The Government has made no such concession here. Far from it: USPS officials have instead confirmed that the Government is well on its way to implementing procedures consistent with the proposed rule. See Decl. of S. Monteith, ECF Doc. 194–2, ¶7.

The majority's reliance on *Clapper* is likewise misplaced. The no-standing determination in that case involved attorneys who were not directly targeted, had no statutory duties requiring them to act, and were perceived by this Court to be attempting to "manufacture standing merely by inflicting harm on themselves." 568 U.S. at 410–416, 133 S.Ct. 1138. Here, the opposite is true. The rule changes the President has ordered federal authorities to make target state election officials. See 91 Fed. Reg. 17125 (requiring federal officials to "transmit to the chief election official of each State" the Citizenship Lists); *id.*, at 17126 (requiring the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State and local officials"). And the Plaintiff States have not manufactured the complained-of harms; "[they] have no practical choice but to respond to the [Order] now." 183 F. 4th, at 66, App. 9a.

***16** One case that the Court's order does *not* mention is our ruling just last Term in *Bost v. Illinois Bd. of Elections*, 607 U.S. 71, 146 S.Ct. 513, 223 L.Ed.2d 357 (2026). In *Bost*, we assessed the standing of a political candidate who wanted to challenge a new election rule that extended a ballot-receipt deadline. *Id.*, at 71–72, 146 S.Ct. 513. The Court concluded that political candidates who challenge election-rule changes easily clear Article III's harm hurdle based solely on the risk that an unlawful rule poses to their general interest in a fair election—*i.e.*, they do not need to demonstrate any other actual injury. See *id.*, at 77, 146 S.Ct. 513. *The majority holds the opposite now*. Today, less than a year after issuing *Bost*, the Court concludes that States

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

with even greater fair-election interests do *not* have standing to sue even when the election-rule changes they seek to challenge pose significant risks of injury to those interests. [13]

In short, none of the justiciability cases the Court relies on supports its conclusion on the facts presented here. And there is obvious tension between today's reasoning and *Bost*'s. [14] So the Government has failed to demonstrate a *strong likelihood* of success on the merits of its standing and ripeness arguments, as our stay precedents require. See *Nken*, 556 U.S., at 426, 129 S.Ct. 1749. The contention that sovereign States with a constitutionally assigned duty to administer elections do not have a concrete injury when the President orders his subordinates to interfere with the ballot-distribution plans those States are in the midst of executing (the majority's bottom line) is not a strong argument.

IV

In the end, though, what makes today's ruling so off-base is the Court's lack of situational awareness regarding this equitable judgment. It treats the Government's stay application as if the whole point is merely to demonstrate that the Plaintiff States' claims are not justiciable. Taking its eye off the ball, the majority misses the Government's actual objective: to secure our imprimatur for its effort to foment chaos ahead of the November elections.

Consider (as the Court has failed to do) what the Government has and has not argued, as well as how it has behaved. In seeking this stay, the Government has not made any effort to prove that the enjoined mail-in ballot directives are lawful. Nor has it worked diligently to ensure that the vote-by-mail changes the President has ordered were finalized timely so as to be effectively implemented ahead of the November elections.

***17** Instead, the Government has nonsensically insisted that the mail-in voting changes it is planning to implement were too speculative and distant for the Plaintiff States to challenge them in court, while simultaneously asserting that it needs emergency relief right now to immediately implement those changes. This suspect scenario appears tailor-made to weaponize this case as a means of destabilizing the nation's vote-by-mail systems through court-assisted procedural maneuvers. And the Government seems well on its way to accomplishing that tactical objective, as evidenced by its decision to delay issuance of a final rule beyond July 29, 2026, while this Court considered its stay application. See 91 Fed. Reg. 44880 (2026). [15]

Rather than swallow the Government's gamesmanship whole, the Court should have given this empty, strategic, and bad-faith stay bid the swift rejection it deserves. Cf. *Olmstead v. United States*, 277 U.S. 438, 483–484, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) ("The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands .... Where the government is the actor, the reasons for applying it are even more persuasive"); *Niz-Chavez v. Garland*, 593 U.S. 155, 172, 141 S.Ct. 1474, 209 L.Ed.2d 433 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them"). [16] Notwithstanding the perceived legal merits of the Government's standing and ripeness arguments, stay applications call for an *equitable* judgment. And, all things considered, there is no way to rationally conclude that equity favors the Government here.

* * *

This is not a close call. The Government suffers no harm from an injunction limiting unlawful actions, much less "hypothetical" and "speculative" acts that the Government says it was not even sure it would take. Denying this stay request preserves the status quo in the fraught period ahead of a national election. Granting it, on the other hand, risks significant harm, including continued affronts to the Plaintiff States' sovereign interests, a strain on their pocketbooks, and the possibility that last-minute rule changes will cause confusion on the ground, jeopardizing the public's interest in a fair and orderly election cycle. There is also more than enough evidence in the record here to support the lower courts' conclusion that these harms were actual or imminent when the Plaintiff States filed their complaint such that these claims are presently justiciable.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***18** In any event, this Court should not have gone out of its way to error correct the District Court's purported misapplication of our standing and ripeness doctrines, especially given the Government's abject failure to defend the Executive's underlying legal authority and all that is at stake in disputes involving last-minute changes to election rules. When the Government's obvious goal is to interfere with the Plaintiff States' practices and prerogatives in a manner that the Constitution does not authorize, it is both a serious legal error and a grave misuse of our equitable emergency powers to let the Executive proceed even one step further.

**All Citations**

609 U.S. ----, --- S.Ct. ----, 2026 WL 2473573

## Footnotes

1 The States do not dispute that this application presents a significant legal question. *Trump v. Cook*, 609 U. S., at ––––, 146 S.Ct. at 2246.

2 The principal dissent suggests that, if the Order does not legally bind the States, then the Government cannot suffer irreparable harm from the injunction. See *post*, at –––– (opinion of SOTOMAYOR, J.). The dissent reasons that this is so because the injunction merely prohibits prosecutions " 'stemming from violations or purported violations of the unconstitutional provisions in' " the Order. *Ibid.* And if it is impossible to violate the Order, then the injunction targets a null set of conduct, so the Government suffers no harm at all. *Ibid.* But the injunction is far broader than the dissent lets on. It declares all of § 2 ultra vires as to the States, blocks the Government from "giving effect to" § 2 as to the States, and requires the Government "to prevent explicit or implicit implementation of " § 2 as to the States. Final Judgment in No. 1:26–cv–11581 (D Mass.), ECF Doc. 207, pp. 2–4. It is the breadth of these provisions—and the resulting intrusion into the Executive Branch's internal operations—that irreparably harms the Government.

* The majority responds by pointing to other portions of the injunction. *Ante*, at ––––, n. 2 (quoting ECF Doc. 207, pp. 2–4, ¶¶1, 2.A, 2.D). Here, I address only the part of the injunction tailored to the threat of § 2(b) prosecutions based on the § 2(a) lists. See ECF Doc. 207, p. 4, ¶2.C.

1 See also, *e.g.*, Opposition to Applications 26; Decl. of G. Rosenberg in No. 1:26–cv–11581 (D Mass.), ECF Doc. 100–7, ¶23 (detailing that certain state officials "have had to divert time from the[ir] planned trainings" to create new "guidance on this [Executive Order]" to communicate with local officials); Decl. of D. Dawson, ECF Doc. 100–19, ¶9 (noting that officials have already had to respond to numerous inquiries from confused and concerned voters); Decl. of S. Holmes, ECF Doc. 100–4, ¶43 (same).

2 One of the three panel jurists concurred in part and dissented in part. See 183 F.4th at ––––, App. 16a (opinion of Dunlap, J.). Judge Dunlap agreed that the Plaintiff States had suffered harm and had Article III standing as to § 3's ballot-change mandate. *Id.*, at ––––, App. 18a. He also agreed that the Plaintiff States were sufficiently harmed for standing purposes by the "imminent enforcement [in § 2(b)] of a voting-age requirement (not established by federal statute) that conflicts with certain States' laws permitting voting by certain 17-year-olds in primaries." *Id.*, at ––––, App. 17a. But he disagreed with the majority's view that §§ 2(a) and 2(b)—shorn of its unlawful enforcement in relation to certain 17-year-olds and standing alone—caused States any imminent injuries. See *id.*, at ––––, App. 17a–18a.

3 Our holding in *Trump v. CASA*, 606 U.S. 831, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025), is thus inapposite to the irreparable harm analysis here. *CASA*'s conclusion that universal injunctions were irreparably harmful to the Government —because they "improperly intrud[e] on a coordinate branch" and "preven[t] the Government from enforcing its policies against nonparties," *id.*, at 859, 145 S.Ct. 2540 (internal quotation marks and alterations omitted)—presupposes that

the Executive Branch has the lawful authority to enforce its policies in the first place. Not so here, as I have explained. Moreover, the District Court's injunction "does nothing to prevent the federal defendants from taking steps today to implement the [Executive Order] for federal elections in all [S]tates after November 3, 2026." 183 F. 4th at 72, App. 15a. And even if the Government is harmed by the injunction's narrow restriction preventing implementation of the Order ahead of this November's elections, that harm is obviously self-inflicted. See *O'Brien* v. *Skinner*, 409 U.S. 1240, 1242, 93 S.Ct. 79, 34 L.Ed.2d 211 (1972) (Marshall, J., in chambers). The Executive Order itself created the time crunch here: With an eye toward the November elections, the Order set the date for the issuance of a final rule regulating mail-in ballots as July 29, 2026, regardless of the States' late-August envelope-mailing deadlines. Given that choice, the Government should not be heard to complain about the limited time it has to litigate the Plaintiff States' challenges.

4 It suffices because stay applications turn on harm assessments—if it were otherwise, the applicant could just wait to get a merits ruling from the lower court. A party with no harm from an injunction (or with less harm than his opponent) has no justification for asking this Court to involve itself in the pending lower-court proceedings. Thus, in my view, a stay applicant seeking our intervention needs to show not only that his interim injury is irreparable but also urgency—*i.e.*, that immediate relief is required. See *Labrador v. Poe*, 601 U. S. 1110, 1130, 144 S.Ct. 921, 218 L.Ed.2d 400 (2024) (JACKSON, J., dissenting from grant of stay). The Government has not cleared either hurdle here.

5 Under this approach, the Executive can intentionally act in harmful ways that violate the law, decline to defend the legal merits of its unlawful actions, and nevertheless put challengers on the defensive (by thwarting injunctions on the basis of alleged flaws with the form of plaintiffs' legal claims), thereby extending its unlawful activity for as long as possible. See, *e.g.*, *CASA*, 606 U.S., at 839, 145 S.Ct. 2540 (considering only threshold procedural questions while the underlying merits issues festered). This is a noxious litigation strategy that should be a red flag for courts. It forestalls resolution of the merits, prolongs unjustified harms, and wounds public confidence in the judiciary's ability to award actual relief for meritorious challenges. Furthermore, if sowing chaos is the Government's ultimate goal, as it is here (see Part IV, *infra*), the effectiveness of judicial review is substantially undercut when the Court shunts all consideration of the lawfulness of the Government's conduct at the stay stage and greenlights significant harms in the interim.

6 See, *e.g.*, Opposition to Applications 26–30; Decl. of J. Lean, ECF Doc. 100–1, ¶8; Decl. of M. Tassinari, ECF Doc. 100–2, ¶¶36, 81; ECF Doc. 100–4 ¶35; Decl. of A. Albence, ECF Doc. 100–8 ¶75; Decl. of D. Barber, ECF Doc. 100–15, ¶49.

7 These, by the way, are *facts*: The District Court considered evidence and made findings about the detrimental consequences of allowing the Order to stand. See ––– F. Supp. 3d at –––– – ––––, App. 35a–44a. Under this Court's precedents, those findings are entitled to "clear error" deference. See *Alexander v. South Carolina State Conference of NAACP*, 602 U.S. 1, 18, 144 S.Ct. 1221, 218 L.Ed.2d 512 (2024). We cannot simply set them aside or ignore them. See *Cooper v. Harris*, 581 U.S. 285, 298–299, 137 S.Ct. 1455, 197 L.Ed.2d 837 (2017); *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Glossip v. Gross*, 576 U.S. 863, 882, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015) ("Where an intermediate court reviews, and affirms, a trial court's factual findings, this Court will not lightly overturn the concurrent findings of the two lower courts" (internal quotation marks omitted)). But nowhere does this Court's order suggest or conclude that the lower courts' harm-related factfinding was clearly erroneous.

8 This is another way in which today's case differs from *CASA*. In *CASA*, the Court found that the balance-of-the-equities factor favored the Government because the plaintiffs experienced "*no* harm" from the Court's partial stay blocking the universal nature of the injunction, as they would "remain protected ... to the extent necessary and appropriate to afford them complete relief." 606 U.S. at 861, 145 S.Ct. 2540 (emphasis added). The stay here leaves the Plaintiff States completely (and needlessly) unprotected in the interim, experiencing harm before they can obtain relief through future litigation.

9 Today's ruling injects additional unknowns into the already fraught pre-election period. Beyond whether the proposed election-related rule changes are lawful, one must now wonder whether, when the Government announces a rule change, a resulting legal challenge is *too late, too early, or just right?* (And, of course, only this Court knows the answer.) Today's tolerance for delayed resolution of the Plaintiff States' legal claims is impossible to square with our admonishment in

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Bost v. Illinois Bd. of Elections*, 607 U.S. 71, 80, 146 S.Ct. 513, 223 L.Ed.2d 357 (2026) (directing lower courts *not* to apply justiciability doctrines in ways that “channel ... election disputes to shortly before election day”). The last-minute litigation the majority now endorses could also prompt further chaos, as election officials would have to communicate the twists and turns of late-breaking legal developments to voters on the fly. Voters who disproportionately rely on voting by mail—including those who are elderly or physically disabled—would then be on a knife's edge, having to cast their ballots without knowing the results of the litigation churning in the background. It makes no practical sense to require the Plaintiff States (parties with sovereign interests, constitutional duties, and valid election-related claims) to wait until the eve of an election to file these kinds of lawsuits.

10 To appreciate the fallacy of the Court's injury analysis, imagine a purely “internal” directive that a President sends to the Postal Service mandating that it not deliver mail-in ballots sent in by voters in disfavored States. That mandate is no less injurious because the President is only directing the “internal” conduct of his subordinates. States and voters would obviously have Article III standing to challenge that patently unlawful directive, internal or not.

11 The fact that the President's Order was not fully implemented before this suit was filed does not render these Plaintiffs' claims nonjusticiable. Finality is not a prerequisite to Article III standing: Nonfinal acts can still cause injury. In any event, the Plaintiff States are complaining about a “final” act—the President has unequivocally issued an allegedly ultra vires and unconstitutional Executive Order directing his subordinates to act in a manner that is causing present and imminent harm. The majority seems to forget that the Plaintiff States have not brought Administrative Procedure Act claims that might logically falter due to a purported lack of finality (and even then, those claims would fail for want of *a cause of action*, not for nonjusticiability). The Court glosses over what we have long said Article III standing requires (actual injury), opting instead to rest its conclusion on a brand-new, made-up finality barrier for injured plaintiffs who want to have their constitutional claims adjudicated.

12 See, *e.g*., Decl. of S. Monteith, ECF Doc. 194–2, ¶7 (“Consistent with the Proposed Rule, the Postal Service has been taking steps to create a Postal Service portal that state and local election officials ... will utilize to provide their lists to the Postal Service of voters who are mailed ballots” with the intent that States “will be preparing to mail their first mail-in ballots by the end of August [2026]”).

13 It is true that candidate Bost challenged a *final* election rule, while the Plaintiff States sought to assail an Executive Order that directs USPS to *propose* one. But that distinction makes no difference: Proposed orders can cause injuries. See n. 11, *supra*. *Bost* found standing based upon the general risk of harm to a candidate's fair-election interests, and that same interest is similarly threatened here, albeit under circumstances that are far less speculative than in *Bost*. But today we find that the risk of harm to the Plaintiff States' interests is not sufficient to confer standing. This means either *Bost* is wrong or today's decision is indefensible (or both).

14 One more note on this: Two Justices in *Bost* concluded that a candidate's voluntary spending to guard against the possibility that the challenged rule would impact the election's outcome—a highly speculative risk—counted as a classic pocketbook injury that sufficed to confer Article III standing. See 607 U.S. at 83, 146 S.Ct. 513 (BARRETT, J., concurring in judgment). Today's ruling embraces (but then misapplies) the antithesis, adopting the Court's (original) principle regarding self-inflicted economic harms: that “[s]pending money to hedge against a ‘speculative threat’ does not constitute an Article III injury.” *Ante*, at —— (quoting *Clapper*, 568 U.S., at 416, 133 S.Ct. 1138). Thus, the gap between *Bost* and today's analysis might be greater than the fair-election-interest flip-flop I've described.

15 Reconciling the Government's request for this Court's urgent intervention, on the one hand, with the fact that the stay it has requested has been treated as a justification for *postponing*implementation of the planned election-rule changes, on the other, is a struggle—and an obvious tell. Either the Government wanted a new mail-in voting process for the midterm elections or it didn't. If it did, one would have expected it to go ahead and promptly promulgate a final rule on or before July 29, 2026 (even if doing so undercut the stay application's justiciability arguments). And if it didn't, its stay request is pointless. Either way, it seems that delaying a final rule—and working instead to secure a Court order that

blesses the strategy of proposing contestable changes, and prompting chaos, while keeping valid legal claims at bay—was more beneficial to the Government than actually implementing the mail-in voting policy changes it is now urging.

16 If nothing else, rejecting this stay request now would prevent the Government from potentially asserting that the *Purcell* principle bars a new complaint, contrary to its current representations. See Application for Stay 5 (promising that "the [Plaintiff States] can pursue claims" after the issuance of a final rule, and that "courts can [then] resolve any legal questions presented"). Given all that has happened, *Purcell* would be an odd and inequitable fit. Judicial estoppel would plainly preclude it. And it cannot logically be the case that the Plaintiff States are deemed too early to challenge the Executive Order's proposed rule changes now, but are later denied judicial review on the ground that their subsequent challenges to the Order's chaotic prompting of a new mail-in ballot rule comes too close to the election.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2426300
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

HENNEPIN COUNTY, MINNESOTA et al., Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES et al., Defendants.

Case No. 26-cv-2460 (CRC)
|
Filed 08/19/2026

**Attorneys and Law Firms**

Hannah Klain, Pro Hac Vice, Dunn Isaacson Rhee LLP, New York, NY, Jeannie Sclafani Rhee, Dunn Isaacson Rhee LLP, Washington, DC, Karen L. Dunn, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Allison Marcy Zieve, Cormac A. Early, Stephanie Garlock, Public Citizen Litigation Group, Washington, DC, Carrie Y. Flaxman, Kate Talmor, Robin F. Thurston, Skye Perryman, Michael Torcello, Democracy Forward Foundation, Washington, DC, for Plaintiffs HENNEPIN COUNTY, MINNESOTA, Washington King County, Sexuality Information and Education Council of the United States.

Dylan Shea Cowit, Pro Hac Vice, Valentina De Fex, Pro Hac Vice, Planned Parenthood Federation of America, New York, NY, Emily B. Nestler, Planned Parenthood Federation of America, Washington, DC, Hannah Klain, Pro Hac Vice, Dunn Isaacson Rhee LLP, New York, NY, Jeannie Sclafani Rhee, Dunn Isaacson Rhee LLP, Washington, DC, Karen L. Dunn, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Carrie Y. Flaxman, Democracy Forward Foundation, Washington, DC, for Plaintiff Planned Parenthood of the Heartland, Inc.

Andrew J. Vaden, Dimitar Georgiev-Remmel, DOJ-United States Attorney's Office, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

CHRISTOPHER R. COOPER United States District Judge

***1** Millions of American teenagers have sex. Resulting unplanned pregnancies impose widespread costs on affected individuals and society generally. Alarmed by the country's rising teenage birth rate, Congress funded grants through the Teen Pregnancy Prevention ("TPP") Program to support local initiatives proven to reduce teen pregnancy, as well as promising approaches that might also prove effective after further observation and study. Congress intended for these programs to employ a range of strategies, from encouragement of abstinence and delayed sexual activity to education about contraceptives. The effort seems to be working: The teen pregnancy rate has plummeted since Congress began funding the grants in 2010. [1]

Under the current administration, the Department of Health and Human Services ("HHS") has a different take on teen pregnancy. In its view, the money Congress has appropriated for teen pregnancy prevention should be used *only* for programs that promote abstinence and "body literacy," a nebulous concept that appears to elevate fertility and marital procreation over well-tested forms of contraception and pregnancy prevention. The agency also seeks to bar grant recipients from encouraging or "normalizing" teen sexual activity, including through "sexually explicit" content and discussion.

Despite prior judicial rebukes of components of this same policy, HHS has memorialized its new approach through official policy pronouncements, which have in turn been incorporated into recent grant solicitations known as "notices of funding opportunity" ("NOFOs"). HHS has also applied its reimagined teen pregnancy policy by terminating existing grants held by TPP

Program providers across the country. Among these providers are the two local governments and one non-profit organization that filed this lawsuit, alongside a second non-profit that supports TPP programming but is not itself a grant recipient. These four Plaintiffs now seek to preliminarily enjoin the policy's implementation through the issuance of new NOFOs and mass termination of existing grant awards.

HHS is perfectly entitled to formulate its own views about how to stem teen pregnancy—or even whether it is worth preventing at all—and to pursue policy initiatives consistent with its viewpoint. But it is not at liberty, under the Administrative Procedure Act ("APA"), to impose conditions on grant recipients that Congress did not intend or that are unreasonable or unexplained. The preliminary record suggests that HHS has done just that. Through the TPP, Congress sought to fund a range of evidence-based teen pregnancy prevention strategies, not just abstinence. According to unrebutted record evidence, programs that teach abstinence to the exclusion of all other approaches are ineffective in delaying sexual initiation and reducing adolescent pregnancy, at least as a general matter. [2] The agency's NOFOs *themselves* acknowledge a near-absence of evidence on "body literacy" approaches to pregnancy prevention. And an educational initiative that counsels teens on how to avoid pregnancy without discussing the realities of unprotected intercourse and its alternatives would seem to defy social reality, common sense, and scientific evidence alike. Yet HHS seeks to impose these and other unexplained criteria on *all* TPP grantees moving forward. As such, HHS's new TPP policy is likely arbitrary and capricious.

***2** Having established the Court's jurisdiction over this challenge and satisfied the other requirements for preliminary relief, the grant-recipient Plaintiffs are therefore entitled to a preliminary injunction preventing HHS from implementing its new policy, including through its recently-issued NOFOs, while this lawsuit is pending. The Court declines, however, to order the interim reinstatement of existing grants at this early stage, as it is less clear that this Court, as opposed to the Court of Federal Claims, may exercise jurisdiction over those portions of Plaintiffs' APA claims that seek such relief. To be sure, that "agency guidance discusses" or memorializes "policies related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract that only the [Court of Federal Claims] can hear" under a channeling statute known as the Tucker Act. Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH"), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). But there is a difference between vacating an unlawful agency policy and vacating an unlawfully terminated grant, "*if* the [Court of Federal Claims] has exclusive jurisdiction" over the latter under the Act. Id. (emphasis added). Present uncertainty over that jurisdictional question counsels against enjoining enforcement of HHS's grant terminations at this time.

## I. Background

### A. The TPP Program

Teenage pregnancy is a critical public health issue in the United States, and unplanned adolescent childbearing has lasting and widely-felt health and economic consequences. Compl. ¶ 18. The federal government "has long recognized" the costs of teen pregnancy. Pol'y & Rsrch., LLC v. HHS, 313 F. Supp. 3d 62, 68 (D.D.C. 2018). Yet "its preferred method of addressing this societal concern has changed over time." Id. at 69. In the late 1990s and early 2000s, Congress focused on "abstinence-only education as the primary tool" for reducing teen pregnancy. Id. (citation omitted). In the mid-2000s, teen birth rates began to tick up after years of decline. Compl. ¶ 20. Legislators were "deeply concerned" by this upward trend, H.R. Rep. No. 111-220, at 176 (2009), and especially "alarmed" given that "America's teen birth rate" was "already high compared to other developed nations," S. Rep. No. 111-66, at 160 (2009). [3]

To address this reemerging problem, Congress created the TPP Program by way of the Consolidated Appropriations Act of 2010. The "short" and "simple" statutory language that created the Program "has remained consistent since [its] inception." Planned Parenthood of Greater Wash. & N. Idaho v. HHS ("PPGWNI"), 946 F.3d 1100, 1105 (9th Cir. 2020). Congress appropriated funds "for making competitive contracts and grants to public and private entities to fund *medically accurate* and *age appropriate* programs that *reduce teen pregnancy*." Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009) (emphasis added). Aside from a portion of TPP funds set aside for "training and technical assistance, evaluation, outreach, and additional program support activities," the remaining appropriation was to be split into two funding streams. Id. Tier 1

grants, which represent 75% of available funds, would "be for *replicating programs that have been proven effective through rigorous evaluation* to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Id. (emphasis added). Tier 2 grants, which represent 25% of available funds, would "be available for research and demonstration grants to *develop, replicate, refine, and test additional models and innovative strategies* for preventing teenage pregnancy." Id. (emphasis added). In short, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." PPGWNI, 946 F.3d at 1106.

Congress has appropriated TPP funding on a bipartisan basis since 2010, Compl. ¶ 25, supporting a variety of programs that had worked to reduce the prevalence of teen pregnancy since even before that inaugural year. If the drop in the teen birth rate —a roughly two-thirds reduction over the last two decades—is any indication, the Program has been a resounding success. Id.; see also Decl. of Ashley Johnson ("Johnson Decl.") ¶ 22. [4]

***3** Despite this seemingly impressive track record, the Trump Administration excluded the TPP Program from its proposed budget for Fiscal Year ("FY") 2026. Compl. ¶ 26 n.8. Congress rejected that idea and once more appropriated a large sum for the initiative—$101 million, to be exact. Following the usual structure, 75% of non-administrative funds would support the "replicati[on]" of "programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy," while the remaining 25% of funds would be for developing, refining, and testing "additional models and innovative strategies for preventing teenage pregnancy." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 281 (2026).

Separately, but in the very next sentence of the appropriations act, Congress allocated $35 million to fund abstinence-only sexual education. Id. at 281–82. That pot of funding would be for "making competitive grants which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity)," so long as such programming relied on "medically accurate information referenced to peer-reviewed publications," "implement[ed] an evidence-based approach," and taught "benefits associated with self-regulation, success sequencing for poverty prevention," and "healthy relationships," among other social objectives. Id.

Before addressing the policy changes at the heart of this suit, two brief notes on the mechanics of TPP grant disbursement. *First*, HHS allocates TPP funds through "cooperative agreements," which—as defined under the Federal Grant and Cooperative Agreement Act ("FGCAA")—are "legal instrument[s]" that the federal government uses when the "principal purpose of the relationship" between the government and the recipient "is to transfer a thing of value" to the recipient in order to "carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring ... property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6305. Under a cooperative agreement, "substantial involvement is expected between the executive agency" and the recipient "when carrying out the activity contemplated in the agreement." Id. § 6305(2).

*Second*, HHS chooses TPP recipients "through a competitive process after issuing" a NOFO. Planned Parenthood of Greater N.Y. v. HHS ("PPGNY II"), No. 25-cv-2453 (BAH), 2025 WL 2840318, at *2 (D.D.C. Oct. 7, 2025). "The awards apply to a given 'project period,' during which HHS intends to keep funding the grant 'without requiring the project to recompete for funds.' " Id. (citing 42 C.F.R. § 52.6(c)(1)). In practice, the agency funds the project for one year, and at the start of each subsequent year, the grantee submits an application (with a progress report, budget, and work plan) for a non-competing continuation ("NCC") award. Id. HHS reviews that application and, if all is well, approves the project for its next year of funding.

B. Recent Changes to the TPP Program

*1. March 2025 Guidance*

Despite steadfast congressional commitment to reducing teen pregnancy, the TPP Program has experienced turmoil in the last year and a half. HHS issued the last round of TPP funding in 2023, with each cohort member's five-year project period slated to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

run from 2023 to 2028. Grantees were required to submit their NCC applications at the start of each year of the project period. In March 2025, as the cohort prepared to enter its third year of the project period, HHS released guidance clarifying that recipients were expected to "review and be aware of current Presidential Executive Orders," including those that, in the Administration's words, rejected "gender ideology extremism," "ended radical indoctrination in K-12 schooling," and "ended radical and wasteful government DEI programs and preferencing." Id. at *2–3 (cleaned up) (quoting March 2025 NCC guidance document). A handful of 2023 NOFO recipients challenged this guidance document in early 2025, arguing that the requirements associated with the Executive Orders were impossible for them to satisfy and violated their rights under the APA and the Constitution. See Planned Parenthood of Greater N.Y. v. HHS ("PPGNY I"), No. 25-cv-1334 (TJK), 2025 WL 1768100 (D.D.C. June 26, 2025). Before the plaintiffs could get their challenge off the ground, however, their NCC applications were approved, and they voluntarily dismissed the suit. See PPGNY II, 2025 WL 2840318 at *5.

*2. July 2025 Policy Notice*

***4** The legal tussle over the direction of the TPP Program was only just beginning. In July 2025, HHS issued a "Policy Notice" purporting to "clarify" to TPP Program grant recipients "when materials and activities are not 'medically accurate,' 'age appropriate,' do not 'reduce teen pregnancy,' or are otherwise outside the scope of the TPP Program." See Compl., Ex. C ("July 2025 Policy Notice") at 1. The Policy Notice emphasized that recipients were to "revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders," including those alluded to above. Id. at 1–2. It specifically highlighted President Trump's Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling," id. at 2–3, and underscored that "TPP Program-funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," id. at 3, citing the Supreme Court's decision in Mahmoud v. Taylor, 606 U.S. 522 (2025). The Policy Notice went on to explain that "[p]rograms cannot be funded under the TPP Program if they include materials or activities ... that are inconsistent with, or beyond the scope of, the statutory requirements for TPP programs," which in HHS's view included "teaching minors" about "gender ideology" or "discriminatory equity ideology," including "the radical ideological claim that boys can identify as girls and vice versa." July 2025 Policy Notice at 4–5. "Programs must be aimed at reducing teen pregnancy, not instructing in such ideological content," the agency elaborated. Id. at 5. "By the same token," the agency explained,

> material or instruction outside the scope of the TPP Program may include other content that is not related to, or counter to the aim of, reducing teen pregnancy, such as content that encourages, normalizes, or promotes sexual activity for minors, including anal and oral sex, or masturbation, including through sexually themed roleplay. This also may include content on the eroticization of birth control methods, creating more pleasurable sexual experiences, or foreplay techniques.

Id. at 4.

The Policy Notice further clarified HHS's understanding of the definition of key terms in the TPP Program's authorizing statute. The phrase "medically accurate" excluded "inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." Id. at 6. "Age appropriate" programs for minors could not "contain material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content." Id. And the agency's previous references to terms like "health equity," "inclusivity," and "adolescent-friendly services" could "not be construed ... to permit unlawful diversity, equity, or inclusion-related discrimination." Id.

Three 2023 NOFO recipients challenged the Policy Notice as constitutionally defective, contrary to the TPP's authorizing statute, and arbitrary and capricious. See PPGNY II, 2025 WL 2840318, at *3, *5. Considering the matter on an expedited summary

judgment schedule, Judge Howell concluded that the Notice's "vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque 'we-know-it-when-we-see-it' standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application." Id. at *22. She additionally found that the Notice "suffer[ed] from several of the other deficiencies plaintiffs identif[ied], including that it entirely lack[ed] reasoned explanation and justification, which independently require[d] the Policy Notice to be set aside." Id. Granting summary judgment on the plaintiffs' claim that the Policy Notice was arbitrary and capricious, Judge Howell vacated the guidance document and barred HHS from implementing it. Id. at *30.

### *3. 2026 Policy Changes*

#### a. FY 2026 Tier 1 and Tier 2 NOFOs

That brings us to the events at the core of this case. Undeterred by the vacatur of its guidance last fall, HHS waited out the 2025–26 school year. On June 23, 2026, the agency released FY 2026 NOFOs for Tier 1 and 2 funding, respectively, which set out the parameters for a new cycle of grant-making. The NOFOs reflect an array of substantial changes to the Program.

*First*, HHS doubled down on several of the policy changes articulated in its now-vacated July 2025 Policy Notice, including the requirement that awardees "align" with agency policy priorities eschewing diversity, equity and inclusion ("DEI"), "gender ideology," the denial of the sex binary, and the "normaliz[ation]" of sexual activity among minors. Compl. ¶ 41(b)–(d), (f). The agency did so both by incorporating the policy priorities it had articulated elsewhere and by reiterating multiple of those priorities directly in the body of the NOFO. See Compl., Ex. D ("FY 2026 Tier 1 NOFO") at 4 ("The recipients of this award must ... effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health ["OASH"] (available at https://health.gov/priorities), and when authorized by law according to the TPP statute, regulations, legislative mandates, and additional program guidance."); id. at 44 ("In carrying out any project funded under this NOFO, the recipient must adhere to the HHS priorities (available online at: https://hhs.gov/about/priorities/index.html)[.]"), id. at 45 ("[D]iscretionary awards shall not be used to fund ... activities where race or intentional proxies for race will be used as a selection criterion for ... program participation; denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic .... If an application does not align, the application will not receive funding to the extent permitted by law and applicable court orders."); Compl., Ex. E ("FY 2026 Tier 2 NOFO") at 4–5, 10, 22, 32, 55 (specifying the same requirements). In addition, the NOFOs echoed the July 2025 Policy Notice in mandating that grant recipients provide information about health risks associated with contraception and afford parents advance notice and the opportunity to opt out of pregnancy prevention programming on their children's behalf. Compl. ¶¶ 41, 78.

***5** *Second*, HHS imposed new blanket requirements on TPP awardees that have not yet been judicially tested. For one thing, prospective awardees must incorporate "sexual risk avoidance" education in their programming, which the parties do not contest means an abstinence-only approach to teen pregnancy prevention. See FY 2026 Tier 1 NOFO at 12; FY 2026 Tier 2 NOFO at 9–10. For another, the NOFOs require awardees to promote "body literacy" education, which they defined as "the ability to understand how the body functions in a state of health." FY 2026 Tier 1 NOFO at 55; FY 2026 Tier 2 NOFO at 66. The concept entails, among other things, "two distinct educational modules" focused on "female reproductive health and male reproductive health" that address topics like how "repeated or artificially stimulated arousal may affect neural development and behavior over time." FY 2026 Tier 1 NOFO at 10. Under the "body literacy" heading, awardees must also provide instruction that includes "an overview of approaches to managing menstrual health concerns, including the advantages and disadvantages of ovarian suppression compared to approaches that address root causes." Id. The FY 2026 Tier 1 NOFO further directs awardees to "affirm marriage and parenthood as meaningful and valued components of adult life," id. at 11, and to provide "counseling that helps adolescents reflect on their goals related to relationships, childbearing, career, and future family formation," id. at 6.

Zooming out, the Tier 1 notice instructs applicants to describe their "organization's mission and how it aligns with the goals of th[e] NOFO, including advancing body literacy, informed consent, and optimal health." Id. at 20. Prospective grantees are

assessed on the degree to which they "demonstrate[ ] a strong alignment between the organization's mission and the goals of the NOFO." Id. at 38. In a marked shift from the FY 2023 NOFOs, see Compl., Ex. A ("FY 2023 Tier 1 NOFO") at 6–7; Compl., Ex. B ("FY 2023 Tier 2 NOFO") at 5–8, neither FY 2026 NOFO mentions a focus on populations disproportionately affected by teen pregnancy.

HHS has additionally changed how award recipients are selected and truncated the project period length. The Tier 1 NOFO does not mention the agency's "Teen Pregnancy Prevention Evidence Review" ("TPPER"), which is a review process akin to expert peer review that HHS previously used to identify programs eligible for "replication." Compl. ¶¶ 23, 47. In fact, the new Tier 1 NOFO "awards bonus points to applicants who do *not* hold active TPP awards or have never received one," suggesting that prior experience is now a *dis*advantage in competing for funding. Id. ¶ 47 (emphasis added); see also FY 2026 Tier 1 NOFO at 42; FY 2026 Tier 2 NOFO at 52. Lastly, the Tier 1 NOFO shortens the project period from five years to two years, with an "optional competitive third year" available. FY 2026 Tier 1 NOFO at 1.

b. Mass Grant Terminations

The 2026 NOFOs are forward-looking, setting forth a multifaceted rubric against which future TPP applicants are to be assessed. But HHS did not stop there. On June 26, 2026, three days after the publication of the FY 2026 NOFOs, the agency issued termination letters to nearly all members of the 2023–2028 funding cohort, including two local governments and one non-profit that are plaintiffs in this case. Compl. ¶ 52.

"The termination letters informed recipients that their cooperative agreements would be canceled immediately pursuant to 2 C.F.R. § 200.340(a)(4)" because, in the agency's view, the projects "no longer effectuate[d] the program goals or agency priorities." Id. ¶ 54. The letters did not suggest that the awardees had failed to satisfy the terms of their cooperative agreements or that they had engaged in any misconduct warranting termination. Id. ¶ 55. Instead, the agency explained with boilerplate language, "After a review of all curricular content, [the agency] believes that some curricula normalize adolescent sexual activity and are not age appropriate." Id. ¶ 56. The letters invoked the understandings of "age appropriate" and "medically accurate" content articulated in both the 2026 NOFOs and vacated July 2025 Policy Notice. Id. ¶¶ 58–60. The letters concluded by explaining that the grantees' awards would be terminated—and not merely suspended—in order to "better prioritize agency resources" because "[c]urrent program priorities ... differ fundamentally from prior approaches." Id. ¶ 61.

***6** The FY 2026 NOFOs and mass grant termination decision are related in two key ways. *First*, the NOFOs mandate "[a]lignment" with the "[p]riorities" of OASH ("available at https://health.gov.priorities"), a policy document which—as noted above—the NOFOs incorporate by reference. FY 2026 Tier 1 NOFO at 4; FY 2026 Tier 2 NOFO at 4. The grant termination letters, issued just three days after the publication of the new notices, likewise justified the cancellation of the majority of TPP grants on the basis that they were inconsistent with published OASH priorities. See Johnson Decl., Ex. 2 at 1; Decl. of Andrea Gerber ("Gerber Decl. I"), Ex. 2 at 1; Decl. of Virginia Miller ("Miller Decl."), Ex. 2 at 1. *Second*, the grant terminations appear to be necessary to the issuance of the NOFOs, as HHS will fund new projects using "the same pot of appropriated funds that would have supported" the now-terminated programs "in years four and five of [their] awards." Johnson Decl. ¶ 25.

C. Procedural History

A few weeks after HHS released its 2026 NOFOs and terminated virtually all existing TPP awards, four plaintiffs—Hennepin County, Minnesota; King County, Washington; Planned Parenthood of the Heartland ("PPH"); and the Sexuality Information and Education Council of the United States ("SIECUS")—filed this lawsuit. Their complaint takes aim at HHS's "2026 Policy," which they define as a pivot away from congressionally-mandated, evidence-based programming and toward abstinence-only programming that "aligns" with ideologically-inflected agency priorities and "restrict[s] discussion of teen sexual activity." Compl. ¶ 5. Plaintiffs understand HHS to have "implemented the Policy through two related actions: the issuance of the 2026 NOFOs and the mass termination of ongoing cooperative agreements." Id. ¶¶ 81, 88. They submit that both the Policy and

(independently) the new NOFOs are contrary to law, in excess of HHS's statutory authority, and arbitrary and capricious under the APA. See Compl. ¶¶ 79–85 (Count I), 86–95 (Count II), 96–102 (Count III), 103–07 (Count IV). Additionally, Plaintiffs allege that the Tier 1 NOFO constitutes unlawful viewpoint discrimination in violation of the First Amendment. See id. ¶¶ 108–10 (Count V).

As of the filing of the complaint on July 14, 2026, no Plaintiff had applied for funding under the new NOFOs. On July 18, King County submitted a Tier 2 application. See Supp. Decl. of Andrea Gerber ("Gerber Decl. II") ¶ 5. It proposed a new abstinence-only program for target populations who are not sexually active, id. ¶¶ 8–11, doing "the best [it] could to comply with the vague priorities set out in the NOFO" in launching this fledgling initiative, id. ¶ 12.

One day after filing the complaint, Plaintiffs filed a motion for a preliminary injunction and a stay of agency action under 5 U.S.C. § 705, supported by a slate of declarations from staff members who implement TPP-related programming for Plaintiffs. See generally Johnson Decl.; Gerber Decl. I; Miller Decl.; Decl. of Calleen Simon ("Simon Decl."). HHS has opposed the motion. After an expedited briefing schedule and hearing, the motion is ripe for adjudication.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To secure such an injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted).

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "[F]actors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." District of Columbia v. USDA, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

## III. Analysis

***7** As detailed above, Plaintiffs challenge a new set of policy priorities imposed by HHS on TPP grant recipients. In analyzing their request for preliminary relief, the Court first explains its working understanding of the *object* of this challenge—which Plaintiffs characterize as HHS's singular "2026 Policy" and the government casts instead as two discrete agency actions. Next, the Court turns to Plaintiffs' likelihood of success in this case, which encompasses their chance of (1) demonstrating Article III standing, (2) establishing that the Court has jurisdiction over its claims, and (3) proving that the agency's actions are unlawful under the APA. [5] Finally, the Court evaluates the remaining preliminary injunction factors to determine whether status-quo-preserving relief is warranted.

Before embarking on this journey, it is worth noting that "[t]entative conclusions" reached on this expedited briefing timeline and in the absence of a full administrative record "may not harden into settled judgments later." Beatty v. Trump, 830 F. Supp. 3d 25, 48 (D.D.C. 2026) (Cooper, J.). Nevertheless, in light of the governing case law and the uncontroverted evidence available for review, "at least some [preliminary] relief is now in order." Id.

### A. Scoping Plaintiffs' Challenge

Let's begin by examining the object of this legal challenge. Plaintiffs contest HHS's "2026 Policy," which they say "rejects the [TPP] Program Congress created and replaces it with one divorced from the evidence-based programs funded by the statute." Compl. ¶ 5. In Plaintiffs' telling, the 2026 Policy mandates an abstinence-only approach to pregnancy prevention, promotes the amorphous concept of "body literacy," and prohibits programming that could be understood to "normalize" sexual activity among adolescents, all while requiring TPP recipients to "align" with the agency's repudiation of concepts like DEI and "gender

ideology." According to Plaintiffs, the agency has implemented its new Policy "through two related actions": (1) the issuance of the FY 2026 NOFOs that condition TPP funding on these policy prescriptions and (2) the application of these prescriptions to existing TPP cooperative agreements, which led to the termination of the "vast majority" of awards. Id.

The APA subjects "[a]gency action" to judicial review. 5 U.S.C. § 704. Agency action, in turn, "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13). In ascertaining the contours of the agency action here, the Court is guided by two key principles. On one hand, agency action is not so broad as to encompass "continuing (and thus constantly changing) operations" of an agency that do not represent a discernible decision. Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 890 (1990). Rather, agency action must entail some type of "circumscribed, discrete" decision or occurrence. Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004). On the other hand, agency action "generally need not be committed to writing to be final and judicially reviewable," Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin., 972 F.3d 83, 100 (D.C. Cir. 2020), so long as there is a discernible course of agency conduct that reflects a discrete decision, cf. Venetian Casino Resort, LLC v. EEOC, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that even though the "details" of the agency's policy were hazy, "the record le[ft] no doubt" that it had a "policy of disclosing confidential information"); Her Majesty the Queen in Right of Ontario v. EPA, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[T]he absence of a formal statement of the agency's position, as here, is not dispositive[.]"). Otherwise, an agency could insulate its decisions from APA review by simply refusing to write them down.

***8** On the unrebutted record presently before the Court, HHS has made a discernible decision to reorient TPP criteria toward the goals of abstinence and "body literacy" and away from other forms of pregnancy prevention, as well as DEI, "gender ideology," and the "normalization" of teen sexual activity. The agency's decision is evidenced both by discrete statements of policy (*i.e.*, the FY 2026 NOFOs and OASH policy priorities that the NOFOs incorporate) and by its course of conduct (*i.e.*, the termination of almost all existing TPP programs and reallocation of that funding to future grantees).

The government, for its part, recognizes that HHS has decided to reallocate funding in this way. Although it asks the Court to treat the NOFOs and grant terminations distinctly for jurisdictional purposes (more on that in a moment), it does *not* contest that the agency has changed the TPP parameters in a decisive fashion. At the hearing on Plaintiffs' motion, the government acknowledged that the new NOFOs "reflect the administration's priorities" and "emerge" from the "same underlying considerations" as the grant termination decision. Prelim. Inj. Hr'g Rough Tr. 43:8–11. Counsel elaborated that "obviously the agency has made a shift ... because of the incoming administration," and the agency's new funding conditions serve to "implement[ ] the program in a way consistent with the agency's [stated] priorities." Id. at 55:1–3, 10–12. To assess the merits of the agency's policy shift, counsel also urged, the Court should look "not just at the termination letters themselves," but also at the terms of the NOFOs, and, "of course, the HHS priority statement" released by OASH, which outlines the core "priorities that the NOFOs" and termination letters "refer to." Id. at 50:11–22. The government thereby confirms that HHS has decided to impose a new set of programmatic requirements on TPP recipients, driven by policy priorities that the agency has set down on paper.

Despite the government's recognition that the FY 2026 NOFOs and mass grant termination decision stem from the same change in agency policy, the Court cannot wholly elide the distinction between these actions. Though they both implement the 2026 Policy, the FY 2026 NOFOs and grant terminations are unique in effect: One represents HHS's forward-looking articulation of how grant funds will be allocated, while the other is a backward-looking decision to discontinue funding relationships with grant recipients based on non-compliance with the agency's new priorities. As Justice Barrett observed in her controlling concurrence in NIH, even if guidance and grant terminations "are linked, vacating the guidance does not necessarily void decisions made under it" or automatically entail the reinstatement of a terminated grant. 145 S. Ct. at 2661 (Barrett, J., concurring). That Plaintiffs have requested a preliminary order staying the implementation of the 2026 Policy, including both "the issuance of the 2026 NOFOs and the June 26, 2026[ ] terminations of [TPP] Program awards," see Pls.' Proposed Order for Prelim. Inj. Mot. at 1, reinforces that they seek two distinct forms of relief.

The Court's delineation of Plaintiffs' challenge may evolve as the case develops. For purposes of resolving the present motion, however, the Court recognizes the existence of HHS's overarching 2026 Policy, which mandates that TPP grantees operate

abstinence-only, "body literacy"-focused pregnancy prevention programs that do not "normalize" teen sex or otherwise promote DEI or "gender ideology." Yet it views the mass termination of existing TPP grants and issuance of the FY 2026 NOFOs as distinct, if interrelated, strategies for implementing that Policy. As we shall see, that distinction bears on the likely sweep of the Court's jurisdiction.

B. Likelihood of Success on the Merits

*1. Jurisdictional Issues*

a. Article III Standing

***9** "For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue," and "[t]o demonstrate standing, plaintiffs must answer a basic question—What's it to you?" Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 110 (2025) (cleaned up). "In other words, plaintiffs must show that they possess a personal stake in the dispute and are not mere bystanders." Id. at 110 (cleaned up). Standing, of course, has three elements: injury in fact, causation, and redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). The first element "requires the plaintiff to demonstrate an injury that is concrete, particularized, and actual or imminent, not speculative." Diamond Alt. Energy, LLC, 606 U.S. at 111 (cleaned up). The second and third elements, "usually flip sides of the same coin," necessitate a showing that the plaintiff's injury was likely caused by the defendant, and that the injury would be redressed by judicial relief. Id. (cleaned up).

"The plaintiff 'bears the burden of establishing standing as of the time' " the lawsuit is brought. Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Carney v. Adams, 592 U.S. 53, 59 (2020)). The plaintiff must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. At the preliminary injunction stage, the plaintiff must make a "clear showing" that it is "likely" to establish each element of standing. Murthy, 603 U.S. at 58 (quoting Winter, 555 U.S. at 22). "When determining whether a plaintiff has Article III standing, the court must assume that [the plaintiff] will prevail on the merits." Comm. on Judiciary of U.S. House of Representatives v. McGahn, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc).

Plaintiffs have made a clear showing that they likely have Article III standing to challenge the 2026 Policy and its component parts.

*i. Hennepin County, King County, and PPH*

First, consider the three litigants whose TPP funding has been terminated ("Awardee Plaintiffs"). It is evident from their evidentiary submissions that they are injured by the cancellation of their FY 2023 awards. Hennepin County will either have to request stop-gap funds from county leadership to keep its Tier 1 program alive or end it entirely. Compl. ¶ 65; Johnson Decl. ¶¶ 36–37, 47. Within two months, King County will not have sufficient funding to continue its Tier 2 teen pregnancy prevention program study, Compl. ¶ 69, meaning that "the efforts of the last three years" of its research into innovative pregnancy prevention strategies "will largely go to waste," Gerber Decl. ¶ 49. PPH has already begun winding down its Tier 1 TPP project and laying off staff. Compl. ¶ 72; Miller Decl. ¶¶ 28–30. Awardee Plaintiffs' programmatic harms are clearly attributable to the 2026 Policy, instantiated in the FY 2026 NOFOs and the June 26 termination letters. The requested remedy—vacatur of the Policy, the new NOFOs, and any actions taken in furtherance of them—would remediate those harms.

Even if Awardee Plaintiffs have standing to challenge the mass termination of the TPP cooperative agreements—which HHS all but concedes, see Opp'n at 16—the agency maintains that they lack standing to contest the forward-looking FY 2026 NOFOs. Plaintiffs' injuries "arise from the cooperative agreement terminations, not the 2026 NOFOs," the government's argument goes, and at the time the complaint was filed, no plaintiff "allege[d] that it ha[d] applied for or intend[ed] to apply for funding" under

either Tier. Id. To the government, that makes Plaintiffs mere "bystanders" to the grant-making process, "entities that wish the Administration would have issued NOFOs better aligned with their own policy preferences." Id.

Not so fast. To begin, HHS ignores that the policy decisions enshrined in the FY 2026 NOFOs have, in effect, been applied retroactively to strip FY 2023 grantees of their funding. In its termination letters to each Awardee Plaintiff, HHS explained that "[c]urrent program priorities, such as focusing on projects that do not normalize or promote sexual activity for minors, differ fundamentally from prior approaches." Johnson Decl., Ex. 2 at 2; Gerber Decl. I, Ex. 2 at 2; Miller Decl., Ex. 2 at 1–2. And again, the decision to cancel most existing TPP grants necessarily accompanies the decision to reallocate funds according to the terms of the FY 2026 NOFOs because HHS will apparently fund new two-year projects using "the same pot of appropriated funds that would have supported" the terminated projects in their final two years. Johnson Decl. ¶ 25. These considerations make it conceptually difficult to disentangle the harms associated with the FY 2026 NOFO from those associated with the grant terminations, as HHS asks the Court to do. But it is obvious that the interconnected components of the 2026 Policy have led to the serious consequences described by the Awardee Plaintiffs.

***10** That aside, there is another problem with HHS's standing argument. Awardee Plaintiffs are *independently* injured by the issuance of the forward-looking FY 2026 NOFOs. Assuming they are correct on the merits, the agency has "divert[ed] funding intended for TPP programs for which Plaintiffs were eligible to compete into new programs, not consistent with Congress's directive, for which Plaintiffs cannot compete." Reply at 6. That diversion causes injury under the competitor standing doctrine, id., which "recogniz[es] that economic actors suffer an injury in fact when agencies ... allow increased competition against them." Wash. All. of Tech. Workers v. DHS, 892 F.3d 332, 339 (D.C. Cir. 2018) (second alteration in original) (quoting Sherley v. Sebelius, 610 F.3d 69, 72 (D.C. Cir. 2010)). When a "complainant show[s] actual or imminent increase in competition" as a result of agency action, that increase "almost certainly cause[s] an injury in fact." Id. (quoting Sherley, 610 F.3d at 73). Prospective grantees are competing to win government funding to accomplish Congress's policy goals. Fundamental programmatic changes that favor certain groups of grant applicants over others create the kind of competition-related injury that is cognizable under Article III's case or controversy requirement.

HHS posits that Hennepin County and PPH cannot have Article III standing because they failed to submit grant applications by the July 23, 2026 deadline to secure FY 2026 TPP funding. See Opp'n at 16. The government overstates Plaintiffs' burden. Just as workers have standing to challenge a government regulation that increases competition in their labor market without "fill[ing] out formal job applications" for sought-after positions, Wash. All. of Tech. Workers, 892 F.3d at 340; see Mendoza v. Perez, 754 F.3d 1002, 1013–14 (D.C. Cir. 2014), Awardee Plaintiffs have standing to challenge agency action that forecloses their eligibility for federal funding. See also Global Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025) ("[A] plaintiff may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete."); Coal. of MISO Transmission Customers v. FERC, 45 F.4th 1004, 1014–16 (D.C. Cir. 2022) (holding the same).[6] Under this competitor standing theory, the injury in fact is an inability to compete on equal footing in a competitive grant application process, rather than the inability to actually secure a grant but-for some enumerated disadvantage. See Multnomah County v. Azar, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018). Such an injury is not, as the government suggests, merely a "self-inflicted" wound stemming from a would-be grantee's ideological disagreement with agency policy. See Opp'n at 16–17.

***11** Here, it is evident that Hennepin County, King County, and PPH would have continued to carry out their existing pregnancy prevention programs and/or studies under Tiers 1 and 2 through the next TPP funding cycle, but they cannot operate those initiatives while complying with the 2026 Policy. See, e.g., Compl. ¶¶ 67, 70–71, 72–75; Johnson Decl. ¶¶ 32–35, 38; Gerber Decl. ¶¶ 36–38, 45–47, 50–53; Miller Decl. ¶¶ 31, 36–45. New entrants into the grant "market" will obtain resources for which Awardee Plaintiffs would have vied, absent allegedly unlawful eligibility criteria. That is a classic competitor injury in fact.

Awardee Plaintiffs also satisfy the causation and redressability requirements, which in this case are "flip sides of the same coin." Diamond Alt. Energy, 606 U.S. at 111 (cleaned up). The new policy prescriptions enshrined in the FY 2026 NOFOs categorically disqualify Awardee Plaintiffs from seeking funding for the TPP programs they currently run and allow newly-qualified competitors to take advantage of their absence. Assuming Plaintiffs are right on the merits of their challenge, the

vacatur of the 2026 Policy, as implemented through the FY 2026 NOFOs, gives Plaintiffs a fairer opportunity to compete for TPP funding moving forward.

In summary, the plaintiffs need not have "appl[ied] for" grants they knew they could not obtain under the new rubric "just to maintain standing to bring this suit." Mendoza, 754 F.3d at 1014 n.6. Such a standard "would require plaintiffs 'to engage in a futile act,' " id. (quoting Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1102 (D.C. Cir. 2005)), and deny "commonsense economic" realities of the competitive grant process, Diamond Alt. Energy, 606 U.S. at 116, 120. This conclusion is bolstered by the opinions of other courts likewise concluding that prospective grantees have Article III standing to challenge allegedly unlawful TPP Program NOFOs. See PPPGWNI, 946 F.3d at 1108–09; Multnomah County, 340 F. Supp. 3d at 1054–55; Planned Parenthood of N.Y.C., Inc. v. HHS ("PPNYC"), 337 F. Supp. 3d 308, 319–24 (S.D.N.Y. 2018).

*ii. SIECUS*

Our fourth Plaintiff requires a separate standing analysis. "[O]rganizations may have standing to sue on their own behalf for injuries they have sustained." FDA v. All. for Hippocratic Med., 602 U.S. 367, 393 (2024) (cleaned up). It is not enough for an organization to show a mere "setback" to its "abstract societal interests," id. at 394 (citation omitted), because it "object[s]" to a defendant's conduct, id. Nor can a group "spend its way into standing simply by expending money to gather information and advocate against" such action. Id.

SIECUS is a non-profit organization "dedicated to promoting access to comprehensive sex education in order to improve the health and wellbeing of young people." Compl. ¶ 13. It is not a TPP grantee but "works with many TPP grantees and sub-grantees to provide technical assistance and create opportunities for cross-organization learning and collaboration." Simon Decl. ¶ 9. In particular, SIECUS provides technical assistance through the Sex Education Policy Action Council ("SEPAC"), which includes several TPP Program awardees as dues-paying members. Id. It also "partners" with other organizations "to develop and promote standards elevating the provision of quality sexuality education, including co-developing and updating the National Sex Education Standards." Id. ¶ 7.

SIECUS attests that the issuance of the FY 2026 NOFOs and termination of most existing TPP cooperative agreements will cause it economic and programmatic injuries. First, "[i]n previous instances when SEPAC members have faced funding cuts, they have either paid reduced or no dues, or left SEPAC entirely," and "[b]ased on those experiences, SIECUS expects to collect lower dues for SEPAC than it would have had the TPP Program cooperative agreements not been terminated." Id. ¶ 12. These financial harms to the organization are neither speculative nor "manufactured," as SIECUS has not "spen[t] its way into standing" simply by "advocat[ing] against" HHS's actions. All. for Hippocratic Med., 602 U.S. at 394. Rather, the non-profit faces a redressable economic injury as a direct result of the agency's actions. According to SIECUS's uncontested declaration, it will likely lose dues-paying members. In addition, the organization provides technical assistance directly to TPP grantees and develops sex education standards nationwide. HHS's new policy positions, as implemented through the FY 2026 NOFOs and grant terminations, "directly impair[ ] SIECUS's ability to carry out" this work by undermining proven and accurate sex education curricula and discouraging SIECUS's potential partner organizations from working on sex education programs. Simon Decl. ¶¶ 11, 13.[7] That suffices to show a likelihood of standing.

***12** To conclude, all four Plaintiffs in this case have made a clear showing that they are likely to have Article III standing.

b. Tucker Act Jurisdiction

The next jurisdictional issue is trickier. According to the government, the Tucker Act deprives this Court of jurisdiction over that portion of Plaintiffs' APA challenge which concerns the termination of existing TPP grants. Plaintiffs counter that the Tucker Act does not apply because TPP awards are issued in the form of cooperative agreements, and such agreements are not

"contracts." They add that SIECUS is not in privity with the federal government, so that group can maintain *its* challenge to the validity of the grant terminations regardless of whether the grants are Tucker Act "contracts." The parties seem to agree, and the Court concurs, that there is no Tucker Act impediment to the Court's consideration of HHS's 2026 Policy, as implemented through the FY 2026 NOFOs. Cf. NIH, 145 S. Ct. at 2661 (Barrett, J., concurring) (explaining that the district court "was likely correct to conclude that it had jurisdiction to entertain an APA challenge to [agency] guidance," even if the guidance "discuss[ed] internal policies related to grants").

The standards governing the interrelationship between APA and Tucker Act jurisdiction are well familiar to courts in this district, even if their application has often proven elusive. The APA "provide[s] a general authorization for review of agency action in the district courts." Bowen v. Massachusetts, 487 U.S. 879, 903 (1988). The statute waives sovereign immunity where an action "seek[s] relief other than money damages." 5 U.S.C. § 702. But that waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.' " Dep't of Ed. v. California, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). The Tucker Act is one such statute, granting the Court of Federal Claims ("CFC") jurisdiction "to render judgment upon any claim against the United States" for over $10,000 "founded ... upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). The Supreme Court recently opined that, in light of the Tucker Act's grant of jurisdiction, "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' "—but simultaneously reiterated that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside any agency's action may result in the disbursement of funds[.]" Dep't of Ed., 604 U.S. at 651 (first quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002); and then quoting Bowen, 487 U.S. at 910). The high Court reaffirmed this view in NIH. 145 S. Ct. at 2658.

In Megapulse, Inc. v. Lewis, the D.C. Circuit explained that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." 672 F.2d 959, 968 (D.C. Cir. 1982). Although the Supreme Court's emergency docket rulings in Dep't of Ed. and NIH created a good deal of "confusion ... in this district and others" about the circumstances under which an APA challenge to a grant termination must be channeled to the CFC pursuant to the Tucker Act, the Megapulse test "still stands as binding precedent to be followed by this Court." Am. Acad. of Pediatrics v. HHS, 816 F. Supp. 3d 27, 51–52 (D.D.C. 2026). So the Court will apply that test to the claims advanced by Awardee Plaintiffs and SIECUS, respectively, given their distinct positions respecting the grants at issue.

*i. Megapulse Test Applied to Awardee Plaintiffs*

***13** The *first* prong of the Megapulse test queries the "source of the rights upon which the plaintiff bases its claims." 672 F.2d at 968. Plaintiffs' chief contention is that TPP cooperative agreements are not contracts at all—at least not under the Tucker Act. [8] According to the Federal Circuit, "any agreement can be a contract within the meaning of the Tucker Act, provided that" it reflects "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Consideration, as it reflects mutual intent to contract, is the main sticking point here.

In assessing whether the TPP cooperative agreements are supported by consideration, the Court looks to another pair of guiding principles. One is that the government's decision to use a cooperative agreement, as opposed to some other funding instrument, is an informative datapoint. See, e.g., Pacito v. Trump, 169 F.4th 895, 925–26 (9th Cir. 2026); Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer, 789 F. Supp. 3d 66, 87 (D.D.C. 2025); St. Bernard Par. Gov't v. United States, 134 Fed. Cl. 730, 735 (2017), aff'd on other grounds, 916 F.3d 987 (Fed. Cir. 2019); Anchorage v. United States, 119 Fed. Cl. 709, 713–14 (2015). After all, Congress has distinguished cooperative agreements, whose "principal purpose" is to "carry out a public purpose of support or stimulation authorized by a law of the United States," 31 U.S.C. § 6305(1), from procurement contracts, whose "principal purpose" is to "acquire ... property or services for the direct benefit or use of the United States Government," id. § 6303(1). And the Federal Circuit has emphasized that, just because an agreement confers some indirect or incidental benefit

on the government does not transform a cooperative agreement into a procurement contract. Hymas v. United States, 810 F.3d 1312, 1328–39 (Fed. Cir. 2016). What emerges is a sort of "presumption that ... cooperative agreements are not contracts" in the Tucker Act sense. Pacito, 169 F.4th at 927 n.13 (emphasis omitted). More precisely, if the government has funded a project to achieve some broad statutory goal, the lack of "direct, tangible benefits" to the government suggests a lack of consideration and of *bona fide* mutuality. St. Bernard Par. Gov't, 134 Fed. Cl. at 736; see also Am. Near E. Refugee Aid v. USAID, Supp. 3d 126, 133–34 (D.D.C. 2023) (Cooper, J.) (holding that a cooperative agreement did not provide "direct, tangible benefits" to government agency and thus lacked consideration); Pa. Dep't of Pub. Welfare v. United States, 48 Fed. Cl. 785, 791 (2001) (holding that a state plan implementing a federally-funded welfare program did not contain a contractual obligation because the funds at issue were akin to a "gift[ ] or gratuit[y]" that the government conveyed in its "role as sovereign" (quoting Marshall N. Dana Constr., Inc. v. United States, 229 Ct. Cl. 862, 864 (1982))).

***14** Another key principle, however, is that the "cooperative agreement" label is not itself dispositive of either the presence of consideration or the existence of a Tucker Act contract. See, e.g., Pacito, 169 F.4th at 926–27 n.13 (an agreement's "classification is not determinative of whether an instrument is a contract for purposes of the Tucker Act"); San Antonio Hous. Auth'y, 143 Fed. Cl. 425, 462 (2019) ("Since the issuance of Trauma Service ... a number of Judges of [the CFC] have noted that a contract's classification as a cooperative or grant agreement does not determine whether this court has jurisdiction over a party's breach of contract claim."). Courts therefore must venture beyond labels and examine the respective benefits and obligations contained within a particular agreement to determine whether it is a Tucker Act contract.

Without the benefit of definitive pronouncements from the Supreme Court,[9] D.C. Circuit, or Federal Circuit, courts have navigated between these two analytical guideposts in different ways. At least one has ruled that a grantee's anodyne agreement to "comply with an array of requirements attached to the receipt, use, and distribution" of grant funds is enough consideration to qualify a cooperative agreement as a Tucker Act contract. Vera Inst. of Just. v. DOJ, 805 F. Supp. 3d 12, 28–30 (D.D.C. 2025) (quoting Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1340 (Fed. Cir. 2021)). Others have found consideration where the government received more than a generic promise to adhere to terms and conditions, even though the predominant purpose of the grant was for recipients to carry out some important public purpose on the government's behalf. See, e.g., Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found., 804 F. Supp. 3d 45, 54, 61 (D.D.C. 2025) (finding consideration in National Science Foundation research grants where grantees promised to publish their research results and issue royalty-free licenses to intellectual property resulting from the research, among other requirements); Thermalon Indus., Ltd. v. United States, 34 Fed. Cl. 411, 415 (1995) (similar); Columbus Reg'l Hosp., 990 F.3d at 1340 (finding consideration where state grantee agreed to adhere to traditional compliance conditions *and* took on specific responsibilities borne by FEMA, including agreeing to act on FEMA's behalf in collecting erroneously disbursed sub-grantee funds and reporting employees who had committed drug offenses). Still others have refused to find standard terms and conditions of grant funding sufficient to establish consideration, where the overwhelming benefit conferred to the government was the "advanc[ement]" of "certain policy priorities, statutory goals, and the mission" of the agency. Urb. Sustainability Dirs. Network v. U.S. Dep't of Agriculture, No. 25-cv-1775 (BAH), 2025 WL 2374528, at *15–17 (D.D.C. Aug. 14, 2025).

In the face of this divergent case law, Plaintiffs offer a fitting, if not entirely satisfying, answer to the question of when a cooperative agreement bears sufficient consideration to render it a Tucker Act contract: It depends. See, e.g., Prelim. Inj. Hr'g Rough Tr. at 20:15–19 ("THE COURT: So your position is that agreeing to the terms and conditions of grants may or may not be consideration depending on what the overarching purpose of the grant is. COUNSEL: Right."). The government offers no countervailing read on the equivocal precedent.[10]

***15** As this long wind-up suggests, substantial uncertainty remains as to whether, and under what circumstances, a cooperative agreement qualifies as a contract under the Tucker Act. The Federal Circuit has applied the "principal purpose" test to determine whether a grant is more like a cooperative agreement or a procurement contract under the FGCAA. See Hymas, 810 F.3d at 1327–29. But that test may not necessarily apply in evaluating Tucker Act jurisdiction. See, e.g., Thermalon Indus., Ltd., 34 Fed. Cl. at 418 (questioning whether Congress's distinctions between cooperative agreements and procurement contracts in the FGCAA can be "interpreted as an indication that Congress intended for all grant agreements ... to fall outside the scope of ...

Tucker Act jurisdiction”); cf. Laborant, LLC v. United States, 180 Fed. Cl. 76, 88 (2026) (observing that the Federal Circuit has not “endorse[d] the St. Bernard Parish court's theory that to form a contract, the government must receive a benefit that is ‘direct’ or otherwise tangible”). [11] Adding to the uncertainty, neither side has fulsomely parsed the provisions of the cooperative agreement, examining the respective obligations it places on the parties. Lastly, the D.C. Circuit may (and hopefully will) opine soon on this question, which features prominently in the pending appeals in Vera Institute and Urban Sustainability. See Vera Inst. of Just. v. DOJ, No. 25-5248 (D.C. Cir. appeal docketed July 10, 2025); Urb. Sustainability Dirs. Network v. AGRI, No. 25-5370 (D.C. Cir. appeal docketed Oct. 17, 2025).

What about the *second* prong of the Megapulse test? Uncertainty reigns on this front, as well. It is not entirely clear whether Awardee Plaintiffs seek essentially contractual relief. On one hand, they do not ask for money damages [12] or specific performance in so many words. Instead, they request the vacatur of the “2026 Policy,” which has been implemented in part through the retroactive application of HHS's new TPP policy agenda to existing TPP projects. And “the Tucker Act does not deprive [a district court] of jurisdiction to vacate and prospectively enjoin unlawful policies concerning [grant] terminations or decisions to cut funds appropriated by Congress.” New Mexico v. Musk, 824 F. Supp. 3d 80, 93 (D.D.C. 2026). On the other hand, a request for the government to stop withholding grant funds has been construed by some courts as an *effective* request for specific performance. See, e.g., U.S. Conf. of Cath. Bishops v. U.S. Dep't of State, 770 F. Supp. 3d 155, 163 (D.D.C. 2025). And as Justice Barrett expressed in her controlling concurrence in NIH, “if the CFC has exclusive jurisdiction over” some set of “grant terminations,” plaintiffs “cannot end-run that limit simply by packaging them with a challenge to agency guidance.” 145 S. Ct. at 2661–62 (Barrett, J., concurring).

Considering both Megapulse factors, and given the dynamic equilibrium of the case law, Awardee Plaintiffs may very well ultimately persuade the Court that it has jurisdiction to order relief as to the grant terminations. Given the closeness of the question, however, the Court cannot say with the requisite confidence that they have established a likelihood of success warranting “extraordinary” interim relief of that nature. Winter, 555 U.S. at 24.

*ii. Megapulse Test Applied to SIECUS*

Plaintiffs argue that, Awardee Plaintiffs aside, SIECUS can carry the torch on their APA claims, as that organization also seeks relief from the mass grant terminations. The source of SIECUS's rights cannot be contractual because it is not a party to any TPP agreement, nor is it in privity with the government. Instead, the group's right to challenge the grant terminations stems from the APA's prohibition on agencies acting contrary to law and arbitrarily. And SIECUS does not seek contractual relief because, again, it has not contracted with the government.

***16** Plaintiffs have a stronger position here. As the Court recently observed, “a growing chorus of courts has ruled that a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling.” Dallas County v. Kennedy, No. 25-cv-4242 (CRC), 2026 WL 2123225, at *9 (D.D.C. July 23, 2026) (collecting cases). If a plaintiff is not in privity with the government, the logic goes, it cannot maintain a contractual cause of action in the CFC pursuant to the Tucker Act unless some exception to the privity requirement exists. Id. at *8-9 (citing Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998); Teton Hist. Aviation Found. v. DOD, 686 F. Supp. 2d 75 (D.D.C. 2010)). If a third-party plaintiff lacks privity with the government and no exception to the privity requirement applies, the plaintiff is boxed out of the CFC. Id. at *9. At that point, the familiar principle articulated in Tootle v. Secretary of Navy kicks in: “There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.” 446 F.3d 167, 777 (D.C. Cir. 2006).

The government makes no attempt to rebut this argument or suggest that any exception to the privity requirement applies here. Although the issue has yet to be addressed by the Supreme Court or D.C. Circuit, Plaintiffs are likely to succeed in showing that the Tucker Act does not divest the Court of jurisdiction over *SIECUS*'s challenge to its members' grant terminations. Cf. Dallas County, 2026 WL 2123225, at *10; Brighton Park Neighborhood Council v. McMahon, No. 25-cv-4523 (SLS), 2026

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

WL 1707623, at *17 (D.D.C. June 12, 2026) (explaining that third-party plaintiffs lacking contractual privity with the federal government have "little [Tucker Act] difficulty" proceeding in district court on their grant discontinuance-related claims).

That tentative conclusion does not magically entitle Plaintiffs to preliminary relief on the grant terminations, however. As explained further below, SIECUS has not shown that it has suffered irreparable harm. The Court cannot order the interim reinstatement of the mass-terminated TPP grants based on SIECUS's non-privity with the federal government when that Plaintiff has not demonstrated irreparable harm that would result absent preliminary relief.

To sum up, the Court may have the power to order the reinstatement of the terminated TPP grants, whether because the Program's cooperative agreements are not contracts under the Tucker Act or because SIECUS can obtain this relief through its more obviously non-contractual APA challenge. But for different reasons, the Court cannot see fit to issue preliminary relief as to the grant terminations at this time.

*2. Other Threshold Issues*

a. Committed to Agency Discretion

HHS raises two other threshold issues that the Court will consider in turn. First, it argues, the policy change decisions at issue in this case are committed to agency discretion by law and are therefore unreviewable under 5 U.S.C. § 701(a)(2). Opp'n at 18–20. Given the APA's presumption of judicial review of agency action, the Supreme Court has counseled courts to read this exception to reviewability "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' " Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018) (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)).

This is not one of those rare circumstances. Although the TPP Program's authorizing statute is succinct, it provides clear benchmarks against which the lawfulness and reasonableness of agency action may be assessed. Awardees must offer "medically accurate" and "age appropriate" programming that serves to reduce teen pregnancy. 140 Stat. at 281. Tier 1 awardees must "replicat[e]" programs that have already "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Id. And Tier 2 recipients must "develop," "replicate," "refine," or "test" other "models and innovative strategies for preventing teenage pregnancy." Id. Plaintiffs' legal challenge is "directly related to [this] specific statutory language." Hosp. for Special Surgery v. Becerra, No. 22-cv-2928 (JDB), 2023 WL 5448017, at *7 (D.D.C. Aug. 24, 2023). Both the contrary-to-law and arbitrary-and-capricious claims take aim at HHS's alleged abandonment of these statutory goals and guardrails.

***17** The government's effort to analogize this case to Lincoln v. Vigil and Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002) falls short. The statute at issue in Lincoln, which was an APA challenge to the Indian Health Service's decision to discontinue a program it had previously funded from a lump-sum appropriation, included no meaningful or legally binding restriction on how to spend the appropriated funds; in fact, the appropriations statute did "not so much as mention" the relevant program. 508 U.S. at 193–94. And the statute at issue in Milk Train directed that appropriated funds were to be used "to provide assistance directly ... to dairy producers, *in a manner determined appropriate by the Secretary [of Agriculture]*." 310 F.3d at 751 (emphasis added). The D.C. Circuit concluded that such language "left to the Secretary the decision about how the [relevant] moneys ... could be best distributed consistent with" the statute's other general policies and thus deprived the district court of jurisdiction to review decisions taken within the scope of that discretion. Id. at 751–52.

Per Lincoln and its progeny, the § 701(a)(2) bar on judicial review under the APA applies where Congress has left an agency with virtually " 'unbounded' discretion," Shawnee Tribe v. Mnuchin, 984 F.3d 94, 100–01 (D.C. Cir. 2021) (quoting Dep't of Commerce v. New York, 588 U.S. 752, 772 (2019))—for instance, when it authorizes a lump-sum appropriation to an agency without restricting the use of funds or expressly defers to the discretion of the agency head. Under such circumstances, the

"lump-sum appropriation reflects a congressional recognition that [the] agency must be allowed flexibility to shift funds within a particular appropriation" and make "necessary adjustments for unforeseen developments and changing requirements." Lincoln, 508 U.S. at 193 (cleaned up).

By contrast, the limitations in the TPP statute "afford a statutory reference point by which the court is able to review" the agency's substantial adjustments to the criteria it will use to award TPP funds. Milk Train, 310 F.3d at 752 (cleaned up). A reviewing court may have "no business second-guessing the agency's [specific] decision to fund one program over another, but [it] *does* have the authority to ensure that when making that decision HHS considers statutory restrictions," and "in doing so, the court applies manageable standards." Health Teen Network v. Azar, 322 F. Supp. 3d 647, 659 (D. Md. 2018) (emphasis added). After all, "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," as it has done here. Lincoln, 508 U.S. at 193. The Court thus joins others "that have reached a consensus that the [Consolidated Appropriations Act] creates meaningful standards such that judicial review of appropriations to the TPP Program is available under the APA." PPNYC, 337 F. Supp. 3d at 325–26 (collecting cases); see also Multnomah County, 340 F. Supp. 3d at 1062.

In sum, the agency actions challenged here are not judicially unreviewable as committed to agency discretion.

b. Final Agency Action

The government's second threshold obstacle is equally surmountable. HHS contends that any judicial review of the FY 2026 NOFOs is unavailable because they do not constitute final agency action, as required by 5 U.S.C. § 704. Opp'n at 20–22. Finality is determined by the familiar two-prong test set forth in Bennett v. Spear, 520 U.S. 154 (1997). The action must, first, "mark the consummation of the agency's decisionmaking process" and "not be of a merely tentative or interlocutory nature." Id. at 177–78 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. at 178 (cleaned up).

***18** Bracketing whether the FY 2026 NOFOs can be disentangled from the grant terminations (which are undoubtedly final), the NOFOs qualify as final agency action in their own right.

*First*, the NOFOs mark the consummation of the agency's decision-making process as to how it will allocate funds in the next round of TPP grant-making. Although the awardees are yet to be chosen, there is nothing remotely "tentative" or "interlocutory" about the *rubric* that the agency will use to select awardees. For instance, the NOFOs state that the agency "intends to make available" TPP grants, and they specify the criteria with which funded "[r]ecipients *will be expected to*" comply. FY 2026 Tier 1 NOFO at 1, 8 (emphasis added); see also FY 2026 Tier 2 NOFO at 1, 9–11. The documents provide that recipients "*must align* program design and activities" with the specified priorities and are "*required* to administer any project that is awarded under this NOFO in accordance" with its enumerated objectives. See FY 2026 Tier 1 NOFO at 4, 9, 45 (emphasis added); FY 2026 Tier 2 NOFO at 4–5 (emphasis added). In other words, funding eligibility hinges on compliance with the guidelines articulated in the NOFOs, making clear that the notices represent the agency's "last word on the matter" of eligibility even if the final awardees have yet to be chosen. Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001). Said yet another way, "while additional steps must be taken to actually award grants, no further steps need to be taken to disqualify applicants such as the [plaintiffs] from receiving grants at all." Multnomah County, 340 F. Supp. 3d at 1057. And "[w]aiting to see which projects are actually funded before calling this a final agency action would force the [plaintiffs] to engage in a futile exercise that would not put the parties in any meaningfully different posture than the one they are in now." Id.

*Second*, "legal consequences" plainly "flow" from the NOFOs' issuance—namely that the notices serve to disqualify would-be applicants whose programming does not conform to HHS's newly-imposed requirements. As Awardee Plaintiffs have alleged, they cannot seek funding under either the Tier 1 or Tier 2 NOFOs to support their teen pregnancy prevention initiatives, at least without transforming programming that HHS previously found to be effective and evidence-based. Compl. ¶¶ 67, 70, 75. If they were to apply to continue their current work, which HHS has blessed—over several years—as compliant with applicable law, they would be ineligible for FY 2026 funding based on the express terms of the notices. See, e.g., Tier 1 NOFO at 45 ("If

an application does not align [with the enumerated policy priorities], the application will not receive funding[.]"). "[C]ourts routinely hold that agency action is final where it affects grant eligibility criteria." PPNYC, 337 F. Supp. 3d at 329 (collecting cases); see also Multnomah County, 340 F. Supp. 3d at 1058 (finding the second prong of the Bennett test "easily satisfied" where TPP call for funding reflected HHS's "decision to deny federal funding to applicants" who did not establish their eligibility). [13]

***19** The Court has little doubt that the FY 2026 NOFOs qualify as final agency action. That the next cohort of TPP recipients has not yet been chosen poses no obstacle to judicial review of the notices or the Policy that informs them.

### *3. Merits*

Although Plaintiffs bring contrary-to-law, arbitrary-and-capricious, and First Amendment claims, they "need only show a likelihood of success on one to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied." Am. Bar. Ass'n v. DOJ, 783 F. Supp. 3d 236, 242 (D.D.C. 2025) (Cooper, J.).

Aspects of the 2026 Policy appear contrary to law and in excess of HHS's authority. For instance, the TPP statute requires Tier 1 grantees "replicat[e] programs ... proven effective through rigorous evaluation." 140 Stat. at 281. The 2026 Tier 1 NOFO requires awardees to incorporate "body literacy" into their curricula, but according to the uncontested record, there are no "curricula/programs that center [on] body literacy and the related topics as described in the NOFO" and "align" with other eligibility criteria outlined in the notice. Simon Decl. ¶ 21. HHS itself acknowledges a "near absence of body literacy education standards nationwide." FY 2026 Tier 1 NOFO at 5. If a program has "never been implemented," it necessarily "cannot be replicated." PPGWNI, 946 F.3d at 1113; see also id. ("To prove something effective requires a previous implementation that one can test against a standard."). The body literacy requirement is thus seemingly irreconcilable with the statutory requirement for Tier 1 funding. That HHS seeks to "identify effective interventions focused on promoting body literacy" through *Tier 2*'s pot of experimental research funding, FY 2026 Tier 2 NOFO at 5, only reinforces that the "body literacy" framework is incompatible with the Tier 1 statutory mandate.

In addition, notwithstanding the brevity of the statutory provision that authorizes TPP funding, Congress's creation of a separate pot of abstinence-only funding in last year's appropriations law strongly suggests that TPP funding was *not* meant to fund exclusively such programming. Cf. 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); see also Penn. Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139, 154 (3d Cir. 2012) (government agency could not use funds from one program to fund another "because despite sharing similar purposes," the programs were governed by "distinct statutes with separate appropriations"); cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., 484 U.S. 365, 371 (1988) ("Statutory construction ... is a holistic endeavor."); Noble v. Ass'n of Letter Carriers, AFL-CIO, 103 F.4th 45, 50 (D.C. Cir. 2024) ("The text [of a law] must be read in the context of the entire statute.").

Finally, the 2026 NOFOs require that applicants "align" themselves with HHS priorities, which, in turn, prohibit the "normali[zation]" of sexual activity for minors and even the "descri[ption]" or "present[ation]" of "sexually explicit content." Compl. ¶¶ 41(d), 58. But both common sense and the record evidence confirm the "impossi[bility]" of "implement[ing] a program that targets and seeks to modify sexual behavior" without "talking about sexual behavior." Gerber I Decl. ¶ 36; see also Johnson Decl. ¶ 32 ("We do not believe that we can effectively run a teen pregnancy prevention program without talking about teens having sex."). If HHS's new funding notice forbids even the discussion of sexual activity by minors, one wonders how an awardee could possibly *address* the topic of teen pregnancy and related sexual risk behaviors, let alone work to prevent them as the appropriations act necessitates. As such, the "alignment" requirement seems incongruous with the TPP statute, which mandates that HHS fund programs that actually "reduce teen pregnancy." 140 Stat. at 281; cf. Khedkar v. USCIS, 552 F. Supp. 3d 1, 7–8 (D.D.C. 2021) ("An agency policy or regulation which operates to create a rule out of harmony with the statute is a mere nullity." (cleaned up)).

***20** The Court need not, however, resolve such questions of statutory interpretation at this early juncture and on an expedited schedule. That is because Plaintiffs have demonstrated an even stronger likelihood of success on the arbitrary-and-capricious front, which is sufficient "to obtain [the] preliminary relief" they seek. Am. Bar. Ass'n, 783 F. Supp. 3d at 242.

"Agency action is arbitrary and capricious if [the agency] 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " Sinclair Wyoming Refin. Co. LLC v. EPA, 114 F.4th 693, 711 (D.C. Cir. 2024) (quoting Motor Vehicle Mfrs. Aff'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "Under this standard, an agency must engage in reasoned decision making." Id. Although the Court may not "substitute its own judgment" for that of the agency, Ameren Ill. Co. v. FERC, 58 F.4th 501, 505 (D.C. Cir. 2023) (cleaned up), the APA "requires that agency action be reasonable and reasonably explained," FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021).

At present, the Court is persuaded that the 2026 Policy, as applied through the implementation of the FY 2026 NOFOs and mass grant termination decision, is likely unreasonable and insufficiently explained in several crucial respects.

a. HHS's action is likely impermissibly vague.

An initial problem with HHS's new approach to the TPP Program, as articulated in the FY 2026 NOFO, is that several of its terms are likely impermissibly vague. "An agency's requirements must be comprehensible and give entities fair notice of what is required of them." PPGNY II, 2025 WL 2840318, at *23 (citing Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995)). Regulated parties need "an opportunity to conform their behavior to legal rules," meaning that they require some way of identifying, "with ascertainable certainty, the standards with which the agency expects parties to conform." Nissan Chem. Corp. v. FDA, 744 F. Supp. 3d 1, 8–9 (D.D.C. 2024) (cleaned up).

As articulated in the FY 2026 NOFO, the 2026 Policy imposes requirements that are so indeterminate as to deprive regulated parties of any "ascertainable certainty" about how to comply. Moving forward, awardees must "align" with various agency priorities, which include eschewing DEI policies and practices, support for "gender ideology," and the "encourage[ment], normaliz[ation], or promot[ion] [of] sexual activity for minors." Compl. ¶ 41(b)–(d). Yet there is nothing in the NOFO documentation, termination letters, or on the OASH policy priorities webpage (which the government suggests that the Court consider) that defines "DEI," "gender ideology," or the "normalization" of sexual activity. So the "sweep" of the agency's bans on these topics is "entirely unclear," and the "lack of agreed-upon meaning of terms like [DEI] have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein." PPGNY II, 2025 WL 2840318, at *25 (collecting cases). As with the July 2025 Policy Notice, HHS has made no effort in its NOFOs, termination letters, or OASH policy statement to cabin or clarify these prohibitions.

***21** Plaintiffs' declarations illustrate the problems with vagueness. HHS terminated Hennepin County's TPP Tier 1 grant on the basis that its "*Love Notes* curriculum" "normalizes and encourages sexual activity for minors." Johnson Decl. ¶ 28. As far as the County could understand, HHS's termination letter, along with the new Tier 1 NOFO, seemed to be "suggesting that any program that talks about having sex is not age appropriate for any adolescents." Id. ¶ 32. But because the "prohibition on normalizing sexual activity [was not] clearly defined," the County could only speculate as to the reasons their grant had been terminated. Id. Other declarants expressed similar uncertainty about the basis for cancelling their TPP grants, [14] "leaving [them] to guess at what is and is not permissible in the government's view, while ... facing the threat of adverse actions during the guessing." PPGNY II, 2025 WL 2840318, at *26 (quoting Perkins Coie LLP v. U.S. Dep't of Just., 783 F. Supp. 3d 105, 177 (D.D.C. 2025)). Declarants conveyed concern that HHS might characterize other activities—such as an initiative that aimed at increasing condom use among students who have sex or educators' answers to common questions that young people have about sexual activity—as "encouraging" teen sexual activity. See Gerber Decl. I ¶ 37; Miller Decl. ¶¶ 41–42. In short, nothing in the challenged policy documents reveals how regulated parties could meaningfully conform their behavior to the requirement that they "align" with vague agency priorities.

b. HHS's action likely runs counter to the evidence, fails to consider an important part of the problem, and considers factors Congress did not intend.

Several aspects of the 2026 Policy likely run counter to the evidence before the agency; reflect HHS's failure to consider an important part of the problem; rely on factors that Congress did not intend for the agency to consider; or suffer from some combination of these deficiencies.

Start with the requirement that recipients "incorporate sexual risk avoidance ... education as a component of program delivery," FY 2026 Tier 1 NOFO at 12; FY 2026 Tier 2 NOFO at 9, which the government does not contest is another way of mandating an abstinence-only approach to pregnancy prevention. According to the record before the Court at this early stage, abstinence-only education is not only "ineffective in delaying sexual initiation and reducing adolescent pregnancy, but also actively harmful and stigmatizing to adolescents." Simon Decl. ¶ 15. The NOFOs do not address the lackluster evidence base for abstinence-only sexual education—which is especially concerning in the Tier 1 context, as such projects *must* "replicat[e]" programs that have been "proven effective through rigorous evaluation to reduce teenage pregnancy" or related risk factors. 140 Stat. at 281. Again, that Congress separately appropriated $35 million to fund "sexual risk avoidance" programs, id. at 281–82, strongly suggests that it did not intend for HHS to apply the same requirement to the TPP Program writ large. [15] While abstinence-only education may well be appropriate for some age groups or communities, the agency has proffered no explanation or evidence to support its across-the-board mandate that *only* abstinence strategies be pursued.

Next, consider that both FY 2026 NOFOs mandate the promotion of "body literacy," a vague public health framework that purports to "equip young people with a clear understanding of how their bodies function in a state of health." FY 2026 Tier 1 NOFO at 10. As noted earlier, HHS *itself* highlights a "near absence of body literacy education standards nationwide." Id. at 5. On the topic of body literacy, the notices (remarkably) reference public health studies that appear either not to exist or not to support the propositions for which they are cited—a hallmark of AI-generated citations. See id. at 6–7 & nn. 1–5; FY 2026 Tier 2 NOFO at 7–8 & nn. 1–5; see also Decl. of Kate Talmor ¶¶ 6–12 ("[I]t appears that five out of seven of the NOFOs' cited articles could not be found as cited in the NOFO. Two out of the seven appear to be completely made up. Three of the seven did not publish in the cited journals but appear to have similar titles to articles published in completely different journals.") And according to the early-stage factual record, there seem to be no pregnancy prevention curricula and programs that "center [on] body literacy" and other newly-imposed TPP requirements. Simon Decl. ¶ 21. The dearth of scientific evidence supporting a "body literacy" approach to teen pregnancy prevention makes it an ill-fitting requirement for Tier 1 awardees. And even though Tier 2 funding is designed to test innovative new strategies for preventing teen pregnancy, the agency has proffered no explanation whatsoever, much less a reasonable one, for requiring *all* Tier 2 grantees to adopt a "body literacy" focus, given the myriad other "innovative" teen pregnancy prevention strategies whose development HHS has funded in the past and now abruptly abandons.

***22** Relatedly, the NOFOs obligate grantees to inform teens of "potential health risks" associated with "widely prescribed medications for sexual and reproductive health," including by providing an "overview of approaches to managing menstrual health concerns," such as "the advantages and disadvantages of ovarian suppression compared to approaches that address root causes." FY 2026 Tier 1 NOFO at 9–10; see FY 2026 Tier 2 NOFO at 9–10 (similar). Based partly on this new requirement, HHS cancelled King County's Tier 2 grant due to its purported "fail[ure] to identify common side effects, contraindications, or health risks" associated with various forms of birth control "(e.g., bleeding changes, headaches, cramping, bone density loss, hormonal imbalances, and risks for specific medical conditions or later infertility)." Gerber Decl. I, Ex. 2 at 2. Not only does the vagueness of HHS's requirement render it "susceptible to discriminatory application," PPGNY II, 2025 WL 2840318, at *22, the agency has apparently failed to consider that a "large body of evidence" "contradict[s]" the notion that the use of birth control "entails the risk of later infertility," Simon Decl. ¶ 17. HHS also seems to have ignored evidence that "spreading fear about [contraception's] purported risks ... is more likely to decrease uptake of birth control and therefore increase the teen pregnancy rate." Gerber Decl. I ¶ 42. The insistence on apprising teens of detailed medical information further runs up against the reality that TPP staff are educators, "not medical providers," and not appropriately positioned to advise teens about the

medical consequences of using certain methods of birth control based on "their health history or other factors." Id. ¶ 44. At bottom, apprising adolescents of full, accurate information about various forms of contraception could be a perfectly defensible policy prescription, but the agency has not defended it here with any precision or due consideration of contrary evidence.

Turn next to the requirement that future TPP grantees "provide parents or guardians with advance notice" about programming, "offer a meaningful opportunity to review such materials upon request," and provide a "clear and accessible process for parents to opt their children out of any specific content or activities, particularly those related to sexuality, that may burden their religious exercise." FY 2026 Tier 1 NOFO at 7; see FY 2026 Tier 2 NOFO at 8–9 (similar). HHS justified this mandatory increase in parental involvement in and vetting of pregnancy prevention programs by referencing the Supreme Court's decision in Mahmoud v. Taylor, 606 U.S. 522 (2025). But as Plaintiffs fairly point out, the agency fails to "explain why that school-centered decision is relevant where TPP programming is decidedly *not* limited to the school setting." Mot. for Prelim. Inj. at 29. [16] "Further," the NOFO does not address "how such parental opt-outs, which could result in partial participation in programming by teenagers," might very well "diminish effectiveness or diverge from the statutory 'replication' requirement." PPGNY II, 2025 WL 2840318, at *24.

Aside from being vague, HHS's prohibition on content that it deems "sexually explicit" or that it considers to "normalize" sexual activity for minors is likewise contrary to evidence that was apparently before the agency and fails to consider the seeming logical impossibility of operating an effective pregnancy prevention program without some discussion of sexual activity. See Compl. ¶¶ 41(d), 57–58. Again, if common sense weren't enough, the unrebutted evidence before the Court makes clear that "a teen pregnancy prevention program" cannot be run "effectively ... without talking about teens having sex." Johnson Decl. ¶ 32; see also Gerber Decl. I ¶ 36 ("[I]f you are implementing a program that targets and seeks to modify sexual behavior, it is impossible to do that without talking about sexual behavior."). To be sure, the TPP statute requires that educational content be "age appropriate," 140 Stat. at 281, and not all pregnancy prevention curricula will be appropriate for all age groups. But the government is hard-pressed to argue that Congress intended for the TPP's "age appropriateness" requirement to bar *any* discussion of teen sexual activity, no matter the target audience. Cf. Gerber Decl. I ¶ 36 (explaining that the seeming prohibition on discussing teen sex makes little sense in King County's TPP initiative, which "work[s] with young men who are already sexually active").

***23** Finally, the NOFOs ask future TPP recipients to take an "upstream, preventive approach" to promoting "optimal health" by "emphasizing root-cause understanding of chronic health conditions that may impact overall health and fertility." FY 2026 Tier 1 NOFO at 1; see also FY 2026 Tier 2 NOFO at 8. The Tier 1 NOFO also urges that program counseling "affirm marriage and parenthood as meaningful and valued components of adult life and support adolescents in considering long-term reproductive goals." Id. at 11. These new TPP parameters imply a desire to promote fertility and marital procreation—twin aims that sit uneasily with Congress's decision to supports programs aimed at "reduc[ing]" and "preventing teenage pregnancy." 141 Stat. at 281. In any event, the unrebutted declarations cast doubt on the efficacy of a pregnancy prevention effort that focuses on fertility and marriage. See Simon Decl. ¶ 21.

Faced with this mountain of uncontroverted evidence suggesting the arbitrariness of HHS's new TPP requirements, the government has little to say. See Opp'n at 24 (explaining that a "full ... discussion of the merits is not possible in this emergency posture"). Given a second opportunity to oppose the merits of Plaintiffs' arbitrary-and-capricious claims at the motion hearing, the government downplayed various elements of the 2026 Policy. "It is not the case that all the programming has to address abstinence or body literacy," counsel submitted. Prelim. Inj. Hr'g Rough Tr. at 51:22–25. And TPP awardees were not barred from discussing teen sexual activity, so long as the discussion was "age [ ] appropriate." Id. at 52:6–9.

These qualifications may be sensible. But they were proposed by counsel, not the agency. According to the text of the FY 2026 NOFOs, Tier 1 and Tier 2 awardees are "required" and "expect[ed]" to operate their programs in a way that promotes body literacy and sexual risk avoidance. See FY 2026 Tier 1 NOFO at 1, 4, 10, 12; FY 2026 Tier 2 NOFO at 9. And the OASH policy priorities, which the FY 2026 NOFOs incorporate by reference, pronounce that the agency "*will* focus on programs that do not promote material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content, including

content that encourages, normalizes or promotes sexual activity for minors." Priorities of Office of the Assistant Secretary for Health, OASH, https://health.gov/priorities [https://perma.cc/3MMA-37FK] (last visited Aug. 14, 2026). HHS does not qualify its directives, as counsel does, by applying criteria insofar as they are "age appropriate." Rather, the agency *defines* "age appropriate" programming *as* programming that does not "normalize[ ]" teen sex. See Simon Decl. ¶ 18.

Government counsel's attempt to soften the 2026 Policy's impositions on TPP awardees is thus unavailing. The proffered caveats are "not at all obvious or even apparent" from the policy documents the Court has before it. PPGNY II, 2025 WL 2840318, at 25. And courts may only review the "rationale actually offered by the agency" at the time it rendered its decision, Grand Canyon Air Tour Coal. v. FAA, 154 F.3d 455, 469 (D.C. Cir. 1998), rejecting "as evidence of reasoned decisionmaking a post hoc rationalization for agency action," Kansas City v. HUD, 923 F.2d 188, 194 (D.C. Cir. 1991).

c. HHS's action likely fails to acknowledge its change in policy position.

The FY 2026 NOFOs fall short in yet another respect: They depart significantly from the FY 2023 NOFOs and others that have come before them, without even recognizing the shift. For instance, the new notices abandon any reference to populations disproportionately affected by higher rates of teenage pregnancy and appear to require awardees to deny the existence of intersex and transgender individuals altogether. Compl. ¶ 49; Simon ¶ 20; FY 2026 Tier 1 NOFO at 45; FY 2026 Tier 2 NOFO at 55. HHS has apparently jettisoned the TPPER, which is the peer-review-like process by which the government assessed whether Tier 1 applicants were poised to replicate an evidence-based pregnancy prevention program. Id. ¶ 47. The agency has shortened the project period from five years to two, ignoring its previous position that a shorter award period would not be sufficient to "allow grantees enough time to form the community relationships, partnerships, and wider engagement needed to adopt a comprehensive systems-thinking approach." Id. ¶ 50. And instead of encouraging experience and tested methods for reducing teen pregnancy, the program now actively penalizes past awardees by giving bonus points to applicants who have never received a TPP award. Id. ¶ 47; FY 2026 Tier 1 NOFO at 41–42; FY 2026 Tier 2 NOFO at 52.

***24** Agencies may, of course, change policy positions without acting arbitrarily, so long as they "display awareness that they are changing position," "provide a reasoned explanation for the change," and "consider serious reliance interests." Narragansett Indian Tribe by and through Narragansett Indian Trib. Hist. Pres. Off. v. McMaster, 176 F.4th 671, 688 (D.C. Cir. 2026) (quoting FDA v. Wages & White Lion Invs., 604 U.S. 542, 568 (2025)); see also FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Aside from the cursory acknowledgement in HHS's boilerplate grant termination letters that "[c]urrent program priorities ... differ fundamentally from prior approaches," see, e.g., Johnson Decl., Ex. 2 at 2, the agency has not acknowledged that the substance and administration of the TPP Program will change dramatically under the auspices of the new NOFOs—let alone provide *any* kind of "reasoned explanation for the change."

The government retorts that the "deferential standard" laid out in Fox "permits the Department to revise its policy priorities" without showing that its new policy is "better" than the old one. Opp'n at 24. True enough. But Fox also requires agencies to give "good reasons" for changing course. 556 U.S. at 515. Here, HHS appears to have "depart[ed] from a prior policy *sub silentio*," offering no reason at all. Id.

d. Conclusion

The party seeking a preliminary injunction is responsible for establishing a likelihood of success on the merits. Plaintiffs have meticulously outlined the unlawful elements of the 2026 Policy as articulated in the FY 2026 NOFOs and applied through the grant terminations. The government responds half-heartedly, asserting that a "full and definitive discussion of the merits is not possible in this emergency posture." Opp'n at 24. An arbitrary-and-capricious challenge *does* usually entail a "full[ ] review" of the "entire administrative record." E.Q. v. DHS, --- F. Supp. 3d ---, 2026 WL 946181, at *18 (D.D.C. 2026) (Cooper, J.) (cleaned up). But just because a more thorough assessment will come later does not mean that the Court may *presume* the government acted reasonably at this early stage.

HHS is, of course, at liberty to design a policy approach to reducing teen pregnancy and award grant funding consistent with that policy. But it can do so neither in an unreasonable and unreasonably explained fashion, nor in a manner that conflicts with the parameters set forth by Congress. At the very least, the agency must "explain why it chose to do what it did." Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (cleaned up). As to many of HHS's novel TPP criteria, even a brief "statement of reasons [ ]sufficient to permit a court to discern its rationale" seems to be lacking. Id.

Based on the unimpugned record before the Court at this stage, Plaintiffs have established that they are likely to succeed on their arbitrary-and-capricious challenge to the lawfulness of the 2026 Policy and the NOFOs and grant terminations that have implemented it.

C. Irreparable Harm

"[P]reliminary injunctive relief is never awarded as of right and, as a matter of equitable discretion, it does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." Kim v. FINRA, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) (cleaned up). Plaintiffs cannot obtain preliminary relief unless they demonstrate irreparable harm and a favorable balance of the equities.

"[T]he irreparable harm prong of the preliminary injunction analysis is no walk in the park." Dallas Cty., 2026 WL 2123225, at *4. The D.C. Circuit imposes a "high standard" for irreparable harm. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). A movant's injury must "be both certain and great," and "actual and not theoretical." Id. (quoting Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)). It must also be imminent and beyond remediation sans judicial intervention. Id.

*1. Awardee Plaintiffs*

***25** The Awardee Plaintiffs have demonstrated that they face irreparable harm in the absence of a preliminary injunction preventing the implementation of the 2026 Policy, including both the issuance of the FY 2026 NOFOs and the termination of their grants. According to their uncontested declarations, Awardee Plaintiffs have not only had their grant funding brusquely terminated, but the new guidance effectively bars them from reapplying for TPP funding because their programs are incompatible with the agency's new requirements. As a result, all three Plaintiffs attest to facing an existential threat to the continuation of their TPP programming. Although Hennepin County has "not yet decided whether [it] can continue to support" its TPP-funded pregnancy prevention project, if it cannot make up the shortfall in funds, the County's "program partners" will "not be able to keep health mentors in the schools and clinics where they currently work, and most would need to lay off those health mentors entirely." Johnson Decl. ¶¶ 37, 40. Even if the County could secure some stopgap funding, "operating the program without a guarantee that [it would] have funds to continue" is "not" an "option[ ]." Id.

The situation is reportedly even more dire for King County and PPH. The former attests that within two months, it will "not have sufficient funding to continue [its] evaluation" of its Tier 2 study, meaning that "the efforts of the last three years" of data collection "will largely go to waste." Gerber Decl. I ¶ 49. "The longer [the County] go[es] without funding, the more difficult it is to pick back up." Id. ¶ 52. But if the County "were able to complete [the] study as expected," it predicts it would "turn out another evidence-based program that would be eligible for replication under Tier 1," which would be "an enormous benefit to the field." Id. ¶ 53.

Similarly, PPH's TPP program was entirely funded by its federal grant, and "without that funding, PPH has been forced to begin winding down [its] TPP Project entirely." Miller ¶ 26. The organization reports having already begun to lay off staff members who were responsible for administering the TPP program. Id. ¶ 28. Absent even the prospect of a restoration of TPP funding, PPH's "work will not be picked up by others, at least not by others with the same level of substantive expertise or deep knowledge of the communities served by PPH's TPP Program." Id. ¶ 29. And if PPH were to re-apply for funding under the FY 2026 NOFO,

it would be forced to "adopt changes to [its] programming that would run counter to its core purpose," thereby "prevent[ing] the communities of young people in Iowa and Nebraska that PPH serves from receiving sexual and reproductive health education that has proven to be effective" and "leaving these communities at risk of increased rates of teen pregnancy." Id. ¶ 36, 38.

The significant harms faced by Awardee Plaintiffs are not, as the government contends, purely economic or merely temporary. All three entities—but especially King County and PPH—swear to the imminent dismantling of their teen pregnancy prevention initiatives, some of which has already begun. Though "economic loss" does not generally, "in and of itself, constitute irreparable harm," Wisc. Gas Co., 758 F.2d at 674, a loss of access to federal funding may cause irreparable harm when, as here, it "threatens the very existence of the recipient's operations," Harris County v. Kennedy, 786 F. Supp. 3d 194, 219 (D.D.C. 2025) (Cooper, J.) (cleaned up). Moreover, Plaintiffs' declarations make clear there is no way to operate their existing programming in line with the agency's latest funding parameters. So the government's argument that Plaintiffs' "opportunity to compete for new funding ... forecloses as a matter of law any claim of irreparable harm" misses the point. Opp'n at 28.

Separately, enjoining the implementation of the 2026 Policy through the FY 2026 NOFOs *alone* would staunch the flow of irreparable harm, even if the Court does not order the interim reinstatement of Plaintiffs' grants. The government does not dispute that HHS plans to reallocate the now-terminated TPP awards toward projects that adhere to the agency's new policy priorities. See Johnson Decl. ¶ 25. The application period closed on July 23, 2026, and the agency could, at any moment, disburse under the new TPP rubric, which is irreconcilable with Awardee Plaintiffs' current programming. See Prelim. Inj. Hr'g Rough Tr. at 39:24–40:2. Were HHS to do so, those Plaintiffs would have no way of competing for TPP funding on an even playing field, if the Court were eventually to determine that the agency's new TPP requirements are unlawful. In short, the harms to Awardee Plaintiffs "cannot be easily undone." Harris County, 786 F. Supp. 3d at 220.

***26** A preliminary injunction preventing HHS from implementing the 2026 Policy by way of the FY 2026 NOFOs would preserve Awardee Plaintiffs' opportunity to seek forward-looking funding for their current TPP programs. As such, it would be a fitting "stopgap measure" aimed at "maintain[ing]" the status quo and preserving "the relative positions of the parties" until the merits of the case are finally resolved. Sherley v. Sebelius, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).

*2. SIECUS*

By contrast, the Court is not persuaded that SIECUS faces irreparable harm at this time. For starters, SIECUS faces financial harm due to the loss of its dues-paying members. See Simon Decl. ¶ 12. This injury strikes the Court as precisely the type of economic loss that courts do not consider to be irreparable. SIECUS also alludes to impairment of its technical assistance and standard development work, which seeks to prevent unintended pregnancy and promote sexual health. See id. ¶¶ 9, 13–14. While this programmatic injury is likely to satisfy Article III's case or controversy requirement, a perceptible impairment to an organizational plaintiff's operations does not necessarily demonstrate *irreparable* harm warranting preliminary relief.

At the motion hearing, Plaintiffs suggested that the D.C. Circuit held otherwise in League of Women Voters v. Newby, 838 F.3d 1 (D.C. Cir. 2016). In Plaintiffs' framing, the D.C. Circuit concluded that a voting rights group faced irreparable harm because agency action prevented them from "register[ing] voters adequately," requiring them to "divert resources and reorganize the way they did things to counteract the harm in that case." Prelim. Inj. Hr'g Rough Tr. at 23:13–18. Not exactly. The impairment to the organization's operations was enough to establish "*injury* for purposes both of standing and irreparable harm." Newby, 838 F.3d at 9 (emphasis added). But the harm was "*irreparable* because after the registration deadlines for the [upcoming] November election pass[ed], 'there [could] be no do over and no redress.' " Id. (emphasis added) (quoting League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014)). It is far from clear that SIECUS will experience this kind of irremediable injury as a result of the 2026 Policy. The Court therefore cannot order preliminary relief based on SIECUS's showing of irreparable harm (or lack thereof).

D. Balance of the Equities

The Court at last arrives at the balance of equities and the public interest, considerations that "merge" when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435 (2009). As to the requested injunction preventing the agency from implementing its 2026 Policy—specifically through the FY 2026 NOFOs—for the pendency of this action, the balance of equities militates in Plaintiffs' favor. On one side of the ledger, the harm to Awardee Plaintiffs' operations is great and imminent. Sworn declarants aver that their TPP programs will soon shut down unless they have some reprieve or possibility of future HHS funding.

On the other side of the ledger, the harms to the government associated with temporarily enjoining the implementation of the 2026 Policy through the NOFOs are relatively minor. After Judge Howell vacated HHS's July 2025 Policy Notice last October, the agency waited the better part of a year to issue a new set of NOFOs articulating its adjusted policy preferences. It has not explained why a temporary restriction on imposing those preferences during the pendency of this action—*i.e.*, a restoration of the status quo as of just a few weeks ago—imposes any meaningful harm. Nor does it suggest why the requested relief would "preclude [HHS's] review of any [TPP] applications at all." Opp'n at 30. HHS may, for instance, reissue the NOFOs under the previously-applied TPP guidelines and thereby achieve its statutory mandate.

***27** The calculus is different, however, when it comes to temporarily enjoining the June 26, 2026 terminations of TPP awards, which Plaintiffs have separately requested. See Pls.' Proposed Order for Prelim. Inj. Mot. at 1. Again, whether the Court has jurisdiction to order the reinstatement of Plaintiffs' grants is an open question, and the D.C. Circuit seems likely to weigh in soon on whether, and under what circumstances, a cooperative agreement qualifies as a "contract" under the Tucker Act. Even if the Plaintiffs are likely to succeed in showing that the Tucker Act does not deprive the Court of jurisdiction over *SIECUS's* APA challenge because that group is a third-party to the TPP agreements, SIECUS does not face irreparable harm. The Court sees no route to cobbling together a preliminary injunction where the viability of a particular claim rests on a plaintiff who has not experienced the requisite magnitude of harm.

Awardee Plaintiffs, by contrast, *do* face serious existential threats to their TPP initiatives. But given the doctrinal uncertainties that plague their challenge to the grant terminations, there is a substantial risk that the Court could erroneously order the government to pay grant funds that HHS has no guarantee of recovering once disbursed. See Dep't of Ed., 604 U.S. at 651–52. At the motion hearing, Plaintiffs' counsel further implied that the threat to their TPP programming will be somewhat mitigated by a temporary injunction prohibiting the agency from implementing the 2026 Policy through the FY 2026 NOFOs. See Prelim. Inj. Hr'g Rough Tr. at 39:19–40:14. In the immediate future, the Awardee Plaintiffs may compete on an even playing field for TPP funding and perhaps reobtain funding for projects that the agency has in the past deemed consistent with program criteria.

* * *

"Crafting a preliminary injunction" is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017). And "because preliminary injunctions are a significant measure, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown by the facts." North. Am. Bldg. Trades Unions v. DOD, 783 F. Supp. 3d 290, 301 (D.D.C. 2025) (cleaned up).

The Court concludes that the Plaintiffs' likelihood of success on their arbitrary-and-capricious claim, combined with the severity and irremediable harm to their programming and the balance of equities in their favor, justify the issuance of a preliminary injunction in this case. For the pendency of this action, HHS and its agents may not implement their 2026 Policy, including through the issuance of the FY 2026 NOFOs. However, the Court will not go so far as to enjoin the implementation of the grant termination letters at this early stage—unless, perhaps, some intervening legal development substantiates Plaintiffs' argument that the TPP cooperative agreements are not, in fact, Tucker Act "contracts."

E. Security and Stay Pending Appeal

*1. Security*

The government requests that the Court order Plaintiffs to post security in light of its issuance of injunctive relief. Federal Rule of Civil Procedure 65(c) requires that a PI movant "give[ ] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

"Rule 65(c) gives this court broad discretion to determine the appropriate amount of an injunction bond," which may include imposing "no bond at all." North. Am. Bldg. Trades Unions, 783 F. Supp. 3d at 315 (cleaned up). HHS has not identified "quantifiable costs" it would "incur as a result of being temporarily restrained from enforcing" the 2026 NOFO and returning to the *status quo ante*. Id. The Court can imagine some administrative costs associated with the temporary change in course. But it has no way of ascertaining those costs, especially because HHS was poised to implement the TPP Program in line with FY 2023 parameters as of a few weeks ago. In light of all this and the careful scope of the preliminary injunction, the Court finds that a nominal bond of $1.00 is appropriate. Accord Endocrine Soc'y v. FTC, No. 26-cv-512 (JEB), 2026 WL 1257289, at *15 (D.D.C. May 7, 2026).

*2. Stay*

***28** A stay of the preliminary relief pending appeal is not warranted. As the government points out, the stay factors are "substantially similar to the preliminary injunction factors." Opp'n at 31; see also Nken, 556 U.S. at 434 ("There is substantial overlap between [the stay factors] and the factors governing preliminary injunctions."). The above application of these factors shows that it is *Plaintiffs* who are likely to succeed on the relevant aspects of their APA challenge; the government has identified no irreparable harm that could be attributed to the carefully scoped preliminary injunction the Court orders here; and the remaining equitable and public interest factors militate in Plaintiffs' favor.

**IV. Conclusion**

As the saying goes, "When at first you don't succeed, try, try again." HHS has taken this adage to heart. Last year, a judge on this Court vacated an HHS guidance document that made substantial policy changes to the TPP Program, on the ground that the changes were arbitrary and capricious under the APA. Unfazed by the adverse ruling, HHS issued new NOFOs that repackaged the vacated policy changes and imposed additional grant parameters. The TPP Program now mandates an abstinence-only approach to pregnancy prevention, promotes the nebulous concept of "body literacy," and prohibits the "normalization" of sexual activity among minors. That new policy is likely arbitrary and capricious.

Because Plaintiffs have shown that the preliminary injunction factors weigh in their favor, the Court will temporarily enjoin implementation of the policy, including the implementation of the FY 2026 NOFOs, for the pendency of this action. However, it will not order interim reinstatement of the terminated grants at this time because of lingering uncertainty over the Court's power to order such relief.

For the foregoing reasons, the Court will GRANT in part and DENY in part Plaintiff's Motion for a Preliminary Injunction. A separate Order shall accompany this Memorandum Opinion.

**All Citations**

Slip Copy, 2026 WL 2426300

## Footnotes

1 Recent surveys from the Centers for Disease Control and Prevention indicate that about one-third of the country's roughly 17 million high school students have had sex at least once, and one-fifth are currently sexually active. These figures are down from approximately half and one-third of high schoolers, respectively, in 2013. See Jacob Fabina, Erik L. Hernandez & Kevin McElrath, School Enrollment in the United States: 2021, U.S. Census Bureau 2 tbl.1 (June 2023), https://www.census.gov/content/dam/Census/library/publications/2023/acs/acs-55.pdf [https://perma.cc/WFR4-U86J]; Youth Risk Behavior Surveillance Sys., Youth Risk Behavior Survey Data Summary & Trends Report: 2013–2023, CDC (2024), https://www.cdc.gov/yrbs/dstr/index.html [https://perma.cc/UZ2R-6UH2].

2 Whether that holds true for specific age groups, sub-populations, or communities is not evident on this early-stage record.

3 Despite recent improvements, the United States has one of the highest teen birth rates among industrialized countries. Its rate is over twice that of France and Canada and over five times that of Sweden. Alexandria K. Mickler and Jessica Tollestrup, Cong. Rsch. Serv., R45184, Teen Births in the United States: Overview and Recent Trends 11 (2025).

4 All declarations cited in this Memorandum Opinion are appended to Plaintiffs' Motion for Preliminary Injunction.

5 As will become evident below, the Court need not, and does not, evaluate the merits of Plaintiffs' First Amendment challenge in this preliminary posture.

6 At the motion hearing, the government advanced a different understanding of the competitor standing doctrine. The Court asked counsel for the government, "So your conception of the competitor standing doctrine is that the decision has to let entirely new players in, not simply change the competitive landscape such that certain competitors are now better situated to compete?" Prelim. Inj. Hr'g Rough Tr. 59:7–11. Counsel responded, "I think it would have to be an injury of that magnitude." Id. 59:12–13. That conception of the competitor standing theory is unduly restrictive, as courts recognize injury in fact not only where "agencies lift regulatory restrictions on [plaintiffs'] competitors," but also where their actions "otherwise allow increased competition." La. Energy and Power Auth. v. FERC, 141 F.3d 364, 367 (D.C. Cir. 1998). In any event, Awardee Plaintiffs have established injury even under the government's narrowed recitation of the doctrine. The new NOFOs make TPP funding available to recipients whose projects would likely not have qualified under prior criteria. For instance, in prior cohorts, HHS would have been hard-pressed to fund a Tier 1 program that adopts a "body literacy" approach to preventing teen pregnancy, as there are a "near absence of body literacy education standards nationwide"—let alone any that have proven effective at reducing teen pregnancy or a related risk behavior. FY 2026 Tier 1 NOFO at 5.

7 Citing no case law or evidence, the government makes a drive-by suggestion that SIECUS does not fall within the "zone of interests protected by the relevant statutes or regulations." Opp'n at 14. The Court will not address that non-jurisdictional assertion here, as it was raised only in "the most skeletal way" in the government's opposition. Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); see also CSL Plasma Inc. v. CBP, 33 F.4th 584, 588 (D.C. Cir. 2022) (confirming that the "zone of interests test is a merits issue," not a jurisdictional one); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992) (noting that courts usually do not consider arguments "ignored or left undeveloped by counsel in the first round of briefing").

8 Plaintiffs also argue that the APA and Constitution are the source of their rights, not any particular term or condition of their TPP agreements. See Mot. for Prelim. Inj. at 41. The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the [scope of] the Tucker Act.' " Crowley Gov't Servs., Inc. v. GSA, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting Megapulse, 672 F.2d at 967–68). "[T]he mere fact that a court may have to rule on a contract issue

does not, by triggering some mystical metamorphosis, automatically transform an action ... into one on the contract." Megapulse, 672 F.2d at 968. In applying the first prong of the Megapulse test, courts consider whether: "the plaintiff's asserted rights and the government's purported authority arise from statute"; the "plaintiff's rights 'exist[ ] prior to and apart from rights under the contract' "; and "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the relevant ... contracts." Crowley Gov't Servs., 38 F.4th at 1107 (alterations in original) (first quoting Spectrum Leasing Corp. v. United States, 764 F.2d 891, 894 (D.C. Cir. 1985); and then quoting Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 619 (D.C. Cir. 2017)).

The Court appreciates Plaintiffs' assertion that the rights they aim to vindicate are primarily non-contractual in nature. But that was also precisely and primarily what the respondents in Dep't of Ed. and NIH argued, and their position did not carry the day in either case. Likewise, the First Circuit observed that the plaintiffs' claims in the NIH litigation were not "premised upon the individual terms of the grant agreements," but instead upon alleged "violat[ions]" of "various federal statutes and the Constitution," Am. Pub. Health Ass'n v. Nat'l Insts. of Health, 145 F.4th 39, 51 (1st Cir. 2025), and a majority of the Supreme Court apparently did not agree with that conclusion, either. Without opining on Plaintiffs' jurisdictional argument one way or the other at this time, the Court will stay its hand, rather than risk awarding preliminary relief on a ground that has apparently not persuaded the high Court. See Harris County v. Kennedy, 786 F. Supp. 3d 194, 218 (D.D.C. 2025) (Cooper, J.).

9 See, e.g., Am. Acad. of Pediatrics, 816 F. Supp. 3d at 50 n.7 (observing that neither of the Supreme Court's emergency rulings in Dep't of Ed. and NIH "considered whether the grants at issue amounted to 'contracts' within the meaning of the Tucker Act"); accord Pacito, 169 F.4th at 928–29.

10 At the motion hearing, counsel declined to commit whether the government would maintain that TPP cooperative agreements are contracts if Plaintiffs were to sue HHS for breach of contract in the CFC. Prelim. Inj. Hr'g Rough Tr. at 46:1–3. The government seems to want to "have its cake and eat it too by insisting that cooperative agreements *are not* Tucker Act contracts when it does not want to litigate in the CFC but that they *are* Tucker Act contracts when—as in this case—it would rather be there." Pacito, 169 F.4th at 927.

11 Relatedly, to the extent St. Bernard Parish could be read to say that "cooperative agreements are ... categorically excluded" from CFC jurisdiction for lack of consideration, its holding may be in tension with the notion that "any contract, including a cooperative agreement, *could* fall within th[at] court's jurisdiction so long as the contract contains the four required elements of offer, acceptance, consideration, and proper government authority." San Antonio Hous. Auth'y, 143 Fed. Cl. at 463 (emphasis added).

12 It is "well-established that 'cooperative agreements, unlike procurement contracts, are not presumed to provide money damages.' " Crestview Clinical Lab'y, LLC v. United States, 181 Fed. Cl. 1, 21 (2026) (quoting St. Bernard Par. Gov't, 134 Fed. Cl. at 734).

13 It is also worth noting that the 2026 NOFOs do not just determine the rights and obligations of prospective grant applicants, but they also bind the agency itself. By issuing the notices, HHS has committed to assessing applications by certain principles and metrics. Should the agency deviate from its own rubric, it is susceptible to an arbitrary-and-capricious challenge by *other* applicants who sought TPP funds on the basis of the agency's published notices.

14 See, e.g., Gerber Decl. I ¶ 36 ("This prohibition on normalizing sexual activity is not clearly defined. The agency appears to be suggesting that any programming that talks about having sex is not age appropriate for anyone under the age of eighteen."); Miller Decl. ¶ 41 ("HHS has provided no guidance on what it means to encourage, normalize, or promote sexual activity for minors or on how PPH should incorporate that into our TPP programming.").

15 To draw a colorful analogy developed at the motion hearing, say that Congress appropriated $100 million to support the growth of college sports programs. And say that Congress, in its next legislative breath, committed a separate $35 million to supporting the growth of college bobsled programs, specifically. Some of the original $100 million may incidentally

go toward developing college bobsled programs. But an agency's decision to dedicate *all* of the general sports funding to bobsledders ignores Congress's careful decision to create two distinct programs—one deliberately general, the other deliberately specific.

16 The parental rights provisions in the FY 2026 NOFOs also suffer from a vagueness problem, in that they require funded programs to "be implemented in a manner that avoids compelling participation in content that conflicts with protected beliefs and does not rely on or require ideological content inconsistent with these protections." FY 2026 Tier 1 NOFO at 7; FY 2026 Tier 2 NOFO at 9. As with the July 2025 Policy Notice, the NOFOs "leave[ ] wide open for interpretation precisely what constitutes" "ideological content" that might "conflict[ ]" with parents' "protected beliefs." PPGNY II, 2025 WL 2840318, at *24.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 800961
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Melissa A. NIBLETT, Plaintiff,
v.
EXP REALTY, LLC, et al., Defendants.

Civil No. 1:21-CV-01345
|
Signed 03/23/2026

**Attorneys and Law Firms**

Richard J. Gerace, Philadelphia, PA, for Plaintiff.

Gerald E. Arth, Pro Hac Vice, Fox Rothschild LLP, Philadelphia, PA, Danielle E. Ryan, Jocelyn Mendez, Fox Rothschild LLP, Exton, PA, for Defendants EXP Realty, LLC, Colin Cameron, Nicole Butcher.

William D. Longo, Margolis Edelstein, Philadelphia, PA, for Defendant Laury O'Neill.

Eileen Teresa Burns, Thomas D. Kenny, Kenny, Burns & McGill, Philadelphia, PA, for Defendant Jennifer Hommerbocker.

## MEMORANDUM

JENNIFER P. WILSON, United States District Court Judge

***1** This matter is before the court on Plaintiff Melissa A. Niblett's motion to alter or amend the court's July 29, 2025 order, Doc. 242, pursuant to Federal Rule of Civil Procedure 59(e) or in the alternative for interlocutory appeal ("motion for reconsideration"). (Doc. 245.) For the reasons that follow, the court will deny Niblett's motion for reconsideration.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Niblett purchased a townhome from Defendant Jennifer Hommerbocker ("Hommerbocker") in 2019. (Doc. 241, p. 2.)[1] In this real estate transaction, eXp Realty, LLC ("eXp") agent Colin Cameron ("Cameron") represented Niblett, and agent Laury O'Neill ("O'Neill") represented Hommerbocker. (*Id.*) Nicole Butcher ("Butcher"), another eXp agent, accompanied Niblett on a walkthrough of the town home. (*Id.*)[2] Niblett avers that the eXp agents are dual agents of both Niblett and Hommerbocker. (*Id.*) Niblett alleges that Hommerbocker learned of problems with the townhome's backfilling, did not adequately address those problems, and together with the eXp Defendants, failed to inform her of those problems before she bought the townhome. (*See id.* at 3.)

Niblett's amended complaint contains eight claims. (Doc. 72, ¶¶ 145–216.) When Defendants filed their motions for summary judgment, five claims remained. (Doc. 241, p. 10.) In those remaining claims, Niblett alleged that eXp, Cameron, Butcher, and O'Neill violated the Pennsylvania Unfair Trade Practices and Consumer Protections Law ("UTPCPL"), 73 P.S. § 201-1–201-10, and brought state law fraud, fraudulent concealment, fraudulent inducement, and concert of action claims against all defendants. (Doc. 241, p. 10.)

eXp, Cameron, and Butcher filed a partial motion for summary judgment, and O'Neill joined that motion. (Docs. 221 & 222.) Hommerbocker filed a separate motion for summary judgment. (Doc. 224.)[3] The court granted both motions and ordered that final judgment in favor of the eXp Defendants and Hommerbocker on Niblett's state law fraud, fraudulent concealment, fraudulent inducement, and concert of action claims will be entered at the conclusion of the case. (Doc. 242, pp. 1–2.) The court also held that should Niblett recover on her UTPCPL claim at trial, her damages will be limited to $100. (Doc. 241, p. 26; Doc. 242, p. 2.)

***2** Niblett filed the motion for reconsideration on August 26, 2025. (Doc. 245, p. 1.) Therein, she requests "reconsideration, oral argument, and [ ] vacatur of the orders granting summary judgment to the defendants, or, in the alternative, certification to the Third Circuit for interlocutory appeal ...." (*Id.* at 1–2.) She filed an accompanying brief in support on September 9, 2025. (Doc. 249.)

eXp, Cameron, and Butcher filed a brief in opposition to the motion for reconsideration on September 23, 2025. (Doc. 253.) Hommerbocker filed a separate brief in opposition the same day. (Doc. 254.) Niblett filed a reply on October 7, 2025. (Doc. 256.) Therefore, the motion is ripe for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1332 because the parties have complete diversity and the amount in controversy exceeds $75,000.[4] Venue is appropriate under 28 U.S.C. § 1391 because all acts or omissions giving rise to the claims occurred in the Middle District of Pennsylvania.

## STANDARD OF REVIEW

Niblett's motion for reconsideration requests that the court either alter its order pursuant to Federal Rule of Civil Procedure 59(e) or, in the alternative, certify the issues she presents for interlocutory appeal. (Doc. 245, pp. 1–2.) The court addresses the legal standards applicable to Niblett's two requests in turn.

### A. The court may not grant Niblett relief pursuant to Federal Rule of Civil Procedure 59(e).

Federal Rule of Civil Procedure 59(e) states that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Rule 54(a) defines the term "judgment" as "a decree and any order from which an appeal lies." Rule 54(b) states that:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

The court's July 29, 2025 order did not adjudicate all of the claims in this case. (Doc. 242, p. 2 ("The only remaining claim in this case is the UTPCPL claim against eXp Realty, Colin Cameron, Nicole Butcher, and Laury O'Neill.").) And the court

did not enter final judgment as to any of the claims the order adjudicated. (*Id.* ("Final judgment in favor of all defendants on Counts II through V shall be entered at the conclusion of this case in accordance with the Federal Rules of Civil Procedure.")) "Partial summary judgment orders are interlocutory decisions," so "a party against whom summary judgment was entered as to less than all claims against all parties may not seek relief under Rule 59(e)." *Azer Sci. Inc. v. Quidel Corp.*, No. 5:21-CV-02972, 2023 WL 289696, at *2 (E.D. Pa. Jan. 18, 2023) (quoting *Robinson v. Fair Acres Geriatric Ctr.*, No. CV 15-06749, 2020 WL 1313721, at *15 (E.D. Pa. Mar. 20, 2020), *aff'd*, 842 F. App'x 779 (3d Cir. 2021)). Therefore, the court may not grant Niblett's requested relief pursuant to Rule 59(e).

### B. The court construes Niblett's motion for reconsideration to be brought pursuant to Federal Rule of Civil Procedure 54(b).

***3** Contrary to Rule 59(e), Rule 54(b), allows the court to "revise[ ]" any order or judgment that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" in a case "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Accordingly, a party may move for reconsideration of a court's interlocutory order pursuant to Rule 54(b) any time before the court enters final judgment on all the claims pending in the case. *In re Anthanassious*, 418 F. App'x 91, 95 (3d Cir. 2011) (recognizing that a trial court could reconsider an interlocutory order pursuant to Federal Rule of Civil Procedure 54(b)); *Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016) ("The court reaffirms the better-reasoned view that motions for reconsideration of interlocutory orders—whether denials of summary judgment, grants of partial summary judgment, or any other non-final orders—are motions under Federal Rule of Civil Procedure 54(b).") In the interest of efficiency, the court will consider Niblett's motion for reconsideration to be brought under Rule 54(b) and will address the merits of the arguments she presents. [5]

A district court may reconsider an interlocutory order "even if the movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issued the underlying order, or 'the need to correct a clear error of law or fact or to prevent manifest injustice.' " *Qazizadeh*, 214 F. Supp. 3d at 295 (quoting *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). [6] "Instead, the court may permit reconsideration whenever consonant with justice to do so." *Id.* (quoting *St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co.*, 472 F. Supp. 2d 630, 632 (M.D. Pa. 2007)) (internal quotation marks omitted).

Nonetheless, a trial court must exercise the discretion Rule 54 grants "in a responsible way, both procedurally and substantively," and "[e]ffective trial court management requires a presumption against reconsideration of interlocutory decisions." *Anthanassious*, 418 F. App'x at 95–96. The movant must show good cause for reconsidering the prior decision, and good cause is not shown by rearguing points already made or presenting new arguments or evidence that could have been raised before the court entered the decision at issue. *Qazizadeh*, 214 F. Supp. 3d at 295–96; *Stockton v. Wetzel*, No. 1:16-CV-00613, 2023 WL 5751409, at *2 (M.D. Pa. Sept. 6, 2023). Overall, a motion for reconsideration "should not be used to try to get a 'second bite at the apple ....' " *Qazizadeh*, 214 F. Supp. 3d at 295 (quoting *Kropa v. Cabot Oil & Gas Corp.*, 716 F. Supp. 2d 375, 378 (M.D. Pa. 2010)). [7]

### C. 28 U.S.C. § 1292(b) governs Niblett's request to certify the court's partial summary judgment rulings for interlocutory appeal.

***4** A district court may certify an order for appeal if the court finds that it "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, certification under § 1292(b) is only proper when "(1) the issue involve[s] a controlling question of law; (2) as to which there are substantial grounds for difference of opinion; and (3) an immediate appeal of the order may materially advance the ultimate termination of the litigation." *Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003). The party seeking a certificate of appealability bears the burden of showing that the certificate should issue. *Consumer Fin. Protection Bureau v. Navient Corp.*, 522 F. Supp. 3d 107, 113 (M.D. Pa. Feb. 26, 2021) (citing *Orson Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 320 (E.D. Pa. 1994)).

### DISCUSSION

Niblett argues that the court's memorandum opinion and order granting the eXp Defendants' motions for partial summary judgment and Hommerbocker's motion for summary judgment "appear, generally, clearly erroneous, in some cases manifestly unjust, as well as in contravention of the summary judgment standards, and finally, in some instances, in direct contravention of controlling law." (Doc. 245, p. 1.) After discussing Niblett's arguments, the court will specifically address several ethically problematic assertions made by counsel in briefing Niblett's motion.

#### A. Niblett's arguments in support of her motion for reconsideration

Niblett identifies several specific points in the court's reasoning that she argues justify reconsideration. (*Id.* at 2–14.) The court addresses each in turn.

##### 1. Niblett has not presented a valid reason to reconsider the court's refusal to consider the "preliminary statements" Niblett included in her responses to defendants' statements of material fact.

Niblett filed a separate response to each of the two statements of fact Defendants filed. (Docs. 231 & 232.) She included a "preliminary statement" in both responses. (Doc. 231, pp. 1–18; Doc. 232, pp. 1–6.) The preliminary statements are not identical, but they both precede Niblett's specific responses to Defendants' respective statements of material fact.

The court expressly declined to consider Niblett's preliminary statements when analyzing the motions for summary judgment. (Doc. 241, p. 2 n.1.) It found that the preliminary statements "outline[ ] the factual scenario in a narrative format and make[ ] legal argument," and that because "this is contrary to this court's Local Rules, the court will not consider the preliminary statement and will consider only [Niblett's] responses to Defendants' numbered statement of facts." (*Id.*) (citing M.D. Pa. L.R. 56.1.) Niblett argues that the court improperly refused to consider her preliminary statements because: her paragraph-numbered answers incorporated the statements; the court may consider any materials in the record when deciding a motion for summary judgment; and her responses to Defendants' statements of material fact are not briefs, they could incorporate other materials by reference. (Doc. 245, pp. 3–4; Doc. 249, pp. 6–10.) She claims that the court's refusal to consider her preliminary statements deprived her of a complete and fair analysis of the question of whether a dispute of material fact existed. (Doc. 249, pp. 8–9.)

Local Rule 56.1 states, in relevant part, that:

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

***5** Niblett's preliminary statements do not respond to the numbered paragraphs set forth in Defendants' statements of material fact; they present her understanding of the factual issues in the case in narrative form. (Doc. 231, pp. 1–18; Doc. 232, pp. 1–6.) Additionally, they frequently veer into argument about whether a dispute of material fact exists in violation of the rule's request for "a short and concise statement of the material facts." M.D. Pa. L.R. 56.1; (*see, e.g.*, Doc. 231, p. 18 ("Thus, Defendants frantic argument that even if there were concealed latent material defects, Plaintiff suffered no damages, is as false as the argument they abandoned. Accordingly, there are no grounds to grant any of the defendants summary judgment"); Doc. 232,

p. 6 ("One or all of the defendants have lied about concealing material defects from Plaintiff leaving no doubt that material defects were concealed in violation of the UTPCPL and the common law.") Allowing Niblett to circumvent Local Rule 56.1 by simply "incorporate[ing]" an improperly formatted and separate section into her response to Defendants' statements of material fact would make the rule's requirements obsolete. (Doc. 249, p. 7.)

Moreover, the Third Circuit recognized, in a case Niblett cites, that "the District Court is in the best position to determine the extent of a party's noncompliance with [M.D. Pa.] Local Rule 56.1, as well as the appropriate sanction for such noncompliance." *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018); (Doc. 249, p. 8.) In that case, the court found "no error" in the district court's summary judgment analysis because the district court "fully addressed plaintiffs' factual allegations" and the plaintiffs failed to identify any prejudicial error. *Weitzner*, 909 F.3d at 614 & 614 n.12. Here, the court considered Niblett's responses to the numbered paragraphs in Defendants' statements of material fact as well as her briefs in opposition. (Doc. 241, p. 2 n.1.) Moreover, Niblett claims that the court's "analysis failed to include (inter alia) the following and other dispositive facts," but merely excerpts a deposition transcript without explaining why that excerpt would have been dispositive to the court's ruling. (Doc. 249, p. 9.) For these reasons, the court's application of Local Rule 56.1 does not give cause to revisit its July 29, 2025 order. (Doc. 242, pp. 1–2.)

**2. Niblett has not presented a valid reason to reconsider the court's conclusion that Niblett could recover no more than $100 on her UTPCPL claim.**

Niblett argues that, "where a trial court caps [UTPCPL] damages at $100 pretrial, no matter what Plaintiff may prove at trial," the legislative intent of the UTPCPL is "undermined," so the court should reconsider its order. (Doc. 249, p. 10.) Niblett relies on the Supreme Court of Pennsylvania's holding in *Dwyer v. Ameriprise Financial, Inc.*, 313 A.3d 969, 973 (Pa. 2024), to make this argument. (Doc. 249, p. 12 ("Because this ruling is so obviously without consideration of legislative intent and the *Dwyer* decision, reconsideration is necessary.").)

Niblett made an almost identical argument, and cited *Dwyer*, in her briefs in opposition to Defendants' motions for partial summary judgment and summary judgment. (Doc. 235, p. 13) ("Even more useful, the High Court directs the trial court to follow a legislative and judicial philosophy that 'benefits the public at large by eradicating' fraudulent acts or practices by sellers.") (quoting *Dwyer*, 313 A.3d at 978). The court considered this argument and found it unpersuasive. (Doc. 241, p. 24) ("Niblett responds that the UTPCPL is a remedial statute, which is to be construed liberally, and points to case law showing that 'ascertainable loss' can be very small in these types of cases.")

"Whether involving a final or interlocutory order, a motion for reconsideration is 'not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant.' " *Qazizadeh*, 214 F. Supp. 3d at 295 (quoting *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002).) Therefore, Niblett's UTPCPL legislative purpose argument does not demonstrate cause to reconsider the court's July 29, 2025 order. (Doc. 242, pp. 1–2.)

**3. Niblett has not presented a valid reason to reconsider the court's treatment of the parties' dual agency agreement.**

***6** Niblett's motion for reconsideration presents multiple arguments about the "Dual Agency Addendum" she executed with Hommerbocker and its effect on the court's holding. (Doc. 245, pp. 6–8; Doc. 249, pp. 12–15.) It is not clear to the court whether Niblett argues that the court should have considered the dual agency addendum's impact on the obligations of Hommerbocker, the eXp Defendants, or both. Accordingly, the court addresses the dual agency addendum's potential application to the court's adjudication of both Hommerbocker and the eXp Defendants' motions for summary judgment.

In her brief in support of her motion for summary judgment, Hommerbocker argued that "[t]he release language contained in the Standard Agreement of Sale precludes any claims by Plaintiff [against] Defendant Hommerbocker stemming from the sale of the property." (Doc. 228, pp. 14–15.) Niblett did not address this argument. (Doc. 236 pp. 1–17; Doc. 241, p. 15 ("Niblett does not respond to any of these arguments.").) The dual agency addendum was available to Niblett before she filed her brief in opposition to Hommerbocker's motion for summary judgment. (Doc. 234-6, p. 2.) A motion for reconsideration should not be used "to raise new arguments or evidence that could have been proffered prior to the issuance of the order in question ...." *Qazizadeh*, 214 F. Supp. 3d at 295–96 (citing *McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co.*, 817 F. Supp. 538, 541 (M.D. Pa. 1993)). Therefore, Niblett's invocation of the dual agency addendum does not give cause to alter the court's ruling on Hommerbocker's motion for summary judgment.

As for the eXp Defendants, Niblett generally argues that they are "liable for concealing and/or withholding the disclosure of latent defects under the Dual Agency Addendum" and "on Plaintiff's common law fraud claims." (Doc. 249, pp. 13–15; *see* Doc. 256, pp. 16–21.) The court granted the eXp Defendants' motion for partial summary judgment because Niblett did not present evidence sufficient to create a dispute of material fact about the damages she suffered as a result of the eXp Defendants' alleged misrepresentations. (Doc. 241, pp. 21–22, 26.) Niblett's argument about the dual agency addendum in her motion for reconsideration does not address the damages she allegedly suffered because of the eXp Defendants' alleged misrepresentations. (Doc. 245, pp. 6–8; Doc. 249, pp. 12–15 ("These real estate agents all had actual knowledge of a material defect that was not disclosed to Plaintiff"); Doc. 256, pp. 16–21.) Accordingly, the dual agency addendum does not provide cause to revisit the court's decision to grant the eXp Defendants' motion for summary judgment. (Doc. 242, pp. 1–2.)

**4. Niblett has not presented a valid reason to reconsider any determination made by the court regarding Hommerbocker's credibility.**

Niblett argues that the court made an impermissible credibility determination in its summary judgment analysis by labelling Hommerbocker's testimony as "honest" or "honestly stated." (Doc. 245, pp. 8–9; Doc. 249, pp. 15–16.) In its memorandum opinion, the court noted that "Hommerbocker contends she honestly believed the repairs on her side of the home were completed." (Doc. 241, p. 4.) This is not a credibility determination; it is a description of a party's assertion. In the next sentence, the court notes that "Niblett contends that Hommerbocker knew the repairs were not completed on her side due to her taking a settlement and emailing the RWC report to O'Neill shortly before the completion of the sale to Niblett." (*Id.*)

On the next page of its memorandum opinion, the court noted that Hommerbocker "did not explain what these issues were in the section provided to do so and claims she 'honestly must have missed that section[.]' " (*Id.* at 5.) The phrase "honestly must have missed that section" is surrounded by quotation marks in the opinion because it is a quotation from the parties' statements of facts. (Doc. 232, p. 21.) This is also not a credibility determination. Therefore, Niblett fails to show cause for reconsideration of the court's July 29, 2025 order. (Doc. 242, pp. 1–2.)

**5. Niblett has not presented a valid reason to reconsider the court's conclusion that Niblett profited from the sale of the townhome.**

***7** Niblett argues that she still owes a balance on the promissory note she executed before purchasing the townhome as demonstrated by the 1099-C form she received, and the court improperly refused to consider evidence of that outstanding balance or the taxes Niblett owes on any forgiven debt. (Doc. 245, pp. 9–11; Doc. 249, pp. 17–18; Doc. 256 p. 9.) Had the court considered this evidence, she argues, it would not have found that Defendants presented evidence demonstrating that she made a profit of $36,348.14 when she ultimately sold the townhome. (*Id.*)

Niblett described the 1099-C form and stated that taxes are due on her cancelled debt in the "counter statement of the case" sections of her briefs in opposition to Defendants' motions for summary judgment. (Doc. 235, p. 9; Doc. 236, pp. 9–10.)

However, in the argument section of her briefs, Niblett cited only to her Exhibit 16, which she described as a “list of ascertainable damages” after a discussion of caselaw. (Doc. 235, pp. 11–16 (“Whether there is a genuine issue of material fact as to actual damages is easily resolved by comparing the feeble arguments of the EXP Defendants to the itemized list of ascertainable damages Plaintiff has provided”); Doc. 236, pp. 11–17.)

Niblett did not argue the materiality of the 1099-C form or point to evidence demonstrating any specific tax liability in the argument section of either brief in opposition. (*See id.*) If the party moving for summary judgment meets its burden to identify “specific portions of the record that establish the absence of a genuine issue of material fact,” then the burden shifts to the nonmoving party to “go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial.*” *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) and then quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted). “A party asserting that a fact cannot be or is genuinely disputed must support the assertion by [ ] citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.” Fed. R. Civ. P. 56(c)(1)(A)–(B).

Niblett cited only her Exhibit 16 in arguing that a dispute of material fact existed, not the 1099-C or other unidentified evidence demonstrating the tax consequences of her loan. (Doc. 235, pp. 11–16; Doc. 236, pp. 11–17.) For the reasons explained in the memorandum opinion, the court found that the portion of the record Niblett cited did not create a genuine dispute of material fact. (Doc. 241, pp. 19–23.) Moreover, nothing prevent Niblett from arguing that the 1099-C or other unidentified evidence about tax liability created a dispute of material fact in her briefs in opposition to the motions for summary judgment. She did not. (Doc. 235, pp. 11–16; Doc. 236, pp. 11–17.) Therefore, she fails to show cause for the court to reconsider its July 29, 2025 order. *Qazizadeh*, 214 F. Supp. 3d at 295–96.

**6. Niblett's argument that the court's ruling turns Pennsylvania into a “buyer beware” state is not a reason to reconsider.**

Niblett argues that the court should reconsider its order because “[t]he answers provided by Plaintiff to the Defendants' summary judgment motions show[ ], or at the very least, raise[ ] a genuine issue of material fact that Hommerbocker certainly knew about latent material defects on the property and so did O'Neill. Yet, neither ... provide[d] that necessary and mandatory disclosure.” (Doc. 245, p. 12–14; Doc. 249, pp. 18–20.) Accordingly, Niblett claims that the court's decision to grant summary judgment in Defendants' favor turns Pennsylvania into a “buyer beware state.” (Doc. 249, p. 20.)

***8** Niblett does not explain how this argument relates to: (1) The release contained in the seller's contract that shielded Hommerbocker from liability; or (2) Niblett's failure to prove that a dispute of material fact exists as to the extent of damages she suffered as a result of the Defendants' alleged acts. The court granted the motions for summary judgment on those grounds. (Doc. 241, pp. 14–26.) Therefore, this argument does not justify reconsideration of the court's July 29, 2025 order. (Doc. 242, pp. 1–2.)

**7. Niblett has not presented a valid reason to reconsider the court's conclusion that some of her evidence was inadmissible hearsay.**

Niblett argues that the court improperly found that an email she cited as evidence of a disputed material fact contained “multiple levels of hearsay,” Doc. 241, p. 21. (Doc. 256, pp. 6–21.) She claims that the court should have considered this evidence regardless of its status as hearsay because she could have ultimately presented it in an admissible form at trial. (*Id.* at 12–13.) It is true that “[i]n ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial.” *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). But as Niblett recognizes in her reply, “[t]he proponent need only explain the admissible form that is anticipated ... In [*City of Camden*, 832 F.3d at 238], the Third Circuit held that all that was required to survive this aspect

of a motion for summary judgment is that the proponent identify the declarant and note their ability to testify." (Doc. 256, pp. 12–13) (quoting *Zamichieli v. Andrews*, No. CV 12-3200, 2025 WL 1171594, at *2 (E.D. Pa. Apr. 22, 2025) (internal citations and quotation marks omitted)). Niblett does not identify where, in her briefs in opposition to Defendants' motions for summary judgment, she explained the admissible form in which her otherwise inadmissible evidence would be presented at trial, nor where she averred that the parties who made the hearsay statements would testify at trial. (Doc. 256, pp. 6–21.) [8] Therefore, the court will not reconsider its July 29, 2025 order on these grounds. [9]

### 8. The court will not certify the issues presented in Niblett's motion for reconsideration for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

***9** Niblett argues that the court should certify the issues she presents in her motion for reconsideration for interlocutory appeal because they involve controlling questions of law "as to which there is a substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation." (Doc. 249, p. 20) (quoting 28 U.S.C. § 1292(b).) The party seeking a certificate of appealability bears the burden of showing that the certificate should issue. *Consumer Fin. Protection Bureau v. Navient Corp.*, 522 F. Supp. 3d 107, 113 (M.D. Pa. 2021) (citing *Orson Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 320 (E.D. Pa. 1994)). Other than reciting the standard, Niblett does not explain how the issues she presents qualify as "controlling question[s] of law as to which there is substantial ground for difference of opinion" or how "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292. To the extent Niblett argues that the arguments she presents in favor of reconsideration also warrant an interlocutory appeal, the court finds that those arguments do not identify a controlling question of law "as to which there is substantial ground for difference of opinion." *Id.*

### B. The court cautions Plaintiff's counsel regarding ethically problematic statements and allegations in Niblett's briefing.

Throughout the briefing in support of Niblett's motion for reconsideration, Plaintiff's counsel stated that the court is both incompetent and biased against Niblett or her attorney, Richard J. Gerace. For example, counsel wrote "that the court doubts counsel's contact and correspondence with the United States Department of Agriculture, LaTrice Buckner, Supervisory Management and Program Analyst, demonstrates an unexplainable bias against Plaintiff or counsel ...." (Doc. 245, p. 11.) Counsel accuses the court of "prejudging the outcome of trial whereby no matter what Plaintiff proves this Court has already decided that Plaintiff is not worthy of anything other than $100." (*Id.* at 6.) Counsel characterizes the court's ruling as "a cynical use of power in blatant violation of Plaintiff's right to trial ...." (Doc. 256, p. 10.) And at various points throughout her briefing, counsel claims that the court "suggests that Niblett was foolish," Doc. 245, p. 14, "apparently does not think the Plaintiff deserves the law's protection because she did not hire enough professionals or do enough to protect herself," Doc. 249, p. 19, "[takes] off on [a] delusion," Doc. 256, p. 15, and is generally unfair. Doc. 256, p. 16.

Concerned by these unsupported allegations of bias and gross mischaracterizations of the court's actual ruling, the court examined Attorney Gerace's disciplinary record as a member of the bar of the Commonwealth of Pennsylvania. The court found that the Disciplinary Board of the Supreme Court of Pennsylvania publicly reprimanded Attorney Gerace in 2023 for accusing another judge of bias in briefs he filed in support of a motion for summary judgment. *Office of Disciplinary Counsel v. Gerace*, No. 26 DB 2023 (Pa. D. Bd. Order Feb. 15, 2023) (explaining that Attorney Gerace alleged that the court "stepped over the line of impartiality to side with a criminal organization and the lawyers who lie to support that organization").

Local Rule 83.23.2 largely adopts the Rules of Professional Conduct of the Supreme Court of Pennsylvania. The Rules of Professional Conduct of the Supreme Court of Pennsylvania prevent a lawyer from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge ...." Pa. RPC 8.2(a).

Niblett v. eXp Realty, LLC, Slip Copy (2026)


It is entirely appropriate for an attorney to move for reconsideration and to argue that a court has erred. It is also appropriate for an attorney to disagree with a court's analysis and to take an appeal based on that disagreement. However, it is not permitted by the governing ethical rules to accuse a court of bias without evidentiary support. If, in fact, a party has a good faith basis upon which to assert that a court has a conflict or some perceived bias, then the party should file a motion for recusal and state the evidence in support. Moreover, frivolously accusing a court of lacking integrity in a written submission to the court is a serious matter that could give rise to disciplinary action, as demonstrated by the 2023 public reprimand suffered by Attorney Gerace. The court strongly cautions Attorney Gerace to provide supported legal arguments and factual statements rather than *ad hominem* attacks against the court in future briefing. Apart from this warning, the court finds that no further action on this issue is currently necessary.

## CONCLUSION

***10** For the reasons explained herein, Niblett's motion for reconsideration and her request for a certificate of appealability will be denied. An order follows.

### All Citations

Slip Copy, 2026 WL 800961

## Footnotes

1 For ease of reference, the court uses the page numbers from the CM/ECF header. Moreover, in this memorandum opinion, the court includes only a brief recitation of the facts of this case for the purpose of resolving Niblett's motion for reconsideration. A more detailed recitation of the facts and claims of this case, and the parties' disputes about those facts, are set forth in the court's memorandum opinion granting Defendants eXP Realty, LLC, Colin Cameron, Nicole Butcher, Laurey O'Neill, and Jennifer Hommerbocker's motions for partial summary judgment and summary judgment. (Doc. 241, pp. 2–11.)

2 The court refers to Butcher, Cameron, O'Neill and eXp itself as, collectively, “the eXp Defendants.” The court refers to the eXp Defendants and Hommerbocker, collectively, as “Defendants.”

3 The court refers to these motions, collectively, as the “motions for summary judgment.”

4 Niblett is a Maryland Citizen, Cameron, Butcher, O'Neill and Hommerbocker are Pennsylvania Citizens, and eXp is located in Pennsylvania. (Doc. 72, ¶¶ 1–3.)

5 Hommerbocker argues that, because Rule 59(e) does not apply to Niblett's motion, the motion is untimely. (Doc. 254, pp. 6–8.) Middle District of Pennsylvania Local Rule 7.10 states that “[a]ny motion for reconsideration or reargument must be ... filed within fourteen (14) days after the entry of the order concerned. This rule is not applicable to a motion to alter or amend a judgment under Fed. R. Civ. P. 59.” But the plain text of Rule 54(b) permits the court to alter its interlocutory orders “at any time” before the entry of final judgment on all claims. When the Federal Rules of Civil Procedure conflict with a court's local rules, the former take precedence. *Milesco v. Norfolk S. Corp.*, No. 1:09-CV-1233, 2010 WL 11714013, at *7 (M.D. Pa. Aug. 18, 2010) (“When court orders or local rules conflict with the mandates of the Federal Rules of Civil Procedure, the latter must triumph”) (citing *Lasky v. Cont'l Prod. Corp.* 804 F.2d 250, 255 (3d Cir. 1986)). Therefore, the court finds that Niblett's motion is timely when construed as a motion for reconsideration pursuant to Federal Rule 54(b). *Harding v. Jacoby & Meyers, LLP*, No. CV 14-5419, 2021 WL 2472323, at *1 (D.N.J.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Niblett v. eXp Realty, LLC, Slip Copy (2026)


June 16, 2021) (Finding that a Rule 54(b) motion for reconsideration was not restricted to the time limits for motions for reconsideration set by the court's local rules).

6 The court may still look to these factors for guidance, even though they are not binding, in considering Niblett's Rule 54(b) motion. *Wells v. Houston*, No. 2:22-CV-01641, 2024 WL 4591445, at *2 (W.D. Pa. Oct. 28, 2024) (quoting *Nyamekye v. Mitsubishi Elec. Power Prods., Inc.*, No. CV 17-852, 2018 WL 3933504, at *3 (W.D. Pa. Aug. 16, 2018)).

7 *See also Nyamekye*, 2018 WL 3933504, at *3 ("In discussing the scope of a district court's discretion to reconsider an interlocutory decision, the Third Circuit Court of Appeals has explained that while 'a court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance ... as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice' ") (quoting *In re Pharmacy Benefit Managers*, 582 F.3d 432, 439 (3d Cir. 2009)).

8 Niblett claims that "as for damages, which Defendants also claim is all hearsay evidence, Plaintiff herself is the declarant of those damages and certainly available at her own trial." (Doc. 256, p. 13.) The court assumes Niblett refers to her Exhibit 16, "a list of damages Niblett believes that she incurred by virtue of her involvement with the property." (Doc. 241, pp. 19–20.) But the court found that Exhibit 16 did not create a dispute of material fact because it did not connect Niblett's alleged damages to Defendants' alleged misrepresentations, did not cite to supporting documentary evidence in the record, and was not provided during discovery, not because it was hearsay. (*Id.* at 19–20.)

9 Niblett also argues that "the Court somehow wholly misconstrues the Fertich Report as a report produced for or by Plaintiff's expert, then blaming Plaintiff for failing to disclose it in discovery." (Doc. 256, pp. 15–16.) She explains that "Fertich is not Defendants expert. Fertich was employed by Freedom Mortgage to provide a report on the property to decide if it had any value or was worth repairing. Because the report convinced Freedom Mortgage the property had no value, Freedom Mortgage declared the mortgage lien valueless." (*Id.*) Again, Niblett fails to explain how this clarification impacts the court's ultimate rulings regarding the seller's release agreement and her failure to demonstrate disputed material facts about damages. (*Id.* at 14–16.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.